Westlaw.

Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
(Cite as: 1996 WL 473456 (N.D.Ill.))

Page 1

H

Motions, Pleadings and Filings

United States District Court, N.D. Illinois, Eastern
Division.
Jim FITZGERALD and Ellen J. Rindal, P.C., on
behalf of themselves and all
others similarly situated, Plaintiffs,
v.
CHRYSLER CORPORATION, Defendant.
No. 96 C 0021.

Aug. 16, 1996.

*MEMORANDUM OPINION AND ORDER*

MAROVICH, District Judge.

**\*1** Plaintiffs Jim Fitzgerald ("Fitzgerald") and Ellen
J. Rindal, P.C. ("Rindal") (together "Plaintiffs") filed
this action against Defendant Chrysler Corporation
("Chrysler"), alleging that Chrysler employed
fraudulent and illegal practices in connection with the
sale of service contracts and extended warranties to
consumers. Specifically, Plaintiffs assert that
Chrysler and its agents "grossly misrepresented the
coverage of the service contracts, which were sold as
purportedly 'complete' and 'comprehensive' " and
"actively concealed the material fact that there were
numerous 'exceptions' to the contracts' coverages."
(Amend.Compl. ¶ 1.) Plaintiffs' Amended
Complaint (the "Complaint") alleges violations of the
Racketeer Influenced and Corrupt Organizations Act
("RICO"), 18 U.S.C. § 1961 et seq.; the Magnuson-
Moss Warranty--Federal Trade Commission
Improvement Act ("Magnuson-Moss Act"), 15
U.S.C. § 2301 et seq.; and various state consumer
fraud statutes. The Complaint also asserts a state-
law breach of contract claim.

Chrysler now moves to dismiss the RICO,
Magnuson-Moss Act and consumer fraud claims
against it pursuant to Fed.R.Civ.P. 12(b)(6) and/or
Fed.R.Civ.P. 9(b). Chrysler further maintains that
Plaintiff's RICO and consumer fraud claims are time-
barred.

*BACKGROUND*
A. *Alleged Facts Particular to Fitzgerald*

According to the Complaint, when Fitzgerald
purchased a Chrysler Eagle Premier from an
authorized Chrysler dealership on September 28,
1989, Chrysler sold him a vehicle service contract
(the "service contract") entitling him to financial
reimbursement for repairs to his vehicle. Chrysler,
both directly and through its dealer, purportedly
represented to Fitzgerald that the service contract
"fully describe[d] the coverage and features of the
Plan." (Amend.Compl. ¶ 21.) Yet, as alleged by
Fitzgerald, Chrysler deliberately failed to enumerate
various repairs which were not, in fact, reimbursable
under the service contract.

Fitzgerald asserts that he brought his 1989 Eagle to
Heiser Ford, Inc. ("Heiser Ford") of Milwaukee,
Wisconsin for repairs on November 4, 1991; Heiser
Ford made $171.97 in repairs to the Eagle on that
date. On November 7, 1991, Fitzgerald filed a claim
with Chrysler for reimbursement of the Heiser Ford
repair bill. On December 5, 1991, Fitzgerald
received reimbursement from Chrysler in the amount
of $39.36.

According to Fitzgerald, the statement sent to him by
Chrysler along with the $39.36 payment included a
series of "Adjustment Codes." The key to these
"Adjustment Codes" contained on the back of the
Chrysler statement purportedly revealed the reason/s
for Chrysler's refusal fully to reimburse Fitzgerald for
the Heiser Ford repairs: (1) "Diagnostic time not
covered"; (2) "Incorrect deductible amount"; (3)
"Contains parts and/or labor not covered"; and (4)
"Shop supplies not covered."

On December 19, 1991, Fitzgerald wrote to Ed
Olmeda ("Olmeda"), the Customer Relations
Manager at Chrysler Service Contracts, requesting
that Fitzgerald be reimbursed for the total repair cost-
-$171.97--, less the required $25.00 deductible.

**\*2** The Complaint avers that, in a letter dated
January 10, 1992, Olmeda stated that Chrysler would
not reimburse Fitzgerald for the unpaid amounts
because those amounts represented, among other
things, "excessive diagnostic work" not covered by
the service contract.

B. *Alleged Facts Particular to Rindal*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                        Page 2
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

According to the Complaint, Rindal purchased a Dodge Dynasty from Schaumburg Dodge, Inc. ("Schaumburg Dodge") on July 25, 1990. On that date, Rindal also purchased from Chrysler the "7/70 Added Coverage Plan" (the "service contract") as a supplement to the manufacturer's warranty.

On November 3, 1992, Rindal purportedly took her Dynasty to Schaumburg Dodge for repairs; these repairs were performed by Schaumburg Dodge for a cost of $83.50. On November 16, 1992, Rindal again brought her Dynasty to Schaumburg Dodge for repairs; these repairs were completed for a total cost of $454.10.

Rindal avers that "the repairs, with the exception of one repair, were not covered under her 7/70 added coverage plan." (Amend.Compl. ¶ 43.)

*C. Plaintiffs' Various Claims*

The Complaint asserts four causes of action against Chrysler. Count One alleges that Chrysler participated in the conduct of the affairs of a RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In support of this claim, Plaintiffs assert that Chrysler engaged in predicate acts of mail and wire fraud in contravention of 18 U.S.C. § § 1341 and 1343, respectively.

Count Two alleges violations of the consumer protection statutes of the fifty states and the District of Columbia. Count Three asserts that Chrysler breached the service contracts by failing to reimburse Plaintiffs for the total cost of repairs; and Count Four purports to state a claim under the Magnuson-Moss Act for Chrysler's breach of warranty/ies.

In its present motion, Chrysler seeks dismissal of Plaintiffs' Counts One, Two and Four. Specifically, Chrysler maintains that Count One should be dismissed because (1) Chrysler is not a "person" distinct from the asserted "enterprise/s" as required by 18 U.S.C. § 1962(c); (2) Plaintiffs fail to plead the predicate acts of mail and/or wire fraud with the specificity required by Fed.R.Civ.P. 9(b); and (3) Fitzgerald's RICO claim is time-barred. Chrysler argues that Count Two should be dismissed because (1) Plaintiffs' consumer fraud claims are barred by the applicable statute of limitations, and (2) Rindal fails to plead her consumer fraud claim with the required degree of specificity. Finally, Chrysler urges this Court to dismiss Plaintiffs' Count Four because (1) Plaintiffs fail to name 100 plaintiffs as required by the Magnuson-Moss Act, and (2) Rindal

failed to allege that she gave Chrysler an opportunity to cure any defect in its performance under the service contract. For the reasons set forth below, the Court grants Chrysler's motion as to all Counts. [FN1]

> FN1. Chrysler also filed a motion to strike Plaintiffs' prayer for injunctive relief under Count Three. Plaintiffs do not contest this motion. Accordingly, Chrysler's motion to strike is granted.

*DISCUSSION*
A. *Standards for Motions to Dismiss*

**\*3** When considering a motion to dismiss, the Court examines the sufficiency of the Complaint, not the merits of the lawsuit. *Triad Assocs. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989), *cert. denied,* 498 U.S. 845 (1990). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). A motion to dismiss will be granted only if the Court finds that the plaintiff can prove no set of facts that would entitle her to relief. *Venture Assoc. Corp. v. Zenith Data Systems Corp.,* 987 F.2d 429, 432 (7th Cir.1993); *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). On a motion to dismiss, the Court draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well-pleaded facts are true. *Dimmig v. Wahl,* 983 F.2d 86, 86 (7th Cir.), *cert. denied,* 510 U.S. 861 (1993).

B. *Plaintiffs' RICO Claim (Count One)*

Section 1962(c) of RICO--the provision under which Count One is brought-- makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, to state a claim under Section 1962(c), a RICO plaintiff must show "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985). [FN2]

> FN2. As noted by the court in *Katzman v. Victoria's Secret Catalogue,* 1996 WL 351228, at *3 (S.D.N.Y. June 26, 1996): "Civil RICO is an unusually potent weapon- -the litigation equivalent of a thermonuclear device." *Miranda v. Ponce Fed. Bank,* 948

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

F.2d 41, 44 (1st Cir.1991). Because the "mere assertion of a RICO claim ... has an almost inevitable stigmatizing effect on those named as defendants, ... courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *Figueroa Ruiz v. Alegria, 896 F.2d 645, 650 (1st Cir.1990).*

A RICO enterprise is "an ongoing 'structure' of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making." *Jennings v. Emry, 910 F.2d 1434, 1440 (7th Cir.1990).* A "pattern" requires "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5). Finally, "racketeering activity" is defined as any act constituting one of over fifty state and federal crimes listed in 18 U.S.C. § 1961(1), including mail fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C. § 1343.

Here, Plaintiffs identify three enterprises in their Amended Complaint: (1) the Chrysler Group--a corporate group which includes Chrysler Financial Corporation ("CFC"), a wholly owned subsidiary of Chrysler; Chrysler Credit Corporation ("Chrysler Credit"), a subsidiary of CFC; Chrysler Auto Receivables Company ("CARC"); and a number of "subsidiaries and affiliates" which manufacture Chrysler products abroad or export Chrysler products--; (2) an association-in-fact consisting of Chrysler and the Chrysler dealers through which Chrysler service contracts are sold; and (3) an association-in-fact consisting of Chrysler and each of the Chrysler dealers through which Chrysler service contracts are sold, individually. [FN3] The pattern of racketeering activity alleged by Plaintiffs consists of Chrysler's scheme to defraud Fitzgerald, Rindal and other consumers by selling purportedly "complete" and "comprehensive" service contracts without disclosing the existence of numerous "exceptions" to the service contracts' coverages. According to Plaintiffs, "Chrysler made extensive use of the United States mails and interstate wire transmissions, in repeated violation of 18 U.S.C. § § 1341 and 1343, to execute, effectuate, facilitate and further the above described scheme on consumers...." (Amend.Compl. ¶ 77.)

FN3. An "association-in-fact" enterprise is defined by RICO as a "union or group of

individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Supreme Court has described it as "a group of persons associated together for a common purpose of engaging in a course o conduct." *United States v. Turkette, 452 U.S. 576, 583 (1981).*

*1. Plaintiffs Adequately Plead the Predicate Acts of Mail and/or Wire Fraud*

**\*4** In pleading the existence of predicate acts involving fraud, Fed.R.Civ.P. 9(b) applies. Rule 9(b) states:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. malice, intent, knowledge, and other condition of mind of a person may be averred generally.

In *Bankcard America, Inc. v. Universal Bancard Systems, Inc., 904 F.Supp. 753 (N.D.Ill.1995),* the court explained the requirements of Rule 9(b) in the RICO context:

When the underlying fraudulent conduct is alleged to be mail or wire fraud, this Court addresses the circumstances of the "communication" rather than those of the "misrepresentation." The first sentence of Rule 9(b) requires the pleading of circumstances constituting the fraud. In the mail and wire fraud contexts, it does not require a plaintiff to explain in a complaint the theory f how or why a particular postal or telephonic communication was false or misleading, or was relied upon to the plaintiff's detriment.... In other contexts, more intricate detail might be required in a complaint concerning statements and omissions to give effect to the purposes behind Rule 9(b).

Pleading the circumstances of fraud with particularity, then, requires that the plaintiff state at a minimum the time, place, an content of the alleged communications perpetrating the fraud. Where mail and wire fraud are at issue, "the plaintiff must, within reason, describe the time, place and content of the mail and wire communications, and it must identify the parties to these communications." A plaintiff should also name the method of communication used to achieve the predicate acts.

*Id.* at 759 (quoting *Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir.1994)*) (citations omitted); *see also Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1020 (7th Cir.1992); Ouaknine v. MacFarlane, 897 F.2d 75, 79-80 (2d Cir.1990); R.E. Davis Chemical Corp. v. Nalco Chemical Co., 757 F.Supp.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

1499, 1516 (N.D.Ill.1990).

 Here, the Court has identified at least five predicate acts--that is, five mailings and/or wire communications--pled with the specificity required by Rule 9(b): (1) the dealer's transmittal of Fitzgerald's service contract to Chrysler and to Chrysler Credit; (2) Chrysler's December 5, 1991 mailed statement to Fitzgerald containing the "Adjustment Codes" identifying the reason for Chrysler's partial reimbursement of Fitzgerald's claim; (3) Olmeda's January 10, 1992 letter to Fitzgerald indicating that Chrysler would not reimburse Fitzgerald for the remainder of his repair bill; (4) Schaumburg Dodge's transmittal of Rindal's service contract to Chrysler and to Chrysler Credit; and (5) Chrysler's letter to Rindal "congratulating" her on her purchase of the service contract. [FN4] Thus, contrary to Chrysler's contention, Plaintiffs have alleged the predicate acts of mail and/or wire fraud with particularity; and, accordingly, the Complaint cannot be dismissed pursuant to Fed.R.Civ.P. 9(b).

> FN4. Plaintiffs also point to the following "classes" of mail and/or wire communications in support of their Section 1962(c) claim: (1) Chrysler's use of the mails to get service contract forms to dealers so that the dealers could sell those contracts; (2) the dealers' transmittal to Chrysler by interstate wire of executed service contract applications; (3) letters received by consumers from Chrysler immediately following the purchase of service contracts purportedly describing the service contracts' coverages; (4) Chrysler's use of the mail to solicit customers who had not purchased service contracts through dealers; and (5) Chrysler's sending of partial reimbursement checks to service contract purchasers who made claims under the contracts. These "classes" do not, by themselves, comply with the pleading requirements of Rule 9(b), however.

*2. Plaintiffs' RICO Claim Fails Because Chrysler Cannot be Held Liable Under Section 1962(c) for Conducting its Own Corporate Affairs*

**\*5** The law of this Circuit is well-settled that, to be liable under Section 1962(c), a "person" must be separate and distinct from the "enterprise." Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 646 (7th Cir.1995); Haroco, Inc. v. Nat'l Bank & Trust Co., 747 F.2d 384, 401-02 (7th Cir.1984), aff'd on other grounds, 473 U.S. 606 (1984). Indeed, "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 1173 (1993) (as quoted in Richmond, 52 F.3d at 646).

