Westlaw.

Not Reported in A.2d

2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073
**(Cite as: 2004 WL 2191030 (Del.Super.))**

C

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Superior Court of Delaware.
Lavon PENDER, Plaintiff,
v.
DAIMLERCHRYSLER CORPORATION,
Defendant.
**No. Civ.A.03C12022FSS.**

Submitted April 1, 2004.
Decided July 30, 2004.

Upon Defendant's Motion to Dismiss--Granted.

Renee D. Veney, Kimmel & Silverman, P.C.,
Wilmington, Delaware, for Plaintiff.

Tracy A. Burleigh, Marshall Dennehey Warner
Coleman & Goggin, Wilmington, Delaware, for
Defendant.

OPINION and ORDER

SILVERMAN, J.

**\*1** This case involves an automobile, and alleged
violations of both Delaware and federal, consumer
protection statutes. Plaintiff's car developed a
problem, which persisted almost from when he
bought it until after his extended warranty expired.
After Plaintiff had driven 75,000 miles, and the
warranty ended, Plaintiff filed suit for the car's
contract price plus nearly triple that amount in
statutory damages, $100,000. This decision addresses
when causes of action accrue under various consumer
laws, for statute of limitations purposes.

In Delaware, actions based on statutory violations
are governed by a three-year statute of limitations.
[FN1] Further, actions based on the federal
Magnuson-Moss Act are governed by the four-year
statute of limitations in Delaware's Uniform
Commercial Code, § 2-725(1). Plaintiff's claims
were filed outside all arguably applicable limitations
periods, including strictly hypothetical ones used by
the court merely for argument's sake. Because of this,
and the fact that Plaintiff's warranties are not the kind
that actually extend the statute of limitations,

Plaintiff's claims are barred.

FN1. 10 Del. C. § 8106.

I.

On March 10, 1999, Plaintiff, Lavon Pender,
purchased a new 1999 Jeep Grand Cherokee from
Gambacorta Chrysler Jeep, one of Defendant
DaimlerChrysler's authorized dealers. Along with the
car, Plaintiff acquired a standard warranty providing
that Defendant promised to cover the cost of parts
and labor to repair components defective in material,
workmanship or factory preparation for three years or
36,000 miles, whichever occurred first. Also,
Plaintiff purchased a service contract, effective when
the basic warranty expired. The service contract was
for six years or 75,000 miles, whichever came first,
and provided that Defendant promised to pay the
total cost for parts and labor to correct defects in
materials or workmanship, less a fifty-dollar
deductible per visit.

The car had various problems--the remote in March
1999, ashtray and wiper blades in September 1999,
seat frame in August 2001 and blower fan in January
2002. Each time Plaintiff returned the car to the
dealer. Plaintiff also complained twice about a
stalling problem in July and September, 1999.

More importantly, Plaintiff first encountered what
would become an ongoing idling problem on July 20,
1999. Plaintiff took the car back to the dealer, and
again on October 1, 1999, October 29, 1999,
November 12, 1999 and November 17, 1999. On all
but one occasion the dealer verified that the idling
problem existed and attempted repair. Plaintiff was
never charged for the repairs. Plaintiff complained
again about the idling problem on November 15,
2001, and for the last time on July 8, 2003. By then,
the car was over four years old and it had 74,906
miles. It also still has the idling problem. Presumably,
the 2003 repair visit was meant to establish that the
problem that existed in 1999 and which was worked
on through 2001 was still extant when the warranty
expired.

**\*2** Plaintiff contends that Defendant's failure to
repair the car's defects violates Delaware's
Automobile Warranty Act, and in turn, Delaware's
Consumer Fraud Act, and the federal Magnuson-
Moss Act. Plaintiff further contends that, as a result

Not Reported in A.2d
2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073
**(Cite as: 2004 WL 2191030 (Del.Super.))**

of Defendant's misrepresentations about the car and attendant warranty, Defendant violated the Deceptive Trade Practices Act. Defendant counters simply that all of Plaintiff's claims are barred by applicable statutes of limitations. According to Defendant, Plaintiff filed suit after any remotely conceivable limitations period. Plaintiff retorts that Defendant's repeated attempts to fix the car tolled the limitations period. According to Plaintiff the limitations period did not begin to run until the last repair attempt or the warranty's expiration in 2003. Thus, Plaintiff had until 2006 or 2007 to file suit concerning the problem that appeared in 1999.

## II.

Procedurally, on December 2, 2003, Pender filed a complaint against DaimlerChrysler alleging, as mentioned, violations of four statutes in connection of his purchase of the Jeep Grand Cherokee: Delaware's Automobile Warranty Act, [FN2] or Lemon Law, Consumer Fraud Act [FN3] and Deceptive Trade Practices Act, [FN4] and the federal Magnuson-Moss Act. [FN5] Chrysler filed a motion to dismiss on January 2, 2004 and Pender answered on January 20, 2004. Oral argument on the motion to dismiss was held on February 19, 2004. Subsequently, on March 11, 2004, Chrysler filed an opening brief in support of its motion. On March 26, 2004, Pender filed an answering brief in opposition to Chrysler's motion, and Chrysler completed the motion practice by filing a reply brief on April 1, 2004.

FN2. 6 *Del. C.* § 5001, *et seq.*

FN3. 6 *Del. C.* § 2511, *et seq.*

FN4. 6 *Del. C.* § 2531, *et seq.*

FN5. 15 U.S.C. § 2301, *et seq.*

## III.

Under Superior Court Civil Rule 12(b)(6), a motion to dismiss is appropriate where plaintiff has failed to state a claim upon which relief can be granted. All allegations made in the complaint must be accepted as true. [FN6] The complaint can only be dismissed if it is without merit as to a matter of fact or law. [FN7] A motion to dismiss must be denied, however, if plaintiff may recover under any reasonably conceivable set of circumstances. [FN8] Where a defendant supports its pleading with affidavits and depositions, the motion to dismiss is treated as a motion for summary judgment and disposed of as provided in Rule 56. [FN9]

FN6. *American Insurance Company v. Material Transit, Incorporated,* 446 A.2d 1101, 1102 (Del.Super.Ct.1982).

FN7. *Diamond State Telephone Company v. University of Delaware,* 269 A.2d 52, 58 (Del.1970).

FN8. *Spence v. Funk,* 396 A.2d 967, 968 (Del.1978)(citing *Klein v. Sunbeam Corporation,* 94 A.2d 385, 391 (Del.1952)).

FN9. *Shultz v. Delaware Trust Company,* 360 A.2d 576, 578 (Del.Super.Ct.1976)(citing *Brown v. Colonial Chevrolet Company,* 249 A.2d 439, 441-42 (Del.Super.Ct.1968)).

## IV.

As mentioned, the issue is whether Plaintiff's claims are barred by the statutes of limitations, three years as to Plaintiff's state law-based claims and four years as to his Magnuson-Moss Act claim. Each of the claims is indeed barred. The "Lemon Law," Consumer Fraud Act and Deceptive Trade Practices Act claims are barred by § 8106 of Title 10, and the Magnuson-Moss Act claim by § 2-725(1) of Title 6. Because the warranty is for repair or replacement, and not future performance, the four-year limitations period in § 2-725(1) applies and is not extended under the "future performance" exception.

### A. Three-Year Statute of Limitations
**\*3** Section 8106 states:
   ... no action based on a statute ... shall be brought after the expiration of 3 years from the accruing of the cause of such action.... [FN10]

FN10. 10 *Del. C.* § 8106. See generally *Butler v. Butler,* 222 A.2d 269, 272 (Del.1966)(confining "action based on a statute" to actions to recover money or property where new right created by statute).

The three-year period begins to run when a cause of action accrues . [FN11] A cause of action accrues on the date plaintiff can first bring an action. [FN12] Put another way, the limitations period "begins to run at the time of the wrongful act." [FN13]

FN11. *Dofflemyer v. W.F. Hall Printing Company,* 558 F.Supp. 372, 379 (D.Del.1983).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073
**(Cite as: 2004 WL 2191030 (Del.Super.))**

FN12. *Curran v. Time Insurance Company,* 644 F.Supp. 967, 972 (D.Del.1986). See generally 6 *Del. C.* § 5002 (Lemon Law duty to repair applies only after consumer reports nonconformity to seller within one year of automobile's delivery).

FN13. *David B. Lilly Company, Incorporated v. Fisher,* 18 F.3d 1112, 1117 (3d Cir.1994) (citations omitted).

Plaintiff's Lemon Law claim most likely accrued on July 20, 1999, the date he reported the idling problem to the dealer. Before then, Plaintiff had not experienced major problems with the car and he could not have thought bringing suit would be necessary. When Plaintiff first reported the idling problem, however, he triggered the Lemon Law and the three-year limitations period under § 8106 began to run. Plaintiff's suit, filed December 2, 2003, is outside the limitations period by more than a year.

Plaintiff's Consumer Fraud Act cause of action is similarly barred by the statute of limitations. A violation of the Lemon Law automatically constitutes a violation of the Consumer Fraud Act. [FN14] Assuming that Defendant violated the Lemon Law, Plaintiff's July 20, 1999 Lemon Law accrual date is the Consumer Fraud Act accrual date. Again, because Plaintiff filed suit on December 2, 2003, he was late by more than a year.

FN14. 6 *Del. C.* § 5009.

Plaintiff's Deceptive Trade Practices Act cause of action is likewise barred, but in a slightly different time frame. Plaintiff alleges the statute was violated when Defendant made incorrect representations about the vehicle's characteristics and quality, and that repairs would be made under the warranty. Those representations are generally made at the time of purchase. The wrongful act occurred, and the statute of limitations began to run, then, on the car's purchase date, March 10, 1999. Moreover, the idling problem, reported by Plaintiff on July 20, 1999, implicitly contradicted representations concerning quality made by Defendant when the car was sold. Therefore, at the latest, Plaintiff was required to bring this claim by July 20, 2002.

**B. "Time of Discovery" Rule Inapplicable**
Even a gratuitous, lenient application of the Lemon Law does not save Plaintiff. Under the law:
   (a) It shall be presumed that a reasonable number of attempts have been undertaken to conform a

new automobile to the manufacturer's express warranty if ...:
(1) [s]ubstantially the same nonconformity has been subject to repair or correction 4 or more times by the manufacturer, its agents or its dealers and the nonconformity continues to exist.... [FN15]

FN15. 6 *Del. C.* § 5004.

Here, Plaintiff returned the car to the dealer five times between July 20, 1999 and November 17, 1999 for the idling problem. After the fifth failed repair attempt, if not before, Plaintiff undeniably knew that the car's idling problem was a continually existing nonconformity.

Relying on *Pack & Process, Incorporated v. Celotex Corporation,* [FN16] Plaintiff essentially argues that the "time of discovery" rule applies to his three, state law-based claims. That rule provides for tolling of the statute of limitations where "an injury was inherently unknowable" and the "injured party ... was blamelessly ignorant." [FN17] In *Pack & Process,* the injury was inherently unknowable to plaintiff. There, defendant roof manufacturer's agents, using their expertise, were contractually required to determine whether a defect existed. Because plaintiff in *Pack & Process* did not have expertise, any injury there was inherently unknowable to plaintiff. Further, plaintiff was deemed blamelessly ignorant of the problem's severity because defendant represented that necessary repairs were a result of ordinary wear and tear when in fact they were not.

FN16. 503 A.2d 646 (Del.Super.Ct.1985).

FN17. *Id.* at 650.

*4 Unlike *Pack & Process,* the injury here was not inherently unknowable and Plaintiff was not blamelessly ignorant. On the contrary, Plaintiff's repeatedly returning the car to the dealer undeniably establishes that Plaintiff was aware of the nonconformity, before the fifth repair attempt. But, even assuming *arguendo* that the statute of limitations did not begin to run until after the fifth repair attempt on November 17, 1999, Plaintiff *still* missed the deadline by more than a year.