 In Richmond, the Seventh Circuit specifically endorsed the analyses employed by the Third Circuit in Brittingham v. Mobil Corp., 943 F.2d 297 (3d Cir.1991), and by the Second Circuit in Riverwoods Chappaqua v. Marine Midland Bank, 30 F.3d 339, 343 (2d Cir.1994). The Seventh Circuit took notice of the fact that, in Brittingham, the court rejected an attempt "to circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or entities affiliated with a defendant corporation," Brittingham, 943 F.2d at 301-02, because "when a defendant is itself a collective entity, it is more likely that the alleged enterprise is in reality no different from the association of individuals or entities that constitute the defendant or carry out its actions." Id. at 302. [FN5] The Seventh Circuit similarly noted the Riverwoods court's conclusion that a defendant bank--the "person"--was not distinct from an "enterprise" consisting of an association-in-fact of the bank and a group of the bank's employees. [FN6]

> FN5. While Plaintiffs correctly note that the "distinctiveness" analysis set forth in Brittingham and a host of similar Third Circuit cases--Glessner v. Kenney, 952 F.2d 702 (3d Cir.1991); Lorenz v. CSX Corp., 1 F.3d 1406 (3d Cir.1993); and Gasoline Sales, Inc. v. Aero Oil Co., 39 F.3d 70 (3d Cir.1994)--has been shaken by the holding in Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir.1995), the Brittingham analysis retains vitality with respect to claims, such as Plaintiffs', involving corporate "persons." As recently explained:
> In Jaguar Cars, Inc. v. Royal Oaks Motor Car, Co., 46 F.3d 258 (3d Cir.1995), the court determined that its jurisprudence concerning the distinctiveness requirement of § 1962(c) as applied to corporate officers and employees did not survive the Supreme Court's opinions in Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163 (1993) and National Organization for Women v. Scheidler, 510 U.S. 249, 114 S.Ct. 798 (1994).... Nevertheless, this Court does not

Not Reported in F.Supp.                                                     Page 5
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

read Jaguar Cars as in any way undermining or affecting this Court's analysis of the § 1962(c) claim in the instant case, ... *Jaguar Cars* made clear that "the essential holding of *Enright* remains undisturbed--a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient" under § 1962(c). [*Jaguar Cars,* 46 F.3d at 269.] Moreover, as the *Brittingham* court recognized, there is good reason to distinguish between corporate "persons" and individual "persons" in applying the *Enright* rule: [I]ndividual defendants, in contrast to collective entities, are generally distinct rom the enterprise through which they act. Unlike a collective entity, it is unlikely that an individual defendant by himself would constitute a valid enterprise.... But when a defendant is itself a collective entity, it is more likely that the alleged enterprise is in reality no different rom the association of individuals or entities that constitute the defendant or carry out its actions. Unlike individual defendants, a corporation can act only through its employees and agents. *Metcalf v. Painewebber Inc.,* 886 F.Supp. 503, 514 n. 12 (W.D.Pa.1995). Moreover, and perhaps more importantly, the *Brittingham* analysis has expressly been accepted by the Seventh Circuit, the *Jaguar Cars* decision notwithstanding. *Richmond,* 52 F.3d at 646-47.

FN6. The *Riverwoods* court explained: Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is, in reality, no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation. *Riverwoods,* 30 F.3d at 344.

Relying upon *Brittingham* and *Riverwoods,* the *Richmond* court held that the defendant "persons"--Cassel, a sales finance agency, and Nationwide Acceptance, another sales finance agency and the primary owner and general partner of Cassel--were not sufficiently distinct from the two alleged "enterprises"--one of which was the "Nationwide

Group," an association-in-fact made up of Cassel, Nationwide Acceptance and other companies, and the other of which was the Nationwide Group along with the car dealers with which the Group dealt--to satisfy the "distinctiveness" requirement of Section 1962(c). The court stated:

> In this case, Ms. Richmond's claim begins and ends with the fraud allegedly committed by Nationwide Acceptance and Cassel. There is no showing that other members of the alleged association in fact participated in the fraud, or that the persons, Nationwide Acceptance and Cassel, conducted the affairs of either of the alleged enterprises (rather than their own affairs) through a pattern of racketeering activity, as required by *Reves,* 507 U.S. at ----, 113 S.Ct. at 1173.
> *Richmond,* 52 F.3d at 647.

Judge Plunkett accepted, applied and expounded on the *Richmond* court's analysis in *Chamberlain Manufacturing Corp. v. Maremont Corp.,* 919 F.Supp. 1150 (N.D.Ill.1996). In *Maremont,* Plaintiff Chamberlain, the purchaser of Saco Defense, Inc., a former subsidiary of Defendant Maremont, filed a RICO Section 1962(c) claim against Maremont. Specifically, Chamberlain alleged that Maremont was the "person," that Maremont and Saco together were the "enterprise," and that Maremont-Saco had engaged both in a scheme to defraud the government by manufacturing and selling deficient weapons and in a scheme to conceal their fraud on the government from Chamberlain when Chamberlain purchased Saco from Maremont. Finding Maremont to be insufficiently distinct from the Maremont-Saco enterprise to support a claim under Section 1962(c), Judge Plunkett explained:

> *6 We have found no cases from the court of appeals addressing the precise factual scenario before us, in which the parent (Maremont) is the person and the parent and its wholly-owned subsidiary (Maremont-Saco) are, collectively, the enterprise. So, we have considered the fates of Section 1962(c) claims presenting similar scenarios. Under *Haroco,* it is impossible to state a section 1962(c) claim where a single corporation is both the person and the enterprise. [*Haroco,* 747 F.2d at 400.] Therefore, Chamberlain could not have alleged that Maremont was both the person and the enterprise. And, under [*Lorenz v. CSX Corp.,* 1 F.3d 1406 (3d Cir.1993) ], it is impossible to state a claim where the parent is the person and the subsidiary is the enterprise unless the activities of the parent and the subsidiary are clearly distinct. *Lorenz,* 1 F.3d at 1406....
> Yet all Chamberlain has done is allege that

Not Reported in F.Supp.                                                    Page 6
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
(Cite as: 1996 WL 473456 (N.D.Ill.))

Maremont is the person and Maremont-Saco is the enterprise. If this is to succeed, then the Maremont-Saco association-in-fact must be, in some meaningful way, different from either Maremont or Saco individually. But it is not. To put it another way, Chamberlain has not alleged, and the facts have not shown, that Maremont conducted or participated in the affairs of the enterprise, as distinct from its own affairs (through itself and Saco), through a pattern of racketeering activity.
*Maremont*, 919 F.Supp. at 1157; *see also Moore v. Fidelity Financial Services, Inc.*, 897 F.Supp. 378, 379-80 (N.D.Ill.1995); *Katzman v. Victoria's Secret Catalogue*, 1996 WL 351228, at *6 (S.D.N.Y. June 26, 1996); *Department of Economic Development v. Arthur Andersen & Co.*, 924 F.Supp. 449, 470-71 (S.D.N.Y.1996).

Like the enterprises at issue in *Richmond, Brittingham, Riverwoods,* and *Maremont,* each of the three enterprises alleged by Fitzgerald and Rindal-- the Chrysler Group, an association-in-fact of Chrysler and all Chrysler dealers, and an association-in-fact of Chrysler and each Chrysler dealer individually-- consists of no more than a conglomeration of Chrysler and one or more of Chrysler's subsidiaries, divisions, affiliates and/or agents. Each and every component of the "Chrysler Group"--CFC; Chrysler Credit; CARC; Chrysler Canada, Ltd.; Chrysler de Mexico, S.A.; Chrysler Motors de Venezuela, S.A.; Chrysler Japan Sales Ltd.; Chrysler do Brasil Commercial Exportadora Improtadora, Ltd.; and several dozen trusts--is recognized by Plaintiffs to be either a division, a wholly-owned subsidiary, or an affiliate company under the control of Chrysler. [FN7] (Amend.Compl. ¶ ¶ 9-14.) Further, Plaintiffs admit that the various Chrysler dealers, while independent businesses for other purposes, are agents of Chrysler with respect to the service contracts which are at the heart of the alleged "pattern of racketeering activity." Indeed, in their Amended Complaint, Plaintiffs describe the dealers as follows:

> FN7. That Chrysler is a formal legal entity distinct from the subsidiary corporations that make up the Chrysler Group is irrelevant. As stated by the *Maremont* court:
> As [*Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256 (2d Cir.1995) ] makes clear, our conclusion that section 1962(c) requires more than the existence of separate legal entities where the person and the enterprise are affiliated corporations does not eviscerate section 1962(c) in the

corporate context. *Securitron* demonstrates that where the conduct of the corporations is sufficiently distinct, a valid section 1962(c) may exist [sic]. But, the facts in this case are much more similar to those in *Richmond* and *Brittingham* than they are to those in *Securitron,* and the result should be similar as well.
*Maremont,* 919 F.Supp. at 1158.

59. Each Chrysler dealer is an independent businessman for the purpose of reselling Chrysler vehicles. However, the dealer is expressly authorized to engage in the following acts by Chrysler with respect to service contracts and is the agent of Chrysler for the purposes of engaging in those acts:
*7 a. Selling Chrysler service contracts to members of the public. The contract is between Chrysler and the consumer, and the dealer is not a party to it.
b. Delivering information about Chrysler service contracts to members of the public.
c. Performing repairs to which holders of Chrysler service contracts are entitled under the terms of their service contracts.
(Amend.Compl. ¶ 59.)

Thus, it is clear from the facts contained in Plaintiffs' Complaint that, "the elements of an ongoing structure and an organization capable of hierarchical or consensual decision-making are nothing more than the existing corporate structure of parent and subsidiary, while the element of a joint purpose is merely the normal business affairs" of Chrysler. *Maremont,* 919 F.Supp. at 1157. This is true regardless of whether the enterprise is defined as the Chrysler Group, Chrysler plus all dealers, or Chrysler plus each individual dealer. [FN8] As a result, Plaintiffs have asserted nothing more than that, with respect to the sale and financing of Chrysler service contracts, Chrysler conducted, and is conducting, its own corporate affairs; such an assertion is legally insufficient to satisfy the "distinctiveness" requirement for a valid RICO Section 1962(c) claim. Accordingly, Plaintiffs' Count One is dismissed pursuant to Fed.R.Civ.P. 12(b)(6). [FN9]

> FN8. While the latter two enterprises-- Chrysler plus all dealers and Chrysler plus each dealer--certainly are more distinct from Chrysler than is the first alleged enterprise-- the Chrysler Group--, these two enterprises ultimately fail to satisfy the distinctiveness requirement. As recognized by Plaintiffs'

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases  P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

own statements in their Amended Complaint, the dealers are Chrysler's agents for purposes of any and all acts relating to the sale of service contracts. Consequently, these dealers, like the advertising agencies in *Brittingham* and the car dealers in *Maremont,* are deemed to be merely the "arms" of Chrysler with respect to the contracts; the dealers take no action with respect to the contracts independent of Chrysler.

Further, as in *Maremont,* there is no allegation by Plaintiffs that any of subsidiaries, dealers, divisions or affiliate companies under Chrysler's corporate control directed Chrysler's activities with respect to the service contracts; indeed, the Complaint makes clear that all policies and practices related to the contracts were dictated by Chrysler. Thus, the various cases cited by Plaintiffs in support of their position--all cases in which the named "persons" either were individuals or were subsidiary corporations that directed the actions of their parent corporations with respect to the pattern of racketeering activity--are inapposite.

> FN9. Because the Court finds Plaintiff's RICO Section 1962(c) claim to be substantively deficient, the Court need not, and does not, address Chrysler's argument that Fitzgerald's RICO claim is time-barred.

*C. Plaintiffs' Claim for Violations of The States' Consumer Fraud Statutes (Count Two)*

In Count Two, Plaintiffs allege violations of one or more of the consumer fraud statutes of the fifty states and the District of Columbia. Yet, because this case has not been certified as a class action, Plaintiffs' "shotgun" pleading method (as Chrysler calls it) is overinclusive. *See Jefferson v. Security Pacific Financial Services, Inc,* 1995 WL 579305, at *1 (N.D.Ill. Oct. 2, 1995); *Cowen v. Bank United of Texas, FSB,* 1995 WL 38978, at *7 (N.D.Ill. Jan. 25, 1995), aff'd, 70 F.3d 937 (1995). Consequently, this Court considers Plaintiffs' claim only with respect to the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Act"), 815 ILCS 505/1 *et seq.*. [FN10]

> FN10. A federal court sitting in diversity applies the choice of law rules of the forum state. *Klaxon v. Senator Elec. Mfg. Co.,* 313

U.S. 487, 496 (1941). "In deciding choice of law questions, Illinois courts will apply the law of the state where the tort occurred unless Illinois has a more significant relationship with the occurrence and with the parties." *Kwasniewski v. Schaid,* 607 N.E.2d 214, 217 (Ill.1993); *see also Miller v. Long-Airdox Co.,* 914 F.2d 976, 978 (7th Cir.1990). Here, not only did the alleged fraud occur in Illinois, but Illinois unquestionably has the most significant relationship with Fitzgerald, with Rindal and with the occurrences at issue.

Fitzgerald resides, and Rindal has its offices, in Illinois. Plaintiffs' allege that "acts, transactions, and injuries complained of occurred in substantial part in the Northern District of Illinois." (Amend.Compl. ¶ 4.) The service contracts about which Plaintiffs complain were allegedly issued by Chrysler to Plaintiffs at their respective Illinois addresses. All correspondence between Chrysler and Plaintiffs were sent to Plaintiffs in Illinois. Finally, Rindal purchased its vehicle and service contract from Schaumburg Dodge, a deal located in Schaumburg, Illinois.

Chrysler maintains that, under the Illinois Act, both Rindal's and Fitzgerald's claims are time-barred. The Illinois Act provides that a plaintiff must bring a claim for a violation of the Act within three years of the date the cause of action accrues. 815 ILCS 505/10a(e). A cause of action under the Act accrues when a plaintiff "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Knox College v. Celotex Corp.,* 430 N.E.2d 976, 980 (Ill.1981) (as quoted in *Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 441 (7th Cir.1994)).

Here, Plaintiffs concede that Fitzgerald knew or should have known that his injury was wrongfully caused more than three years before the present action was filed; accordingly, Fitzgerald's claim is, in fact, time-barred. [FN11] Yet, Plaintiffs contend that, while Rindal similarly may have known of her injury more then three years prior to her joining this action in April 1996, Rindal did not know of the existence of the "Adjustment Codes"--and, thus, did not know or have reason to know that her injury was wrongly caused-- until only recently. This contention is unavailing.

> FN11. Plaintiffs contend that Fitzgerald is

Case 1:05-cv-00075-SLR    Document 8-2    Filed 03/31/2005    Page 8 of 33

Page 8
Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases  P 71,629, RICO Bus.Disp.Guide 9159
(Cite as: 1996 WL 473456 (N.D.Ill.))

permitted to bring his claim under the Michigan Consumer Protection Act, Michigan Compiled Laws § 445.901-914. This contention must fail, however, as Fitzgerald is not a Michigan resident, he was not injured in Michigan, and he did not purchase or execute his service contract in Michigan. *See Highsmith v. Chrysler Credit Corp.*, 150 B.R. 997, 1007-08 (N.D.Ill.1993), *aff'd in part, rev'd in part on other grounds,* 18 F.3d 434 (7th Cir.1994).

**\*8** The substance of Rindal's claim under the Illinois Act is that Chrysler defrauded her by representing that her service contract coverage was "complete" and "comprehensive" when, in fact, the contract contained several unstated coverage "exceptions." Rindal knew or reasonably should have known of Chrysler's alleged fraud in November 1992, when her claim for reimbursement for repairs to her Dynasty was denied by Chrysler. That Rindal was not specifically told of the "Adjustment Codes" in November 1992 is irrelevant; she was squarely confronted with Chrysler's purported fraud when Chrysler refused to pay for her repairs—a refusal that was wholly inconsistent with, and contrary to, her understanding that the service contract required total reimbursement. Thus, like Fitzgerald, Rindal knew or should have known that her injury was wrongfully caused more than three years before she asserted her present claim; and, consequently, her action is barred by the applicable three-year statute of limitations. [FN12]

> FN12. Because this Court finds Plaintiffs' claims under the Illinois Act to be untimely, the Court need not, and does not, address Chrysler's contention that Rindal fails to plead her claim of consumer fraud with the requisite specificity.

D. *Plaintiffs Fail to Satisfy the "100 Named Plaintiffs" Requirement of the Magnuson-Moss Act*

Count Four of Plaintiffs' Complaint attempts to set forth a claim under the Magnuson-Moss Act, 15 U.S.C. § 2301 *et seq..* Yet, Section 2310(d)(3) of the statute provides:

> No claim shall be cognizable in a suit brought under paragraph (1)(b) of this subsection--
> * * *
> (C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred.
> 15 U.S.C. § 2310(d)(3). As recognized by the

Seventh Circuit, the "100 named plaintiffs" requirement "remains a substantial barrier to maintaining class actions under the Act. It was enacted by Congress to prevent 'trivial or insignificant' class actions from being brought in the federal courts." *In re General Motors Corp. Engine Interchange Litigation,* 594 F.2d 1106, 1114 n. 2 (7th Cir.), *cert. denied,* 444 U.S. 870 (1979).