**C. Magnuson-Moss Act**
Remaining is Plaintiff's Magnuson-Moss Act claim. That Act, *inter alia,* is tied to Delaware's version of the Uniform Commercial Code, [FN18] and claims brought under the Act are governed by the statute of limitations in the UCC. [FN19] Section 2-725 of Title

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                Page 4
2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073
**(Cite as: 2004 WL 2191030 (Del.Super.))**

6 states:

> FN18. 6 *Del. C.* § 1-101, *et seq.*

> FN19. *Dalton v. Ford Motor Company,* Del.Super., C.A. No. 00C-09-155, Carpenter, J. (Feb. 28, 2002).

(1) An action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued ...
(2) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made.... [FN20]

> FN20. 6 *Del. C.* § 2-725. See also *Wilson v. Class,* 1992 WL 68920, at *3 (Del.Super.)(warranty limitations period accrues on date defendant charged with breach tenders delivery of goods).

The "time of discovery" rule [FN21] has not been extended to warranty cases. [FN22] Rather, the purchase date is paramount. [FN23]

> FN21. See generally *Kaufman v. C.L. McCabe & Sons, Incorporated,* 603 A.2d 831, 835 (Del.1992)(where injury is "inherently unknowable" and plaintiff is "blamelessly ignorant," limitation period does not begin running until plaintiff has reason to know wrong committed).

> FN22. *S & R Associates, L.P. v. Shell Oil Company,* 725 A.2d 431, 435 (Del.Super.Ct.1998)(citing *Elmer v. Tenneco Resins, Incorporated,* 698 F.Supp. 535, 539 (D.Del.1988)).

> FN23. *S & R Associates,* 725 A.2d at 435 (citing *Harvey v. Sears, Roebuck & Company,* 315 A.2d 599, 601 (Del.Super.Ct.1973)).

Plaintiff's Magnuson-Moss Act claim is barred by the statute of limitations. Defendant tendered delivery of Plaintiff's car on March 10, 1999. Thus, any breach occurred on that date. Plaintiff was required under 6 *Del. C.* § 2-725 to file an action by March 10, 2003. The "time of discovery" rule does not apply to this, a warranty case. But even if the rule applied, Plaintiff would still have missed the deadline. Using *Pack & Process's* reasoning, the statute of limitations would have begun to run on this claim November 17,

1999. Plaintiff filed suit more than two weeks after November 17, 2003, the hypothetical deadline.

D. "Future Performance" Exception Inapplicable
Plaintiff's final argument, that this case falls within the "future performance" exception to § 2-725, is equally unavailing. Section 2-725, subsection 2, states:

> ... where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered. [FN24]

> FN24. 6 *Del. C.* § 2-725(2).

*Ontario Hydro v. Zallea Systems, Incorporated* [FN25] is helpful. In that case, a contract between buyer and seller for expansion joints included language requiring that, if at any time up to twelve months following acceptance of the equipment by the buyer the equipment should succumb to defects, the seller had to repair all defects. *Ontario Hydro* held that this was a repair or replacement warranty, not a future performance warranty. Essentially, a future performance warranty must "expressly provide some form of guarantee that the product will perform in the future as promised." [FN26] Conversely, a repair or replacement warranty merely provides that "if a product fails or becomes defective, the seller will replace or repair" the product. [FN27] Distinguishing between the two, a repair or replacement warranty "merely provides a *remedy* if the product becomes defective," while a future performance warranty "*guarantees the performance* of the product itself...." [FN28]

> FN25. 569 F.Supp. 1261 (D.Del.1983).

> FN26. *Id.* at 1266.

> FN27. *Id.*

> FN28. *Id.*

**5** The warranties here are repair or replacement warranties. Even though Plaintiff purchased an extended, service contract, the "future performance" exception is inapplicable. Under the limited express warranty of three years or 36,000 miles, whichever occurred first, Defendant agreed to cover the cost of parts and labor needed to repair any defective, covered component. Similarly, under the service contract of six years or 75,000 miles, whichever occurred first, Defendant agreed to pay the total cost

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073
**(Cite as: 2004 WL 2191030 (Del.Super.))**

to correct any defective, covered component. The warranties do not include performance assurances by Defendant or guarantees that repairs will be unnecessary. Plaintiff's claims are barred by the statute of limitations as explained above.

## V.

In closing, the court understands the dilemma with which Plaintiff was confronted. Anyone who has owned a car with an ongoing problem appreciates the inconvenience and frustration Plaintiff experienced. Deciding to forsake the service department and go to court is daunting. Nevertheless, the statute of limitations does not let consumers have it both ways. Absent misrepresentations or fraud, which are not alleged here, plaintiffs cannot wait five years and put 75,000 miles on a "lemon" before filing suit. They must go to court in the proper time frame.

## VI.

For the foregoing reasons, Defendant's motion to dismiss is *GRANTED.*

IT IS SO ORDERED.

2004 WL 2191030 (Del.Super.), 54 UCC Rep.Serv.2d 1073

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d
2004 WL 2694916 (Del.Ch.)
(Cite as: 2004 WL 2694916 (Del.Ch.))

Page 1

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Sheldon H. SOLOW, Plaintiff,
v.
ASPECT RESOURCES, LLC, Aspect Energy, LLC, Aspect Management Corp., and Alex M. Cranberg, Defendants.
No. Civ.A. 20397.

Submitted July 30, 2004.
Decided Oct. 19, 2004.

Jesse A. Finkelstein, Richard P. Rollo, and Brock E. Czeschin, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Richard Ben-Veniste, Lily Fu Swenson, and Craig W. Canetti, of Mayer, Brown, Rowe & Maw L.L.P., Washington, D.C., for Plaintiff, of counsel.

Jon E. Abramczyk and Susan D. Wood, of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Michael Gallagher and Jonathon D. Bergman, of Davis Graham & Stubbs LLP, Denver, Colorado, for Defendants, of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

**\*1** This case involves claims that arise from a partnership between plaintiff Sheldon H. Solow ("Solow") and defendant Aspect Resources, LLC ("Aspect Resources"). Defendants Aspect Energy, LLC ("Aspect Energy") was, at all relevant times, between a 100% and 50% owner of Aspect Resources. Aspect Management Corp. ("Aspect Management") is the company responsible for employing all of Aspect Energy's personnel, and is funded by Aspect Energy. Defendant Alex M. Cranberg ("Cranberg") has been at all relevant times the controlling shareholder of all of the Aspect entities. Solow became the limited partner and Aspect Resources became the general partner of the Aspect/SHS Limited Partnership (the "Partnership").

The Partnership's purpose was to use three-dimensional seismic technology ("3D seismic") to discover and develop oil and gas producing properties. The Partnership has been largely unsuccessful, and Solow has brought this suit alleging breaches of contract and fiduciary duty, aiding and abetting a breach of fiduciary duty, as well as claims for accounting and fraudulent inducement. Much of Solow's allegations and argument contrast the dismal performance of the Partnership with a later venture by the Aspect entities, known as the 95 Program, which became very lucrative.

Defendants have moved to dismiss certain claims and for summary judgment on others. I will group the motions as follows: 1) to dismiss the fraudulent inducement claim (Count XI) as against all defendants; 2) to dismiss the breach of contract claims (Counts II, IV, VI, and VIII) as against defendants Alex M. Cranberg ("Cranberg") and Aspect Management; 3) to dismiss four of the breach of fiduciary duty claims (Counts III, V, VII, and IX) as against all defendants; 4) for summary judgment in favor of defendants and against Solow on claims relating to the 1995 or Phase II program (Counts VI & VII); and 5) for summary judgment against Solow on his claim of constructive trust (Count XIII). The First Amended Complaint also pleads claims for accounting (Count I), breach of fiduciary duty (Count X), and aiding and abetting a breach of fiduciary duty (Count XII), which are not addressed by the instant motion.

For reasons that are explained in more detail below, I grant the motions to dismiss, but I deny the motions for summary judgment.

I. STATEMENT OF FACTS

In May 1993, plaintiff Solow was solicited by the defendants [FN1] to invest in a venture that would use computer-aided, three-dimensional seismic technology to identify properties with potential for oil and gas production. In the course of this solicitation, defendants allegedly made a series of false statements to Solow designed to induce him to enter into a partnership agreement. These statements were contained in an offering memorandum known as Aspect Management's "Proposal for Investment in High Technology Petroleum Exploration" ("Proposal"). [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2694916 (Del.Ch.)
(Cite as: 2004 WL 2694916 (Del.Ch.))

FN1. Neither the First Amended Complaint nor the briefing clarifies whether it was defendant Cranberg that engaged in the solicitation or whether it was some other agent on behalf of any or all of the various defendant Aspect entities.

FN2. Aff. of Jon E. Abramczyk at Tab 1, with Bates numbers A73119– A73180. Because this document is integral to and incorporated into the complaint that quotes extensively from it, the Court may appropriately consider it on a motion to dismiss. *See Vanderbilt Income and Growth Assoc. v. Arvida/JMB Managers, Inc., 691 A.2d 609, 612-13 (Del.1996); In re Santa Fe Pac. Corp. S'holder Litig., 669 A.2d 59, 69-70 (Del.1995); Orman v. Cullman, 794 A.2d 5, 15-16 (Del. Ch.2002).*

On December 28, 1993, Solow and Aspect Resources, LLC entered into a partnership agreement in which Aspect Resources was the sole general partner, with a 1% interest in the partnership's assets and Solow was the sole limited partner, with a 99% interest in the partnership's assets.

**\*2** The partnership agreement provided that in the event that Aspect Resources were to conduct future 3D seismic programs, Solow would have a right to participate in them. Solow alleges that Aspect Resources began a new program in 1995 (the "95 Program") without first offering him the opportunity to invest in it. Defendants dispute this assertion and contend that Solow was notified numerous times with respect to the 95 Program, and that because Solow did not invest within 30 days, Solow waived his right to participate in the 95 Program.

## II. STANDARD OF REVIEW--RULE 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6), the Court considers only the allegations in the First Amended Complaint, and any documents incorporated by reference therein. [FN3] For this purpose, the Court accepts as true all well-pled factual allegations contained in the First Amended Complaint, [FN4] but conclusory statements--those unsupported by well-pled factual allegations--will not be accepted as true. [FN5] The Court will, however, draw all inferences logically flowing from the First Amended Complaint in favor of the plaintiffs but only if such inferences are reasonable. [FN6] Furthermore, the Court will not dismiss any claim under Rule 12(b)(6) unless it appears to a reasonable certainty that the plaintiffs cannot prevail on any set of facts that might be proven to support the allegations in the First Amended Complaint. [FN7]

FN3. *See* n. 2.

FN4. *See Orman, 794 A.2d at 15.*

FN5. *Grobow v. Perot, 539 A.2d 180, 187 (Del.1988)* (stating that "conclusory allegations of fact or law not supported by allegations of specific fact may not be taken as true").

FN6. *See id.* (stating that the Court "need not ... draw all inferences from [the allegations] in plaintiffs' favor unless they are reasonable inferences").

FN7. *See Rabkin v. Philip A. Hunt Chem. Corp., 498 A.2d 1099, 1104 (Del.1985).*

## III. ANALYSIS--RULE 12(b)(6)
### A. Count XI--Fraudulent Inducement

Count XI alleges that the defendants fraudulently induced Solow to enter the Partnership by misrepresenting the defendants' experience with 3D seismic, and that Solow justifiably relied on that misrepresentation to his detriment. The elements of a claim for fraud in Delaware are: 1) a false statement, generally of fact, made by the defendant; 2) who knew or believed that statement to be false at the time it was made, or that defendant made the statement with reckless indifference to the truth; 3) the statement was made with the intent that plaintiff act or refrain from acting as a result of the statement; 4) plaintiff justifiably relies on that statement in his action or inaction; and 5) plaintiff is damaged as a result of that reliance. [FN8] In addition, under Court of Chancery Rule 9(b), these elements must be pled with particularity.