Plaintiffs Complaint currently does not identify 100 named plaintiffs as required by Section 2310(d)(3). Since compliance with the Magnuson-Moss Act's strict jurisdictional requirements must be achieved at the time of the Complaint's filing, *Shazes v. Sylvan Pools, Inc.,* 1988 WL 3096, at *2 (E.D.Pa. Jan. 14, 1988), "the absence of one hundred plaintiffs is fatal to plaintiffs' standing to proceed with their Magnuson-Moss claim in the class action mode." *Id.* [FN13]

> FN13. While Plaintiffs contend that this Court may exercise supplemental jurisdiction over the Magnuson-Moss Act claim even in the absence of 100 named plaintiffs, this contention is unavailing for two primary reasons. First, such an assertion contradicts the plain language of section 2310(d)(3). Second, this Court's exercise of supplemental jurisdiction over a jurisdictionally deficient Magnuson-Moss Act claim would contravene Congress's intent in passing such clear jurisdictional hurdles--namely, to screen out potentially trivial or minor class actions. *See Shazes,* 1995 WL 3096, at *2; *Abraham v. Volkswagen of America, Inc.,* 795 F.2d 238, 246 n. 6 (2d Cir.1986).
> Because the Court dismisses Plaintiffs' Magnuson-Moss Act class action for failure to name 100 plaintiffs, the Court does not address Chrysler's arguments as to Rindal's failure to afford Chrysler an opportunity to cure its deficient performance.

*CONCLUSION*

For the foregoing reasons, the Court grants Chrysler's motion to dismiss Plaintiffs' Count One (RICO), Count Two (Consumer Fraud), and Count Four (Magnuson-Moss Act) pursuant to Fed.R.Civ.P. 12(b)(6). Chrysler's motion to strike Plaintiffs' Count Three prayer for injunctive relief is similarly granted.

1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases  P 71,629, RICO Bus.Disp.Guide 9159

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases  P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**

**Motions, Pleadings and Filings** (Back to top)

.         1:96CV00021                    (Docket)
(Jan. 02, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                      Page 1
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
**(Cite as: 2001 WL 541472 (Del.Super.))**

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
OUTDOOR TECHNOLOGIES, INC., Plaintiff,
v.
ALLFIRST FINANCIAL, INC., F/K/A First
Maryland Bancorp, a Maryland corporation;
Allfirst Bank, F/K/A First National Bank of
Maryland, a United States
Association; and Allfirst Financial Center, N.A.,
F/K/A First Omni Bank, N.A.,
a United States Association, Defendants.
No. 99C-09-151-JRS.

Date Submitted: Feb. 9, 2001.
Date Decided: April 12, 2001.

Defendants' Motion for Summary Judgment.
Granted.

Kathleen M. Miller, Esquire, Smith, Katzentstein &
Furlow, LLP, Wilmington, Delaware, 19899; Andrew
C. Kassner, Esquire, Drinker, Biddle & Reath, LLP,
Philadelphia, Pennsylvania. Attorneys for Plaintiff.

Neal J. Levitsky, Esquire, Agostini, Levitsky, Isaacs
& Kulesza, Wilmington, Delaware, 19899; James T.
Heidelbach, Esquire, Gebhart & Smith, LLP,
Baltimore, Maryland. Attorneys for Defendants.

SLIGHTS, J.

## I. INTRODUCTION

**\*1** My predecessor on the Court has stated that "[t]he
facts of this case look like a payment systems
hypothetical written by a law school professor."
[FN1] As usual, an apt observation from a wise jurist.
Plaintiff, Outdoor Technologies, Inc. ("Outdoor"),
presented a check for payment to defendants, Allfirst
Financial Center, N.A. f/k/a First Omni Bank, N.A.
("Omni"), Allfirst Financial, Inc. f/k/a Maryland
Bankcorp ("Bancorp") and Allfirst Bank f/k/a First
National Bank of Maryland ("FNB"). The defendant
banks refused to cash the check. Because the drawer
of the check, Hechinger, Inc., filed for bankruptcy
protection before the check could be paid, leaving
Outdoor without a remedy against Hechinger,
Outdoor has determined to pursue its remedies

against the banks in this Court.

> FN1. *Outdoor Technologies, Inc. v. Allfirst
> Financial, Inc.*, Del.Super., C.A. No. 99C-
> 09-151 WTQ, Quillen, J., (Jan. 24, 2000),
> Letter Op. at 2.

At first glance, this controversy would appear to be
subsumed within Delaware's Uniform Commercial
Code ("UCC"). Article 3 of the UCC governs
negotiable instruments [FN2]; Article 4 governs
bank deposits and collections. [FN3] The parties
agree, however, that statutory remedies under the
UCC are not available to Outdoor in this case. Article
3 does not provide a basis for relief when the drawee
bank has not accepted the negotiable instrument.
[FN4] And Article 4 limits the bank's statutory
liability to its customer. [FN5] In this case, the banks'
customer was Hechinger as the drawer of the check,
not Outdoor. [FN6] Accordingly, left without a UCC
remedy, Outdoor has raised common law claims
against the banks for breach of a contract to which it
was a third party beneficiary, fraud, negligent
misrepresentation and civil conspiracy.

> FN2. *6 Del. C. § 3-101 et. seq.*

> FN3. *6 Del. C. § 4-101 et. seq.*

> FN4. *6 Del. C. § 3-408.*

> FN5. *6 Del. C. § 4-402.*

> FN6. *Id.*

This Court has already dismissed Outdoor's breach
of contract claim upon concluding that the claim is
precluded by the UCC. [FN7] The Court has also
determined that Outdoor's claims for fraud (Count II),
negligent misrepresentation (Count III) and civil
conspiracy (Count IV) are not preempted by the UCC
and that Outdoor's complaint states a legally viable
claim on each of these legal theories. [FN8]
Discovery has run its course and defendants have
now moved for summary judgment on all remaining
claims against them. For the reasons that follow,
defendants' motion is GRANTED.

> FN7. *Outdoor Technologies, Inc.,* supra.

> FN8. *Id.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
(Cite as: 2001 WL 541472 (Del.Super.))

Page 2

## II. FACTS

Outdoor is a Delaware corporation with its principle place of business in Macon, Mississippi. [FN9] Outdoor manufactures and distributes garden accessories and related goods such as vinyl fencing, decking and rail material. Outdoor enjoyed an ongoing business relationship with Hechinger, a retail supplier of garden, outdoor and hardware products. On June 2, 1999, Hechinger issued a check for $706,735.62 made payable to Outdoor as delayed payment for goods previously supplied by Outdoor. That check was drawn on Hechinger's account at Omni, although it mistakenly indicated on its face that it was drawn on a Hechinger account at FNB. [FN10] When Outdoor received Hechinger's check it was aware that Hechinger was on the verge of filing for bankruptcy protection. Outdoor's desire to expedite payment of the check, in advance of Hechinger's bankruptcy filing, animated the events which give rise to this litigation.

> FN9. At the time these events took place, Outdoor was a wholly owned subsidiary of Jannock Limited, a Canadian corporation.

> FN10. Hechinger maintained accounts at each of the three defendant banks. Hechinger also printed its own checks. Apparently, Hechinger mistakenly identified FNB as the drawee bank on the printed check even though the check correctly identified the Omni account number.

*2 The Hechinger check was received by Outdoor at its Macon, Mississippi offices on June 4, 1999. Rather than deposit the check in the Outdoor corporate account, and face the delays of the Federal Reserve's inter-bank payment system, the corporate decision-makers at Outdoor determined that Outdoor's controller, John Hurt ("Hurt"), would travel personally to a FNB branch in Baltimore, Maryland to negotiate the check. Hurt's purpose was to secure immediate payment of the check through a wire transfer or receipt of certified funds.

On the morning of June 7, Hurt arrived at the Baltimore FNB branch to present the check for payment. The branch manager informed Hurt that the check was drawn on an Omni account, not a FNB account as indicated on the check, and that FNB could not negotiate the check. The branch manager also provided Hurt with the name of FNB corporate attorney, William Thomas ("Thomas"), to whom Hurt's questions should be addressed. Hurt returned

to his hotel room and placed a telephone call to Omni. During that call, Hurt was informed that Omni was owned by Bancorp.

Armed with this information, Hurt traveled to Bancorp's corporate headquarters in downtown Baltimore seeking guidance on the quickest means to get paid on the Hechinger check. Hurt ultimately was directed to Thomas. [FN11] Hurt and Thomas met for between five and fifteen minutes in the Bancorp legal department's lobby area. [FN12] This brief conversation is the genesis of Outdoor's claims of fraud and misrepresentation.

> FN11. As it turned out, Thomas served as corporate counsel to all three corporate affiliates named as defendants: Bancorp, Omni, and FNB.

> FN12. Thomas stated during his deposition that the conversation lasted for five minutes, while Hurt stated that it lasted between ten and fifteen minutes. Because the parties do not dispute the essential content of the conversation, its actual duration is of little import.

The parties agree that during the course of the Hurt/Thomas conversation Thomas inspected the Hechinger check and confirmed that it was drawn on an Omni account. He then advised Hurt that neither FNB nor Bancorp were obligated to negotiate the check and that neither bank would do so. Thomas also generally discouraged Hurt from attempting to negotiate the check in person and, instead, prodded him to deposit the check in Outdoor's depository account and obtain payment of the check through customary channels. Undaunted, Hurt pressed Thomas to commit Omni to negotiate the check if he traveled to the closest Omni branch (located in Millsboro, Delaware). Thomas responded that if Hechinger maintained sufficient funds in the account, and if Hechinger had not yet filed for bankruptcy protection, Omni would negotiate the check upon presentation by Hurt of "proper authorization." [FN13] Aside from Hurt's mention that "proper authorization" would be required, Thomas and Hurt did not discuss what Omni would require as evidence of Hurt's "proper authorization" to negotiate the check. In his apparent haste to accomplish his mission, Hurt did not inquire what form of authorization would be required by Omni and Thomas did not volunteer this information. [FN14]

> FN13. Thomas' concession was contrary to

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
(Cite as: 2001 WL 541472 (Del.Super.))

Hechinger's account agreement with the defendant banks which provided that the banks were not obligated to cash a check made payable to a corporation. The banks' written policies also provided that the banks generally would not certify funds or initiate a wire transfer except at the request of a customer. The proffered reason for these policies is that the bank would bear the risk of loss if it provided immediate funds to the presenter of a check who, for whatever reason, was not authorized to negotiate the check. 6 _Del. C._ § 3-417.

FN14. The record reveals that Hurt was aware that banks generally required a board of directors' resolution as evidence of an individual's authorization to conduct banking business on behalf of the corporation. The record also reveals, however, that Hurt had never himself attempted to "cash" a check made payable to Outdoor and that he was aware that others had done so by simply presenting personal identification.

Hurt then contacted his superior, Ian Douglas, to discuss the next move. Hurt and Douglas decided that Hurt should attempt to negotiate the check at Omni's branch in Millsboro. They also decided that for "proper authorization" Hurt would present a letter from Peter Orebaugh ("Orebaugh"), Outdoor's President, indicating that Hurt was authorized to negotiate the check on behalf of Outdoor. That letter, printed on Outdoor stationary, was faxed to Hurt on the morning of June 8, 1999. It read: "Please accept this letter as authorization for John Hurt, Controller of Outdoor Technologies Inc., to certify the check in the amount of $706,735.62 as payment from Hechingers [sic], Inc. Please release a certified check or wire transfer the amount according to the instructions John Hurt will provide." The letter is signed: "Peter Orebaugh, President."

**\*3** Hurt entered the Omni branch in Millsboro at 9:00 A.M. on the morning of June 8 in possession of both the check and the faxed Orebaugh letter. After some delay, an Omni employee at the branch reported to Hurt that she had been speaking with Thomas on the telephone and that Thomas now wished to speak with Hurt. Thomas informed Hurt that the letter from Orebaugh was not "proper authorization" and that Omni would require a resolution from Outdoor's board of directors authorizing Hurt to negotiate the check. Unable to

obtain a board resolution on such short notice, Hurt sent the check, via federal express, to a Detroit, Michigan bank where Outdoor maintained a depository account. As feared by Outdoor, Hechinger initiated its bankruptcy filing on June 11 before the check was paid. This filing froze Hechinger's accounts and prevented Omni from paying the check. Consequently, the check was returned to Outdoor unpaid. The $706,735.62 owed to Outdoor by Hechinger remains outstanding.

## II. STANDARD OF REVIEW

Summary Judgment may only be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. [FN15] The Court must view the evidence of record in the light most favorable to the non-moving party. [FN16] In making its determination, the Court will consider the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits submitted by the parties. [FN17]

FN15. _Dale v. Town of Elsmere,_ Del.Supr., 702 A.2d 1219, 1221 (1997) (citation omitted).

FN16. See _Brzoska v. Olson,_ Del.Supr., 668 A.2d 1355, 1364 (1995) (citation omitted).

FN17. Super. Ct. Civ. R. 56(c).

The movant bears the initial burden of showing the absence of a material factual dispute. [FN18] Upon sustaining this burden, the burden then shifts to the nonmoving party to demonstrate that a material factual issue exists. [FN19] Neither bare assertions nor conclusory allegations will allow the nonmoving party to meet this burden. [FN20] "Facts adduced under oath by the movant which remain uncontroverted must be assumed to be true." [FN21]

FN18. _Sterling v. Beneficial Nat'l Bank, N.A.,_ Del.Super., C.A. No. 91C-12-005, Ridgely, P.J. (April 13, 1994), Mem. Op. at 6 (citing _Moore v. Sizemore,_ Del.Supr., 405 A.2d 679, 680 (1979)).

FN19. _Id._ (citation omitted).

FN20. _Id._ at 5-6 (citing _Celotex Corp. v. Catrett,_ 477 U.S. 317, 324 (1986); _Martin v. Nealis Motors,_ Del.Supr., 247 A.2d 831, 833 (1968)).

FN21. _Ward v. Fox & Lazo,_ Del. Ch., C.A.

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
(Cite as: 2001 WL 541472 (Del.Super.))

Page 4

No. 13582, Chandler, V.C. (July 8, 1996),
Letter Op. at 7-8 (citation omitted).

### III. DISCUSSION

A. The Choice of Law

The parties disagree on choice of law. Outdoor argues that Delaware law applies; the defendant banks argue that Maryland law applies. The defendants perceive an advantage under Maryland's law with respect to negligent misrepresentation in that Maryland arguably requires privity of contract as a predicate to a duty of care where Delaware law does not. [FN22] The Court is not certain that the distinction appreciated by the parties is actually supported by the case law. In any event, the Court need not resolve this issue. The Court will give Outdoor the benefit of the doubt and apply the arguably less onerous burden imposed by Delaware law. In the Court's view, at the end of the day, the mandated result is not affected by choice of law considerations.

FN22. Compare *Weisman v. Connors,* Md. Ct.App., 540 A.2d 783, 790- 94 (1988)(holding that when claiming only economic loss plaintiff must prove an "intimate nexus" or "special relationship" between the parties to establish a duty of care), with *Guardian Constr. Co. v. Tetra Tech Richardson, Inc.,* Del.Super., 583 A.2d 1378, 1381-86 (1990)(applying Restatement (Second) of Torts, § 552, court recognized a duty of care absent contractual privity where plaintiffs allege only economic loss).