FN8. *Gaffin v. Teledyne, Inc., 611 A.2d 467, 472 (Del.1992); Stephenson v. Capano Development, Inc., 462 A.2d 1069, 1074 (Del.1983); H-M Wexford LLC v. Encorp. Inc., 832 A.2d 116, 144 (Del. Ch.2003); York Lingings v. Roach, 1999 WL 608850 at \*3 (Del. Ch .).*

Defendants argue that the fraudulent inducement claim must be dismissed because: 1) the complaint does not allege that the statements were false when made; 2) that cautionary statements in the solicitation documents precluded plaintiff from justifiably relying

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2694916 (Del.Ch.)
**(Cite as: 2004 WL 2694916 (Del.Ch.))**

upon those statements; 3) that statements regarding defendants' skill, knowledge, and experience are mere puffery and, therefore, not actionable; and 4) plaintiff's fraud claim, if any claim is stated, is one for breach of contract rather than fraud. Defendants also argue that Aspect Energy did not make any of the alleged fraudulent statements, and therefore should be dismissed as to this claim. Furthermore, defendants argue that, in any event, the three-year statute of limitations bars any claim for fraudulent inducement.

**\*3** The motion to dismiss Count XI is granted because plaintiff fails to allege adequately facts that, if true, would prove that defendants made false statements regarding their experience with 3D seismic. Plaintiff alleges that the defendants made false representations "regarding the extent of defendants' experience with the use and application of 3D seismic." [FN9] Looking at the Proposal, as it is integral to the First Amended Complaint, the Proposal contains many representations about the experience of Cranberg and Dirk W. McDermott ("McDermott"), [FN10] who was Vice President of Aspect Management in 1993. [FN11] The resumes of both Cranberg and McDermott were also attached to the Proposal. [FN12]

> FN9. Pl.'s Opp. To Defs.' Mtn. To Dismiss and for Partial Summ. J. Upon Certain Claims Asserted in First Am. Compl. at 9-10.

> FN10. McDermott is not a named defendant.

> FN11. These representations include: "Aspect has the skills, experience, and resources to successfully and quickly capitalize on the 3D opportunity. Aspect's principals have outstanding oil and gas investment records, in-depth knowledge of the details of oil and gas investing, hands-on experience in 3D exploration, and extensive relationships with high quality industry partners." Proposal at A73121. "Hands-on oil and gas industry experience: Aspect's principals are cognizant of the land, engineering and other pitfalls which must be taken into account when assessing the quality of one opportunity against another." *Id.* at A73124. "Specialized 3D technical expertise and experience: Aspect's principals have seen the results of more 3D programs than almost any other industry independent." *Id.* "Aspect's principals have established a

long track record of excellence in managing capital investment in the oil and gas industry...." *Id.* "Aspect's principals have operating experience in 3D exploration, in-depth exposure to the details of oil and gas investing, excellent relationships with industry leaders, and outstanding records of return." *Id.* at A73126.

> FN12. Proposal at A73176-79. A narrative of some of this experience can be found in the Proposal itself at A73125.

Plaintiff alleges that these statements were false when made by saying that, "[t]he falsity of the [representations regarding defendant's experience with 3D seismic], as well as the defendants' fraudulent intent, is revealed by, among other things, the stark contrast between the performance of the Partnership and that of the 95 Program." [FN13] Even drawing all reasonable inferences in favor of plaintiff, poor performance in one venture and better results in a later venture does not reasonably imply that defendants made false representations about their experience with 3D seismic, especially considering that plaintiff acknowledges "the vagaries of oil and gas exploration." [FN14]

> FN13. First Am. Compl. ¶ 172.

> FN14. Pl.'s Opp. To Defs.' Mtn. To Dismiss and for Partial Summ. J. Upon Certain Claims Asserted in First Am. Compl. at 17.

Plaintiff does not allege that Cranberg and McDermott lied on their resumes in that they did not work for the entities for which they purport to have worked. [FN15] There are no factual allegations that the extent of their experience in oil and gas exploration was inflated in the Proposal. Without more, plaintiff has failed to allege adequately, especially given the heightened pleading standard under Rule 9(b), [FN16] that defendants' statements regarding their experience with 3D seismic were false when made. [FN17]

> FN15. The First Amended Complaint contains no factual allegations regarding the falsity of these statements, but in Solow's brief at page 14, he attempts to impugn the truthfulness of the Proposal's statements with respect to Cranberg's and McDermott's work experience by characterizing it as "putative work experience." Still, without more, this is not an allegation of fact that

Not Reported in A.2d                                                                 Page 4
2004 WL 2694916 (Del.Ch.)
**(Cite as: 2004 WL 2694916 (Del.Ch.))**

would cause this claim to survive the motion to dismiss.

FN16. *See Anglo Am. Sec. Fund L.P. v. S.R. Global Int'l Fund, L.P.,* 829 A.2d 143 (Del. Ch.2003); *H-M Wexford LLC,* 832 A.2d at 145.

FN17. If plaintiff's argument were translated into the legal realm, it would read something like this: Party visits Attorney seeking redress for an injury. Attorney represents to Party that he has the "skills, experience, and resources" to successfully try Party's case. Party retains Attorney, and Party's case goes to trial, where Party does not prevail. Party later discovers that Attorney has since tried a similar case, and succeeded in obtaining a substantial judgment for that plaintiff. Party then sues Attorney claiming that Attorney fraudulently induced Party to retain Attorney by way of Attorney's statements regarding his experience. To demonstrate the falsity of Attorney's statements, Party does not allege how few trials Attorney has conducted, or any lack of legal education or experience, but instead merely alleges in a conclusory manner that Attorney's statements must have been false because Party lost his case and another plaintiff subsequently represented by Attorney prevailed in that other matter, presumably because Attorney acquired the necessary skills and expertise while representing Party. This is clearly a *non sequitur,* and Solow's allegations are similarly flawed.

Inadequate pleading is not the only ground upon which the fraudulent inducement claim is infirm. First, to the extent that plaintiff is arguing that any statements of opinion rise to the level of a fraudulent representation, statements such as, "Aspect has the skills, experience, and resources to successfully and quickly capitalize on the 3D opportunity," [FN18] are mere puffery and cannot form the basis for a fraud claim. [FN19]

FN18. Proposal at A73121.

FN19. *See Kronenberg v. Katz,* 2004 WL 1152282 at *9 (Del. Ch.) (statements of principal's experience and expertise were mere puffery, in contrast to omissions of his criminal background, which were material); *Great Lakes Chem. Corp. v. Pharmacia*

*Corp.,* 788 A.2d 544, 554 ("Predictions about the future cannot give rise to actionable common law fraud. Nor can expression of opinion.") (citations omitted); *In re IBP, Inc. S'holders Litig.,* 789 A.2d 14, 74 (Del. Ch.2001) (applying New York law, the Court held that expressions of confidence of future projects are mere puffery).

Second, plaintiff has failed to "plead[ ] *specific facts* that, if true, would establish tolling" [FN20] of the three-year statute of limitations applicable to fraud claims. [FN21] Here, again, plaintiff merely pleads the facts that the venture in which Solow was involved failed, whereas the later venture by defendants was successful, and that Solow could not have known of defendants' fraudulent behavior until the success of the later venture was made known.

FN20. *In re MAXXAM, Inc./Federated Dev. S'holders Litig.,* 1995 WL 376942 at *6 (Del. Ch.) (emphasis added).

FN21. 10 *Del. C.* § 8106.

Solow does not allege that he requested that any of the defendants provide references or that they verify their previous employment. Solow did not make any other request that a reasonable investor with doubts about the expertise and experience might make in regards to those persons with whom that investor will entrust more than $1 million. Nor does Solow allege that his requests for information in this area were rebuffed. Having failed to do so, Solow cannot in good faith plead that he "could not through the exercise of reasonable diligence have discovered" the alleged falsity of defendants' representations regarding their expertise and experience before December 2001. [FN22]

FN22. First Am. Compl. ¶ 176.

*4 Therefore, plaintiff has not pled facts that, if true, would establish that the effect of the statute of limitations should be tolled. The fraudulent inducement claim not only fails to state a claim, but even if it did, the claim would be barred as a matter of law because it was not brought within the applicable limitations period. [FN23]

FN23. Solow's arguments with respect to continuing violations of the partnership agreement sound in contract, not in fraud, and therefore do not provide a basis upon

Not Reported in A.2d
2004 WL 2694916 (Del.Ch.)
(Cite as: 2004 WL 2694916 (Del.Ch.))

Page 5

which to toll the statute of limitations for fraudulent inducement.

*B. Counts II, IV, VI, and VIII--Breach of Contract*

In Counts II, IV, VI, and VIII, Solow alleges that the defendants breached the partnership agreement in various ways, including improper reinvestment of partnership revenue, unapproved sales of partnership property, failure to offer Solow the opportunity to participate in the 95 Program, and the unauthorized substitution of the general partner. Defendants Cranberg and Aspect Management have moved to dismiss the breach of contract claims (Counts II, IV, VI, and VIII) as to them, as they were not parties to the partnership agreement and are not in privity with Solow. [FN24] There are no allegations to the contrary, and plaintiff does not dispute this contention in his brief.

> FN24. *See Summit Investors II, L.P. v. Sechrist Industries, Inc.,* 2002 WL 31260989 at *5 (Del. Ch.) (defendants that were not parties to the contract could not be sued for breach of that contract).

Plaintiffs' only argument is that because Cranberg "dominated and controlled" each of the Aspect Entities, discovery should be permitted to determine whether Cranberg or Asset Management have contractual liability to Solow. [FN25] Solow advances no authority for his position. Had Solow pled a claim for tortious interference with contract, his argument might prevail. In the absence of such a claim, however, Solow has pled no facts, nor argued any law, that would indicate that a person or entity that is not a party to a contract could be liable for a breach thereof. Therefore, the motion to dismiss Counts II, IV, VI, and VIII as to defendants Cranberg and Aspect Management is granted.

> FN25. Pl.'s Opp. To Defs.' Mtn. To Dismiss and for Partial Summ. J. Upon Certain Claims Asserted in First Am. Compl. at 23 n. 6.

*C. Counts III, V, VII, and IX--Breach of Fiduciary Duty*

Solow alleges in Counts III, V, VII, and IX that the same allegedly bad acts discussed in Counts II, IV, VI, and VIII constitute breaches of fiduciary duty. Defendants have moved to dismiss Counts III, V, VII, and IX for breaches of fiduciary duty because they are duplicative of Counts II, IV, VI, and VIII for

breach of contract. Because of the primacy of contract law over fiduciary law, if the duty sought to be enforced arises from the parties' contractual relationship, a contractual claim will preclude a fiduciary claim. [FN26] This manner of inquiry permits a court to evaluate the parties' conduct within the framework created and crafted by the parties themselves. [FN27] Because the four fiduciary duty counts in the complaint arise not from general fiduciary principles, but from specific contractual obligations agreed upon by the parties, the fiduciary duty claims are precluded by the contractual claims.

> FN26. *Gale v. Bershad,* 1998 WL 118022 at *5 (Del. Ch.); *see Madison Realty Partners 7, LLC v. AG ISA, LLC,* 2001 WL 406268 at *6 (Del. Ch.); *Winston v. Mandor,* 710 A.2d 835, 841-42 (Del. Ch.1997). *See also RJ Assoc., Inc. v. Health Payors' Org. Ltd. P'ship,* 1999 WL 550350 at *9-10 (Del. Ch.). *RJ Assoc., Inc.* held that the fiduciary duty claim was not precluded by the contract claim because the contract claim was based on a provision in the partnership agreement providing that the defendant general partner "shall be under a fiduciary duty to conduct and manage the affairs for the Partnership," and therefore, a determination that a fiduciary duty was breached would be a necessary condition precedent to concluding whether that particular contractual provision was breached. *Id.*

> FN27. *Universal Studios, Inc. v. Viacom, Inc.,* 705 A.2d 579, 594- 95 (Del. Ch.1997).