B. Count II, Fraud

In Delaware, the elements of fraud are: "1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance." [FN23] Delaware courts require proof of fraud to be made by a preponderance of the evidence. [FN24]

FN23. *Stevenson v. Capano Dev., Inc.,* Del.Supr., 462 A.2d 1069, 1074 (1983)(citing *Nye Odorless Incinerator Corp. v. Felton,* Del.Super., 162 A. 504, 510-11 (1931); W. Prosser, *Law of Torts,*

685-86 (4th ed.1971)).

FN24. *State v. Gardiner,* Del.Super., C.A. No. 98C-02-135, Quillen, J. (June 5, 2000), Letter Op. and Order at 7 (citations omitted).

*4 The Court need not go beyond the first element of Outdoor's *prima facie* case for fraud to dispose of this claim. The evidence of record simply does not support the contention that Thomas made a false statement to Hurt or any other representative of Outdoor. Thomas advised Hurt that Omni would require the presentation of "proper authorization" before it would negotiate the Hechinger check. This statement was consistent with the direction Thomas provided to the Omni bank branch after Hurt left his office and consistent with banking industry practice. The fact that the conversation did not last long enough for either party to address what would or would not be deemed "proper authorization" is unfortunate but not a basis for actionable fraud. [FN25]

FN25. *See Miller v. Fairchild Indus., Inc.,* Md. Ct. Spec.App., 629 A.2d 1293, 1303 (1993)(a statement that is not false does not support claim of fraud).

Moreover, the statements made by Thomas clearly related to future events. Generally, " 'statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud." ' [FN26] Only when such statements are made with the present intention not to perform will courts endorse a fraud claim. [FN27] Defendants have presented evidence indicating that Thomas authorized Omni to negotiate the Hechinger check. [FN28] Outdoor has failed in its burden to present evidence contradicting the banks' proffer. [FN29] The only evidence of record that Thomas did not intend to negotiate the check is that he refused to do so when Hurt presented the check at Omni. "Ordinarily, in the absence of additional circumstances, it will be found that a mere failure to perform is as consistent with an honest intent as with a dishonest one." [FN30]

FN26. *Miller,* 629 A.2d at 1302 (quoting *Finch v. Hughes Aircraft Co.,* Md. Ct.App., 469 A.2d 867 (1984)). *See also Esso Standard Oil Co. v. Cunningham,* Del. Ch., 114 A.2d 380, 383 (1955)("Opinions and statements as to probable future results are not generally fraudulent even though they relate to material matters ....")(citing *E.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
**(Cite as: 2001 WL 541472 (Del.Super.))**

*States Petroleum Co. v. Universal Oil Prods. Co.,* Del. Ch., 3 A.2d 768 (1939)).

FN27. *Miller,* 629 A.2d at 1302 (citations omitted).

FN28. Specifically, Thomas testified that "If [Hurt] showed up [at the Omni branch] with the proper authorities [sic] and there was money in the account and [Hechinger] hadn't filed bankruptcy, I was going to go ahead and cash it for him." (D.I. 47, Ex. 5 at 101) Defendants also presented the testimony of Shaun Murphy, a senior credit officer at FNB. Murphy's testimony establishes that he and Thomas discussed the Hurt situation, and that Thomas was prepared to authorize Omni to pay the Hechinger check. (D.I. 47, Ex. 11 at 28-36)

FN29. *Moore,* 405 A.2d at 680.

FN30. *Murphy v. T.B. O'Toole, Inc.,* Del.Super., 87 A.2d 637, 638 (1952).

Finally, it is apparent from the record that Hurt made no effort during his discussions with Thomas to ascertain what would suffice as "proper authorization." Although the "deliberate concealment of material facts would qualify as a false representation," [FN31] the Court cannot conclude on this record that a jury could find Thomas deliberately concealed anything from Hurt. In this regard, it is particularly probative that Hurt had absolutely no evidence of authorization from Outdoor to negotiate the check at the time he first discussed the issue with Thomas. It is also clear that Hurt had not yet received his "marching orders" to proceed to Omni when he discussed procedures with Thomas. It cannot be said, then, that Thomas even knew what Hurt was going to do next with the check when he discussed Omni's requirements with Thomas, much less what evidence of authorization Hurt might present to Omni if he attempted to negotiate the check. And, in light of these and the other circumstances of the conversation, it cannot be said that Thomas deliberately concealed either that the faxed letter would be insufficient evidence of authorization or that only a board resolution would be sufficient.

FN31. *In re Asbestos Litigation, Spong Trial Group,* Del.Super., C.A. No. 90C-10-72, Gebelein, J. (June 2, 1993), Mem. Op. at 5 (citing *Gaffin v. Teledyne, Inc.,* Del.Super.,

611 A.2d 467, 472 (1992)).

When a plaintiff fails to present sufficient evidence of a factual controversy with respect to an essential element of a claim after a full and fair opportunity to discover such evidence, summary judgment is proper. [FN32] Defendants' Motion for Summary Judgment as to Count II (fraud) is GRANTED.

FN32. *Burkhart v. Davies,* Del.Super., 602 A.2d 56, 59 (1991)(quoting *Celotex,* 477 U.S. at 322-23); *Murphy v. Berlin Constr. Co.,* Del.Super., C.A. 98C-01-097, Quillen, J. (Jan. 22, 1999), Letter Op. at 4-7; *Giordano v. Marta,* Del. Ch., C.A. No. 11613, Lamb, V.C. (Apr. 27, 1998), Mem. Op. at 12-14; *In re Asbestos Litigation,* supra, Mem. Op. at 4 (citations omitted); *Miller,* 629 A.2d at 1303.

C. Count III, Negligent Misrepresentation

*5 Under Delaware law, allegations of negligent representation require proof of the following elements: "(1) a pecuniary duty to provide accurate information, (2) the supplying of false information, (3) failure to exercise reasonable care in obtaining or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information." [FN33]

FN33. *Outdoor,* supra, Letter Op. at 6 (citations omitted).

As was the case with Outdoor's claim of fraud, Outdoor cannot sustain a claim of negligent misrepresentation when it has failed to produce any evidence that the defendant banks supplied false information. [FN34] Since the Court has already concluded that Thomas' statement incontrovertibly was not false or on its face misleading, the Court would be inclined to stop its analysis here and to enter summary judgment in favor of the defendants but for Outdoor's contention that Thomas negligently misrepresented facts by omission. [FN35] Outdoor's presentation at oral argument suggested that this, in fact, is Outdoor's showcase argument. Accordingly, the Court will address this argument and the remaining elements of plaintiff's *prima facie* burden on this claim.

FN34. *Darnell v. Myers,* Del. Ch., C.A. No. 14859-NC, Steele, V.C. (May 27, 1998), Mem. Op. at 12 ("If plaintiffs fail to prove any of the four required elements, their

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
**(Cite as: 2001 WL 541472 (Del.Super.))**

claim for negligent misrepresentation must fail").

FN35. *See, e.g.,* Restatement (Second) of Torts § 551 ("Section 551"); *Schmuesser v. Schmuesser,* Del.Supr., 559 A.2d 1294, 1295-96 (1989).

Section 551 provides: "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question." [FN36] The question of whether a duty exists, while a mixed question of law and fact, is for the Court to decide as a matter of law. [FN37]

FN36. Section 551(1) (emphasis supplied).

FN37. *Naidu v. Laird,* Del.Supr., 539 A.2d 1064, 1070 (1988).

Legal duties arise from relationships. [FN38] At the heart of Section 551 is a recognition that certain "business" relationships which evolve in the context of "business transaction[s]" can give rise to a duty of complete disclosure. Restatement (Second) of Torts § 552(1) speaks in terms of disclosures made in the context of a transaction in which the speaker has a "pecuniary interest." Delaware common law embraces a "pecuniary duty to provide accurate information." [FN39] In each instance, the law contemplates that a duty of disclosure will arise when the parties are in the midst of a "business relationship" from which they expect to derive "pecuniary" benefits. Thus, while contractual privity may not be required to form a duty, something more than a casual business encounter must be demonstrated before a duty of care will be imposed.

FN38. *Id.* (citing W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on Torts* § 236 (5th ed.1984).

FN39. *Wolf v. Magness Constr. Co.,* Del. Ch., C.A. No. 13004, Chandler, V.C. (Sept. 11, 1995), Mem. Op. at 3.

Outdoor cannot establish the requisite relationship with the defendant banks to justify the duty of complete candor it urges the Court to impose here. Outdoor had no prior relationship with the defendant banks; prior to their meeting, Thomas had never met Hurt. During an unscheduled encounter in the lobby of defendants' legal offices, Hurt asked Thomas some questions and Thomas endeavored to respond. Outdoor has failed to identify what pecuniary interest Thomas or the banks he represented might have been protecting in the course of the discussions with Hurt and the Court cannot discern any such interest from the record *sub judice.* [FN40] Consequently, the Court will not impose an affirmative duty of complete disclosure upon the defendants under these circumstances.

FN40. Indeed, Thomas' concession to authorize Omni to negotiate the check was contrary to bank policy and possibly exposed the bank to a loss if it later turned out that Hurt was not authorized to cash the check.

**\*6** Even assuming *arguendo* that the Court found a duty, and a negligent failure to provide complete information, summary judgment, nevertheless, is appropriate because Outdoor could not, as a matter of law, reasonably have relied upon Thomas' vague statement regarding "proper authorization" as the sole direction for its future conduct. [FN41] "A party is chargeable with the knowledge of what may be reasonably found if they make an investigation." [FN42] The undisputed record reveals that neither Hurt nor his superiors at Outdoor took the time to investigate what was required to accomplish their goal of prompt payment of the Hechinger check. For his part, Hurt was aware that banks generally required individuals to present board resolutions when conducting business with corporate bank accounts. A simple question from him in advance of his "mad dash" to Millsboro would have revealed that Omni's practice was no different than the industry practice. Under these circumstances, the Court concludes that Hurt's reliance on the vague reference to "proper authorization" was not reasonable as a matter of law. [FN43]

FN41. *Sipple v. Kaye,* Del.Super., C.A. No. 83C-01-1-CV, Del Pesco, J. (Oct. 30, 1995), Order at 2 (finding, as a matter of law, that plaintiff could not reasonably have relied on statements alleged to have been misleading).

FN42. *Ward,* supra, Letter Op. at 8 (citing *Lock v. Schreppler,* Del.Super., 426 A.2d 856, 862 (1981)); *Stidham v. Kinnamon,* Del.Super., C.A. No. 86C-AP-18, Ridgely, J. (Dec. 29, 1988), Mem. Op. at 7.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801
(Cite as: 2001 WL 541472 (Del.Super.))

FN43. *Ward,* supra, Letter Op. at 11-12.

Defendant's Motion for Summary Judgment as to Count III (negligent misrepresentation) is GRANTED.

D. Count IV, Civil Conspiracy

Under both Maryland and Delaware law, allegations of civil conspiracy cannot be sustained as an independent tort, but rather the allegations must relate to the completion of a tort independent of the conspiracy itself. [FN44] Since the Court has determined that Outdoor's fraud and negligent misrepresentation claims are not viable as a matter of law, Outdoor's civil conspiracy claim also must fail as there is no independent tort to sustain it. Accordingly, Defendants' Motion for Summary Judgment on Count IV (civil conspiracy) is GRANTED.

FN44. *See, e.g., Connolly v. Labowitz,* Del.Super., 519 A.2d 138, 143 (1986)(citing *Phoenix Canada Oil Co. v. Texaco, Inc.,* D. Del., 560 F.Supp. 1372, 1388 (1983); *McLaughlin v. Copeland,* D. Del., 455 F.Supp. 749, 752 (1978)); *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.,* Md. Ct.App., 665 A.2d 1038, 1045 (1995)(citing *Alexander v. Evander,* Md. Ct.App., 650 A.2d 260, 265 n. 8 (1994)).

## IV. CONCLUSION

Outdoor has failed to present any evidence that the defendant banks made a false statement or that they wrongfully withheld material information. This failure of proof in the record, in the face of evidence that the banks were truthful in their discussions with Outdoor, requires that summary judgment be entered on the fraud, negligent misrepresentation and civil conspiracy claims.

IT IS SO ORDERED.

2001 WL 541472 (Del.Super.), 44 UCC Rep.Serv.2d 801

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

United States District Court, D. Delaware.
In re WARFARIN SODIUM ANTITRUST
LITIGATION
**No. MDL 98-1232-SLR.**

Dec. 7, 1998.

Kevin G. Abrams, Esquire of Richards Layton & Finger, Wilmington, Delaware. Counsel for Plaintiff Barr Laboratories, Inc. Of Counsel: Daniel R. Murdock, Esquire of Winston & Strawn, New York, New York. Kurt L. Schultz, Esquire, Brant C. Weidner, Esquire and Jay L. Levine, Esquire of Winston & Strawn, Chicago, Illinois.

Pamela Tikellis, Esquire and Robert J. Kriner, Jr., Esquire of Chimicles & Tikellis LLP, Wilmington, Delaware. Counsel for Class Plaintiffs.

Of Counsel for Class Plaintiffs Kusnerik and Altman: Bernard Persky, Esquire and Barbara J. Hart, Esquire of Goodkind, Labaton, Rudoff & Sucharow LLP, New York, New York. Mel Lifshitz, Esquire of Bernstein, Liebhard & Lifshitz, New York, New York. J. Dennis Faucher, Esquire and Bryan L. Clobes, Esquire of Miller, Faucher, Chertow, Cafferty & Wexler, Philadelphia, Pennsylvania.

Of Counsel for Class Plaintiff Steckel: Bernard Persky, Esquire, Barbara J. Hart, Esquire, and Hollis L. Salzman, Esquire of Goodkind, Labaton, Rudoff & Sucharow LLP, New York, New York. Marvin A. Miller, Esquire and Jennifer Winter Sprengel, Esquire of Miller, Faucher, Chertow, Cafferty & Wexler, Chicago, Illinois. Mel Lifshitz, Esquire of Bernstein, Liebhard & Lifshitz, New York, New York. Hanzman, Criden, Korge, & Chaykin P.A., Miami, Florida. James T. Capretz, Esquire and Marc G. Reich, Esquire of Capretz & Radcliffe LLP, Newport Beach, California. Andrew G. Sykes, Esquire of Pittsburgh, Pennsylvania. Paul M. Goltz, Esquire of Pittsburgh, Pennsylvania.

Of Counsel for Class Plaintiff Tischler: Michael E. Criden, Esquire, Alan H. Rolnik, Esquire and Keith E. Hope, Esquire of Hanzman, Criden, Korge & Chaykin P.A., Miami, Florida.

Donald J. Wolfe, Jr., Esquire of Potter Anderson & Corroon LLP, Wilmington, Delaware. Counsel for Defendants. Of Counsel: Donald L. Flexner, Esquire,

George D. Ruttinger, Esquire, James P. Denvir, Esquire, Jeane A. Thomas, Esquire and Ramona Romero, Esquire of Crowell & Moring LLP, Washington, D.C. James P. Tallon, Esquire of Shearman & Sterling, New York, New York. Thomas C. Morrison, Esquire and Frederick C. Warder, III, Esquire of Patterson, Belknap, Webb & Tyler, New York, New York. Philip S. Beck, Esquire and Adam Hoeflich, Esquire of Bartlit, Beck, Herman, Palenchar & Scott, Chicago, Illinois.

MEMORANDUM OPINION

ROBINSON, District J.