Count III for unauthorized reinvestment of partnership revenue into the partnership is not an action that inherently would be a breach of a fiduciary duty. It is, however, alleged in the complaint that the partnership agreement expressly provides that Solow can terminate the Partnership's right to reinvest his portion of the Partnership's revenues. [FN28] Therefore, Count III is a claim sounding in contract law, not in fiduciary law, and the fiduciary claim is superfluous. [FN29]

> FN28. Am. Compl. ¶¶ 90-91.

> FN29. Article 3.1 of the partnership agreement, which according to the Amended Complaint, "expressly imposes upon Aspect Resources a fiduciary duty and obligation to use its reasonable business judgment to conduct the affairs of the Partnership" does

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 2694916 (Del.Ch.)
**(Cite as: 2004 WL 2694916 (Del.Ch.))**

not change this result because the alleged reinvestment is not inherently a breach of fiduciary duties, nor are the other allegations making up Counts V, VII, and IX. *Id.* at ¶ 87.

**\*5** The analysis of Count V is identical. The sale by the general partner of partnership property worth greater than \$50,000 is not inherently a breach of fiduciary duty. Because a specific contractual provision allegedly addresses this conduct, the conduct should be analyzed under contract law. [FN30]

> FN30. *Id.* at ¶ 111. Furthermore, Solow has not alleged that the sales were of all or substantially all of the partnership's assets, which might have fiduciary implications independent of the partnership agreement.

Again, Count VII is the same. A general partner's beginning of a second venture without the limited partner is not inherently a breach of fiduciary duty, and Solow has not pled that the alleged failure to offer him the opportunity to participate in the 95 Program constituted usurpation of a partnership opportunity. The partnership agreement allegedly requires Aspect Resources to offer Solow the opportunity to participate in future projects. [FN31] Therefore, Aspect Resources' alleged failure to do so should be analyzed under the partnership agreement.

> FN31. *Id.* at ¶ 131.

Count IX is yet another example of this principle. Article 8.2 of the partnership agreement allegedly prohibits substitution of the general partner. [FN32] Solow alleges that Aspect Energy was substituted as the *de facto* general partner, and therefore, Article 8.2 was breached. A breach of Article 8.2 would be a breach of the contract, not of a fiduciary duty.

> FN32. *Id.* at ¶ 152.

Therefore, because all four fiduciary duty counts are duplicative of the contractual claims, [FN33] and because the claims arise from the partnership agreement instead of general fiduciary principles, the fiduciary claims are precluded by the contract claims. [FN34]

> FN33. Indeed, in the Amended Complaint, the contract and fiduciary claims are pled in almost identical terms, with large portions of the contract claims merely copied and pasted

into the fiduciary claims. Pleading in this manner almost invariably leads to the result I have reached here. *See* [In re GM Class H S'holders Litig.,](#) 734 A.2d 611, 619- 20 (Del. Ch.1999).

> FN34. Nor can these claims exist, as Solow argues, in the alternative. That argument was made to the [Madison Realty Partners 7, LLC Court, and was rejected.](#) 2001 WL 406268 at *6.

## IV. STANDARD OF REVIEW AND ANALYSIS--RULE 56

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." [FN35] In ruling on the motion, the Court must view the facts in the light most favorable to the non-moving party, and make all reasonable inferences in favor of the non-moving party. [FN36]

> FN35. CT. CH. R. 56(c).

> FN36. [Judah v. Del. Trust Co.,](#) 378 A.2d 624, 632 (Del.1977).

Because there are still genuine issues of material fact that are in dispute with respect to whether Solow was offered the opportunity to participate in the 95 Program, summary judgment is inappropriate at this time, and therefore, defendants' motion for summary judgment on Count VI is denied. [FN37] It therefore follows that the motion for summary judgment on Count XIII is also denied.

> FN37. The motion as to Count VII is moot, as I dismissed that claim above.

In support of their motion for summary judgment, defendants have offered the affidavit of defendant Cranberg, who states that he and other Aspect Resources personnel met with Solow's agents in New York City on or about April 20, 1995 to discuss the 95 Program (or Phase II as defendants call it). Solow, on the other hand, states in the Amended Complaint that he was never offered the opportunity to participate in the 95 Program. In addition to the dueling allegations with respect to the offering of the 95 Program, both parties offer certain memoranda as evidence in support of their positions. All these memoranda indicate at this point is that the issue is

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                    Page 7
2004 WL 2694916 (Del.Ch.)
**(Cite as: 2004 WL 2694916 (Del.Ch.))**

sufficiently unclear as to preclude summary judgment
on this claim. [FN38]

> FN38. *See* Affidavit of Alex M. Cranberg at
> Tabs 2-7; Affidavit of John D. Hendershot at
> Tabs 2-4.

**\*6** The only thing that is currently clear is that if
Solow was offered the opportunity to participate in
the 95 Program, it was accomplished in such an
obscure, obtuse, and obfuscatory manner that Solow
could not have distinguished the solicitation
regarding the 95 Program from the ongoing
operations of Aspect Resources pursuant to the 1993
partnership agreement. Therefore the question
whether Solow received the opportunity to participate
in the 95 Program is disputed and will have to be
resolved at trial. Being that it is unresolved as to
whether Solow was offered the opportunity to
participate in the 95 Program, Solow's claim for a
constructive trust upon the profits made by
defendants as a result of the 95 Program must also
survive the motion for summary judgment. The
motions for summary judgment are denied.

### V. CONCLUSION

Because plaintiff fails to allege facts that, if true,
would prove the falsity of the representations made
by defendants, or alternatively, because the statute of
limitations bars the claim, the motion to dismiss
Count XI is granted. Due to the uncontroverted fact
that neither Cranberg nor Aspect Management were
parties to the partnership agreement, the motion to
dismiss Counts II, IV, VI, and VIII is granted as to
them. The motion to dismiss Counts III, V, VII, and
IX is granted because those counts allege breaches of
fiduciary duty that are duplicative of the breach of
contract claims and because the alleged breaches
stem from the partnership agreement and not general
fiduciary principles. The motion for summary
judgment as to Count VII is moot because the motion
to dismiss that count was granted. The motions for
summary judgment on Count VI and XIII are denied
because there are genuine issues of material fact to be
resolved at trial regarding whether Solow was offered
the opportunity to invest in the 95 Program in
accordance with the partnership agreement.

IT IS SO ORDERED.

2004 WL 2694916 (Del.Ch.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in A.2d                                                    Page 1
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

C
UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.
WAL-MART STORES, INC., and Wachovia Bank
of Georgia, N.A., in its capacity as
Trustee of the Wal-Mart Stores, Inc. Corporation
Grantor Trust, Plaintiffs,
v.
AIG LIFE INSURANCE COMPANY; Hartford Life
Insurance Company; Westport
Management Services, Inc.; International Corporate
Marketing Group, LLC;
National Benefits Group, Inc., d/b/a Marsh Financial
Services; Seabury & Smith,
Inc., Marsh, Inc., and Marsh & McLennan National
Marketing Corporation, now
known as J & H Marsh & McLennan Private Client
Services, Inc., Defendants.
**No. Civ.A. 19875.**

Submitted Jan. 9, 2004.
Decided March 2, 2004.

Robert K. Payson, Gregory A. Inskip, Potter
Anderson & Corroon LLP, Wilmington, Delaware;
Michel Y. Horton, Zevnik Horton LLP, Los Angeles,
California; Paul A. Zevnik, Zevnik Horton LLP,
Washington, D.C., for Plaintiffs.

Richard D. Heins, Ashby & Geddes, Wilmington,
Delaware; James F. Jorden, Paul A. Fischer, Kristin
A. Shepard, Jordon Burt LLP, Washington, D.C. for
Defendant AIG Life Insurance Co.

R. Franklin Balotti, Lisa A. Schmidt, Richards
Layton & Finger, Wilmington, Delaware; Barry A.
Chasnoff, David R. Nelson, Akin Gump Strauss
Hauer & Feld LLP, San Antonio, Texas; Michael
Quigley, Akin Gump Strauss Hauer & Feld LLP,
Washington, D.C., for Hartford Life Insurance
Company and International Corporate Marketing
Group.

Elizabeth A. Wilburn, Blank Rome LLP,
Wilmington, Delaware; Ian M. Comsky, Roger F.
Cox, Blank Rome LLP, Philadelphia, Pennsylvania,
for Defendant National Benefits Group, Inc.

Edward P. Welch, Julie A. Tostrup, Skadden Arps

Slate Meagher & Flom LLP, Wilmington, Delaware,
for Defendants Marsh Financial Services, Seabury &
Smith, Inc., Marsh, Inc., and Marsh & McLennan
National Marketing Corporation, formerly known as
J & H Marsh & McLennan Private Client Services,
Inc.

*MEMORANDUM OPINION AND ORDER*

LAMB, Vice Chancellor.

I.

*1 In the early 1990s, a large national retailer
embarked on a plan to acquire corporate owned life
insurance ("COLI") policies covering an enormous
number of its employees. The principal purpose of
this plan was to generate substantial federal income
tax benefits for the owner of the policies. The retailer,
working with a number of insurance brokers and
insurers, began purchasing blocks of policies in 1993
and continued these purchasers until 1995. By then it
owned life insurance policies covering hundreds of
thousands of its employees.

At the time the retailer began its COLI purchases,
there was widespread media coverage discussing the
tax law and other legal risks associated with COLI
schemes. In 1996, Congress enacted legislation that
effectively eliminated the future tax benefits
associated with all but a few of the retailer's COLI
plans. Soon thereafter, the Internal Revenue Service
(the "IRS") began to bring enforcement actions
claiming that employers participating in COLI plans,
including the retailer, underpaid past taxes,
Moreover, employees and the estates of deceased
employees also filed litigation claiming that the
proceeds of any policies should be paid to them,
rather than to the retailer. In the face of these
developments, the retailer began to surrender its
insurance policy plans in 1996. In 2002, it settled
with the IRS.

In September 2002, nearly a decade after making its
first COLI investment, the retailer brought suit
against all the parties involved in its purchase of
these plans. Its complaint alleges a broad range of
legal and equitable claims against the insurance
brokers and providers-all seeking to recover from
them the losses it incurred in connection with this
risky tax avoidance scheme. On a motion to dismiss,
the court concludes that the retailer's claims are all

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

barred by the relevant 3-year statute of limitations. The claims alleged all arose between 1993 and 1995, when the retailer purchased the plans. Thus, there is no question that its September 2002 complaint is time barred. Moreover, there are no grounds in this case to resort to principles of equitable tolling of the limitations period, as the record is irrefutably clear that the retailer either knew (or was on inquiry notice) of the substantial risks associated with the scheme at the time it began purchasing policies in 1993.

II.

A. *The Parties*

Plaintiff Wal-Mart Stores, Inc. ("Wal-Mart Stores") is incorporated in Delaware with its principal place of business located in Bentonville, Arkansas. Wal-Mart is a "large and sophisticated" retail sales company with over 1 million employees. [FN1] Plaintiff Wachovia Bank of Georgia, N.A. is the trustee of the Wal-Mart Stores, Inc. Corporation Grantor's Trust (the "Wal-Mart Trust"). [FN2] The Wal-Mart Trust was set up in December 1993 for the sole purpose of facilitating the COLI plans that are at the heart of this case. Starting in December 1993, Wal-Mart purchased COLI plans from defendants AIG Life Insurance Company ("AIG") and Hartford Life Insurance Company ("Hartford") (collectively, the "Insurers"). Defendant AIG is incorporated in Delaware with its principal place of business in Wilmington, Delaware. Defendant Hartford is incorporated in Connecticut with its principal place of business in Hartford, Connecticut.