I. INTRODUCTION

**\*1** This litigation consists of five actions consolidated here by the Judicial Panel on Multidistrict Litigation pursuant to 28 U.S.C. § 1407(a). Plaintiff Barr Laboratories, Inc. ("plaintiff") originally filed its suit on March 9, 1998 in the Southern District of New York against defendant DuPont Merck Pharmaceutical Company ("defendant"). [FN1] (D.I. 1 (98 Civ. 1695)) Plaintiff is a generic pharmaceutical manufacturer incorporated in New York with a principal place of business in Pomona, New York. (D.I. 1, ¶ 5 (98 Civ. 1695)) Defendant is a partnership between E.I. DuPont de Nemours & Co. (a Delaware corporation with a principal place of business in Wilmington, Delaware) and Merck & Co. (a New Jersey corporation with its principal place of business in Whitehouse Station, New Jersey). (D.I. 1, ¶ 6 (98 Civ. 1695)) Defendant manufactures and distributes pharmaceuticals and has its principal place of business in Wilmington, Delaware. (D.I. 1, ¶ 6 (98 Civ. 1695))

> FN1. By letter dated July 30, 1998, the court was informed that defendant had changed its name to DuPont Pharmaceuticals Company.

Class plaintiffs Kusnerik and Altman filed class action complaints in the District of Delaware, (D.I. 1 (C.A.97-659)(C.A.97-670)) while class plaintiffs Tischler and Steckel [FN2] each filed class action suits against defendant in the Southern District of Florida (D.I. 1 (98-178-Civ.)) and the Western District of Pennsylvania (D.I. 1 (98-697)),

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

respectively (collectively, "class plaintiffs"). Class plaintiffs purport to represent a class of more than 1.8 million persons who purchased Coumadin for personal use at any time during the period beginning on or about July 28, 1997 to the present. (D.I. 1, ¶ 6 (C.A.97-659))

> FN2. Class plaintiff Steckel sued defendants DuPont Pharmaceutical Company, E.I. DuPont de Nemours & Company, and Merck & Company, Inc. For purposes of this memorandum opinion, these defendants shall be referred to in the singular.

In this action, plaintiff and class plaintiffs allege that defendant engaged in unlawful monopolization and attempted monopolization in violation of § 2 of the Sherman Act. 15 U.S.C. § 2. Plaintiff also asserts claims against defendant founded on § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), § 2(c) of the Robinson-Patman Act, 15 U.S.C. § 13(c), the New York General Business Law, N.Y. Gen. Bus. L. § § 349 and 350, and common law product disparagement and tortious interference with prospective business advantage. Plaintiff and class plaintiffs seek trebled damages under § 4 of the Clayton Act. Class plaintiffs also seek injunctive relief under § 16 of the Clayton Act. Additionally, class plaintiffs Tischler and Steckel allege that defendant's actions violated various state laws.

Currently before the court is defendant's motion to dismiss plaintiff's claims and class plaintiffs' claims for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The court has federal question jurisdiction pursuant to 28 U.S.C. § § 1331 and 1337. The court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. For the reasons that follow, defendant's motion to dismiss plaintiff's claims is granted in part and denied in part. Defendant's motions to dismiss class plaintiffs' claims are granted.

## II. BACKGROUND

*2 The following facts are taken from plaintiff's and class plaintiffs' complaints and, for purposes of this motion to dismiss, are accepted as true. This suit arises from plaintiff's attempt to market a generic version of defendant's successful and profitable blood thinner known as "Coumadin." Coumadin is the brand name for defendant's formulation of warfarin sodium--an anticoagulant agent, taken orally, prescribed for patients suffering from thrombosis, embolisms, and other blood-clotting disorders. (D.I.

1, ¶ ¶ 1, 9 (98 Civ. 1695)) Warfarin sodium (either in generic form or as the active ingredient in Coumadin) is classified as a Narrow Therapeutic Index ("NTI") drug because too little of it can lead to stroke or cardiac arrest and too much of it can cause internal bleeding. (D.I. 1, ¶ 19 (98 Civ. 1695)) Consequently, treating physicians must carefully monitor patients taking either Coumadin or generic warfarin sodium.

Although the patent protection for Coumadin expired on April 2, 1962, Coumadin has dominated the oral anticoagulant market for over thirty years. (D.I. 1, ¶ ¶ 11, 12 (98 Civ. 1695)) In fact, until plaintiff's generic warfarin sodium tablets were introduced in 1997, no equivalent product competed with Coumadin for several years. (D.I. 1, ¶ ¶ 11, 69 (98 Civ. 1695)) Defendant's annual Coumadin sales are approximately $500 million. (D.I. 1, ¶ 24 (C.A.97-659)) According to class plaintiffs, the cost of Coumadin has escalated 300% to 400% in the past ten years. (D.I. 1, ¶ 25 (C.A.97-659))

Plaintiff and class plaintiffs allege that defendant, anticipating a loss of market share to plaintiff's cheaper warfarin sodium tablets, [FN3] "implemented a multifaceted attack against generic substitutes generally and [plaintiff's] product specifically, the cumulative effect of which has been to raise [plaintiff's] costs to enter the anticoagulant market and to hinder [plaintiff's] ability to penetrate the market effectively." (D.I. 1, ¶ 16 (98 Civ. 1695); D.I. 1, ¶ 33 (C.A.97-659)) Plaintiff and class plaintiffs contend that defendant engaged in allegedly anticompetitive tactics in order to preserve its monopoly in the oral anticoagulant market. Class plaintiffs claim that, due to defendant's anticompetitive activities, they have paid inflated prices for Coumadin. (D.I. 1, ¶ 51 (C.A.98-178))

> FN3. Plaintiff notes in its complaint that [t]he introduction of a generic alternative to a brand name product typically results in significant reduction in the brand name product's market share within the first year. The high level of a generic drug's market penetration is due to its lower cost, generic substitution laws, and preferred status in third-party reimbursement plans. (D.I. 1, ¶ 15 (98 Civ. 1695))

More specifically, in May 1995 plaintiff filed an Abbreviated New Drug Application ("ANDA") with the FDA seeking approval to manufacture and distribute generic warfarin sodium tablets. (D.I. 1, ¶ 21 (98 Civ. 1695)) In October of 1996, defendant

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                              Page 3
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

filed a Petition for Stay with the FDA asking it to postpone approval for all generic warfarin sodium products pending the adoption of stricter bioequivalence standards. [FN4] (D.I. 1, ¶ 22 (98 Civ. 1695)) In its Petition for Stay, defendant argued that the FDA's current bioequivalence standards were inadequate to assure the bioequivalence of Coumadin with other generic warfarin sodium drugs. Defendant asked the FDA to adopt a stricter "individual" bioequivalence standard, rather than an "average" standard, to determine whether generic warfarin sodium products were bioequivalent to Coumadin. [FN5]

> FN4. Bioequivalence "means the absence of a significant difference in the rate and extent to which the active ingredient or active moiety in pharmaceutical equivalents or pharmaceutical alternatives becomes available at the site of drug action when administered at the same molar dose under similar conditions in an appropriately designed study." 29 C.F.R. § 320.1(e) (1998).

> FN5. Plaintiff and class plaintiffs characterize this Petition for Stay as "baseless" and designed specifically to inflict competitive injury on plaintiff by forcing it to conduct time-consuming and costly studies before it could enter the oral anticoagulant market. (D.I. 1, ¶ 68 (98 Civ. 1695); D.I. 1, ¶ 33 (C.A.97-659))

**\*3** The FDA denied defendant's petition, stating that it was
> in the process of considering individual bioequivalence testing for all generic drugs. At this time, however, it is neither reasonable nor in the interest of the public to impose such testing standards on generic applicants because the approach has not been fully developed and current methods are effective in establishing bioequivalence between drug products.

(D.I. 1, ¶ 29 (98 Civ. 1695)(citing letter from FDA to defendant of 3/25/97, at 3)) The FDA has since issued a request for public comment on a preliminary draft proposal that "recommends that the individual bioequivalence approach be used by sponsors of ANDAs ... to assess bioequivalence between a generic and a listed drug ." 62 Fed.Reg. 67880, 67881 (Dec. 17, 1997). [FN6]

> FN6. In ruling on a motion to dismiss, a court may consider only the allegations

contained in the complaint, exhibits attached thereto, and matters of public record. See 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357 (2d ed.1990). Where, as here, the parties have provided the court with undisputedly authentic regulatory documents, the court may consider them in reviewing a motion to dismiss. See City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 259 (3d Cir.1998); see also Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir.1993).

During the same period of time, defendant filed a petition with the United States Pharmacopeial Convention, Inc. ("USP"), urging the USP to adopt Coumadin's narrow content uniformity specifications (which are stricter than those the USP currently requires) as the industry standard for all warfarin sodium drugs. [FN7] (D.I. 1, ¶ 24 (98 Civ. 1695)) The USP publishes the official compendium of pharmaceuticals in the United States, and listing in the USP is essential to the acceptance of a pharmaceutical product by the medical community. (D.I. 1, ¶ 24 (98 Civ. 1695)) The USP rejected the petition.

> FN7. Plaintiff further alleges that defendant's petitioning of the USP to narrow the content uniformity specifications for warfarin sodium tablets was "an obvious attempt to impose stricter regulations on a new competitor" designed to thwart plaintiff's entry into the oral anticoagulant market. (D.I. 1, ¶¶ 23, 24 (98 Civ. 1695))

Plaintiff began marketing its warfarin sodium tablets on July 25, 1997. (D.I. 1, ¶ 26 (98 Civ. 1695)) Despite its unsuccessful petitioning efforts with the FDA and the USP, defendant allegedly issued communications setting forth its position that Coumadin is safer and more efficacious than plaintiff's warfarin sodium tablets. It is asserted by plaintiff that:
. Defendant revised its "Couma Care" computer software (a promotional system designed to assist health care practitioners in monitoring patients using Coumadin) to include warnings about switching to generic substitutes. (D.I. 1, ¶ 18 (98 Civ. 1695); D.I. 1, ¶ 35 (C.A.97-659))
. Defendant created and funded the Health Alliance for NTI Patient Safety to lobby state legislatures, formularies, and pharmacy boards to exclude NTI drugs from state generic substitution laws. (D.I. 1,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

Page 4

¶ 19 (98 Civ. 1695))

. Defendant initiated a publicity campaign touting Coumadin's "tighter than USP" content uniformity standards. (D.I. 1, ¶ 24 (98 Civ. 1695))

. Defendant issued a press release which contained the following assertions:

[i]f warfarin products are interchanged, patients should receive additional blood tests to ensure the amount of drug in their bloodstream is appropriate for their condition. It should be noted that this warning is included in the FDA-approved package insert for both [defendant's] Coumadin and for [plaintiff's] generic product.

\* \* \*

[w]hile [plaintiff] focuses on producing a cheaper product to help save money, [defendant] focuses on patient safety and education and the future health of over two million patients who depend on Coumadin everyday.

**\*4** (D.I. 1, ¶ ¶ 27, 31 (98 Civ. 1695) (citing defendant's press release of 7/28/97, at 2))

. Defendant offered for review to health care professionals a slide presentation in which defendant claimed that, regardless of FDA findings of bioequivalence, generic drugs may not be therapeutically equivalent to their branded counterparts. (D.I. 1, ¶ 29 (98 Civ. 1695))

. Defendant used the FDA's Adverse Drug Event ("ADE") reporting system in order to generate fear over switching from Coumadin to generic warfarin sodium. (D.I. 1, ¶ 35 (98 Civ. 1695)) Specifically, defendant issued a press release in which it stated that "it has submitted to the FDA more than 70 spontaneous reports from health care providers of adverse drug events temporally associated with patients who had been switched from one drug to the other." [FN8] (D.I. 1, ¶ 36 (98 Civ. 1695) (citing the press release of 12/3/97, at 1))

> FN8. Plaintiff contends that these ADE reports were rife with lies and mischaracterizations and were "designed to defame plaintiff both at the FDA and in the marketplace." (D.I. 13 at 13 (98 Civ. 1695)) Plaintiff alleges that some of these ADE reports did not even involve its generic warfarin sodium tablets. (D.I. 1, ¶ 38 (98 Civ. 1695)) Plaintiff further claims that defendant solicited a large number of reports or reported events that the health care providers in question did not consider "adverse events;" indeed, many health care providers were unaware of being credited with ADE reports. (D.I. 1, ¶ ¶ 39, 41, 42 (98 Civ. 1695))

The FDA admonished defendant for its assertions that additional blood testing was required following a switch from Coumadin to generic warfarin sodium. (D.I. 1, ¶ 28 (98 Civ. 1695)) For instance, in objecting to defendant's slide presentation, the FDA stated:

> It is misleading to suggest that generic products that FDA has determined are bioequivalent to Coumadin, may not be therapeutically equivalent to the reference product without substantial evidence to support such a claim. All FDA approved dosage forms of generic drugs classified as therapeutically equivalent ... can be substituted for the reference product with the full expectation that the substituted product will produce the same clinical effect and safety profile.

(D.I. 1, ¶ 29 (98 Civ. 1695) (citing FDA letter of 8/26/97, at 2))

In addition to its anticompetitive communications, defendant allegedly entered into a variety of anticompetitive rebate, "market retention" agreements, and "inventory management" agreements with pharmacy benefit managers, retail pharmacies, and pharmaceutical wholesalers in order to preserve its monopoly in the oral anticoagulant market. (D.I. 1, ¶ ¶ 53-62 (98 Civ. 1695)) According to plaintiff, defendant offered and paid rebates to pharmacy benefit managers [FN9] to ensure the dispensing of Coumadin rather than plaintiff's generic warfarin sodium. (D.I. 1, ¶ 54 (98 Civ. 1695)) It is alleged in this regard that defendant rewarded large pharmacy and drug store chains for stocking Coumadin as a substantial part of their oral anticoagulant inventory. (D.I. 1, ¶ 56 (98 Civ. 1695)) The "inventory management" agreements offered wholesalers "unprecedented rebates" and "extended payment terms" for purchases of specific quantities of Coumadin during July, August, and September of 1997. (D.I. 1, ¶ 59 (98 Civ. 1695)) Defendant allegedly timed these agreements to coincide with plaintiff's introduction of its generic warfarin sodium. (D.I. 1, ¶ 60 (98 Civ. 1695)) Defendant has offered similar "inventory management" incentives covering purchases in 1998. (D.I. 1, ¶ ¶ 60, 62 (98 Civ. 1695)) Plaintiff argues that these agreements have had the net effect of excluding its generic warfarin sodium from the oral anticoagulant market. (D.I. 1, ¶ 57 (98 Civ. 1695))

> FN9. Pharmacy benefit managers dictate which brands of pharmaceuticals will be dispensed to patients of managed care

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 5
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
(Cite as: 1998 WL 883469 (D.Del.))

organizations and insurance companies. According to plaintiff, "almost three-quarters of all the prescriptions dispensed in this country are affected by such third-party adjudication." (D.I. 1, ¶ 54 (98 Civ. 1695))

## III. POST-TRANSFER APPLICABLE LAW

*5 In the leading case on choice of law in multidistrict transfers, the District of Columbia Circuit Court has noted that "the law of a transferor forum on a federal question ... merits close consideration, but does not have stare decisis effect in a transferee forum situated in another circuit." *In re Korean Airlines Disaster,* 829 F.2d 1171, 1176 (D.C.Cir.1987), *aff'd on other grounds sub nom. Chan v. Korean Airlines Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989). In *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357 (3d Cir.1993), the Third Circuit assumed, without deciding, that the district court's adoption of the District of Columbia Circuit's rationale was proper. *See id.* at 367 n. 8. The Second Circuit also has held that a transferee federal court should apply its interpretations of federal law, not the transferor forum's constructions of federal law. *See Coker v. Pan Am. World Airways, Inc.,* 950 F.2d 839, 847 (2d Cir.1991) (concerning transfer motion pursuant to 28 U.S.C. § 157(b)(5)).