> FN1. Am. Compl. ¶ ¶ 1, 29. For the purposes of the pending motions to dismiss, the court takes the well-pleaded factual allegations of the complaint as true.

> FN2. For simplicity, this opinion will refer to plaintiffs Wal-Mart Stores and the Wal-Mart Trust collectively as "Wal-Mart."

**\*2** Defendant Westport Management Services, Inc. ("Westport") is a Delaware corporation with its principal place of business in Trumbull, Connecticut. Defendant International Corporate Marketing Group, LLC ("ICMG") is a Delaware limited liability company with its principal place of business in Florham Park, New Jersey. Westport and ICMG, respectively, acted as representatives of AIG and Hartford in connection with the COLI policies that are the subject of this action.

Defendants Seabury & Smith, Inc., Marsh Financial Services, Marsh, Inc., and Marsh & McLennan National Marketing Corporation [FN3] (collectively, the "Marsh Entities") and National Benefits Group, Inc. ("NBG," together with the Marsh Entities the "broker-defendants") are insurance brokers who worked with Wal-Mart in soliciting and evaluating COLI proposals from a number of insurance companies. [FN4]

> FN3. On September 20, 2002, J & H Marsh & McLennan Private Client Services, formerly known as Marsh & McLennan National Marketing Corporation, was dissolved.

> FN4. The Marsh Entities are Delaware corporations with their principal places of business in New York, New York. NBG is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota.

B. *The COLI Policies*

1. *Wal-Mart's COLI Program*

In the early 1990s, Wal-Mart, like other large employers at that time, began considering the acquisition of broad-based COLI plans. Broad-based COLI plans are life insurance policies purchased by a corporate employer covering the lives of a large number of employees . [FN5] The fundamental purposes of the COLI plans, according to Wal-Mart, were: (i) to provide certain free death benefits to classes of associates at Wal-Mart; (ii) to provide financial benefits to Wal-Mart in order to compensate the company for costs related to the death of associates; and (iii) to provide tax benefits to the company in connection with funding the premiums and other costs of the plans. [FN6] Under the COLI plans, the corporate employer secures loans from the insurers to fund the insurance premiums and then deducts the interest paid on those loans from its income taxes, thereby enjoying the investment return on these policies on a tax-free basis.

> FN5. The COLI plans are modeled on "key man" life insurance policies used by corporations for decades to lessen the costs incurred when key employees died. The broad-based COLI plans extend the practice to insure broader classes of corporate employees. Am. Compl. ¶ 21.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

FN6. *Id.* ¶ 3.

In mid-1993, Wal-Mart hired the broker-defendants to advise the company in connection with the purchase of the COLI plans. Specifically, Wal-Mart hired the broker-defendants to "oversee[ ] the design and structure of an appropriate broad-based COLI plan for Wal-Mart, prepare[ ] questions for, and solicit [ ] proposals from, insurance companies involved in such COLI plans, select [ ] the appropriate insurance company or companies to underwrite the COLI plans, and negotiate[ ] the best available terms and conditions for Wal-Mart." [FN7]

FN7. *Id.* ¶ 29.

On December 28, 1993, after working with the defendant-brokers for several months, Wal-Mart purchased a block of more than 20,000 COLI policies from Hartford [FN8] and a block of nearly 200,000 COLI plans from AIG. The initial premium payments for these two blocks of COLI policies exceeded $800 million. Wal-Mart made five subsequent purchases from AIG, from June 1994 through July 1995, adding approximately 135,000 policies and approximately $300 million in initial premium payments. In total, Wal-Mart acquired approximately 350,000 COLI policies. Wal-Mart acquired these policies through Wal-Mart Trust, a Georgia entity that was created specifically to take advantage of Georgia laws that recognize employers' "insurable interests" in the lives of corporate employees. [FN9]

FN8. These policies covered the "managerial group" and provided higher policy limits than the policies purchased from AIG. *Id.* ¶ 42(a).

FN9. *Id.* ¶ 37.

2. *The Risks Associated With The COLI Program*

**\*3** Although the COLI plans were not prohibited by the Internal Revenue Code (the "Code") as it existed at the time they were created, there were well-known concerns about potential legal objections to such plans under federal tax law. [FN10] There was also a known risk that Wal-Mart would be found to lack an insurable interest in the lives of its rank-and-file employees, as evidenced by the use of a Georgia trust to purchase the policies. [FN11] Wal-Mart's awareness of and concern about these risks is reflected in the very application it filed for the AIG policies. Wal-Mart and AIG executed a Letter of Understanding as part of that application process that

specifically addresses Wal-Mart's concerns with "the tax consequences of loans and/or withdrawals from the Policies and the deductibility thereof." [FN12] An exhibit to this letter deals with the possibility that Wal-Mart might be found to lack an "insurable interest" in the lives of its employees.

FN10. "From the beginning of its exploration of COLI plans, Wal-Mart recognized that continued favorable tax treatment was essential to the viability of the plans." *Id.* ¶ 40.

FN11. *Id.* ¶ 37.

FN12. Letter of Understanding, Hartford Mot. Ex. A at 2. In general, matters outside of the pleadings are not considered in a motion to dismiss. A court, however, may consider, for limited purposes, documents that are "integral to or incorporated by reference in the complaint." *In re Lukens Inc. S'holders Litig.,* 757 A.2d 720, 727 (Del.Ch.1999), *aff'd sub nom. Walker v. Lukens, Inc.,* 757 A.2d 1278 (Del.2000) (citing *In re Santa Fe Pac. Corp. S'holders Litig.,* 669 A.2d 59, 69-70 (Del.1995)). Wal-Mart argues that the Letter of Understanding is only a representation and not a warranty and therefore is not part of the contract for the COLI policies (which has already been incorporated by reference) and cannot be considered by the court. The Letter of Understanding, however, is referenced in the complaint so the court may consider it. Am. Compl. at ¶ 80(e).

There was also high-level media coverage of the risks associated with the COLI plans beginning even before Wal-Mart first purchased a COLI policy. For example, *The Wall Street Journal* ran an article in 1992 reporting that the United States Treasury Department characterized the use of COLI plans as "tax arbitrage" and discussing proposed legislation initiatives to narrow their use. [FN13] Media coverage continued during the years Wal-Mart was purchasing policies. In August 1995, *The Wall Street Journal* published another article on the risks of the COLI plans and the possibility of IRS enforcement actions. [FN14] *The New York Times* ran a story in 1995 characterizing COLI plans as "one of those twists in the tax law that rarely capture much public attention yet provide a hidden bonanza for corporations sophisticated enough to know how to exploit them." [FN15] The *New York Times* article

2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

specifically identified Wal-Mart as one of the companies profiting from the use of COLIs. [FN16] A month later, *Newsweek* ran a story describing a proposed congressional attack on COLI plans, again identifying Wal-Mart as "by far the biggest player in this particular tax game" and quoting the head of Wal-Mart's employee benefits department as stating that "[w]e studied this long and hard before we put in." [FN17]

> FN13. Rick Wartzman, *Insurance Loans Stir Controversy Over Tax Breaks,* Wall St. J., Mar. 26, 1992, at B1.

> FN14. Lee Burton, *IRS May Cut Breaks on Life Insurance That Firms Own, Agency Sets Drive to Limit Deductions, Investment Gains on Such Policies,* Wall St. J., Aug. 7, 1995.

> FN15. Michael Quint, *Earning It; A Tax Threat to Company Insurance,* N.Y. Times, Sept. 24, 1995.

> FN16. *Id.*

> FN17. Alan Sloan, *How America's biggest corporations are cashing in on your mortality,* Newsweek, Oct. 23, 1995, at 46.

*C. Congress Changes The Law And The IRS Acts*

In August 1996, Congress enacted the Heath Insurance Portability and Accountability Act ("HIPAA"), which among other things, eliminated interest deductions (as of January 1, 1996) on COLI loans and on borrowings to fund COLI plans adopted after June 20, 1986, with transitional relief provided for 1997 and 1998 for up to 20,000 policies. [FN18] Within a few months, Wal-Mart began unwinding the COLI plans and by January 2000, its last COLI policies were canceled.

> FN18. Am. Compl. at ¶ 46.

Beginning in 1997, the IRS initiated enforcement actions against a number of employers who had claimed tax deductions for interests on loans under COLI plans for tax periods prior to 1996. [FN19] Additionally, in 1998 and 1999, the IRS issued Technical Advisory Memoranda ("TAM") presenting its legal opinion on COLI plans and determining that the interest deductions should be disallowed because they lack economic substance. [FN20] The IRS challenged the Wal-Mart COLI program, and Wal-Mart settled with the IRS in August 2002. [FN21]

> FN19. *See Am. Elec. Power Co., Inc. v. United States,* 136 F.Supp.2d 762 (S.D.Ohio 2001), *aff'd,* 326 F.3d 737 (6th Cir.2003) (upholding IRS disallowance of interest deductions on loans made against COLI policies); *In re CM Holdings, Inc.,* 254 B.R. 578 (D.Del.2000), *aff'd,* 301 F.3d 96 (3d Cir.2002) (upholding bankruptcy claim for unpaid taxes); *Winn-Dixie Stores, Inc. v. Commissioner,* 113 T.C. 254, 1999 WL 907566 (1999), *aff'd,* 254 F.3d 1313 (11th Cir.2001) (upholding disallowance of interest and administrative expense deductions).

> FN20. Tech. Adv. Mem. 9812005 (Mar. 20, 1998) (available without pagination at 1998 WL 123675); Tech. Adv. Mem. 199901005 (Jan. 8, 1999) (available without pagination at 1999 WL 5679).

> FN21. Wal-Mart is not seeking recovery for the "substantial unanticipated tax liability" from its settlement with the IRS. Am. Compl. ¶ 49.

*4 Employees and estates of deceased employees also began challenging the COLI plans starting in 2001, arguing that employers do not have "insurable interests" in their lives under applicable state law. [FN22] Several actions were filed challenging the notion that Wal-Mart has an "insurable interest" in the lives of its deceased employees and demanding that courts impose a constructive trust on death benefits that Wal-Mart may have received under the COLI plans. [FN23] In the most advanced action against Wal-Mart, a federal court in Texas applied Texas law instead of Georgia law in holding that Wal-Mart did not have an "insurable interest" in the lives of its Texas employees. [FN24]

> FN22. *Id.* ¶ 7.

> FN23. These actions are pending in federal courts in Texas, New Hampshire and Oklahoma. *Id. See, e.g., Lewis v. Wal-Mart, Inc.,* No. 02-CV-944-EA (M) (N.D. Okla. filed Dec. 18, 2002); *Miller v. Wal-Mart, Inc.,* No. 02-4015 (S.D. Tex. filed Oct. 22, 2002); *Rice v. Wal-Mart, Inc.,* No. C-02-390-B (D.N.H. filed July 23, 2002); *Waller v. AIG Life Ins. Co.,* No. 4:02-CV-00120 (N.D. Tex. filed Feb. 15, 2002).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00075-SLR    Document 8-3    Filed 03/31/2005    Page 17 of 26

Not Reported in A.2d                                                                    Page 5
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

> FN24. *Mayo v. Hartford Life Ins. Co.*, 220
> F.Supp.2d 794 (S.D.Tex. Aug.8, 2002),
> *aff'd*, 354 F.3d 400, 2004 WL 14654 (5th
> Cir. Jan.5, 2004).