Accordingly, the court will apply Third Circuit precedent to the federal questions presented by these consolidated cases. Where no Third Circuit precedent exists, the court will give careful consideration to the law of the transferor forum. As for the state law issues presented in this case, the rule of *Van Dusen v. Barrack,* 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964), requires the court to apply the substantive state law of the jurisdiction in which the action was filed.

## IV. STANDARD OF REVIEW

In analyzing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all material allegations of the complaint, and it must construe the complaint in favor of the plaintiff. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir.1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of facts consistent with the allegations of the complaint." *Id.* Claims may be dismissed pursuant to a Rule 12(b)(6) motion

only if the plaintiff cannot demonstrate any set of facts that would entitle it to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The moving party has the burden of persuasion. *See Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1409 (3d Cir.1991). With these rules in mind, the court turns to an examination of the sufficiency of plaintiff's and class plaintiffs' complaints.

## V. SUFFICIENCY OF PLAINTIFF'S COMPLAINT

Defendant argues that the court should dismiss plaintiff's monopolization and attempted monopolization claims. Further, defendant argues that its conduct does not state a claim under either the Lanham Act or under § 2(c) of the Robinson-Patman Act. Defendant also asserts that plaintiff has failed to allege the necessary elements of the state law business tort claims asserted against defendant. The court will address each of these issues in turn.

### A. Plaintiff's Monopolization and Attempted Monopolization Claims

*6 Section 2 of the Sherman Act punishes "[e]very person who shall monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States." 15 U.S.C. § 2 ("Sherman § 2"). The offense of monopolization under § 2 of the Sherman Act requires proof of: "(1) possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power, as distinguished from the growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570-71, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In order to prevail on an attempted monopolization claim, a plaintiff must show "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993).

Defendant does not dispute that it enjoys monopoly power in the market for oral anticoagulants. At issue is whether defendant's actions amount to predatory conduct or the willful acquisition of monopoly power. Defendant argues that its petitions to federal and state legislatures and administrative bodies, as well as its statements to health care providers and the general public, do not constitute predatory conduct

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

because they enjoy immunity from antitrust liability under the *Noerr-Pennington* doctrine. Defendant also claims that such activity is not "exclusionary" under Sherman § 2.

### 1. The *Noerr-Pennington* Doctrine

In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court held that concerted efforts to restrain or monopolize trade by petitioning the government enjoy antitrust immunity. *See also United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965) (holding that "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."). The Court has broadened *Noerr-Pennington* immunity to include the petitioning of the executive and judicial branches of government. [FN10] *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 513, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The Supreme Court generally has refused to impose antitrust liability for petitioning the government because doing so would infringe upon the First Amendment's protection of free speech, chill public involvement in our representative government, and impermissibly extend the Sherman Act to cover political as well as commercial activity. *See Noerr,* 365 U.S. at 137-38; *see also* 10 Earl W. Kintner & Joseph P. Bauer, *Federal Antitrust Law* § 77.1, at 187-88 (1994).

> FN10. The Supreme Court has extended *Noerr-Pennington* immunity as well to the petitioning of nongovernmental bodies when they perform quasi-public duties. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988). The USP is a private entity, but it publishes the official compendium of pharmaceuticals in the United States. (D.I. 1, ¶ 24 (98 Civ. 1695)) Since the USP promulgates standards governing pharmaceuticals (through procedures similar to those used by administrative agencies), the court will analyze the defendant's petition to the USP as it would a petition before an administrative agency.

The Supreme Court has ruled, however, that frivolous and illegitimate petitioning of government bodies does not enjoy *Noerr-Pennington* immunity. In *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991), the Court held that the "sham exception" to

*Noerr-Pennington* immunity applies when "persons use the governmental process-- as opposed to the outcome of that process--as an anticompetitive weapon." *Id.* at 380. The Court has enunciated a two-part test to identify sham proceedings. *See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) ( "*PRE* ").

**\*7** The first prong of the test requires a court to determine [FN11] if the suit or proceeding is "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Id.* at 60. A suit is not objectively baseless if "an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *Id.* An antitrust plaintiff cannot prove a sham "merely by showing that its competitor's 'purposes were to delay [the plaintiff's] entry into the market." ' *Id.* at 59-60 (quoting *Omni Outdoor,* 499 U.S. at 381 (1991)).

> FN11. Plaintiff argues the "baselessness" inquiry is inherently a question of fact and, therefore, inappropriate for resolution by the court. (D.I. 13 at 15 (98 Civ. 1695)) The Supreme Court, however, has found that a court may decide, as a matter of law, whether a party invoking *Noerr-Pennington* immunity had probable cause to bring an allegedly baseless suit. *See PRE,* 508 U.S. at 63. A finding of probable cause "compels the conclusion that a reasonable litigant in the defendant's position could realistically expect success on the merits of the challenged lawsuit." *Id.*

Only if challenged litigation is "baseless" may courts examine the subjective motivations of the litigant. The second prong of the test invites courts to determine whether a defendant has anticompetitive motivations. Specifically, this second prong instructs courts to "focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor." ' *PRE,* 508 U.S. at 60-61 (quoting *Noerr,* 365 U.S. at 144)).

### a. Defendant's Petition for Stay to the FDA

Plaintiff alleges that defendant's petition to the FDA was baseless in that it lacked expert testimony and evidentiary support. In support of its position, plaintiff quotes the former head of the FDA's Office of Generic Drugs as stating that defendant's Petition for Stay was "in the class of an economic challenge"

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

rather than a scientific one. (D.I. 1, ¶ 23 (98 Civ. 1695)) Plaintiff complains that defendant's "maneuverings before the FDA delayed the introduction of [its] product by several months and imposed substantial additional costs on [it] and loss of sales revenue." (D .I. 1, ¶ 23 (98 Civ. 1695))

Other than conclusory allegations that defendant's petition lacked evidentiary support, plaintiff offers no basis for its assertion that defendant initiated its Petition for Stay without any "realistic expectation of success on the merits." *PRE, 508 U.S. at 60.* The complaint reveals that defendant's Petition for Stay proposed more stringent bioequivalency standards governing generic substitutes for Coumadin, but does not allege that defendant included fraudulent or misleading information in its Petition for Stay.

Without more, plaintiff cannot show that defendant's Petition for Stay lacked "a realistic expectation of success on the merits." *See PRE, 508 U.S. at 60.* Indeed, the complaint suggests that an objective litigant could conclude that defendant's Petition for Stay was "reasonably calculated to elicit a favorable outcome." *Id.* The complaint reveals that defendant petitioned the FDA for adoption of narrower bioequivalency standards--standards that the FDA had the exclusive power to set. In its ten page reply to the Petition for Stay, the FDA did not find the petition frivolous or unreasonable. Indeed, the FDA granted defendant's request that ANDA applicants be required to conduct certain tests unrelated to bioequivalency. Moreover, the FDA later proposed to adopt the very bioequivalency standards recommended by defendant in its Petition for Stay. *See 62 Fed.Reg. 67880, 67881 (Dec. 17, 1997).*

*8 The Supreme Court has recognized that "a successful 'effort to influence government action ... certainly cannot be characterized as a sham.' " *PRE, 508 U.S. at 58* (quoting *Allied Tube, 486 U.S. at 502*). Plaintiff has failed to provide a basis for inferring that defendant's Petition for Stay was anything other than a successful attempt to secure more stringent bioequivalency standards for generic warfarin sodium drugs. Defendant's motion to dismiss plaintiff's antitrust claim, as the claim relates to the Petition for Stay, is granted.

b. Defendant's Petition to the USP

Likewise, plaintiff's complaint is devoid of any facts from which the court could infer that defendant's USP petition lacked a "realistic expectation of success on the merits." *PRE, 508 U.S. at 60.*

Plaintiff's complaint reveals only that defendant's petition requested a specific form of relief uniquely within the competence of the USP. Plaintiff presents no evidence that would support an inference of frivolousness or baselessness. Although the USP denied defendant's petition, the "court must resist the understandable temptation to engage in *post hoc* reasoning by concluding that an ultimately unsuccessful action must have been unreasonable or without foundation." *PRE, 508 U.S. at 61 n. 5* (internal quotations and citations omitted). Defendant's motion to dismiss plaintiff's antitrust claim, insofar as it is based on defendant's petition to the USP, is granted.

2. Defendant's Alleged Abuse of the FDA's ADE Reporting System

Plaintiff alleges that defendant submitted fraudulent ADE reports to the FDA and used these ADE reports in administrative hearings before state agencies. (D.I. 1, ¶¶ 38, 46 (98 Civ. 1695)) Defendant argues that these ADE reports, even if fraudulent, also enjoy *Noerr-Pennington* immunity. The Supreme Court, however, has declined to extend *Noerr-Pennington* immunity to deceptive practices before adjudicatory bodies like administrative agencies or courts. In *California Motor Transport,* the Court noted that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." *California Motor Transp., 404 U.S. at 513; see also Allied Tube, 486 U.S. at 500* (remarking that "in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations"). Administrative agencies, like state pharmacy boards, act in an adjudicatory capacity when they consider petitions urging the adoption of stricter standards governing NTI drugs.

Accepting the facts contained in the complaint as true, the court can infer that defendant used fraudulent and misleading ADE reports before state administrative agencies. Supplying fraudulent information to state agencies "threatens the fair and impartial functioning of [such] agencies and does not deserve immunity from the antitrust laws." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir.1982).* Insofar as plaintiff's Sherman § 2 claim rests on defendant's use of fraudulent ADE reports before state agencies, defendant's motion to dismiss is denied.

*9 Plaintiff's complaint also alleges that defendant used the ADE reports to urge state legislators to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

exclude generic warfarin sodium from state generic substitution laws. False statements made to legislators and legislative bodies in an effort to change government policy are protected by *Noerr-Pennington* immunity. In *Noerr,* the Court noted that deception in the political arena, "reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned." *Noerr,* 365 U.S. at 145. False statements in the political arena enjoy antitrust immunity because "[t]here is an emphasis on debate in the political sphere, which can accommodate false statements and reveal their falsity." *Clipper Exxpress,* 690 F.2d at 1261. Consequently, plaintiff may not rest its monopolization claims on defendant's misrepresentations to state legislators or legislative bodies. [FN12]

> FN12. Plaintiff argues that the "commercial exception" to *Noerr-Pennington* immunity subjects defendant to antitrust liability for its misrepresentations to state legislatures that purchased pharmaceuticals for its citizens. Because neither the Second nor the Third Circuits have recognized the existence of this exception to *Noerr-Pennington* immunity and because the court has denied defendant's motion to dismiss on other grounds, the court declines to address the validity of plaintiff's "commercial exception" theory.

3. Defendant's Statements to the General Public and the Health Care Industry

Defendant argues that its statements to the general public and to the health care industry, even if false and misleading, are protected by the *Noerr-Pennington* doctrine because they were made as part of a campaign "to shape public policy regarding patient safety in the use of NTI drugs." (D.I. 12 at 10 (98 Civ. 1695)) Alternatively, defendant argues that its "statements of opinion" do not give rise to antitrust liability because they are not exclusionary conduct.

a. *Noerr-Pennington* Immunity

The Supreme Court has held that, where an anticompetitive restraint arises solely from private action, "the restraint cannot form the basis for antitrust liability if it is 'incidental' to a valid effort to influence government action." *Allied Tube,* 486 U.S. at 499 (citing *Noerr,* 365 U.S. at 143) (emphasis added)); *see also Massachusetts School of Law, Andover v. American Bar Ass'n,* 107 F.3d 1027, 1035

(3d Cir.1997) ("*MSL* "). The Supreme Court has recognized, however, that "[t]he validity of such efforts, and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity." *Allied Tube,* 486 U.S. at 499.

The question at bar is whether defendant's public statements were incidental to valid efforts to persuade government agencies to adopt more stringent bioequivalency standards for generic warfarin sodium drugs. Defendant argues that its public statements were "part and parcel" of its campaign to influence public officials and its statements, even if false and misleading, enjoy *Noerr-Pennington* immunity. (*See* D.I. 12 at 10 (98 Civ. 1695))

Defendant's attempts to influence public officials centered on the establishment of stricter bioequivalency standards. In contrast, defendant's public statements warned consumers of "medical-legal" exposure in switching from Coumadin to generic warfarin sodium and urged doctors to conduct additional blood tests following a switch to generic warfarin sodium. (*See* D.I. 1, ¶ ¶ 18, 34 (98 Civ. 1695)) Defendant impugned the quality of plaintiff's generic warfarin sodium and issued press releases publicizing allegedly false ADE reports related to generic warfarin sodium. (*See* D.I. 1, ¶ ¶ 31, 46 (98 Civ. 1695))

*10 In *Noerr,* where the railroads published false and misleading public statements about the trucking industry, those statements were directly related to the railroads' efforts to obtain legislation regarding truck weight limits and increased taxes on heavy trucks. The railroads' publicity campaign addressed the damage done to highways by overweight trucks, the failure of the trucking industry to pay its fair share of road maintenance costs, and the hazards created by overweight trucks. *See Noerr,* 365 U.S. at 131. Indeed, the Supreme Court held that "at least insofar as the railroads's [publicity] campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had." *Id.* at 139-40 (emphasis added). In the case at bar, the court cannot infer at this stage of the proceedings that the totality of defendant's public statements were "part and parcel" of its efforts to secure more stringent bioequivalency standards for warfarin sodium drugs. For purposes of this motion to dismiss, therefore, the court finds that defendant's statements to the general public and to the health care community do not warrant *Noerr-Pennington* immunity.

Not Reported in F.Supp.2d                                                                Page 9
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

b. Sherman § 2

Defendant cites *MSL* for the proposition that the Third Circuit has refused to construe false and misleading speech as exclusionary activity under Sherman § 2. In *MSL,* the Massachusetts School of Law argued that it was injured by the stigmatic effect of the ABA's refusal to accredit it. *See MSL,* 107 F.3d at 1037-38. It claimed this stigmatic effect arose from the ABA's attempts to convince states to make graduation from an ABA accredited law school necessary for bar admission. The law school characterized the ABA's efforts as a "campaign to convey the idea that ABA accreditation is the *sine qua non* of quality." *Id.* at 1037. In affirming the district court's granting of summary judgment in favor of the ABA, the court found that the complained-of speech amounted to nothing more than "the ABA's justification of its accreditation decisions." *Id.*

Unlike the facts in *MSL,* where the ABA was found merely to have defended its own standard setting and accreditation decisions, defendant's speech at issue is directed at consumers and directly attacks the quality and substitutability of plaintiff's generic warfarin sodium. The court finds the Third Circuit's decision in *MSL* inapposite under these circumstances.

Other courts have recognized that misleading advertising can rise to the level of anticompetitive conduct if the plaintiff "overcome[s] a presumption that the effect on competition of such a practice was *de minimis.*" *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 288 n. 41 (2d Cir.1979)(quoted in *National Ass'n of Pharm. Mfrs., Inc. v. Ayerst Labs.,* 850 F.2d 904, 916 (2d Cir.1988)). The Second Circuit, in a case factually similar to the one at bar, held that a plaintiff may overcome the *de minimis* bar (and a motion to dismiss) by "cumulative proof that [defendant's] representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by rivals." *Ayerst Labs.,* 850 F.2d at 916. In the absence of Third Circuit precedent, the court finds these factors helpful in determining whether defendant's allegedly false and misleading statements rise to the level of unlawful exclusionary conduct.