D. *Wal-Mart's Claims*

Wal-Mart filed this action on September 3, 2002, to recover its losses resulting from the failed COLI program. Wal-Mart alleges that since the COLI policies "failed in their fundamental purpose," namely, to secure substantial financial benefits for Wal-Mart, the parties involved in Wal-Mart's purchase of the COLI policies should share in the loss. Wal-Mart does not argue that the failure of its COLI program is due to the 1996 change in the tax code. Instead, Wal-Mart alleges that the failure of the COLI plans is "the product of risks never contemplated by the parties, *i.e.:* (i) the disallowance of interest deductions under pre-HIPAA federal tax law and (ii) attacks on the COLI plans mounted by the estates of insureds that have been predicated on Wal-Mart's alleged lack of 'insurable interest' in the lives of its employees.... [FN25]

> FN25. Answering Br. of Wal-Mart Stores,
> Inc. in Opp'n to AIG's and Hartford's Mot. to
> Dismiss the Am. Compl. at 11.

Wal-Mart asserts that the defendants owed it the "highest duties of care, including a duty of good faith, a duty of full disclosure, a duty of loyalty, and a duty to meet the exacting standards of their respective professions." [FN26] Wal-Mart alleges that the defendants breached their fiduciary duties in "developing, promoting, recommending, advising, selling, and administering" the COLI plans. [FN27] Furthermore, Wal-Mart argues that had certain disclosures been made, it would not have entered into the COLI plans. Specifically, Wal-Mart alleges that the defendants did not disclose the "full range and magnitude" of the risks involved in the COLI plans. [FN28] Wal-Mart complains that it relied to its detriment on the defendants in their roles as fiduciaries, experts, advisors, agents, and providers of the COLI plans.

> FN26. Am. Compl. ¶ 54.

> FN27. *Id.*

> FN28. *Id.* ¶¶ 80(a)-(c).

Wal-Mart's amended complaint alleges breach of contract, breach of fiduciary duties, professional negligence, [FN29] and violation of the Delaware Consumer Fraud Act, [FN30] and seeks to recover its losses associated with the failed COLI plans. Wal-Mart also claims unjust enrichment, restitution, and equitable fraud, and seeks to recover and impose a constructive trust upon the profits that the defendants made in connection with Wal-Mart's COLI plans. In addition, Wal-Mart seeks declaratory relief requiring the defendants to compensate it for any future losses associated with the failed COLI plans, including the costs that may be incurred from the "insurable interest" litigation.

> FN29. Wal-Mart's professional negligence
> claim is asserted exclusively against the
> broker-defendants.

> FN30. 6 *Del. C.* § 2513.

E. *The Motions To Dismiss*

**\*5** The defendants have moved to dismiss the amended complaint on the grounds that it is barred by the applicable statute of limitations and fails to state a claim upon which relief may be granted. The court agrees that the applicable statute of limitations bars all of Wal-Mart's claims and, therefore, does not reach the remaining arguments in favor of dismissal.

III.

A. *Standard Of Review*

A court of equity may grant a motion to dismiss on the ground that the plaintiff's claims are barred by the applicable statute of limitations. [FN31] Moreover, it is "well settled that where the complaint itself alleges facts that show that the complaint is filed too late, the matter may be raised by [a] motion to dismiss." [FN32]

> FN31. "Although statutes of limitation do
> not generally apply directly in equity, equity
> follows the law and will apply a statute of
> limitations by analogy in appropriate
> circumstances." *In re Dean Witter P'ship
> Litig.*, 1998 WL 442456, at *3 (Del.Ch. July
> 17, 1998).

> FN32. *Id.* (quoting *Kahn v. Seaboard Corp.*,
> 625 A.2d 269, 277 (Del.Ch.1993)).

When considering a motion to dismiss, the court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint. [FN33] Although "all facts of the pleadings and reasonable inferences

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true." [FN34] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences." [FN35] On a motion to dismiss, the court may consider for certain limited purposes the contents of documents that are referred to in the complaint. [FN36] As already stated, the court will take judicial notice of the Letter of Understanding executed by Wal-Mart and AIG that formed a part of the application for the COLI policies. Moreover, the court can take judicial notice of publicly available documents, including government publications such as the TAMs and news articles, for the limited purpose of identifying what information was available to Wal-Mart during the limitations period. [FN37]

> FN33. *Grobow v. Perot,* 539 A.2d 180, 187 & n. 6 (Del.1988).

> FN34. *Id.*

> FN35. *Id.*

> FN36. *See In re Santa Fe,* 669 A.2d at 69-70 & n. 9.

> FN37. *Id.*

B. *All Wal-Mart's Claims Are Time Barred*

1. *The Applicable Statute Of Limitations*

Under Delaware law, the appropriate statute of limitations to be applied to tort, contract and fiduciary duty claims is three years. [FN38] In addition, a three-year limitation governs a claim for unjust enrichment. [FN39] While a court of equity is not bound to apply the statute of limitations, it will apply the statute of limitations by analogy when appropriate. [FN40]

> FN38. 10 *Del. C.* § 8106. *See Fike v. Ruger,* 754 A.2d 254, 260 (Del.Ch.1999), *aff'd,* 752 A.2d 112 (Del.2000). In accordance with 10 *Del. C.* § 8121, the court has no occasion to consider whether some other state's law would provide for a longer limitations period.

> FN39. *See Merck & Co. v. SmithKline Beecham Pharms. Co.,* 1999 WL 669354, at

\*42 (Del.Ch. Aug.5, 1999), *aff'd,* 766 A.2d 442 (Del.2000).

> FN40. *See In re Dean Witter,* 1998 WL 442456, at \*3.

2. *Time Of Accrual And Tolling*

It is well-established law in Delaware that the statute of limitations begins to run at the time of the alleged wrongful act, regardless of whether the plaintiff is aware of the injury. [FN41] Wal-Mart first brought suit on September 3, 2002. Thus, in order for its claims to be timely, the wrong alleged must have occurred no earlier than September 3, 1999.

> FN41. *Id.* \*4.

The wrongful act underlying each of Wal-Mart's claims is the defendants' alleged failure to disclose the truth about the COLI policies *at the time* that Wal-Mart purchased them. Indeed, Wal-Mart alleges that it never would have purchased the COLI policies had it known the full extent of the risks it would have faced in the future from the IRS and the "insurable interest" litigation. Accepting these allegations as true, Wal-Mart could have sued, and therefore its causes of action accrued, at the time that it purchased the various COLI policies between 1993 and 1995. More specifically: Wal-Mart could have brought its fraud-based claim as soon as it purchased the COLI policies in reliance on what it alleges were misrepresentations and omissions by the defendants; [FN42] Wal-Mart could have brought its fiduciary duty claim as soon as it purchased the COLI polices that it now says it would not have purchased had its alleged fiduciaries fully disclosed the extent of the risk; [FN43] Wal-Mart could have brought its breach of contract claim as soon as the defendants allegedly failed to disclose "all material information" about the COLI plans when Wal-Mart entered into the contract; [FN44] Wal-Mart could have sued for unjust enrichment at the time that the alleged omissions and misrepresentations were made; [FN45] and, Wal-Mart could have brought its negligence claim against the broker-defendants at the time it purchased the COLI policies in reliance on the "expertise and superior knowledge" of the broker-defendants in buying the plans. [FN46]

> FN42. *See Playtex, Inc. v. Columbia Cas.,* 1993 WL 390469, at \*3 (Del.Super.Sept.20, 1993) (holding that where plaintiff claims that it was fraudulently induced to enter into an insurance contract, a cause of action for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                               Page 7
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
(Cite as: 2004 WL 405913 (Del.Ch.))

fraud accrues at the effective date of the policies at which time the "fraud is successfully perpetrated") (citations omitted).

FN43. See In re Dean Witter, 1998 WL 442456, at *4 (footnotes omitted) ("Plaintiffs allege that defendants breached their fiduciary duties in recommending and selling to plaintiffs Partnerships that would never (and could never) achieve their promised objectives. Accepting this allegation as true, plaintiffs' injury occurred when they purchased their Partnership interests as a result of defendants' alleged misrepresentations. Thus, plaintiffs' cause of action accrued when they invested in the allegedly fraudulent Partnerships.").

FN44. See United States Cellular Inv. Co. v. Bell Atl. Mobile Sys., Inc., 677 A.2d 497, 503 (Del.1996) (holding that an action for breach of contract accrued at the time of the alleged breach of the contract).

FN45. See Merck, 1999 WL 669354, at *42 (quoting Kahn, 625 A.2d at 277 and holding that the statute of limitations for unjust enrichment is three years from the wrongful act because " 'where the statute bars the legal remedy, it shall bar the equitable remedy in analogous cases or in reference to the same subject matter" ').

FN46. See Kaufman v. C.L. McCabe & Sons, Inc., 603 A.2d 831, 834 (Del.1992) (holding that a negligence claim in connection with buying an insurance policy accrues at the time the policy was delivered).

*6 Even if Wal-Mart did not know the extent of all of its damages or later suffered some additional damage, the time of accrual is still when Wal-Mart purchased the policies. In Kaufman v. C.L. McCabe & Sons, Inc., for example, the insureds brought suit against the insurer and the insurance agent for negligent procurement of insurance coverage after discovering that the policy did not cover loss of use. [FN47] The plaintiffs in Kaufman claimed that their cause of action accrued at the time they suffered a loss and became aware of the limits of their coverage. The trial court disagreed and the Delaware Supreme Court affirmed, holding that the plaintiffs suffered injury "at the moment" they purchased the policy in

connection with which the agent was allegedly negligent. [FN48] Applying the rationale of Kaufman to this case, Wal-Mart could have brought its claims at the time that it purchased the COLI policies. Thus, its claims accrued no later than when it purchased its last block of COLI policies in 1995.

FN47. Id. 832.

FN48. Id. 834.

Wal-Mart also has not shown any basis to support an equitable tolling of the limitations period. Under Delaware law, tolling is only applicable in very limited circumstances, and the plaintiffs have the burden of pleading specific facts to prove that tolling is warranted. [FN49] Moreover, even if tolling of the statute is appropriate, the running of the limitations period is "suspended only until a plaintiff discovers his rights or, by exercising reasonable diligence, should have discovered such rights." [FN50] The limitations period resumes once the plaintiff is "objectively aware of the facts giving rise to the wrong, i.e., on inquiry notice." [FN51] Therefore, equitable tolling could be of aid to Wal-Mart only if the facts of the underlying claim were so well hidden that it could not have reasonably discovered them until September of 1999 at the earliest. [FN52] As hereinafter discussed, the Wal-Mart claims fail all of these tests.

FN49. Fike, 754 A.2d at 261 (citations omitted). See In re Dean Witter, 1998 WL 442456, at *6.

FN50. Merck, 1999 WL 669354, at *42 (citations omitted).

FN51. In re Dean Witter, 1998 WL 442456, at *6 (citations omitted).

FN52. See id. *5.

The court has also considered and rejects Wal-Mart's arguments that its claims did not accrue until it settled its dispute with the IRS in 2002 or, at the earliest, when the last of the COLI plans was completely surrendered and canceled in 2000. Neither of these dates is relevant in determining when the underlying claims accrued. The date of Wal-Mart's settlement with the IRS in 2002 is particularly inapposite. It marks only the date when Wal-Mart decided to compromise rather than continue its defense of its earlier tax position. That date bears no relation to any conduct of the

Not Reported in A.2d                                                                 Page 8
2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248
**(Cite as: 2004 WL 405913 (Del.Ch.))**

defendants and cannot possibly mark the first date on which Wal-Mart could have filed suit. That settlement does not even bear the weak relation of fixing the amount of damages because Wal-Mart is *not* seeking to recover the monies paid as a result of the IRS settlement.

Wal-Mart's argument that the clock should start in 2000 when it finished canceling its COLI plans ignores the fact that Wal-Mart started unwinding the large majority of its approximately 350,000 COLI policies in November 1996, shortly after HIPAA was passed. Unmistakably, Wal-Mart knew as early as 1996 that the projected benefits of the planned interest deductions would never be realized. [FN53] Even if Wal-Mart were suing to recover those benefits (and it is not), it would not have been entitled to wait to bring its claim until the last policies were finally unwound.