**\*11** In the present case, plaintiff's complaint satisfies each of the above six factors. The complaint alleges that defendant's extensive publicity campaign

contained false misrepresentations. Plaintiff claims that these material misrepresentations were made to the general public in order to induce potential consumers to avoid purchasing generic warfarin sodium. On a motion to dismiss, plaintiff is entitled to the inference that the general public lacked the sophistication to discern that defendant's statements about bioequivalency were false. Although defendant argues that its statements were "readily susceptible to neutralization" by plaintiff and the FDA (D.I. 14 at 19-20) (98 Civ. 1695)), defendant is not entitled to this inference on a motion to dismiss. Moreover, plaintiff's dismal market share belies this assertion. (*See* D.I. 1, ¶ 16 (98 Civ. 1695)).

Consequently, the court finds that defendant's allegedly false and misleading speech had more than a *de minimis* effect on competition. Plaintiff may premise its Sherman § 2 claim on defendant's public statements.

4. Defendant's Rebate and Market Retention Agreements

Plaintiff claims that defendant's various rebate and market retention agreements also violate § 2 of the Sherman Act. Plaintiff argues that these agreements, in combination with defendant's misleading statements, have had the "synergistic effect" of harming competition in the oral anticoagulant market. (D.I. 13 at 27-29 (98 Civ. 1695)) Defendant contends that its price discounts and its allegedly deceptive statements "cannot possibly be viewed as working together 'synergistically' to produce an anticompetitive result because the theories of competitive harm are fundamentally at odds with each other." (D.I. 14 at 21 (98 Civ. 1695))

In analyzing an antitrust complaint, the court recognizes that "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.,* 370 U.S. 690, 699, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). The court finds that the combined effect of defendant's conduct could harm competition in the oral anticoagulant market. Those consumers that defendant failed to scare away from generic warfarin sodium could be "bought off" by defendant's rebate and inventory management incentives. Thus, defendant's allegedly misleading statements, coupled with financial disincentives to purchase generic warfarin sodium, could form part of an unlawful, multifaceted effort to hinder competition in the oral

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

anticoagulant market.

In sum, plaintiff may premise its Sherman § 2 claim on defendant's use of allegedly fraudulent ADE reports before state agencies, defendant's allegedly false and misleading statements to the general public and the health care community, and defendant's use of rebates and market retention agreements as part of its allegedly multifaceted effort to restrain trade in the oral anticoagulant market. Plaintiff may not base its Sherman § 2 claim on defendant's petitions to the FDA or USP or defendant's use of allegedly fraudulent ADE reports before state legislatures.

B. Plaintiff's Lanham Act Claim

**\*12** Plaintiff claims that defendant violated § 43(a) of the Lanham Act by misrepresenting the nature, characteristics, and quality of plaintiff's product to "the public at large, wholesalers, pharmacies and health care professionals, as well as state and federal regulators." (D.I. 1, ¶ 73 (98 Civ. 1695)) The Lanham Act imposes civil liability on those who, "in commercial advertising or promotion, misrepresent[ ] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services or commercial activities...." 15 U.S.C. § 1125(a)(1)(B) (emphasis added). The Act protects "consumers and competitors from a myriad of misrepresentations of products and services in commerce." Wojnarowicz v. American Family Ass'n, 745 F.Supp. 130, 141 (S.D.N.Y.1990) (quoting Allen v. National Video, Inc., 610 F.Supp. 612, 625 (S.D.N.Y.1985)).

Defendant contends that its public statements are immune from Lanham Act liability because they were not made in the context of "commercial advertising or promotion." Alternatively, defendant argues that, even if its statements occurred in the context of commercial advertising or promotion, its commercial speech was "inextricably intertwined" with protected First Amendment speech designed to influence public policies regarding warfarin sodium drugs. The court must determine whether defendant's public statements occurred "in commercial advertising or promotion" and, if so, whether those statements enjoy First Amendment protection from Lanham Act liability.

1. "In Commercial Advertising or Promotion"

There is a dearth of case law addressing whether a defendant's communications occurred "in commercial advertising or promotion." This is so because

"[g]enerally, a plaintiff can easily satisfy its burden of proving that the complained-of representation was made in 'commercial advertising or promotion' by pointing to paid advertisements by a commercial defendant on television or radio, or in newspapers or magazines." Gordon & Breach Science Publishers S .A. v. American Inst. of Physics, 859 F.Supp. 1521, 1532 (S.D.N.Y.1994). Here, defendant's allegedly false and misleading statements did not appear in the classic form of an advertising campaign. Instead, they were made in the context of press releases, computer software, letters, and facsimile transmissions.

Courts that have addressed the "commercial advertising or promotion" issue have concluded that "the [Lanham] Act's reach is broader than the 'classic advertising campaign.'" ' Seven-Up Co. v. Coca-Cola Co., 86 F.3d 1379, 1384 (5th Cir.1996) (quoting Gordon & Breach, 859 F.Supp. at 1534 (S.D.N.Y.1994)). Courts, for instance, have found § 43(a) applicable to the fundraising letters of a nonprofit pregnancy counseling group, see Birthright v. Birthright, Inc., 827 F.Supp. 1114, 1137-38 (D.N.J.1993), and to an individual's "bad-mouthing" of her former company in telephone calls to friends and former colleagues, see National Artists Management Co. v. Weaving, 769 F.Supp. 1224, 1234-35 (S.D.N.Y.1991).

**\*13** The district court in Gordon & Breach, after an extensive analysis of case law and legislative history, distilled four factors necessary to satisfy the "commercial advertising or promotion" requirement of § 43(a)(1)(B). The statements must be
(1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services ... (4) ... disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.
Gordon & Breach, 859 F.Supp. at 1535-36; accord Seven-Up Co. ., 86 F.3d at 1384 (finding the district court's analysis "accurate and sound").

Applying this analysis to the facts at bar, defendant's statements satisfy at least three Gordon & Breach factors. Defendant competes with plaintiff in the oral anticoagulant market. Plaintiff sufficiently alleges that defendant's statements influenced doctors, pharmacists, and others to purchase or prescribe Coumadin instead of generic warfarin sodium. Defendant disseminated its statements to such a wide audience of the healthcare industry that plaintiff is entitled to the inference that defendant engaged in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

advertising or promotion. (*See, e.g.,* D.I. 1 at ¶ (alleging that defendant faxed a misleading letter to 45,000 pharmacists))

Turning to the final factor, the "commercial speech" requirement, the Supreme Court has defined "commercial speech" as "speech proposing a commercial transaction." *United States v. Edge Broad. Co., 509 U.S. 418, 426, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993); see also Board of Trustees of State Univ. of N.Y. v. Fox,* 492 U.S. 469, 473-74, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989) (characterizing the proposal of a commercial transaction as "the test for identifying commercial speech") (emphasis added). [FN13] Defendant contends that none of its statements proposed any commercial transactions; rather, its statements conveyed merely "that care should be taken in switching between warfarin products given warfarin sodium's status as an NTI drug." (D.I. 14 at 24) A review of plaintiff's complaint indicates that not all of defendant's statements are subject to such an innocuous interpretation.

> FN13. Defendant's petitions to the FDA, the USP, and those state agencies that merely set standards governing the bioequivalency of generic drugs do not fall within this definition. Plaintiff has not alleged, nor could it, that any statements made to these regulatory bodies proposed a commercial transaction.

For instance, defendant's "Couma Care" computer software included praise for the "high quality" of Coumadin while warning of the "risks" and "medical-legal exposure" entailed in switching from Coumadin to generic warfarin sodium. (D.I. 1, ¶ 18 (98 Civ. 1695)) In a press release coinciding with the introduction of plaintiff's warfarin sodium tablets, defendant claimed that "while [plaintiff] focuses on producing a cheaper product to help save money, [defendant] focuses on patient safety and education and the future health of over two million patients who depend on Coumadin everyday." (D.I. 1, ¶ 31 (98 Civ. 1695)) Defendant also allegedly employed false ADE reports to dissuade pharmacists and state pharmacy boards from purchasing plaintiff's generic warfarin sodium.

**\*14** Statements such as these satisfy the court that defendant's press releases and other communications were not confined solely to defendant's efforts to influence public policy on generic substitution of warfarin sodium drugs. Plaintiff at this stage of the

proceedings is entitled to the inference that defendant's statements "proposed a commercial transaction" by (1) denigrating plaintiff's generic warfarin sodium, (2) stressing the dangers of substituting generic warfarin sodium for Coumadin, and (3) touting Coumadin's "high quality" and "tighter than USP" content uniformity specifications. (*See* D.I. 1, ¶ ¶ (98 Civ. 1695))

In order to state a *prima facie* case under § 43(a) of the Lanham Act, the Third Circuit has ruled that a plaintiff must show

> 1) that the defendant has made false or misleading statements as to his own product [or another's]; 2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; 3) that the deception is material in that it is likely to influence purchasing decisions; 4) that the advertised goods travelled in interstate commerce; and 5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of goodwill, etc.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.,* 898 F.2d 914, 922- 23 (3d Cir.1990) (quoting *Max Daetwyler Corp. v. Input Graphics, Inc.,* 545 F.Supp. 165, 171 (E.D.Pa.1982)). Consistent with its findings above, the court finds that plaintiff has satisfied each element of its *prima facie* case.

Nonetheless, the court still must determine whether defendant's commercial speech enjoys First Amendment protection. Defendant contends that its statements are "inextricably intertwined" with protected political speech and, consequently, all of its communications are entitled to full First Amendment protection. Defendant relies heavily on the Supreme Court's decision in *Riley v. National Federation of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988). In *Riley,* the Court assessed the constitutionality of a North Carolina statute which required solicitors of charitable contributions to divulge to potential donors the percentage of the previous year's donations that actually went to charities. In deciding that it would apply strict scrutiny analysis to the statute, the Court noted that "where, as here, the component parts of a single speech are inextricably intertwined, we cannot parcel out the speech, applying one [standard of review] test to one phrase and another test to another phrase." *Id.* at 796.

The Court revisited the issue of "inextricably intertwined" speech in *Fox. See* 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388. In *Fox,* the Court reviewed the constitutionality of a state university

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                 Page 12
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

regulation that prohibited private commercial enterprises in student dormitory rooms. The Court distinguished its holding in *Riley* by finding that the essentially commercial "Tupperware parties" involved in *Fox* did not enjoy full First Amendment immunity from state regulation--even though the commercial activity at issue in *Fox* combined "sales pitches" with lectures on home economics, personal finance, and other protected forms of "pure" speech. Writing for the Court, Justice Scalia explained that in *Riley,*

> **\*15** the commercial speech (if it was that) was "inextricably intertwined" because the state law required that it be included. By contrast, there is nothing whatever "inextricable" about the noncommercial aspects of these ["Tupperware"] presentations. No law of man or of nature makes it impossible to sell housewares without teaching home economics, or to teach home economics without selling housewares.
> *Fox,* 492 U.S. at 474.

Defendant fails to appreciate the Supreme Court's distinction between the protected "inextricably intertwined" speech in *Riley* and the unprotected "voluntarily intertwined" speech in *Fox.* In the case at bar, defendant voluntarily interspersed its protected speech relating to heightened standards for warfarin sodium drugs with comments about plaintiff's product, which comments are alleged to be false and misleading. Nothing required defendant to mislead consumers and disparage plaintiff's product while expressing its protected opinions on the standards governing warfarin sodium.

Thus, defendant's commercial speech is not "inextricably intertwined" with its protected speech. Because false and misleading commercial speech does not enjoy First Amendment protection, [FN14] defendant's statements are subject to Lanham Act scrutiny. Defendant's motion to dismiss plaintiff's Lanham Act claim is denied.

> FN14. Commercial speech, when found to be false and misleading, "is not protected by the First Amendment at all." *City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 434, 113 S.Ct. 1505, 123 L.Ed.2d 99 (Blackmun, J., concurring). Commercial speech enjoys "less protection ... than ... other constitutionally safeguarded forms of expression", *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 64-65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983), because "there is greater potential for deception or

confusion in the context of certain advertising messages." *Id.* at 65. Moreover, commercial speech is marked by "greater objectivity and hardiness ... [which] may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 771 n. 24, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976).

C. Plaintiff's Robinson-Patman Claim

Section 2(c) of the Robinson-Patman Act reads, in relevant part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant ... anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods ... either to the other party to such transaction or to an agent, representative, or other intermediary therein where such intermediary is acting in fact for or in behalf, or is subject to the direct or indirect control, of any party to such transaction other than the person by whom such compensation is so granted or paid.

15 U.S.C. § 13(c). Congress enacted this section in order to combat the use of "dummy" brokerage fees as a means of securing unlawful price rebates. The Supreme Court has found the language of § 2(c) applicable to commercial bribery. *See FTC v. Henry Broch & Co.,* 363 U.S. 166, 169 n. 6, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960) ("the debates on the bill show clearly that § 2(c) was intended to proscribe other practices such as the 'bribing' of a seller's broker by the buyer") (dictum). Commercial bribery is an aspect of "the classic arrangement that § 2(c) aimed to eliminate--a situation where the fiduciary of one party is influenced by another party to the transaction by the payment of brokerage when no services are performed." *Yeager's Fuel, Inc. v. Pennsylvania Power & Light Co.,* 953 F.Supp. 617, 665 (E.D.Pa.1997); *accord Harris v. Duty Free Shoppers Ltd.,* 940 F.2d 1272, 1274 & n. 3 (9th Cir.1991). With respect to commercial bribery, the Third Circuit has required the plaintiff to show that "the illegal payments in question crossed the line from buyer to seller or vice versa." *See Environmental Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1066 (3d Cir.1988) (citing *Seaboard Supply Co. v. Congoleum Corp.,* 770 F.2d 367, 372 (3d Cir.1985)).

**\*16** Defendant argues that plaintiff has failed to

allege that the financial incentives offered by defendant constituted unlawful bribes to fiduciaries of Coumadin purchasers. (D.I. 12, at 25-26 (98 Civ. 1695)) In its complaint, plaintiff alleges that defendant paid rebates and/or "administrative fees" to pharmacy benefit managers, managed care companies, retail pharmacies, and pharmacy wholesalers. (D.I. 1, ¶ ¶ 53, 56, 57, 59 (98 Civ. 1695)) Plaintiff explains that pharmacy benefit managers act as fiduciaries for managed care companies, insurance companies, and others who employ them to broker cost-effective deals with pharmaceutical sellers. Plaintiff claims that these rebates and fees were designed to exclude its generic warfarin sodium from the anticoagulant market. (D.I. 1, at ¶ 53 (98 Civ. 1695)) Plaintiff further alleges that these payments were not made in exchange for any services rendered in connection with the sale of Coumadin. (D.I. 1, ¶ ¶ 53, 58 (98 Civ. 1695))

At this stage of the proceedings plaintiff's complaint permits the inference that defendant unlawfully bribed these pharmacy benefit managers as well as the ultimate purchasers of Coumadin. Because these rebates were never offered by defendant until the introduction of generic warfarin sodium (D.I. 1, ¶ 61 (98 Civ. 1695)), the court can also infer that these financial incentives were offered in order to exclude generic warfarin sodium from the oral anticoagulant market. As such, plaintiff has stated a claim of commercial bribery under § 2(c) of the Robinson-Patman Act.