> FN53. Wal-Mart's reliance on two Ninth Circuit decisions where the court allowed rescission of the contract because the commercial purpose of the transaction was frustrated is misplaced. *Walker v. Cont'l Life & Accident Co.,* 445 F.2d 1072 (9th Cir.1971); *W. L.A. Inst. for Cancer Research v. Mayer,* 366 F.2d 220 (9th Cir.1966). In both cases, the issue of risk allocation is at the forefront of the court's rulings that excused nonperformance by promisors under Arizona and Oregon contract law. In *Mayer,* stockholders were excused from performance of an agreed-upon stock transfer after an IRS revenue ruling which rejected the tax premise on which the stock transfer was based under Oregon's doctrine of commercial frustration. The court in *Mayer* held that there was substantial evidence that the stockholders had not assumed the risk of an adverse tax ruling. In *Walker,* the court sustained the rescission of certain annuity loan transactions on the ground of commercial frustration after a Supreme Court decision eliminated the tax benefits of the contract. The court in *Walker* recognized that no claim for frustration exists when there is risk allocation in the contract, but the court did not reach the issue because the insurer did not raise it at trial and "[t]he general rule is that this Court will not reverse the trial court on a contention that was never presented to it." 445 F.2d at 1074 (citations omitted). Wal-Mart was clearly on notice of the risks associated with the COLI policies when it entered into them, therefore Wal-Mart would be precluded from rescission under the doctrine of commercial frustration, even if it had pleaded such a claim for relief.

**\*7** Finally, Wal-Mart's attempted reliance on the open-ended limitations period found in 10 Del. C. § 8108 ("mutual running accounts") is unavailing. The purpose of Section 8108 is to postpone the running of the limitations period until the date of the last transaction of parties that have mutual and running accounts. [FN54] None of Wal-Mart's claims are based on any account, mutual or otherwise. [FN55] Wal-Mart argues that the defendants had a continuing obligation under the COLI policies "to correct their misrepresentations and to disclose material information relating to the COLI plans, but they failed to do so." [FN56] Even if there were such an alleged continued duty of disclosure it does not give rise to a "mutual running account" within the meaning of Section 8108.

> FN54. *See Brown v. Consol. Fisheries Co.,* 165 F.Supp. 421, 423 (D.Del.1955) ("It is equally clear that both from the terms of the Delaware Statute and from the uniform current of authority that, where there is a mutual open account, there is an implied agreement of the parties that each item shall not constitute an independent debt, due at its date, but that the Statute shall not begin to run until the date of the last transaction.").

> FN55. Delaware courts have defined a "mutual account" as an account "upon which the items of either side belong and on which they would reciprocally operate so that a balance between the two may be ascertained." *Brown,* 165 F.Supp. at 423. *See Chrysler Corp. v. Airtemp Corp.,* 426 A.2d 845, 848 (Del.Super.1980) (defining and discussing the nature of an "account" for Section 8108 purposes).

> FN56. Am. Compl. ¶ 55.

*3. Was Wal-Mart On Inquiry Notice?*

Wal-Mart argues that it was "inherently unknowable" that its COLI program would fail until, at the earliest, the IRS litigation was concluded. Wal-Mart claims that it was "blamelessly ignorant that the cause of action existed." [FN57] until the IRS litigation concluded in a determination that the COLI

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

plans were economic shams. Wal-Mart's argument attributes its state of ignorance to "its lack of expertise in COLI plans and the complexities of accounting, actuarial and operating principles in the life insurance industry." [FN58] This argument falls far short of showing grounds that could possibly warrant a tolling of the limitations period. The "inherently unknowable" standard is a "discovery" rule whereby the plaintiff need only be "on inquiry [notice] which, *if pursued,* would lead to the discovery of the injury." [FN59] Wal-Mart clearly had reason to inquire about the risks of its COLI program long before the IRS cases were decided. Wal-Mart, as a large sophisticated employer, could have discovered and timely pursued its claims even if discovery would require special tax expertise. [FN60] Indisputably, it was not a "practical impossibility" for Wal-Mart to discover the wrongdoing alleged in its complaint long before September 3, 1999. [FN61] On the contrary, the record is rife with "observable or objective factors" that should have put Wal-Mart on inquiry notice as early as 1993. [FN62]

FN57. *Bridgestone/Firestone Inc., v. Cap Gemini Am., Inc., 2002 WL 1042089, at *6 (Del.Super., May 23, 2002).*

FN58. Am. Compl. ¶ 56.

FN59. *In Re Dean Witter, 1998 WL 442456, at *7* (citations omitted).

FN60. *See Ambase Corp. v. City Investing Co., 2001 WL 167698, at * 5 (Del.Ch. Feb.7, 2001)* (dismissing claims even though "complex" tax issues were involved because the IRS Code is not a "secret document"); *In re ML/EQ Real Estate P'ship Litig., 1999 WL 1271885, at *11 (Del.Ch. Dec.21, 1999)* (dismissing plaintiffs' claim that the statute of limitations should be tolled because plaintiffs required an "expert" to discover the claim); *In re Dean Witter, 1998 WL 442456, at *8* (dismissing plaintiffs' claim that the limitations period should be tolled because plaintiffs as investors could have reasonably inquired into the "health of their investments" before having an expert review the public filings).

FN61. *In re ML/EQ, 1999 WL 1271885, at *2 n. 12* (quoting *In re Dean Witter, 1998 WL 442456, at *5*).

FN62. *In re Dean Witter, 1998 WL 442456,*

at *5.

The barrage of relevant information readily available in the marketplace before September 3, 1999 was more than sufficient to put a company of the size and sophistication of Wal-Mart on notice of its claims long before September 3, 1999.

IV.

For all of the foregoing reasons, the motion to dismiss is granted, and the amended complaint is dismissed on the ground that the claims asserted therein are barred by the statute of limitations. IT IS SO ORDERED.

2004 WL 405913 (Del.Ch.), 33 Employee Benefits Cas. 1248

END OF DOCUMENT

Westlaw.

Not Reported in A.2d                                                    Page 1
2000 WL 33653433 (Del.Com.Pl.)
**(Cite as: 2000 WL 33653433 (Del.Com.Pl.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Common Pleas of Delaware.
Patricia G. SMIRNIOTIS, Plaintiff,
v.
SMITH VOLKSWAGEN LTD., Defendant.
**No. 1999-04-193.**

Submitted July 10, 2000.
Decided July 20, 2000.
Darryl K. Fountain, Esquire, Law Offices of Darryl
K. Fountain, Wilmington, DE, for plaintiff.

Ashley B. Stitzer, Esquire, Bifferato, Bifferato &
Gentilotti, Wilmington, DE, for defendant.

FINAL ORDER AND OPINION

JOHN K. WELCH, Associate Judge.

*1 The Plaintiff, Patricia G. Smirniotis, (hereinafter
"Smirniotis") filed this action against the defendant,
Smith Volkswagen, LTD., (hereinafter "Smith
Volkswagen") to recover damages for the sale of an
automobile under a breach of warranty, breach of
contract, and a violation of the Magnuson-Moss
Warranty Act. Trial took place on July 10, 2000 and
after the receipt of evidence and conclusion of
testimony, the Court reserved decision. Smirniotis's
complaint demands total judgment in the amount of
$11,281.87 with pre-judgment and post-judgment
interest and attorney fees.

*The Facts*
At trial the facts indicated that on December 18,
1998, Smirniotis purchased a used 1991 Honda
Prelude from Smith Volkswagen. She testified she
purchased the car for her son so he could drive it to
and from work and school. The salesman who sold
her the car was Greg Mast ("Mast"). Smirniotis
testified that Mast told her the car was in "excellent
condition" and had "only one previous owner." She
further testified that Mast told her the car had been
serviced. She testified when she was at the dealer she
noticed "black stuff coming from the exhaust pipe"
but was told by Mast that they had just cleaned the
vehicle and it was "probably just water." The car was

purchased with a limited warranty for 1,000 miles or
30 days covering certain parts of the vehicle. The
odometer disclosure statement indicates the vehicle
was purchased with 97,181 miles.

Smirniotis testified there were no problems with the
vehicle when she drove it to her son's place of
employment for him to drive home but that the next
day, a Saturday. She testified that she checked the oil
gauge and found "little to no oil" in the vehicle and
the oil in the vehicle was "very black." On Monday
morning December 21, 1998 Smirniotis contacted
Patrick Smith of Smith Volkswagen about the
problem and was told to take the vehicle in the next
day. She was told that Smith Volkswagen had not
serviced the vehicle but that they would, in fact, do
so the next day. However, when Smirniotis arrived
the next day she was informed that Smith
Volkswagen only had one mechanic who could
service used cars and he was not in that day.
Smirniotis testified that her son needed the car to go
out of town and since the Christmas holiday was
coming up she decided to have her car serviced at
Martin Honda. When she took her car in to Martin
Honda she was asked if the required 90,000 miles
maintenance was done to the car along with the
timing belt. She then contacted Smith Volkswagen to
inquire about the timing belt and was not given an
answer so she had it done. She was then called by
Smith Volkswagen and told it was not done and they
would split the costs for the repairs. She was later
told that the previous owner had replaced the timing
belt. The total costs of the repairs at Martin Honda
were $838.44. Thereafter, Smith Volkswagen
tendered a check for $400 to Smirniotis's husband for
the repairs.

*2 Smirniotis testified that her son monitored the oil
gauge on a weekly basis and noticed it to be "a quart
or two low" when he returned from a trip to Ocean
City, Maryland. She also was informed by her son
that the engine light started coming on. She testified
that she took the vehicle to Martin Honda on
December 28, 1998 to inspect the problem and was
told the oxygen sensor needed to be replaced. She
was billed $212.49 by Martin Honda for the repair.
She then testified she took the invoice to Smith
Volkswagen but heard nothing from the manager Pat
Smith.

Smirniotis next testified at an unspecified date she

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 33653433 (Del.Com.Pl.)
**(Cite as: 2000 WL 33653433 (Del.Com.Pl.))**

Page 2

talked to a person at Smith Volkswagen about the vehicle and informed Smith Volkswagen that it was still burning oil. She testified when she was able to talk to the service manager, Pat Smith, he told her she bought the vehicle as is. She testified he was in shock when she showed him the paperwork stating she purchased the vehicle with a warranty and then preceded to say it was no good anymore. Smirniotis testified that Glenn Taylor, the mechanic for used cars at Smith Volkswagen, was to look at the vehicle and she left the vehicle with them on January 18, 1999. She testified that Smith Volkswagen did not call her and that she found out eight (8) days later on January 26, 1999 that the vehicle needed $1,500 worth of repairs and that Smith Volkswagen would agreed to pay half. She testified she told Smith Volkswagen she did not want to pay anymore on the vehicle. She then took the vehicle to two Honda dealers and was told the vehicle needed a new short block. She then had one of the dealers located in Maryland install a remanufactured engine at a total cost of $5,005.94.

Prior to having the engine replaced Smirniotis wrote a letter dated January 29, 1999, stating the car was sold to her with existing oil problems and that she notified them several times during the warranty period. She stated she left the vehicle with Smith Volkswagen for over a week and they failed to repair it.

During cross-examination by the defense, in reference to defendant's Exhibit "2," offered into evidence without objection, it was pointed out in paragraph two on the second page of the exhibit it provides as follows:

Any used motor vehicle sold to purchaser by dealer under this order is sold at the time of delivery by dealer without any guarantee or warranty, expressed or implied, including any implied warranty of merchantability or fitness for a particular purpose, as to its condition or the condition of any part thereof except as may be otherwise specifically provided in writing on the face of this order or in a separate writing furnished to purchaser by dealer.