D. Plaintiff's New York General Business Law Claims

Count V of the complaint alleges that defendant's false and misleading statements violated § § 349 and 350 of the New York General Business Law. Section 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. L. § 349 (McKinney 1997). Section 350 states that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful." Id. § 350. In an action brought under either section, the plaintiff must show "(i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured." Coors Brewing Co. v. Anheuser-Busch Cos., 802 F.Supp. 965, 975 (S.D.N.Y.1992). Although the New York legislature enacted the statute as a consumer protection measure, see Genesco Entertainment v. Koch, 593 F.Supp. 743, 751 (S.D.N.Y.1984), "corporate competitors now have standing to bring a claim under this

[statute] ... so long as some harm to the public at large is at issue." Bristol-Myers Squibb Co. v. McNeill-P.P.C., Inc., 786 F.Supp. 182, 215 (E.D.N.Y.), vacated in part on other grounds, 973 F.2d 1033 (2d Cir.1992). "The critical question, then, is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer or a competitor." Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256, 264 (2d Cir.1995).

*17 In its supporting brief, defendant reiterates its claim that its public statements enjoy First Amendment immunity and, therefore, cannot serve as grounds for liability under the New York General Business Law. (D.I. 12 at 28 n. 9 (98 Civ. 1695)) Consistent with the findings above that at least some of defendant's speech is not protected by the First Amendment, the court further finds that plaintiff has alleged materially false and misleading statements by the defendant that harmed purchasers of anticoagulant drugs. Therefore, the plaintiff has stated a claim for relief under § § 349 and 350 of the New York General Business Law. Defendant's motion to dismiss these claims is denied.

E. Plaintiff's New York Common Law Claims

In Count VI of its complaint, plaintiff alleges that defendant's false statements constituted common law trade disparagement. "Trade libel or product disparagement is an action to recover for words or conduct which tend to disparage or negatively reflect upon the condition, value or quality of a product or property." Angio-Medical Corp. v. Eli Lilly & Co., 720 F.Supp. 269, 274 (S.D.N.Y.1989). In order to prove product disparagement the plaintiff must plead and prove "(1) falsity of the statement, (2) publication to a third person, (3) malice (express or implied), and (4) proven special damages." Id. New York courts have defined special damages as "the pecuniary loss resulting directly from the effect of a defendant's allegedly wrongful conduct." Charles Atlas, Ltd. v. Time-Life Books, Inc., 570 F.Supp. 150, 155 (S.D.N.Y.1983); see also Angio-Medical Corp., 720 F.Supp. at 274 (describing special damages as the "natural and immediate consequence of the disparaging statements"). Loss of sales is a proper item of special damages. See Charles Atlas, Ltd., 570 F.Supp. at 155.

In the case at bar, plaintiff sufficiently alleges that defendant's numerous public comments were malicious and that they disparaged the quality of plaintiff's generic warfarin sodium. Defendant argues that plaintiff has failed to properly plead special

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

damages because plaintiff has not specified the particular customers with whom it would have done business but for defendant's disparaging statements. While defendant rightly notes that some New York courts have required such specificity, at least one New York court has recognized the need for a more liberal approach in cases where it is "virtually impossible to identify those who did not order the plaintiff's product" because "such people would simply have failed to order, thus leaving no record of their identity." *Charles Atlas, Ltd.*, 570 F.Supp. at 156 (citing William Prosser, *Handbook of the Law of Torts* § 128, at 921-22 (4th ed.1971); *see also Teilhaber Mfg. Co. v. Unarco Materials Storage*, 791 P.2d 1164, 1167 (Colo.Ct.App.1989).

Plaintiff has not cited the specific customers it lost because of defendant's allegedly false and misleading statements. Plaintiff, however, has alleged that its market share in the oral anticoagulant market has suffered because of defendant's allegedly misleading publicity campaign. At this stage of the proceedings, the court finds that plaintiff has pled special damages with sufficient particularity. Given the mass dissemination of defendant's allegedly false and misleading statements, the court finds that demanding more specificity from plaintiff at this early stage in the litigation would be unfair and inappropriate.

**\*18** Count VII of plaintiff's complaint alleges tortious interference with prospective business relations. In order to prevail on such a claim, "a plaintiff must demonstrate that the defendant interfered with business relations existing between a plaintiff and a third party, either with the purpose of harming the plaintiff or by means that are dishonest, unfair, or improper." *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, 857 F.2d 55, 74 (2d Cir.1988). A cause of action for tortious interference with prospective business advantage "applies to those situations where the third party would have entered into or extended a contractual relationship with plaintiff but for the intentional and wrongful acts of the defendant." *M.J. & K. Co. v. Matthew Bender & Co.*, 220 A.D.2d 488, 631 N.Y.S.2d 938, 940 (N.Y.App.Div.1995) (quoting *WFB Telecomms., Inc. v. NYNEX Corp.*, 188 A.D.2d 257, 590 N.Y.S.2d 460, 461 (N.Y.App.Div.1992)).

In the present case, plaintiff alleges that, due to defendant's false and misleading statements, pharmacy benefit managers, managed care companies, and others refused to purchase plaintiff's generic warfarin. The facts reveal that these entities normally prefer less expensive generic drugs to branded pharmaceuticals. At this stage of the proceedings, plaintiff is entitled to the inference that, but for defendant's false and misleading statements, these third parties would have entered into contracts with plaintiff. Plaintiff has presented sufficient factual support to state a claim for relief under common law tortious interference with prospective business advantage. Defendant's motion to dismiss is denied.

## VI. SUFFICIENCY OF CLASS PLAINTIFFS' COMPLAINTS

Class plaintiffs' antitrust complaints are identical: they seek treble damages and injunctive relief under § § 4 and 16 of the Clayton Act for allegedly supracompetitive prices charged for Coumadin by defendant. Class plaintiffs' factual summaries of defendant's alleged violations of Sherman § 2 mirror plaintiff's complaint. The court will address class plaintiffs' antitrust claims as a whole. Class plaintiff Tischler also alleges that defendant's actions violate the Florida Deceptive and Unfair Trade Practices Act ("DUTPA"). *Fla. Stat. Ann. § § 501.201 et seq.* Class plaintiff Steckel additionally alleges several Pennsylvania state law claims.

### A. Class Plaintiffs Lack Antitrust Standing

Class plaintiffs seek treble damages under § 4 of the Clayton Act [FN15] for the allegedly supracompetitive prices charged for Coumadin by defendant. Citing the Supreme Court's decision in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), defendant argues that class plaintiffs lack antitrust standing because they are indirect purchasers of Coumadin. Class plaintiffs argue that the "bright-line" rule of *Illinois Brick* does not bar their claim because the Supreme Court has enunciated a broader antitrust standing test in *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("*AGC* "). The court finds that even under the more flexible balancing test of *AGC*, class plaintiffs still lack antitrust standing.

> FN15. Section 4 of the Clayton Act provides, in pertinent part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court ... and shall recover threefold the damages by him sustained...." 15 U.S.C. § 15(a).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

*19 In *AGC,* the Supreme Court synthesized its previous rulings on antitrust standing by analyzing five factors to resolve the standing issue before it. As the Third Circuit explained in *McCarthy v. Recordex Serv., Inc.,* 80 F.3d 842, 850 (3d Cir.1996), the Supreme Court considered (1) the causal connection between the antitrust violation and the harm to the plaintiff, (2) whether the antitrust injury is "of the type that the antitrust statute was intended to forestall," (3) the directness or indirectness of the asserted injury, (4) the existence of more direct victims of the alleged violation, and (5) the potential for duplicative recovery or complex apportionment of damages. *See id.* at 850 (citing *AGC,* 459 U.S. at 537-44).

These factors, when applied to the facts at bar, weigh heavily against class plaintiffs. Factors one and three require class plaintiffs to show that defendant's monopolization of the oral anticoagulant market directly caused their injuries. Although class plaintiffs assert that they were forced to pay supracompetitive prices, their ability to trace this effect to the alleged anticompetitive conduct traverses "several somewhat vaguely defined links." *AGC,* 459 U.S. at 540.

In their complaints, class plaintiffs assert that class members may be identified from records maintained by pharmacies, drugstores, and managed care companies. (D.I. 1, ¶ 7 (C.A.97-659)) This demonstrates that class plaintiffs purchased Coumadin from intermediaries rather than from defendant. Each of these organizations purchased their supplies of Coumadin from pharmaceutical wholesalers. (D.I. 8 at 11 (C.A.97-659)) Class plaintiffs, then, are third in the distribution chain of Coumadin. Although class plaintiffs do not discuss third party payor arrangements, it is almost certain that most of the 1.8 million class members had some sort of health insurance. More often than not, third party payors actually "pay" for the cost of prescriptions while patients pay only a yearly premium (some of which might be subsidized by the patient's employer). Other third party payor arrangements reimburse patients for part or all of the price paid for the prescription.

In sum, this case presents a classic indirect purchaser scenario. It is unclear from the complaints whether class plaintiffs suffered any antitrust injury at all. Any injuries actually suffered by class plaintiffs are too remote to justify antitrust standing.

Turning to the fourth *AGC* factor, the remoteness of class plaintiffs' injuries also points to the existence of more direct victims of defendant's allegedly unlawful conduct. If defendant's monopolization of the oral anticoagulant market resulted in supracompetitive prices for Coumadin, the insurance companies and third party payor organizations most likely absorbed some or all of that overcharge. Those organizations, and not more remote victims like class plaintiffs, are the proper parties to bring suit to recover the overcharge.

*20 The fifth factor of the *AGC* analysis concerns the potential for duplicative recovery or complex apportionment of damages. Allowing class plaintiffs to proceed in the present case would expose defendant to multiple recoveries in antitrust actions brought by those more directly injured by its conduct. Moreover, the sheer variety of third party payor plans would render the apportionment of damages among the class plaintiffs incredibly complex. A trier of fact would have to ascertain the percentage of the overcharge actually suffered by each class plaintiff. This figure would vary from plaintiff to plaintiff due to the involvement of third party payors and other intermediary purchasers--some of which may or may not have absorbed the alleged overcharge. The apportionment problem is magnified by the fact that class plaintiffs purport to represent 1.8 million consumers of Coumadin.

The court concludes that class plaintiffs have not adequately alleged antitrust injury. As the Supreme Court has recognized, "[a]n antitrust violation may be expected to cause ripples of harm to flow through the Nation's economy; but 'despite the broad wording of § 4 there is a point beyond which the wrongdoer should not be held liable." ' *Blue Shield of Va. v. McCready,* 457 U.S. 465, 476-77, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) (citing *Illinois Brick,* 431 U.S. at 760 (Brennan, J., dissenting)). Class plaintiffs at bar lack antitrust standing, and defendant's motion to dismiss their Sherman § 2 claims is granted.

B. Injunctive Relief

Class plaintiffs seek injunctive relief from defendant's alleged monopolistic practices under § 16 of the Clayton Act. Section 16 provides, in relevant part, that "[a]ny person ... shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws...." 15 U.S.C. § 26. The Supreme Court has held that "in order to seek injunctive relief under § 16, a private plaintiff must allege threatened loss or damage 'of the type the antitrust laws were

Not Reported in F.Supp.2d
1998 WL 883469 (D.Del.), 1999-1 Trade Cases  P 72,457
**(Cite as: 1998 WL 883469 (D.Del.))**

designed to prevent and that flows from that which makes defendant['s] acts unlawful." ' *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). The Court remarked in *Cargill* that it would be "anomalous ... to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred." *Id.* at 112. *See also West Penn Power Co.,* 147 F.3d at 264 (holding that "when seeking injunctive relief [under the Clayton Act], 'the complainant need only demonstrate a significant threat of injury from an impending violation of the antitrust laws." ') (emphasis added & citation omitted).

In the present case, class plaintiffs have not sufficiently alleged either antitrust injury or a causal connection between defendant's allegedly unlawful activity and their purported injury. Thus, class plaintiffs have failed to allege injury of the type the Sherman Act was designed to prevent. Therefore, class plaintiffs do not have standing to assert injunctive relief under § 16 of the Clayton Act.

C. Class Plaintiffs' State Law Claims

**\*21** Because the court has dismissed class plaintiffs' federal claims, the only claims remaining arise out of state statutes and state common law. Pursuant to 28 U.S.C. § 1367(c)(2)-(3), the court declines to exercise supplemental jurisdiction over these state claims because state law issues substantially predominate over the now dismissed federal claims. Therefore, the court grants defendant's motions to dismiss class plaintiffs' complaints.

VII. CONCLUSION

For the reasons stated, defendant's motion to dismiss plaintiff's claims is granted in part and denied in part. Defendant's motions to dismiss class plaintiffs' claims are granted. An order shall issue consistent with this memorandum opinion.

1998 WL 883469 (D.Del.), 1999-1 Trade Cases  P 72,457

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
1991 WL 86937 (E.D.Pa.)
**(Cite as: 1991 WL 86937 (E.D.Pa.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
HOUGH/LOEW ASSOCIATES, INC.,
v.
CLX REALTY CO. and Martin H. Fowler.
**Civ. a. No. 90-5859.**

May 21, 1991.

John F. Stoviak, Paula D. Shaffner, Saul, Ewing, Remick & Saul, Philadelphia, Pa., for plaintiff.

Gerald F. McCormick, Duane, Morris & Heckscher, Philadelphia, Pa., and Wayne, Pa., for defendants.

Gordon Gelfond, Margolis, Edelstein, Scherlis, Sarowitz & Kraemer, Philadelphia, Pa., for third-party defendant.

*Memorandum/Order*

LOUIS H. POLLAK, District Judge.

**\*1** Plaintiff Hough/Loew Associates (Hough/Loew) seeks reconsideration of this court's order of March 29, 1991, granting defendant CLX Realty Company's (CLX's) motion to dismiss Count I of the complaint, which undertakes to set forth a cause of action for "tortious interference with prospective contractual relations." Dismissal was granted because plaintiff failed to allege the existence of a prospective contractual relationship which could be interfered with. As I observed in the memorandum accompanying my March 29 order, pp. 6- 7, though

[t]he complaint does suggest that Hough/Loew ... hoped to form and consummate a construction contract [on Subdivided Lot No. 5].... There is no allegation included in the complaint to the effect that any preliminary negotiations about Subdivided Lot No. 5 were under way between Hough/Loew and Scott or between Hough/Loew and any other potentially contracting party.

Hough/Loew moves for reconsideration on the ground that further discovery has substantiated its

claim that a potential construction contract existed. According to Hough/Loew, discovery now shows that negotiations for a contract involving the sale of Subdivided Lot No. 5 were under way between Scott and one of Hough/Loew's agents (Looker, Lees, and Melcher, Inc., a real estate brokerage firm), which involved some contemplation of the possibility of a subsequent Hough/Loew-Scott construction contract on the premises of that lot, a possibility which was foreclosed by the last minute interference of CLX. In response, CLX contends that, according to the evidence of record accumulated thus far, (1) Hough/Loew never really had the "slightest chance" of entering into a subsequent construction contract with Scott, (2) Hough/Loew waived its right to pursue a subsequent construction contract, and (3) nothing has ever prevented nor now prevents Hough/Loew from entering into an independent construction contract with Scott.

Whether Hough/Loew should prevail on its claim of tortious interference with contract is not the question before me now. All I need consider at this stage is whether it is reasonable for Hough/Loew to include such a cause of action in its complaint, regardless of whether such a claim will ultimately be vindicated by the evidence. CLX will have the opportunity to rehearse its objections in a motion for summary judgment. For present purposes, I am persuaded that Hough/Loew's tortious interference claim should not be dismissed from this case.

For the foregoing reasons, it is hereby ORDERED that Hough/Loew's motion for reconsideration is GRANTED. That portion of my March 29, 1991 order granting dismissal of Count I is hereby VACATED.

1991 WL 86937 (E.D.Pa.)

**Motions, Pleadings and Filings** (Back to top)

· [2:90CV05859](Docket) (Sep. 11, 1990)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.