The Court notes that the paragraph is in small lettering, is not highlighted, underlined, bolded, or in any way distinguished by the ten (10) other paragraphs on the document.

As to the express warranty Smith Volkswagen points out that it is a limited warranty for 30 days or 1,000 miles whichever comes first covering engine, transmission, axle assemblies, electrical system and brake system.

**\*3** Smith Volkswagen pointed out that when Smirniotis took her car in to Martin Honda 97,491 mileage when it came in and 97,495 when it left on December 22, 1998. She further testified when she took the vehicle to Martin Honda on December 28, 1998, the vehicle had 97,818 miles on its odometer.

Smirniotis testified that her son checked the oil and it was a quart low on January 9, 1999 and it was losing one to two quarts of oil per week and that on January 26, 1999 Glenn Taylor of Smith Volkswagen told her the car needed a valve replacement. She further testified she received her two estimates on January 27 and 28 of 1999 and her son had been driving the car from December 18 through January 27 of the next year. She testified did not notice black smoke from the rear of the vehicle. Lastly, during cross-examination she testified the vehicle had 99,576 when the remanufactured engine was put in on March 4, 1999.

Patrick Smith, ("Smith") the general sales manager for Smith Volkswagen, testified for the defense. Smith testified that Smirniotis had the vehicle inspected by Martin Honda in Newark, Delaware prior to purchasing it. He testified he was told a few weeks after the purchase of the vehicle that it was losing oil and told Smirniotis to take in the vehicle. He testified that upon inspecting the vehicle they told her it needed a valve job and he agreed they would pay half the costs. He testified that Smirniotis told him this was unacceptable and she wanted the engine replaced. He testified he offered to put in a used engine.

On cross-examination Smith testified he could not recall many of the dates or many of the specifics of the dealings with Smirniotis. He testified it was the policy of Smith Volkswagen to service the vehicle prior to selling it and that he agreed to pay half for the valve job because he thought this was fair or in the alternative offered to put in a used engine. Finally, on re-direct examination Smith testified he believed the vehicle to no longer be under warranty when Smirniotis came in on January 18, 1999.

Gregory Mast next testified for Smith Volkswagen. Mast testified he sold the vehicle to Smirniotis but did not recall anything specific about the sale but did testify that Smirniotis had the vehicle inspected prior to purchasing it.

The next witness offered by the defense was Glenn

Not Reported in A.2d
2000 WL 33653433 (Del.Com.Pl.)
(Cite as: 2000 WL 33653433 (Del.Com.Pl.))

Taylor, ("Taylor") the used car mechanic for Smith Volkswagen. He testified the car came in for servicing on January 18, 1999 and was told the vehicle was consuming too much oil. Taylor testified he performed a cylinder leak down test that pressurizes each cylinder to indicate where the leak is and the severity of the leak. He testified he found leakage to be in the valve system but it was not excessive and it was not past the piston rings. Taylor's conclusion from his testing indicated that the car needed a valve job and it would cost $700 to $800 to repair.

On cross-examination Taylor testified he did recall stating it would cost $1,500 to repair the vehicle and did not recall anything regarding installing another engine.

*4 The final witness offered by the defense was Jeffrey Herman ("Herman"). The plaintiff offered him as an expert in the field of automobile mechanics without objection. Herman testified he reviewed all the documents and testimony in court and it was his expert opinion that the vehicle needed a valve replacement and not another engine. Herman further testified that the work done at Martin Honda after the vehicle was purchased where the manufacturer's maintenance requirements that are to be done at 90,000 miles. Herman testified the oxygen sensor is not a maintenance item and it can wear out anytime during the life of the car. Herman further testified a remanufactured engine is better then a used engine because it has been rebuilt. He testified a used engine can cost between $500 to $1,500 while a remanufactured engine can cost between $1,500 to $4,500. He testified if the car had been burning one to two quarts a week of oil the Smirniotis would have noticed either a large puddle of oil under the car or would have smelled oil burning and that black smoke would have emanated from the tail pipe. Herman also testified a basic valve job could cost between $800 and $1,200 but with valve replacement it "could reach up to $1,500 to $2,000."

On cross-examination Herman admitted he never inspected the vehicle and all his knowledge came through written documents and court testimony, but added he would not have changed his opinion even if he inspected the vehicle. He testified a valve job would be covered under the warranty. He also testified that servicing a vehicle prior to selling it generally meant that Smith Volkswagen would change the oil, check the fluids, and visually inspect the engine and tires. On re-direct Herman testified that during servicing Smith Volkswagen would not

check the timing belt.

Law and Discussion

I. Express Warranties

6 Del. C. § 2-313(1)(a) provides as follows:
Express warranties by the seller are created as follows:
(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
Smirniotis makes several claims for a breach of express warranty. First, she claims the salesman warranted that the car was in excellent condition and had been serviced. As to the warranty that the car was in excellent condition, the Court finds this to be mere puffing and not a warranty. As to the claim that the vehicle has been serviced the Court finds this to be a valid warranty and I find that Smith Volkswagen broke the warranty. Therefore, the Court awards $438.44 to the plaintiff for repairs done by Martin Honda, the first repair bill was $838.44 I have credited the defendant for the tender of a $400 check presented to the plaintiff.

The Court finds that Smith Volkswagen breached the warranty as to the repairs to the engine, however I do not find that the engine needed to be replaced. On admission by Smith Volkswagen the engine was covered by an express warranty however Smith Volkswagen claims Smirniotis did not make a claim within 30 days or 1,000 miles of the warranty and did not give Smith Volkswagen an opportunity to cure.

*5 The Court does not find any merit in Smith Volkswagen's claim that Smirniotis did not make a claim within 30 days or 1,000 miles of the warranty. The record clearly reflects that Smith Volkswagen was on notice that the vehicle was losing oil shortly after its purchase and made assurances to the Smirniotis to keep oil in the engine.

The Court finds that Smith Volkswagen had an opportunity to cure the defects but failed to do so. It is unclear under the code whether defendant has the right to cure under a breach of warranty but that issue is irrelevant to this opinion. Smirniotis delivered the vehicle to Smith Volkswagen and was informed it needed a valve job, however Smith Volkswagen only offered to pay half of the repair. The Court finds this to be equivalent to an outright refusal to repair. Olmstead v. General Motors Corp., Inc., Del.Super., 500 A.2d 615, 619 (1985) (There must be more than

Not Reported in A.2d
2000 WL 33653433 (Del.Com.Pl.)
**(Cite as: 2000 WL 33653433 (Del.Com.Pl.))**

one or two attempts to repair or there must be an outright refusal to repair.).

As to the extent of Smirniotis's claim, the Court finds the vehicle only needed a valve replacement and did not require a remanufactured engine. The Court bases this finding on the expert testimony provided by Jeffrey Herman and the testimony of Glenn Taylor. Therefore, the Court awards $1,500 for the valve job.

As to Smirniotis' claim for the replacement of the oxygen sensor I do not find that this repair was covered under any express warranty and therefore the Court declines to award a judgment for this claim.

II. *Implied Warranties*

Six *Del. C.* § 2-314 provides as follows:
(1) Unless excluded or modified (Section 2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.
(2) Goods to be merchantable must be at least such as
(a) pass without objection in the trade under the contract description; and
(b) in the case of fungible goods, are of fair average quality within the description; and
(c) are fit for the ordinary purposes for which such goods are used; and
(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
(e) are adequately contained, packaged, and labeled as the agreement may require; and
(f) conform to the promises or affirmations of fact made on the container or label if any.
(3) Unless excluded or modified (Section 2-316) other implied warranties may arise from course of dealing or usage of trade.
Six *Del. C.* § 2-316 provides as follows:
(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this Article on parol or extrinsic evidence (Section 2-202) negation or limitation is inoperative to the extent that such construction is unreasonable.
*6 (2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention

merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
(3) Notwithstanding subsection (2)
(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like "as is", "with all faults" or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and
(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and
(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.
(4) Remedies for breach of warranty can be limited in accordance with the provisions of this Article on liquidation or limitation of damages and on contractual modification of remedy (Sections 2-718 and 2-719).
(5) The implied warranties of merchantability and fitness shall not be
applicable to a contract for the sale of human blood, blood plasma or other human tissue or organs from a blood bank or reservoir of such other tissues or organs. Such blood, blood plasma or tissue or organs shall not for the purposes of this Article be considered commodities or goods subject to sale or barter, but shall be considered as medical services.
Smith Volkswagen claims that it has disclaimed all implied warranties under page 2 of the contract. The Court finds this warranty disclaimer to be invalid. The Delaware Code specifies that these warranties must be "conspicuous". "Conspicuous" is defined at 6 *Del. C.* 1-201(10) as follows:
"Conspicuous": A term or clause is conspicuous when it is so written that a reasonable person against whom it is to operate ought to have noticed it. A printed heading in capitals (as: NON-NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is "conspicuous" if it is in larger or other contrasting type or color. But in a telegram any stated term is "conspicuous". Whether a term or clause is "conspicuous" or not is for decision by the court.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2000 WL 33653433 (Del.Com.Pl.)
(Cite as: 2000 WL 33653433 (Del.Com.Pl.))

Page 5

The Court finds the disclaimer in the instant contract not to be conspicuous. It is not in bold print, underlined nor set off in any other way from the rest of the printed language on the contract.

Smith Volkswagen also points to 6 *Del. C.* § 316(3)(b) claiming the vehicle's prior inspection should eliminate any implied warranties. However, the Court disagrees with this position. Although Smirniotis had the vehicle inspected prior to purchasing it there was no testimony in court to the extent of this inspection. The Court finds Smith Volkswagen failed to provide any testimony or evidence to what was inspected. The Court will not speculate to the amount of inspection done and therefore finds this section of the code to be inapplicable.

**\*7** Therefore, the Court concludes that Smith Volkswagen breached the implied warranty of merchantability and that Smirniotis is also entitled to recover under this theory as well as the express warranties for the damages she suffered.

III. *Magnuson-Moss*

Smirniotis makes their final claim under the federal Magnuson-Moss Act. 15 U.S.C. § 2310(d)(2), provides:

> If a consumer finally prevails in any action brought under paragraph (1) of this subsection, he may be allowed by the court to recover as part of the judgment a sum equal to the aggregate amount of cost and expenses (including attorneys' fees based on actual time expended) determined by the court to have been reasonably incurred by the plaintiff for or in connection with the commencement and prosecution of such action, unless the court in its discretion shall determine that such award of attorneys' fees would be inappropriate.

Smith Volkswagen claims Smirniotis did not give them a reasonable opportunity to cure. " § 2310(e) provides, "[n]o action may be brought for failure to comply with any obligation under any written or implied warranty ... unless the person obligated under the warranty is afforded a reasonable opportunity to cure such failure to comply." *Olmstead* at 619. The Court finds that Smirniotis did give Smith Volkswagen the opportunity to cure by notifying them of the problem promptly after it was discovered and that Smith Volkswagen refused to pay for the whole repair as required by law to do so. Therefore, the Court concludes that Smith Volkswagen violated the Magnuson-Moss Warranty Act and must pay reasonable attorney fees to Smirniotis.

*Final Opinion and Order*

Therefore, the Court AWARDS A JUDGMENT OF ONE THOUSAND NINE HUNDRED EIGHTY-THREE DOLLARS AND FORTY-FOUR CENTS ($1,983.44) AGAINST SMITH VOLKSWAGEN plus costs and pre and post-judgment interest at the legal rate of ten percent (10%).

This Court will address Smirniotis's claim for attorney fees upon a timely and proper application and affidavit by Mr. Fountain setting forth in detail his fees and hours spent, with an opportunity ten (10) days thereafter for Ms. Stitzer to respond thereto. The Court shall thereafter issue an appropriate order.

IT IS SO ORDERED this 20th day of July, 2000.

2000 WL 33653433 (Del.Com.Pl.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.