IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PENNSYLVANIA EMPLOYEE BENEFIT TRUST FUND, on behalf of itself and all others similarly situated, JOSEPH MACKEN, and COMMISSIONER LINDA A. WATTERS<br><br>Plaintiffs,<br><br>v.<br><br>ZENECA, INC. and ASTRAZENECA PHARMACEUTICALS, LP,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civ. No. 05-075-SLR<br>(Lead Case) |

---

## DEFENDANTS' COMPENDIUM OF UNREPORTED CASES
## IN SUPPORT OF THEIR MOTION TO DISMISS

OF COUNSEL:

Peter I. Ostroff
Mark E. Haddad
Alycia A. Degen
Joshua E. Anderson
SIDLEY AUSTIN BROWN & WOOD LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
(213) 896-6000

John W. Treece
Maja C. Eaton
Richard D. Raskin
SIDLEY AUSTIN BROWN & WOOD LLP
Bank One Plaza
10 South Dearborn Street
Chicago, IL 60603
(312) 853-7000
*Attorneys for Defendants*

July 1, 2005

MORRIS, NICHOLS, ARSHT & TUNNELL
Jack B. Blumenfeld (#1014)
R. Judson Scaggs, Jr. (#2676)
Natalie J. Haskins (#4472)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*Attorneys for Defendants*

Defendants AstraZeneca Pharmaceuticals, L.P. and Zeneca Inc. respectfully submit this Compendium of Unreported Cases.

**TAB**

## FEDERAL

*Fitzgerald v. Chrysler Corp.*, 1996 WL 473456 (N.D. Ill. 1996)                    1

*Heindel v. Pfizer Inc.*, 2004 WL 1398024 (D.N.J. 2004)                    2

*In re Warfarin Sodium Antitrust Litig.*, 1998 WL 883469 (D. Del. 1998)                    3

*SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck*
  *Consumer Pharms. Co.*, 1996 WL 280810 (S.D.N.Y. 1996)                    4


## STATE

*Benning v. Wit Capital Group, Inc.*, 2001 WL 38781 (Del. Super. Ct. Jan. 10, 2001)                    5

*In re Chrysler Corp. S'holders Litig.*, 1992 WL 181024 (Del. Ch. July 27, 1992)                    6

*Jamgochian v. Prousalis*, 2000 WL 1610750 (Del. Super. Ct. Aug. 31, 2000)                    7

*Merck & Co. v. SmithKline Beecham Pharms. Co.*, 1999 WL 669354
  (Del. Ch. Aug. 5, 1999)                    8

*Murphy v. United Servs. Auto. Ass'n*, 2005 WL 1249374 (Del. Super. Ct.
  May 10, 2005)                    9

*Outdoor Techs., Inc. v. Allfirst Fin., Inc.*, 2001 WL 541472 (Del. Super. Ct.
April 12, 2001)                    10

*Pender v. DaimlerChrysler Corp.*, 2004 WL 2191030 (Del. Super. Ct. July 30, 2004)                    11

#472552

**TAB 1**

Not Reported in F.Supp.
1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159
**(Cite as: 1996 WL 473456 (N.D.Ill.))**
<KeyCite History>

United States District Court, N.D. Illinois, Eastern
Division.

Jim FITZGERALD and Ellen J. Rindal, P.C., on
behalf of themselves and
others similarly situated, Plaintiffs,
v.
CHRYSLER CORPORATION, Defendant.

No. 96 C 0021.

Aug. 16, 1996.

MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

*1 Plaintiffs Jim Fitzgerald ("Fitzgerald") and
Ellen J. Rindal, P.C. ("Rindal") (together
"Plaintiffs") filed this action against Defendant
Chrysler Corporation ("Chrysler"), alleging that
Chrysler employed fraudulent and illegal practices
in connection with the sale of service contracts and
extended warranties to consumers.    Specifically,
Plaintiffs assert that Chrysler and its agents "grossly
misrepresented the coverage of the service contracts,
which were sold as purportedly 'complete' and
'comprehensive' " and "actively concealed the
material fact that there were numerous 'exceptions'
to the contracts' coverages." (Amend.Compl. ¶ 1.)
Plaintiffs' Amended Complaint (the "Complaint")
alleges violations of the Racketeer Influenced and
Corrupt Organizations Act ("RICO"), 18 U.S.C. §
1961 et seq.;    the Magnuson-Moss Warranty--
Federal Trade Commission Improvement Act
("Magnuson-Moss Act"), 15 U.S.C. § 2301 et seq.;
and various state consumer fraud statutes.    The
Complaint also asserts a state-law breach of contract
claim.

Chrysler now moves to dismiss the RICO,
Magnuson-Moss Act and consumer fraud claims
against it pursuant to Fed.R.Civ.P. 12(b)(6) and/or
Fed.R.Civ.P. 9(b).    Chrysler further maintains that
Plaintiff's RICO and consumer fraud claims are
time-barred.

BACKGROUND

A. Alleged Facts Particular to Fitzgerald

According to the Complaint, when Fitzgerald
purchased a Chrysler Eagle Premier from an
authorized Chrysler dealership on September 28,
1989, Chrysler sold him a vehicle service contract
(the "service contract") entitling him to financial
reimbursement for repairs to his vehicle.    Chrysler,
both directly and through its dealer, purportedly
represented to Fitzgerald that the service contract
"fully describe[d] the coverage and features of the
Plan." (Amend.Compl. ¶ 21.)    Yet, as alleged by
Fitzgerald, Chrysler deliberately failed to enumerate
various    repairs    which    were    not,    in    fact,
reimbursable under the service contract.

Fitzgerald asserts that he brought his 1989 Eagle
to Heiser Ford, Inc. ("Heiser Ford") of Milwaukee,
Wisconsin for repairs on November 4, 1991; Heiser
Ford made $171.97 in repairs to the Eagle on that
date.    On November 7, 1991, Fitzgerald filed a
claim with Chrysler for reimbursement of the Heiser
Ford repair bill.    On December 5, 1991, Fitzgerald
received reimbursement from Chrysler in the
amount of $39.36.

According to Fitzgerald, the statement sent to him
by Chrysler along with the $39.36 payment included
a series of "Adjustment Codes."    The key to these
"Adjustment Codes" contained on the back of the
Chrysler statement purportedly revealed the reason/s
for Chrysler's refusal fully to reimburse Fitzgerald
for the Heiser Ford repairs: (1) "Diagnostic time
not covered"; (2) "Incorrect deductible amount";
(3) "Contains parts and/or labor not covered"; and
(4) "Shop supplies not covered."

On December 19, 1991, Fitzgerald wrote to Ed
Olmeda ("Olmeda"), the Customer Relations
Manager at Chrysler Service Contracts, requesting
that Fitzgerald be reimbursed for the total repair
cost--$171.97--, less the required $25.00 deductible.

*2 The Complaint avers that, in a letter dated
January 10, 1992, Olmeda stated that Chrysler
would not reimburse Fitzgerald for the unpaid
amounts because those amounts represented, among
other things, "excessive diagnostic work" not
covered by the service contract.

B. Alleged Facts Particular to Rindal

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *2 (N.D.Ill.))

According to the Complaint, Rindal purchased a Dodge Dynasty from Schaumburg Dodge, Inc. ("Schaumburg Dodge") on July 25, 1990. On that date, Rindal also purchased from Chrysler the "7/70 Added Coverage Plan" (the "service contract") as a supplement to the manufacturer's warranty.

On November 3, 1992, Rindal purportedly took her Dynasty to Schaumburg Dodge for repairs; these repairs were performed by Schaumburg Dodge for a cost of $83.50. On November 16, 1992, Rindal again brought her Dynasty to Schaumburg Dodge for repairs; these repairs were completed for a total cost of $454.10.

Rindal avers that "the repairs, with the exception of one repair, were not covered under her 7/70 added coverage plan." (Amend.Compl. ¶ 43.)

C. Plaintiffs' Various Claims

The Complaint asserts four causes of action against Chrysler. Count One alleges that Chrysler participated in the conduct of the affairs of a RICO enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). In support of this claim, Plaintiffs assert that Chrysler engaged in predicate acts of mail and wire fraud in contravention of 18 U.S.C. §§ 1341 and 1343, respectively.

Count Two alleges violations of the consumer protection statutes of the fifty states and the District of Columbia. Count Three asserts that Chrysler breached the service contracts by failing to reimburse Plaintiffs for the total cost of repairs; and Count Four purports to state a claim under the Magnuson-Moss Act for Chrysler's breach of warranty/ies.

In its present motion, Chrysler seeks dismissal of Plaintiffs' Counts One, Two and Four. Specifically, Chrysler maintains that Count One should be dismissed because (1) Chrysler is not a "person" distinct from the asserted "enterprise/s" as required by 18 U.S.C. § 1962(c); (2) Plaintiffs fail to plead the predicate acts of mail and/or wire fraud with the specificity required by Fed.R.Civ.P. 9(b); and (3) Fitzgerald's RICO claim is time-barred. Chrysler argues that Count Two should be dismissed because (1) Plaintiffs' consumer fraud claims are barred by the applicable statute of limitations, and

(2) Rindal fails to plead her consumer fraud claim with the required degree of specificity. Finally, Chrysler urges this Court to dismiss Plaintiffs' Count Four because (1) Plaintiffs fail to name 100 plaintiffs as required by the Magnuson-Moss Act, and (2) Rindal failed to allege that she gave Chrysler an opportunity to cure any defect in its performance under the service contract. For the reasons set forth below, the Court grants Chrysler's motion as to all Counts. [FN1]

> FN1. Chrysler also filed a motion to strike Plaintiffs' prayer for injunctive relief under Count Three. Plaintiffs do not contest this motion. Accordingly, Chrysler's motion to strike is granted.

DISCUSSION

A. Standards for Motions to Dismiss

*3 When considering a motion to dismiss, the Court examines the sufficiency of the Complaint, not the merits of the lawsuit. Triad Assocs. v. Chicago Hous. Auth., 892 F.2d 583, 586 (7th Cir.1989), cert. denied, 498 U.S. 845 (1990). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A motion to dismiss will be granted only if the Court finds that the plaintiff can prove no set of facts that would entitle her to relief. Venture Assoc. Corp. v. Zenith Data Systems Corp., 987 F.2d 429, 432 (7th Cir.1993); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). On a motion to dismiss, the Court draws all inferences and resolves all ambiguities in the plaintiff's favor and assumes that all well-pleaded facts are true. Dimmig v. Wahl, 983 F.2d 86, 86 (7th Cir.), cert. denied, 510 U.S. 861 (1993).

B. Plaintiffs' RICO Claim (Count One)

Section 1962(c) of RICO--the provision under which Count One is brought--makes it unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs, through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Thus, to state a claim under Section 1962(c), a RICO plaintiff must show "(1) conduct (2) of an enterprise



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *3 (N.D.Ill.))

Page 952

(3) through a pattern (4) of racketeering activity."
Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496
(1985). [FN2]

> FN2. As noted by the court in Katzman v.
> Victoria's Secret Catalogue, 1996 WL 351228, at
> *3 (S.D.N.Y. June 26, 1996): "Civil RICO is an
> unusually potent weapon--the litigation equivalent of
> a thermonuclear device." Miranda v. Ponce Fed.
> Bank, 948 F.2d 41, 44 (1st Cir.1991). Because
> the "mere assertion of a RICO claim ... has an
> almost inevitable stigmatizing effect on those named
> as defendants, ... courts should strive to flush out
> frivolous RICO allegations at an early stage of the
> litigation." Figueroa Ruiz v. Alegria, 896 F.2d
> 645, 650 (1st Cir.1990).

A RICO enterprise is "an ongoing 'structure' of
persons associated through time, joined in purpose,
and organized in a manner amenable to hierarchical
or consensual decision-making." Jennings v. Emry,
910 F.2d 1434, 1440 (7th Cir.1990). A "pattern"
requires "at least two acts of racketeering activity,
one of which occurred after the effective date of this
chapter and the last of which occurred within ten
years (excluding any period of imprisonment) after
the commission of a prior act of racketeering
activity." 18 U.S.C. § 1961(5). Finally,
"racketeering activity" is defined as any act
constituting one of over fifty state and federal
crimes listed in 18 U.S.C. § 1961(1), including mail
fraud, 18 U.S.C. § 1341, and wire fraud, 18 U.S.C.
§ 1343.

Here, Plaintiffs identify three enterprises in their
Amended Complaint: (1) the Chrysler Group--a
corporate group which includes Chrysler Financial
Corporation ("CFC"), a wholly owned subsidiary of
Chrysler; Chrysler Credit Corporation ("Chrysler
Credit"), a subsidiary of CFC; Chrysler Auto
Receivables Company ("CARC"); and a number of
"subsidiaries and affiliates" which manufacture
Chrysler products abroad or export Chrysler
products--; (2) an association-in-fact consisting of
Chrysler and the Chrysler dealers through which
Chrysler service contracts are sold; and (3) an
association-in-fact consisting of Chrysler and each
of the Chrysler dealers through which Chrysler
service contracts are sold, individually. [FN3] The
pattern of racketeering activity alleged by Plaintiffs
consists of Chrysler's scheme to defraud Fitzgerald,
Rindal and other consumers by selling purportedly

"complete" and "comprehensive" service contracts
without disclosing the existence of numerous
"exceptions" to the service contracts' coverages.
According to Plaintiffs, "Chrysler made extensive
use of the United States mails and interstate wire
transmissions, in repeated violation of 18 U.S.C. §§
1341 and 1343, to execute, effectuate, facilitate and
further the above described scheme on
consumers...." (Amend.Compl. ¶ 77.)

> FN3. An "association-in-fact" enterprise is defined
> by RICO as a "union or group of individuals
> associated in fact although not a legal entity." 18
> U.S.C. § 1961(4). The Supreme Court has
> described it as "a group of persons associated
> together for a common purpose of engaging in a
> course o conduct." United States v. Turkette, 452
> U.S. 576, 583 (1981).

1. Plaintiffs Adequately Plead the Predicate Acts
of Mail and/or Wire Fraud

*4 In pleading the existence of predicate acts
involving fraud, Fed.R.Civ.P. 9(b) applies. Rule
9(b) states:

> In all averments of fraud or mistake, the
> circumstances constituting fraud or mistake shall
> be stated with particularity. malice, intent,
> knowledge, and other condition of mind of a
> person may be averred generally.

In Bankcard America, Inc. v. Universal Bancard
Systems, Inc., 904 F.Supp. 753 (N.D.Ill.1995), the
court explained the requirements of Rule 9(b) in the
RICO context:

> When the underlying fraudulent conduct is alleged
> to be mail or wire fraud, this Court addresses the
> circumstances of the "communication" rather than
> those of the "misrepresentation." The first
> sentence of Rule 9(b) requires the pleading of
> circumstances constituting the fraud. In the mail
> and wire fraud contexts, it does not require a
> plaintiff to explain in a complaint the theory f how
> or why a particular postal or telephonic
> communication was false or misleading, or was
> relied upon to the plaintiff's detriment.... In
> other contexts, more intricate detail might be
> required in a complaint concerning statements and
> omissions to give effect to the purposes behind
> Rule 9(b).
> Pleading the circumstances of fraud with
> particularity, then, requires that the plaintiff state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *4 (N.D.Ill.))

at a minimum the time, place, an content of the alleged communications perpetrating the fraud. Where mail and wire fraud are at issue, "the plaintiff must, within reason, describe the time, place and content of the mail and wire communications, and it must identify the parties to these communications."    A plaintiff should also name the method of communication used to achieve the predicate acts. Id. at 759 (quoting Jepson, Inc. v. Makita Corp., 34 F.3d 1321, 1328 (7th Cir.1994)) (citations omitted); see also Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1020 (7th Cir.1992); Ouaknine v. MacFarlane, 897 F.2d 75, 79-80 (2d Cir.1990); R.E. Davis Chemical Corp. v. Nalco Chemical Co., 757 F.Supp. 1499, 1516 (N.D.Ill.1990).

Here, the Court has identified at least five predicate acts--that is, five mailings and/or wire communications--pled with the specificity required by Rule 9(b): (1) the dealer's transmittal of Fitzgerald's service contract to Chrysler and to Chrysler Credit; (2) Chrysler's December 5, 1991 mailed statement to Fitzgerald containing the "Adjustment Codes" identifying the reason for Chrysler's partial reimbursement of Fitzgerald's claim; (3) Olmeda's January 10, 1992 letter to Fitzgerald indicating that Chrysler would not reimburse Fitzgerald for the remainder of his repair bill; (4) Schaumburg Dodge's transmittal of Rindal's service contract to Chrysler and to Chrysler Credit; and (5) Chrysler's letter to Rindal "congratulating" her on her purchase of the service contract. [FN4] Thus, contrary to Chrysler's contention, Plaintiffs have alleged the predicate acts of mail and/or wire fraud with particularity; and, accordingly, the Complaint cannot be dismissed pursuant to Fed.R.Civ.P. 9(b).

FN4. Plaintiffs also point to the following "classes" of mail and/or wire communications in support of their Section 1962(c) claim: (1) Chrysler's use of the mails to get service contract forms to dealers so that the dealers could sell those contracts; (2) the dealers' transmittal to Chrysler by interstate wire of executed service contract applications; (3) letters received by consumers from Chrysler immediately following the purchase of service contracts purportedly describing the service contracts' coverages; (4) Chrysler's use of the mail to solicit customers who had not purchased service contracts through dealers; and (5) Chrysler's sending of partial reimbursement checks to service contract purchasers who made claims under the contracts. These "classes" do not, by themselves, comply with the pleading requirements of Rule 9(b), however.

2. Plaintiffs' RICO Claim Fails Because Chrysler Cannot be Held Liable Under Section 1962(c) for Conducting its Own Corporate Affairs

*5 The law of this Circuit is well-settled that, to be liable under Section 1962(c), a "person" must be separate and distinct from the "enterprise." Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 646 (7th Cir.1995); Haroco, Inc. v. Nat'l Bank & Trust Co., 747 F.2d 384, 401-02 (7th Cir.1984), aff'd on other grounds, 473 U.S. 606 (1984). Indeed, "liability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163, 1173 (1993) (as quoted in Richmond, 52 F.3d at 646).

In Richmond, the Seventh Circuit specifically endorsed the analyses employed by the Third Circuit in Brittingham v. Mobil Corp., 943 F.2d 297 (3d Cir.1991), and by the Second Circuit in Riverwoods Chappaqua v. Marine Midland Bank, 30 F.3d 339, 343 (2d Cir.1994). The Seventh Circuit took notice of the fact that, in Brittingham, the court rejected an attempt "to circumvent the distinctiveness requirement by alleging enterprises that are merely combinations of individuals or entities affiliated with a defendant corporation," Brittingham, 943 F.2d at 301-02, because "when a defendant is itself a collective entity, it is more likely that the alleged enterprise is in reality no different from the association of individuals or entities that constitute the defendant or carry out its actions." Id. at 302. [FN5] The Seventh Circuit similarly noted the Riverwoods court's conclusion that a defendant bank--the "person"--was not distinct from an "enterprise" consisting of an association-in-fact of the bank and a group of the bank's employees. [FN6]

FN5. While Plaintiffs correctly note that the "distinctiveness" analysis set forth in Brittingham and a host of similar Third Circuit cases--Glessner v. Kenney, 952 F.2d 702 (3d Cir.1991); Lorenz v. CSX Corp., 1 F.3d 1406 (3d Cir.1993); and Gasoline Sales, Inc. v. Aero Oil Co., 39 F.3d 70



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *5 (N.D.Ill.))

Page 954

(3d Cir.1994)--has been shaken by the holding in Jaguar Cars, Inc. v. Royal Oaks Motor Car Co., 46 F.3d 258 (3d Cir.1995), the Brittingham analysis retains vitality with respect to claims, such as Plaintiffs', involving corporate "persons." As recently explained: In Jaguar Cars, Inc. v. Royal Oaks Motor Car, Co., 46 F.3d 258 (3d Cir.1995), the court determined that its jurisprudence concerning the distinctiveness requirement of § 1962(c) as applied to corporate officers and employees did not survive the Supreme Court's opinions in Reves v. Ernst & Young, 507 U.S. 170, 113 S.Ct. 1163 (1993) and National Organization for Women v. Scheidler, 510 U.S. 249, 114 S.Ct. 798 (1994).... Nevertheless, this Court does not read Jaguar Cars as in any way undermining or affecting this Court's analysis of the § 1962(c) claim in the instant case, ... Jaguar Cars made clear that "the essential holding of Enright remains undisturbed--a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient" under § 1962(c). [Jaguar Cars, 46 F.3d at 269.] Moreover, as the Brittingham court recognized, there is good reason to distinguish between corporate "persons" and individual "persons" in applying the Enright rule: [I]ndividual defendants, in contrast to collective entities, are generally distinct rom the enterprise through which they act. Unlike a collective entity, it is unlikely that an individual defendant by himself would constitute a valid enterprise.... But when a defendant is itself a collective entity, it is more likely that the alleged enterprise is in reality no different rom the association of individuals or entities that constitute the defendant or carry out its actions. Unlike individual defendants, a corporation can act only through its employees and agents. Metcalf v. Painewebber Inc., 886 F.Supp. 503, 514 n. 12 (W.D.Pa.1995). Moreover, and perhaps more importantly, the Brittingham analysis has expressly been accepted by the Seventh Circuit, the Jaguar Cars decision notwithstanding. Richmond, 52 F.3d at 646-47.

FN6. The Riverwoods court explained: Because a corporation can only function through its employees and agents, any act of the corporation can be viewed as an act of such an enterprise, and the enterprise is, in reality, no more than the defendant itself. Thus, where employees of a corporation associate together to commit a pattern of predicate acts in the course of their employment and on behalf of the corporation, the employees in association with the corporation do not form an enterprise distinct from the corporation. Riverwoods, 30 F.3d at 344.

Relying upon Brittingham and Riverwoods, the Richmond court held that the defendant "persons"--Cassel, a sales finance agency, and Nationwide Acceptance, another sales finance agency and the primary owner and general partner of Cassel--were not sufficiently distinct from the two alleged "enterprises"--one of which was the "Nationwide Group," an association-in-fact made up of Cassel, Nationwide Acceptance and other companies, and the other of which was the Nationwide Group along with the car dealers with which the Group dealt--to satisfy the "distinctiveness" requirement of Section 1962(c). The court stated:
In this case, Ms. Richmond's claim begins and ends with the fraud allegedly committed by Nationwide Acceptance and Cassel. There is no showing that other members of the alleged association in fact participated in the fraud, or that the persons, Nationwide Acceptance and Cassel, conducted the affairs of either of the alleged enterprises (rather than their own affairs) through a pattern of racketeering activity, as required by Reves, 507 U.S. at ----, 113 S.Ct. at 1173.
Richmond, 52 F.3d at 647.

Judge Plunkett accepted, applied and expounded on the Richmond court's analysis in Chamberlain Manufacturing Corp. v. Maremont Corp., 919 F.Supp. 1150 (N.D.Ill.1996). In Maremont, Plaintiff Chamberlain, the purchaser of Saco Defense, Inc., a former subsidiary of Defendant Maremont, filed a RICO Section 1962(c) claim against Maremont. Specifically, Chamberlain alleged that Maremont was the "person," that Maremont and Saco together were the "enterprise," and that Maremont-Saco had engaged both in a scheme to defraud the government by manufacturing and selling deficient weapons and in a scheme to conceal their fraud on the government from Chamberlain when Chamberlain purchased Saco from Maremont. Finding Maremont to be insufficiently distinct from the Maremont-Saco enterprise to support a claim under Section 1962(c), Judge Plunkett explained:
*6 We have found no cases from the court of appeals addressing the precise factual scenario before us, in which the parent (Maremont) is the

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *6 (N.D.Ill.))

Page 955

person and the parent and its wholly-owned subsidiary (Maremont-Saco) are, collectively, the enterprise. So, we have considered the fates of Section 1962(c) claims presenting similar scenarios. Under Haroco, it is impossible to state a section 1962(c) claim where a single corporation is both the person and the enterprise. [Haroco, 747 F.2d at 400.] Therefore, Chamberlain could not have alleged that Maremont was both the person and the enterprise. And, under [Lorenz v. CSX Corp., 1 F.3d 1406 (3d Cir.1993) ], it is impossible to state a claim where the parent is the person and the subsidiary is the enterprise unless the activities of the parent and the subsidiary are clearly distinct. Lorenz, 1 F.3d at 1406....

Yet all Chamberlain has done is allege that Maremont is the person and Maremont-Saco is the enterprise. If this is to succeed, then the Maremont-Saco association-in-fact must be, in some meaningful way, different from either Maremont or Saco individually. But it is not. To put it another way, Chamberlain has not alleged, and the facts have not shown, that Maremont conducted or participated in the affairs of the enterprise, as distinct from its own affairs (through itself and Saco), through a pattern of racketeering activity.

Maremont, 919 F.Supp. at 1157; see also Moore v. Fidelity Financial Services, Inc., 897 F.Supp. 378, 379-80 (N.D.Ill.1995); Katzman v. Victoria's Secret Catalogue, 1996 WL 351228, at *6 (S.D.N.Y. June 26, 1996); Department of Economic Development v. Arthur Andersen & Co., 924 F.Supp. 449, 470-71 (S.D.N.Y.1996).

Like the enterprises at issue in Richmond, Brittingham, Riverwoods, and Maremont, each of the three enterprises alleged by Fitzgerald and Rindal--the Chrysler Group, an association-in-fact of Chrysler and all Chrysler dealers, and an association-in-fact of Chrysler and each Chrysler dealer individually--consists of no more than a conglomeration of Chrysler and one or more of Chrysler's subsidiaries, divisions, affiliates and/or agents. Each and every component of the "Chrysler Group"--CFC; Chrysler Credit; CARC; Chrysler Canada, Ltd.; Chrysler de Mexico, S.A.; Chrysler Motors de Venezuela, S.A.; Chrysler Japan Sales Ltd.; Chrysler do Brasil Commercial Exportadora Improtadora, Ltd.; and several dozen trusts--is recognized by Plaintiffs to be either a division, a wholly-owned subsidiary, or an affiliate

company under the control of Chrysler. [FN7] (Amend.Compl. ¶¶ 9-14.) Further, Plaintiffs admit that the various Chrysler dealers, while independent businesses for other purposes, are agents of Chrysler with respect to the service contracts which are at the heart of the alleged "pattern of racketeering activity." Indeed, in their Amended Complaint, Plaintiffs describe the dealers as follows:

> FN7. That Chrysler is a formal legal entity distinct from the subsidiary corporations that make up the Chrysler Group is irrelevant. As stated by the Maremont court: As [Securitron Magnalock Corp. v. Schnabolk, 65 F.3d 256 (2d Cir.1995) ] makes clear, our conclusion that section 1962(c) requires more than the existence of separate legal entities where the person and the enterprise are affiliated corporations does not eviscerate section 1962(c) in the corporate context. Securitron demonstrates that where the conduct of the corporations is sufficiently distinct, a valid section 1962(c) may exist [sic]. But, the facts in this case are much more similar to those in Richmond and Brittingham than they are to those in Securitron, and the result should be similar as well. Maremont, 919 F.Supp. at 1158.

59. Each Chrysler dealer is an independent businessman for the purpose of reselling Chrysler vehicles. However, the dealer is expressly authorized to engage in the following acts by Chrysler with respect to service contracts and is the agent of Chrysler for the purposes of engaging in those acts:

*7 a. Selling Chrysler service contracts to members of the public. The contract is between Chrysler and the consumer, and the dealer is not a party to it.

b. Delivering information about Chrysler service contracts to members of the public.

c. Performing repairs to which holders of Chrysler service contracts are entitled under the terms of their service contracts.

(Amend.Compl. ¶ 59.)

Thus, it is clear from the facts contained in Plaintiffs' Complaint that, "the elements of an ongoing structure and an organization capable of hierarchical or consensual decision-making are nothing more than the existing corporate structure of parent and subsidiary, while the element of a joint purpose is merely the normal business affairs" of Chrysler. Maremont, 919 F.Supp. at 1157. This



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *7 (N.D.Ill.))

is true regardless of whether the enterprise is defined as the Chrysler Group, Chrysler plus all dealers, or Chrysler plus each individual dealer. [FN8] As a result, Plaintiffs have asserted nothing more than that, with respect to the sale and financing of Chrysler service contracts, Chrysler conducted, and is conducting, its own corporate affairs; such an assertion is legally insufficient to satisfy the "distinctiveness" requirement for a valid RICO Section 1962(c) claim. Accordingly, Plaintiffs' Count One is dismissed pursuant to Fed.R.Civ.P. 12(b)(6). [FN9]

> FN8. While the latter two enterprises--Chrysler plus all dealers and Chrysler plus each dealer--certainly are more distinct from Chrysler than is the first alleged enterprise--the Chrysler Group--, these two enterprises ultimately fail to satisfy the distinctiveness requirement. As recognized by Plaintiffs' own statements in their Amended Complaint, the dealers are Chrysler's agents for purposes of any and all acts relating to the sale of service contracts. Consequently, these dealers, like the advertising agencies in Brittingham and the car dealers in Maremont, are deemed to be merely the "arms" of Chrysler with respect to the contracts; the dealers take no action with respect to the contracts independent of Chrysler. Further, as in Maremont, there is no allegation by Plaintiffs that any of subsidiaries, dealers, divisions or affiliate companies under Chrysler's corporate control directed Chrysler's activities with respect to the service contracts; indeed, the Complaint makes clear that all policies and practices related to the contracts were dictated by Chrysler. Thus, the various cases cited by Plaintiffs in support of their position--all cases in which the named "persons" either were individuals or were subsidiary corporations that directed the actions of their parent corporations with respect to the pattern of racketeering activity--are inapposite.

> FN9. Because the Court finds Plaintiff's RICO Section 1962(c) claim to be substantively deficient, the Court need not, and does not, address Chrysler's argument that Fitzgerald's RICO claim is time-barred.

C. Plaintiffs' Claim for Violations of The States' Consumer Fraud Statutes (Count Two)

In Count Two, Plaintiffs allege violations of one or more of the consumer fraud statutes of the fifty states and the District of Columbia. Yet, because this case has not been certified as a class action, Plaintiffs' "shotgun" pleading method (as Chrysler calls it) is overinclusive. See Jefferson v. Security Pacific Financial Services, Inc, 1995 WL 579305, at *1 (N.D.Ill. Oct. 2, 1995); Cowen v. Bank United of Texas, FSB, 1995 WL 38978, at *7 (N.D.Ill. Jan. 25, 1995), aff'd, 70 F.3d 937 (1995). Consequently, this Court considers Plaintiffs' claim only with respect to the Illinois Consumer Fraud and Deceptive Business Practices Act (the "Illinois Act"), 815 ILCS 505/1 et seq.. [FN10]

> FN10. A federal court sitting in diversity applies the choice of law rules of the forum state. Klaxon v. Senator Elec. Mfg. Co., 313 U.S. 487, 496 (1941). "In deciding choice of law questions, Illinois courts will apply the law of the state where the tort occurred unless Illinois has a more significant relationship with the occurrence and with the parties." Kwasniewski v. Schaid, 607 N.E.2d 214, 217 (Ill.1993); see also Miller v. Long-Airdox Co., 914 F.2d 976, 978 (7th Cir.1990). Here, not only did the alleged fraud occur in Illinois, but Illinois unquestionably has the most significant relationship with Fitzgerald, with Rindal and with the occurrences at issue. Fitzgerald resides, and Rindal has its offices, in Illinois. Plaintiffs' allege that "acts, transactions, and injuries complained of occurred in substantial part in the Northern District of Illinois." (Amend.Compl. ¶ 4.) The service contracts about which Plaintiffs complain were allegedly issued by Chrysler to Plaintiffs at their respective Illinois addresses. All correspondence between Chrysler and Plaintiffs were sent to Plaintiffs in Illinois. Finally, Rindal purchased its vehicle and service contract from Schaumburg Dodge, a deal located in Schaumburg, Illinois.

Chrysler maintains that, under the Illinois Act, both Rindal's and Fitzgerald's claims are time-barred. The Illinois Act provides that a plaintiff must bring a claim for a violation of the Act within three years of the date the cause of action accrues. 815 ILCS 505/10a(e). A cause of action under the Act accrues when a plaintiff "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." Knox College v. Celotex Corp., 430 N.E.2d 976, 980 (Ill.1981) (as quoted in Highsmith v. Chrysler Credit Corp., 18 F.3d 434, 441 (7th



Not Reported in F.Supp.
(Cite as: 1996 WL 473456, *7 (N.D.Ill.))

Page 957

Cir.1994)).

Here, Plaintiffs concede that Fitzgerald knew or
should have known that his injury was wrongfully
caused more than three years before the present
action was filed; accordingly, Fitzgerald's claim is,
in fact, time-barred. [FN11] Yet, Plaintiffs
contend that, while Rindal similarly may have
known of her injury more then three years prior to
her joining this action in April 1996, Rindal did not
know of the existence of the "Adjustment Codes"--
and, thus, did not know or have reason to know that
her injury was wrongly caused--until only recently.
This contention is unavailing.

> FN11. Plaintiffs contend that Fitzgerald is permitted
> to bring his claim under the Michigan Consumer
> Protection Act, Michigan Compiled Laws §
> 445.901-914. This contention must fail, however,
> as Fitzgerald is not a Michigan resident, he was not
> injured in Michigan, and he did not purchase or
> execute his service contract in Michigan. See
> Highsmith v. Chrysler Credit Corp., 150 B.R. 997,
> 1007-08 (N.D.Ill.1993), aff'd in part, rev'd in part
> on other grounds, 18 F.3d 434 (7th Cir.1994).

*8 The substance of Rindal's claim under the
Illinois Act is that Chrysler defrauded her by
representing that her service contract coverage was
"complete" and "comprehensive" when, in fact, the
contract contained several unstated coverage
"exceptions." Rindal knew or reasonably should
have known of Chrysler's alleged fraud in
November 1992, when her claim for reimbursement
for repairs to her Dynasty was denied by Chrysler.
That Rindal was not specifically told of the
"Adjustment Codes" in November 1992 is
irrelevant; she was squarely confronted with
Chrysler's purported fraud when Chrysler refused to
pay for her repairs--a refusal that was wholly
inconsistent with, and contrary to, her
understanding that the service contract required total
reimbursement. Thus, like Fitzgerald, Rindal knew
or should have known that her injury was
wrongfully caused more than three years before she
asserted her present claim; and, consequently, her
action is barred by the applicable three-year statute
of limitations. [FN12]

> FN12. Because this Court finds Plaintiffs' claims
> under the Illinois Act to be untimely, the Court
> need not, and does not, address Chrysler's

contention that Rindal fails to plead her claim of
consumer fraud with the requisite specificity.

D. Plaintiffs Fail to Satisfy the "100 Named
Plaintiffs" Requirement of the Magnuson-Moss Act

Count Four of Plaintiffs' Complaint attempts to
set forth a claim under the Magnuson-Moss Act, 15
U.S.C. § 2301 et seq.. Yet, Section 2310(d)(3) of
the statute provides:
> No claim shall be cognizable in a suit brought
> under paragraph (1)(b) of this subsection--
> * * *
> (C) if the action is brought as a class action, and
> the number of named plaintiffs is less than one
> hundred.
15 U.S.C. § 2310(d)(3). As recognized by the
Seventh Circuit, the "100 named plaintiffs"
requirement "remains a substantial barrier to
maintaining class actions under the Act. It was
enacted by Congress to prevent 'trivial or
insignificant' class actions from being brought in the
federal courts." In re General Motors Corp. Engine
Interchange Litigation, 594 F.2d 1106, 1114 n. 2
(7th Cir.), cert. denied, 444 U.S. 870 (1979).

Plaintiffs Complaint currently does not identify
100 named plaintiffs as required by Section
2310(d)(3). Since compliance with the Magnuson-
Moss Act's strict jurisdictional requirements must be
achieved at the time of the Complaint's filing,
Shazes v. Sylvan Pools, Inc., 1988 WL 3096, at *2
(E.D.Pa. Jan. 14, 1988), "the absence of one
hundred plaintiffs is fatal to plaintiffs' standing to
proceed with their Magnuson-Moss claim in the
class action mode." Id. [FN13]

> FN13. While Plaintiffs contend that this Court may
> exercise supplemental jurisdiction over the
> Magnuson-Moss Act claim even in the absence of
> 100 named plaintiffs, this contention is unavailing
> for two primary reasons. First, such an assertion
> contradicts the plain language of section 2310(d)(3).
> Second, this Court's exercise of supplemental
> jurisdiction over a jurisdictionally deficient
> Magnuson-Moss Act claim would contravene
> Congress's intent in passing such clear jurisdictional
> hurdles--namely, to screen out potentially trivial or
> minor class actions. See Shazes, 1995 WL 3096, at
> *2; Abraham v. Volkswagen of America, Inc., 795
> F.2d 238, 246 n. 6 (2d Cir.1986). Because the
> Court dismisses Plaintiffs' Magnuson-Moss Act

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.
**(Cite as: 1996 WL 473456, \*8 (N.D.Ill.))**

class action for failure to name 100 plaintiffs, the Court does not address Chrysler's arguments as to Rindal's failure to afford Chrysler an opportunity to cure its deficient performance.

### CONCLUSION

For the foregoing reasons, the Court grants Chrysler's motion to dismiss Plaintiffs' Count One (RICO), Count Two (Consumer Fraud), and Count Four (Magnuson-Moss Act) pursuant to Fed.R.Civ.P. 12(b)(6). Chrysler's motion to strike Plaintiffs' Count Three prayer for injunctive relief is similarly granted.

1996 WL 473456 (N.D.Ill.), 1996-2 Trade Cases P 71,629, RICO Bus.Disp.Guide 9159

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**TAB 2**

Not Reported in F.Supp.2d
54 UCC Rep.Serv.2d 586
(Cite as: 2004 WL 1398024 (D.N.J.))
< KeyCite Citations >

Page 503

United States District Court,
D. New Jersey.

Dorothy HEINDEL and Jean Kinmoth Plaintiff,
v.
PFIZER INC., Pharmacia Corp., Monsanto Co.,
G.D. Searle & Co. and Merck & Co.,
Inc., Defendants

No. Civ.A. 02-3348(SRC).

June 7, 2004.

Donna Siegel Moffa, Trujillo Rodriguez &
Richards, LLP, Haddonfield, NJ, for Plaintiff.

Steven A. Karg, Norris, McLaughlin & Marcus,
PC, Somerville, NJ, Wilfred P. Coronato, Hughes,
Hubbard & Reed LLP, Jersey City, NJ, for
Defendants.

OPINION

CHESLER, J.

*1 This matter comes before the Court on the
motion of Defendants, Pfizer, Inc., Pharmacia
Corporation, the Monsanto Company, Searle & Co.,
and Merck & Co., Inc. for summary judgment. The
Court has opted to adjudicate this motion on the
papers, and renders this opinion without oral
argument pursuant to Fed.R.Civ.P. 78. For the
reasons set forth more fully below, Defendants'
motion is granted, and summary judgment entered
dismissing Plaintiff's complaint.

I. INTRODUCTION

Plaintiffs in this matter are two consumers who
suffer from pain associated with osteoarthritis and
other conditions. Both took prescription drugs to
treat their conditions and both got relief from the
drugs they took. Though neither plaintiff suffered
any physical injury from either of the drugs at issue,
both now claim that they are entitled to damages for
the "economic injuries" they suffered due to
Defendants' failure to publicize the results of two
clinical studies that revealed possible risks
associated with the use of the drugs. Plaintiffs
assert claims arising under the consumer fraud

statutes of New Jersey or "other states," claims for
breach of implied warranty of merchantability, and
claims for injunctive/equitable relief requiring
Defendants to issue revised advertising statements,
marketing materials, and product packaging. [FN1]

FN1. Plaintiffs have also withdrawn several
additional claims, which are therefore not addressed
in this opinion.

For the reasons adduced more fully below, the
Court finds that Plaintiffs' claims lack merit under
the laws of Pennsylvania. Moreover, the Court finds
that since the Plaintiffs suffered no injury, there is
no theory under which they are entitled to recover,
and that Defendants are therefore entitled to
summary judgment as to all claims.

II. BACKGROUND

A. Facts

The Defendants in this matter manufactured and
marketed two prescription pain medications which
belong to a class of medications known as "non-
steroidal anti-inflammatory drugs," or "NSAIDs."
Pfizer, Inc., Pharmacia Corporation, Monsanto Co.,
and G.D. Searle & Co. (collectively the "Celebrex
Defendants") are (or were) the makers of Celebrex,
while Vioxx is made by Merck & Co. ("hereinafter
"Merck"). Non-steroidal anti-inflammatory drugs
reduce pain by blocking the body's production of
enzymes called cyclooxygenase, or "COX," of
which there are two forms: COX-1 and COX-2.
Most traditional NSAIDs, (such as ibuprofen) work
by blocking the COX-1 enzyme, which reduces pain
but may lead to gastrointestinal perforations and
bleeds. Celebrex and Vioxx, it is believed, block the
COX-2 enzyme that triggers pain and inflamation
while sparing the (COX-1) enzyme that helps
maintain normal stomach lining. Both drugs are
indicated for, inter alia, treating the signs symptoms
of   osteoarthritis,   and   rheumatoid   arthritis,
management of acute pain in adults, and treatment
of primary dysmenorrhea.

Plaintiffs Heindel and Kinmonth both suffer from
pain associated with osteoarthritis. Both women,
who are citizens of Pennsylvania, were treated by
the same rheumatologist, Dr. Lawrence Leventhal,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



and both were prescribed (and took) traditional NSAIDs. Among other things, Heindel had survived esophageal cancer by having part of her stomach removed (and her stomach thereby raised); and Kinmonth had a history of G.I. complications associated with her ingestion of other drugs used to treat her musculoskeltal aches and pains. These factors put both at risk for serious gastrointestinal side effects, including non-steroidal induced ulcers and ulcer complications because "people that are at risk for developing non-steroidal induced ulcers are: people over the age of 60, individuals with a history of G.I. bleed, [and] individuals with concomitant medical problems." (Deposition of Dr. Lawrence J. Leventhal (hereinafter "Leventhal Dep.) at p. 7-8; 24-26.)

Plaintiff Heindel

**\*2** Heindel first took Celebrex in February of 1999 when Dr. Leventhal provided her with samples of the drug. (Deposition of Dorothy Heindel (hereinafter "Heindel Dep.") at 44-46; Leventhal Dep. at 14). Heindel responded favorably to Celebrex, which apparently gave her tremendous relief from her arthritis pain and other symptoms, and she did not experience any adverse side effects. (Heindel Dep. at 44-48). She continued to take Celebrex until July of 1999, when she read an article in a consumer newsletter that questioned the utility and safety of new drugs like Celebrex. (Heindel Dep. at 60-63, 99-100). Dr. Leventhal told Heindel that Celebrex was the best treatment for her, and advised her to continue using it. (Heindel Dep. at 63-64; Leventhal Dep. at 18-19). Thereafter she resumed taking Celebrex, and apparently used it until February 2001, when, at Dr. Leventhal's suggestion, she switched to Vioxx. (Heindel Dep. at 76-77; Leventhal Dep. at). Vioxx apparently caused her to experience stomach upset, and after a few months she switched back to Celebrex. (Heindel Dep. at 77; Leventhal Dep. at 55). [FN2] In February of 2002, Dr. Leventhal provided Heindel with another prescription drug, Bextra, to "see if it [was] better than Celebrex." (Heindel Dep. At 80). Finding that it was not, Heindel switched back to Celebrex in November of 2002. (Heindel Dep at 84). Heindel does not claim that she suffered ill effects from or was personally injured by Celebrex. It appears that, at least as of the filing of Defendants' motion for summary judgment, she was still taking Celebrex and planned to continue using it

in the future. All of Heindel's treatment took place in Pennsylvania, where Dr. Leventhal is located, where she lives, and where she purchased Celebrex and Vioxx.

> FN2. Heindel and Dr. Leventhal testified that Heindel was prescribed and ingested Vioxx. However, Heindel has not made any claims against Defendant Merck & Co., the manufacturers of Vioxx.

Plaintiff Kinmonth

Kinmonth was first prescribed Celebrex in May or June of 1999. (Deposition of Jean Kinmonth (hereinafter "Kinmonth Dep.") at 16-18, 95-96; Leventhal Dep. at 28). Some time in the spring of 2000, she switched to Vioxx, which Dr. Leventhal thought might provide her with a greater degree of relief. (Leventhal Dep. at 33-34). Though Vioxx initially provided Kinmonth with more complete relief from her symptoms than Celebrex had, its efficacy declined over time, and she eventually switched back to Celebrex.

Kinmonth does not claim that she suffered ill effects from or was personally injured by Celebrex or Vioxx. It appears that, at least as of the time of her deposition, she was still using Celebrex. (It is not clear whether she was still taking Vioxx or had any plans to do so.)All of Kinmonth's treatment took place in Pennsylvania, where Dr. Leventhal is located, where she lives, and where she purchased Celebrex and Vioxx.

B. Plaintiff's Claims

Plaintiffs brought this consumer class action on behalf of the purchasers and users of Celebrex and Vioxx, claiming that they are entitled to recover economic damages they sustained due to Defendants' "unconscionable marketing conduct." Plaintiff's Brief (hereinafter "Pl.'s Br.") at 1. They are pursuing claims under the New Jersey Consumer Fraud Act (Count III) and for breach of implied warranty of merchantability (Count I). [FN3]

> FN3. Plaintiff's Complaint also contains claims under the New Jersey Product Liability Act (Count II) and for Medical Monitoring (Count V). See Complaint ¶¶ 83-91, 109-117. Plaintiffs agreed, in a consent order dated September 22, 2003, to dismiss

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1398024, *2 (D.N.J.))

their medical monitoring claim and to refrain from seeking certification of their products liability claim. Because they were not physically harmed by ingesting Celebrex and Vioxx and are not seeking damages for physical injury, Plaintiffs agreed, in a consent order signed April 28, 2004, to withdraw their individual products liability claims. Finally, Plaintiffs have acknowledged that their claim for injunctive relief is not a separate cause of action, and that accordingly consideration by the Court of that claim would be appropriate only in the event that Plaintiffs were to prevail on the breach of implied warranty and consumer fraud claims.

**\*3** Plaintiffs claim that Defendants knew, by 1998, that their "selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them," but nonetheless made a marketing decision to "push these drugs to market on claimed improvements in gastrointestinal safety while downplaying their cardiovascular dangers." Complaint at ¶¶ 23, 24. Plaintiffs contend that Defendants funded two significant clinical trials to justify their advertising claims and demonstrate that Celebrex and Vioxx had greater gastrointestinal safety than traditional NSAIDs-the Celecoxib Long-Term Arthritis Safety Study ("CLASS") and the Vioxx Gastrointestinal Outcomes Research Study ("VIGOR"). Complaint at ¶ 25.

The CLASS study compared gastrointestinal toxicity in arthritis patients taking Celebrex, ibuprofen, and dicofenac. It included patients with heart problems, who were allowed to take low prophylactic doses of aspirin to reduce the risk of adverse cardiovascular events. The VIGOR study-which compared gastrointestinal toxicity in patients taking VIOXX with those taking naproxen to treat arthritisexcluded patients with heart problems. Complaint at ¶ 26, 27. Plaintiffs claim that Defendants' attention to cardiac factors establishes their "secret acknowledgment of the likelihood cardiovascular events." Id. at ¶ 28. Plaintiffs further allege that once the studies were concluded the Defendants tried to divert attention from cardiovascular risks by either not publishing cardiovascular data they had gathered or publishing partial information. (Presumably this allegation refers to publication in medical journals or other media traditionally used for the purpose of disseminating the results of clinical trials; it is not clear from the briefing.)

The results of both studies were submitted to the FDA's Arthritis Drugs Advisory Committee ("the Committee") as part of requests to exempt Celebrex and Vioxx from gastrointestinal safety warning in their package inserts. Plaintiffs state that the Committee did not consider the cardiovascular safety of Celebrex, but they do not discuss whether this would have been a normal consideration given the scope of the exemption sought. They also state that, because patients in the VIGOR study suffered significantly more adverse cardiovascular events than those taking naproxen, the Committee suggested that "Merck add a warning to its package insert advising that Vioxx lacked the cardio-protective properties of traditional NSAIDs." Id. at 34. However, it is not clear what Merck's obligation was to warn of a protective quality that Vioxx did not have, as opposed to warning of side effects that may have affirmatively caused.

Thereafter, Defendants "initiated extensive pre-release marketing campaigns" that emphasized Vioxx and Celebrex's efficacy without gastrointestinal side effects. This, Plaintiffs claim, was an attempt to "avoid negative publicity from the VIGOR report and the Committee's decisions. Id. at 36. Subsequently, Celebrex and Vioxx were approved by the FDA and released for sale. According to the Plaintiffs, Defendants should have (at this point), used their exponential profits to fund further studies to quantify cardiovascular risks, but instead poured money into advertising campaigns that emphasized the gastrointestinal safety of the drugs. As a "result of" these "misleading advertising campaigns, Celebrex and Vioxx were wildly successful. " Id. at 42-44.

**\*4** Persistent concern within the medical community about possible links between COX-2 inhibitors and increased blood clotting (with related incidence of cardiovascular events) eventually led to further research and study. In 2001 independent doctors from the Cleveland Clinic published a meta-analysis of the CLASS and VIGOR trials that concluded that COX-2 inhibitors posed an increased risk of adverse cardiovascular events compared to naproxen. Defendants did not modify their package inserts to reflect the results of the Cleveland Clinic study. Though Plaintiffs contend that the FDA sent both Defendants cautionary letters reflecting its concern about their failure to include warn of cardiovascular side effects in direct-to-consumer

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Page 506

advertising, it is far from clear that the FDA's letters addressed this issue. Vioxx and Celebrex have not been taken off the market, and remain popular treatments for osteoarthritis and other types of pain.

Plaintiffs admit that they are not pursuing any claims for physical injury, either for themselves or for the two sub-classes they seek to represent. Rather, their claims are based on the economic injury that Defendants' marketing practices have allegedly caused them. (Pl.'s Br. at 2). Specifically, they posit that Defendants' "uniform failure to disclose known cardiovascular risks associated with Celebrex and Vioxx caused consumers to pay artificially inflated prices for them." Id. Plaintiffs seek to recover some or all of the purchase price consumers paid for these drugs. Pl.'s Br. at 4-5.

Though this suit arises out of economic injuries allegedly suffered by the Plaintiffs, both Heindel and Kinmonth denied, when deposed, that they had suffered economic harm. Both plaintiffs also testified that they took Celebrex and Vioxx at the suggestion of their physicians, and did not rely on advertising or marketing materials created or distributed by Defendants.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if all of the probative materials in the record, viewed in the light most favorable to the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Brooks v. Kyler, 204 F.3d 102, 105, n. 5 (3d Cir.2000); Celotex v. Catrett, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir.1989). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it influences the outcome under the applicable law. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating either (1) that there is no genuine issue of fact and that, as a matter of law, the moving party must prevail, or (2) that the non-moving party

has not shown facts relating to an essential element of the issue for which he bears the burden of proof. Celotex, 477 U.S. at 331. Once either showing is made, the burden shifts to the non-moving party, who must demonstrate facts which support each element of the for which he bears the burden, and establish the existence of genuine issues of material fact. Id. To satisfy this burden, the non-moving party "may not rest on mere allegations or denial of his pleading." Fed.R.Civ.P. 56(e). Rather, he must produce sufficient evidence from which a reasonable jury might find in his favor, and may not simply create some metaphysical doubt as to material facts. Matsushita Elec. Indus. Co. V. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV. CHOICE OF LAW

*5 The parties disagree as to which state's law this Court should apply in considering Plaintiff's claims. Plaintiffs claim that, because Defendants have failed to establish specific conflicts between the laws of New Jersey and Pennsylvania, the laws of this forum (New Jersey) should apply. They also contend that the objectives underlying the consumer warranty laws of New Jersey and Pennsylvania are identical, thus requiring the application of New Jersey law to Plaintiff's claims. Turning to the governmental interest analysis, Plaintiffs argue that New Jersey has the greatest interest in having its law govern these claims because (1) the New Jersey legislature has expressed a specific intent to protect the citizens of other states from the deceptive practices of businesses located within its boundaries (even if some aspect of the transaction took place outside New Jersey); (2) many of the corporate decisions and actions that form the basis for Plaintiff's claimsincluding the development, production, and marketing of Celebrex and Vioxx-took place in New Jersey; and (3) because "Defendants have other significant contacts with New Jersey that give this state an express interest in having its laws apply to their conduct." Among the contacts mentioned are Defendants' large corporate presence in the state, the considerable number of people it employs, the tax breaks it receives from New Jersey, and the number of lawsuits (unrelated to this one) filed by Defendants in New Jersey courts.

The Defendants contend, for essentially the same

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1398024, *5 (D.N.J.))

Page 507

reasons, that Pennsylvania law should apply. They stress that both Plaintiffs live in Pennsylvania; that the conduct alleged occurred in Pennsylvania; and that the alleged financial injuries were suffered in Pennsylvania. All Defendants argue that the mere fact of a corporate presence (a minimum threshold which some of these defendants do not even meet, since only one of the four Celebrex Defendants has headquarters in New Jersey) does not give New Jersey an interest in the adjudication of these claims which overrides that of the Plaintiffs' home state. Thus, they argue, New Jersey has neither sufficient contacts with this litigation nor the requisite governmental interest in having its laws applied.

Federal courts sitting in diversity must apply the choice of law rules of the forum in which they sit. Klaxon Co. v. Stentor Electrical Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Accordingly, New Jersey's choice of law rules govern this Court's analysis. Chin v. Chrysler Corp., 182 F.R.D. 448, 457 (D.N.J.1998). New Jersey's rule "applies a flexible 'governmental interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." Gantes v. Kason, 145 N.J. 478, 484, 679 A.2d 106 (1996).

The initial prong of a government interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis. Gantes, 145 N.J. at 484, 679 A.2d 106; see also Veazy v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986). Hence, the Court's inquiry addresses potential conflicts between (1) the laws pertaining to implied warranty of merchantability; and (2) the consumer fraud statutes of New Jersey and Pennsylvania.

A. Whether a Conflict Exists

*6 In addition to not agreeing on which state's laws should apply, the parties do not agree as to how the Court should go about making such a determination. Plaintiffs, citing Boyes v. Greenwich Boat Works, 27 F.Supp.2d 543, 547 (D.N.J.1998), contend that "[w]here the parties fail to point out or establish any difference in the laws of the various

jurisdictions involved in a particular case, its proper for the court to apply the law of the forum." They then point out that, while Defendants may have identified areas of potential differences between the laws of New Jersey and Pennsylvania, these differences are immaterial because the underlying policies of both laws are the same. This approach assumes that the initial determination as to whether a conflict exists should be based on whether the policies underlying the respective laws differ. However, it is clear that under the governmental interest test a court must "first determine whether a conflict exists between the laws of the interested states," Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187 (1986) and, if the court finds a conflict, then determine "the state with the greatest interest in governing the particular issue." Veazey, 103 N.J. at 251, 510 A.2d 1187 (emphasis added). To do this, the court must "identify the governmental policies underlying the law of each state and how these policies are affected by each state's contacts to the litigation and the parties." Id. Hence, the Court should turn to an evaluation of the underlying policies only after determining that there indeed exists a conflict between the laws of the two states.

None of the parties have conducted a conflict analysis that follows this model, perhaps because aspects of each state's laws are unsettled as to one or another of the claims presented. Complicating matters is the somewhat novel application of implied warranty and consumer fraud remedies to claims that are predicated only on "economic injury." Nonetheless, the Court finds that the parties have indeed pointed out differences between the laws of New Jersey and Pennsylvania, and thus proceeds with the analysis.

1. Breach of Implied Warranty of Merchantability

Defendants argue that Pennsylvania law conflicts with New Jersey law in that, under Pennsylvania law, a claim for breach of implied warranty of merchantability may not be maintained against a seller of prescription drugs. The implied warranty of merchantability, "as described in the Uniform Commercial Code ("U.C.C.") and adopted by Pennsylvania, is 'a warranty that the goods will pass without objection in the trade and are fit for the ordinary purposes for which such goods are used." ' Davenport v. Medtronic, Inc., 2004 WL 193197 (E.D.Pa.2004); 13 Pa.C.S. § 2314. In order to

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



prevail under Pennsylvania law on a claim for breach of implied warranty, a plaintiff must show that the product was "defective." Thomas v. Carter-Wallace Inc., 27 Pa. D & C. 4th 146, 149 (C.P. Monroe 1994) (citing Dambacher by Dambacher v. Mallis, 336 Pa.Super. 23, 485 A.2d 408 (1984)), aff'd, 449 Pa.Super. 711, 673 A.2d 412 (1995)(finding that "a breach of implied warranty of merchantability theory in Pennsylvania states that a merchant is 'only liable for harm caused by a defect in their product.' "); Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 10012, 1005 (3d Cir.1992) (an implied warranty of merchantability plaintiff must establish, inter alia, 'that the product malfunctioned.') Grant v. Bridgestone Firestone, Inc. 2002 WL 372941 (Pa.Com.Pl.). New Jersey's uniform commercial code provides, as pertinent, that "[g]oods to be merchantable must be at least such as ... are fit for the ordinary purposes for which such goods are used." The exact showing required to establish a breach of implied warranty of merchantability claim is somewhat more amorphous in New Jersey, and the New Jersey courts have used various terms to describe it. See Yost v. General Motors Corp., 651 F.Supp. 656, 658 (D.N.J.1986) ("[d]amage is a necessary element of ... breach of warranty" claims); Hollinger v. Shoppers Paradise of New Jersey, Inc., 134 N.J.Super. 328, 332, 340 A.2d 687 (Law Div.1975), ("[l]iability is established if the evidence shows that the product was not reasonably fit for the ordinary purposes for which it was sold and [the] defect proximately caused injury to the ultimate consumer."). See also Kaspirowitz v. Schering Plough Corp., 70 N.J.Super. 397, 403-04, 175 A.2d 658 (App.Div.1961) (finding that, where a prescription dandruff shampoo caused the plaintiff to have an adverse reaction "we are not dealing with a Defective product on the sale of which a claim of breach of an implied warranty of merchantability must necessarily rest."); Adams v. Peter Tramontin Motor Sales, Inc., 42 N.J.Super. 313, 325, 126 A.2d 358 (App.Div.1956) (finding that product at issue "met the test of merchantability," where "[i]t was reasonably suitable for ordinary use ... [and] possessed no remarkable defect."). [FN4]

FN4. While Pennsylvania's requirement of a manifest defect or malfunction is slightly different than New Jersey's more amorphous standard, which refers variously to "injury" and "defect," this Court finds that there is no actual conflict between the laws of the two states.

*7 (a) Whether a Claim for Breach of Implied Warranty can be Maintained Against a Manufacturer of Prescription Drugs

Defendants contend- and Plaintiff's concedePennsylvania law bars claims for breach of implied warranty against a manufacturer of prescription drugs. Defendants rely on Makropidis v. Merrell-Dow Pharmaceuticals, Inc., 361 Pa.Super. 589, 593, 523 A.2d 374 (1987) (and its progeny), which holds that

the very nature of prescription drugs themselves precludes the imposition of a warrant of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient.

The reasoning in Makripodis, which involved a claim against a pharmacist, has subsequently been applied to bar breach of implied warranty claims against pharmaceutical manufacturers and makers of medical devices. See Luke v. Am. Home Prods. Corp., 1998 WL 1781624 at *6 (Pa.Com.Pl.1998); Murray v. Synthes (U.S.A.), Inc., 1999 WL 672937 at * 9 (E.D.Pa.1999). See also Hahn v. Richter, 543 Pa. 558, 673 A.2d 888, 891 (Pa.1996) (holding that "where the adequacy of warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the only recognized basis of liability.")

It is uncontested that New Jersey law contemplates no such limitation on breach of implied warranty claims against prescription drug manufacturers. Accordingly, the Court finds that there is an actual conflict between the laws of New Jersey and Pennsylvania as they pertain to this issue, and proceeds to the next step of the analysis.

2. Consumer Fraud Claims

Plaintiffs assert (on behalf of the payer sub-class) a claim arising under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1(c) and "other states' consumer protection statutes." Compl. ¶¶ 93-100. Defendants argue that the Plaintiff's



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1398024, *7 (D.N.J.))

consumer fraud claims should be governed by Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2 et seq.

The UTPCPL provides, as pertinent, that
Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act [73 P.S. § 201-3], may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars, and may provide such additional relief as it deems necessary or proper.

The NJCFA provides, as pertinent, that
The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has been damaged thereby, is declared to be an unlawful practice.

*8 N.J.S.A. 56:8-2.

As Defendants point out, the private remedy provisions of both statutes require a plaintiff to have suffered an ascertainable loss. See Weinberg v. Sprint Corp., 173 N.J. 233, 801 A.2d 281 (2002) (holding that, in order "to have standing under the Act a private party must plead a claim of ascertainable loss that is capable of surviving a motion for summary judgment."); Weinberg v. Sun Co., Inc., 565 Pa. 612, 618, 777 A.2d 442 (2001) ("[t]he statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action.")(emphasis in original).

However, the New Jersey and Pennsylvania laws

differ in several important respects. First, reliance is an element of claims arising under the UTPCPL, but not the NJCFA. The Pennsylvania Supreme Court "has held expressly that successful prosecution of a private cause of action under the UTPCPL is dependant upon pleading and proof by the plaintiff that he or she suffered an ascertainable loss 'as a result of' the defendant's prohibited conduct. The Court has interpreted this language to mean that a plaintiff must establish his specific reliance on some conduct or representation by the defendant that caused him to incur the loss in question." Sexton v. PNC Bank, 792 A.2d 602, 607 (2002) (citation omitted). The New Jersey statute, on the other hand, "requires only a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable loss.' The [New Jersey] Supreme Court has taken pains to point out that this element is significantly distinct from the requirement of reliance in a common law fraud claim. A defendant who violates the Act because of an unlawful 'method, act, or practice' that results from an omission of a material fact with the 'intent that others rely upon such concealment, suppression, or omission,'... is liable for [such] representations whether 'any person has in fact been misled, deceived, or damaged thereby." ' Varacallo v. Mass. Mutual Life Insurance Co., 332 N.J.Super. 31, 48, 752 A.2d 807 (2000) (internal citations omitted ).

Second, the New Jersey and Pennsylvania laws have different damages and attorney's fees provisions. In "New Jersey the assessment of treble damages and attorney's fees is mandatory when a violation of the Consumer Fraud Act has been proved." Huffmaster v. Robinson, 221 N.J.Super. 315, 320, 534 A.2d 435 (Law Div.1986) (citing Skeer v. EMK Motors, Inc., 187 N.J.Super. 465, 455 (App.Div.1982). In Pennsylvania those assessments are discretionary. See Pennsylvania Unfair Competition and Practice Act, 73 Pa.Cons.Stat. § 201-9.2.

Finally, under Pennsylvania law, the learned intermediary doctrine may bar Plaintiff's UTPCPL claims for reasons similar to those discussed above in relation to the implied warranty claims. Pennsylvania courts that have addressed this issue in the context of claims brought against a maker of prescription drugs have ruled that, "[t]here can be no cause of action based on Defendants' alleged

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



omission because Defendants had no duty to disclose any information directly to Plaintiff. Further, to permit a cause of action under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription drug." Luke v. American Home Products Corp., 1998 WL 1781624, * 8 (Pa.Com.Pl.1998). Because New Jersey Courts have not articulated such a doctrinal obstacle to recovery under the state's consumer fraud act, the laws of the states are in conflict in this respect as well.

*9 Based on the foregoing, the Court is satisfied that there is an actual conflict between the UTPCPL and the NJCFA. Accordingly, the Court proceeds to the next stage of the analysis.

B. Underlying Governmental Policies and their Relationship to the Parties' Contacts

I.

Having determined that there is an actual conflict between the laws of Pennsylvania and New Jersey, the "next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." D'Agostino v. Johnson & Johnson, Inc., 133 N.J. 516, 523, 628 A.2d 305 (1993) (citing Veazy, 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)). With respect to both implied warranties of merchantability and consumer fraud statutes, New Jersey and Pennsylvania have similar (and in some respects identical) policy objectives. In both states, the implied warranty of merchantability is "designed to protect the buyer of goods from bearing the burden of loss where merchandise, though not violating a promise expressly guaranteed, does not conform to the normal commercial standards or meet the buyer's particular purpose, a condition upon which he had the right to rely." Vlases v. Montgomery Ward. & Co., 377 F.2d 846, 849 (3d Cir.1967) (applying Pennsylvania law). Moreover, the enforcement of implied warranties of merchantability is intended to address potential imbalances in the bargaining position of and knowledge possessed by respective parties to a transaction, and reduce the risk that in the absence of an express warranty the party in the greater bargaining position will be able to sell a substandard

product with impunity.

Likewise, the consumer fraud statutes of both states are premised on similar legislative goals. The UTPCPL's " 'underlying foundation is fraud prevention," ' Weinberg v. Sun Company, Inc., 565 Pa. 612, 618, 777 A.2d 442 (2001), and in passing it the legislature intended to protect consumers against unfair or deceptive business practices, see Pirozzi v. Penske Olds-Cadillac-GMC, Inc., 413 Pa.Super. 308, 605 A.2d 373, (1992) appeal denied, 532 Pa. 665, 616 A.2d 985, and place the seller and consumer on more equal terms, see Com. by Packel v. Ziomek, 145 Pa.Cmwlth. 675, 352 A.2d 235 (1976). The New Jersey statute was conceived to protect the consumer against imposition and loss as a result of fraud and fraudulent practices by sellers of goods and services. See Scibeck v. Longette 339 N.J.Super. 72, 770 A.2d 1242 (App.Div.2001). Its three main purposes are generally described as (1) compensating the victim for his or her actual loss; (2) punishing the wrongdoer through the award of treble damages; and (3) attracting competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. See Lettenmaier v. Lube Connection, Inc., 162 N.J. 134, 741 A.2d 591 (1999).

II.

The next stage of the choice of law inquiry examines the relationship of each state's contacts to the policies underlying the respective laws. "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." D'Agostino, 133 N.J. at 523, 628 A.2d 305 (citing Veazy, 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)).

*10 The parties' contacts are as follows. Plaintiffs Heindel and Kinmonth live in Pennsylvania, are residents of Pennsylvania, and were treated by their physicians in Pennsylvania. They were prescribed-and purchased-Celebrex and Vioxx in Pennsylvania. To the extent that they saw advertising about Celebrex or Vioxx, or read any package inserts, warnings, or informational newsletters, they appear to have done so in Pennsylvania. (See Merck's 56.1

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1398024, *10 (D.N.J.))

Statement at ¶¶ 16-26; Celebrex Def.'s 56.1 Statement at ¶¶ 7-54). Moreover, their physicians were based in, and worked from offices or hospitals in Pennsylvania.

With respect to the Defendants, Plaintiffs contend that Merck's pharmaceutical business is conducted through its divisional headquarters located in New Jersey. (Pl.'s 56.1 Statement at ¶ 12). Furthermore, they claim that a vast majority of Merck's corporate functions, including those related to Vioxx, are located in New Jersey; that Merck provided the source information for the VIGOR trial from its New Jersey offices; that New Jersey residents participated in the VIGOR study; and that Merck conducted various public relations functions from its New Jersey headquarters. (Id.). However, the record establishes that Merck employees stationed in Pennsylvania had responsibility for much of the interaction with the FDA regarding Vioxx. Declaration of Wilfred Coronato ("Coronato Dec .") at Exh. B, ¶ 10. The department of Merck Research Laboratories responsible for collecting adverse events and reporting them to the FDA is also located in Pennsylvania, as is the headquarters of Merck's United States Human Health Division, which markets Vioxx in the U.S. (Id. at ¶¶ 11, 12, 510 A.2d 1187). The head of the U.S. Human Health Division had his primary office in Pennsylvania during the time period relevant to this lawsuit, and his subordinate directly responsible for marketing Vioxx was also in Pennsylvania. (Id. at ¶ 13, 510 A.2d 1187). The groups within the U.S. Human Health division in charge of training its U.S.-based professional representatives, and which have responsibility for advertising Vioxx in the U.S., are based in Pennsylvania. (Id. at ¶¶ 14, 15, 510 A.2d 1187). Finally, the committee at Merck Research Laboratories that is responsible for the drafting and editing of the Product Circular (containing warnings, precautions, and other information concerning adverse effects and contraindications) is comprised of employees located in both Pennsylvania and New Jersey. (Id. at ¶ 9, 510 A.2d 1187).

With respect to the Celebrex Defendants, Plaintiffs contend that Pfizer conducts corporate functions (such as those related to the development, distribution, manufacture, research, and sale of Celebrex) in New Jersey; that Pfizer broadcast and published Celebrex ads in New Jersey; and that

Pfizer sent "Dear Doctor" letters to New Jersey physicians downplaying the cardiovascular risks of Celebrex. They also contend that Pharmacia maintains headquarters in New Jersey and hired a marketing consultant with a New Jersey based office to handle the global promotion of Celebrex. However, the record establishes that both Plaintiffs started taking Celebrex in 1999, when the drug was manufactured and marketed by corporate predecessors of Pfizer that were neither incorporated nor headquartered in New Jersey. (Celebrex Defendant's Brief in Support of it's Motion for Summary Judgment (hereinafter "Celebrex Def.'s Br.) at 17). Celebrex was developed by Searle, a Delaware Corporation with its principal place of business in Illinois. (Compl. at ¶ 10). In June of 1998 Searle, then a subsidiary of the Missouri-based Monsanto, submitted the marketing application for Celebrex to the FDA, which granted its approval in December of 1998. (Celebrex Def.'s Br. at 17). Celebrex was co-promoted from the time of FDA marketing approval by Searle and Pfizer, a Delaware corporation with its principal place of business in New York, pursuant to a co-promotion agreement between Pfizer and Searle. (Id.) In March of 2000, Searle's parent corporation, Monsanto, merged with Pharmacia & Upjohn to form Pharmacia. According to Defendants, promotional activities were coordinated out of Pharmacia's headquarters in New Jersey and Pfizer's headquarters in New York for some period of time after the March 2000 merger, but the Searle regulatory personnel responsible for Celebrex remained in Illinois. (Id.) In April of 2003, Pfizer acquired Pharmacia, and Celebrex promotional activities are apparently now coordinated out of Pfizer's headquarters in New York. Celebrex is, and was at all relevant times, manufactured in Puerto Rico. (Id.) Hence, only one of the four Celebrex Defendants (Pharmacia) has headquarters in New Jersey.

*11 Finally, Plaintiffs list a number of ancillary contacts that both companies have with the state of New Jersey, such as the length of their corporate presences, the number of people they employ, the tax breaks and businesses incentives they enjoy, and their availment of the courts of this jurisdiction over the course of a year.

In short, it appears that Defendants' contacts with New Jersey can be summarized as (1) the presence of Merck's principal place of business in the state

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



(though the division that markets and advertises Vioxx is headquartered in Pennsylvania); and (2) the presence of Pharmacia's principal place of business in the state between March of 2003 and April of 2003 (though many marketing, advertising, and regulatory functions appear to have been conducted elsewhere). [FN5]

> FN5. For the purposes of this discussion, factors such as the number of people employed in New Jersey by the Defendants are not relevant, just as Defendants' filing of unrelated lawsuits in the District of New Jersey bears no relation to the inquiry at hand.

III.

At the outset, it bears noting that the parties have engaged in assiduous parsing of particular marketing and advertising functions and where they took place. While some corporate and marketing functions clearly took place in New Jersey, it appears that just as many others took place in other states. Generally, courts weighing the competing interests of the state where a corporation is domiciled against those of the consumer's home state do not engage in a microanalysis of specific marketing and promotional practices and their relative significance. This is not to say that courts do not consider where marketing or advertising originated, especially where (as here) the underlying allegations are based on fraud or misrepresentation, as to which advertising and marketing are of course relevant. However, examining in depth which individual functions or phases in the marketing and advertising process are more significant than others would constitute a lengthy and ultimately unproductive digression. With respect to Merck, the marketing and promotional activities that occurred in Pennsylvania appear to outweigh or at the very least equal in significance those that took place in New Jersey. The case for considering the marketing and promotional activities of the Celebrex Defendants is even less compelling, as it appears that there was only a brief period during which these activities took place in New Jersey, and that at all other times marketing and promotion primarily took place elsewhere. In short, this Court finds that the performance of various marketing and promotional activities in New Jersey is not a compelling interest as it pertains to either the warranty claim or the consumer fraud claim.

Hence, as is often the case in conflicts analysis, the determination of which state's law bears the more compelling relationship to the underlying policies turns on the relative interests of the corporation's home state and the consumer's home state. The facts of this case and the nature of the Plaintiff's claim present what have been called "often difficult issues with respect to conduct regulating laws [which] include, but are by no means limited to … the scope and impact of the learned intermediary doctrine, and the rules governing disclosure in the advertising of ethical pharmaceuticals." In re Rezulin Products Liability Litigation, 210 F.R.D. 61, 70 (S.D.N.Y.2002). To be certain, New Jersey has a interest in governing the conduct of its corporate citizens and encouraging truthful marketing and advertising of products. However, with respect to both the warranty and consumer fraud claims, Pennsylvania has a competing interest in ensuring that its own citizens "are compensated for their injuries, that the standards its [sic] sets for product sales within its borders are complied with, and that the rules it establishes to govern physician and pharmacist are upheld." Id. at 70-71. These interests are not outweighed by New Jersey's interest in regulating the conduct of its pharmaceutical companies.

*12 The "particular configuration of the state interests to be balanced, and the relative weight of those interests as dictated by the relevant contacts with the parties" require that "the deterrence interest of New Jersey as the domicile and locus of the defendant manufacturer must yield in this case to the compensation interest" of Pennsylvania. See Gantes v. Kason Corp., 145 N.J. 478, 496-97, 679 A.2d 106 (1996). Here, the only real contacts that Defendants had with New Jersey--the state with the deterrent interest--are somewhat attenuated. Moreover, since Celebrex and Vioxx were marketed, advertised, distributed, prescribed, and purchased in Pennsylvania, that state has both a deterrent interest in and a compensation interest.

Other factors require this outcome. First, while a number of New Jersey courts have chosen to apply the NJCFA over the consumer protection law of another state, finding that New Jersey law "should be construed liberally in favor of protecting consumers," Levin v. Lewis, 179 N.J.Super. 193, 200, 431 A.2d 157 (App.Div.1981) and its mandatory treble damages and fee provisions

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



provide a heightened level of protection, it is important to distinguish the particular transactions at issue in those cases from the one involved here. Obviously, this case does not involve the sale of a boat, a car, or a house. See Boyes v. Greenwich Boat Work, Inc., 27 F.Supp.2d 543 (D.N.J.1998); Huffmaster v. Robinson, 221 N.J.Super. 315, 534 A.2d 435 (Law Div.1986); Gennari v. Weichert, 148 N.J. 582, 691 A.2d 350 (N.J.1997). The "transaction" at issue here is Plaintiffs' ingestion of prescription medicines that were prescribed, purchased, paid for, and allegedly damaged the Plaintiffs in their home state. None of these things could have occurred without the involvement of a physician.

In Incollingo v. Ewing, 444 Pa. 263, 282 A.2d 206 (1971), the Pennsylvania Supreme Court adopted the learned intermediary doctrine, which, among other things, circumscribes the liability of prescription drug manufacturers. Though originally the basis for eliminating the imposition of strict products liability against drug manufacturers, the rule has evolved to apply to other causes of action, including implied warranty and consumer fraud. The learned intermediary doctrine clearly reflects the determination by the Pennsylvania courts to preserve the primacy of the physician's role in making treatment decisions for Pennsylvania patients-including the making of informed choices about prescription drugs. [FN6] In light of this, the most important aspects of the transaction underlying this lawsuit are the decisions of the physician and the relationship between doctor and patient, all of which occurred in Pennsylvania.

> FN6. In fact, the Pennsylvania courts have even declined to abrogate the learned intermediary doctrine in cases involving direct to consumer marketing, holding that despite these practices the decision to take a particular drug is still dependant on the judgment of a physician. See Lennon v. Wyeth-Ayerst Laboratories, Inc., 2001 WL 755944 (Pa.Super.2001); Albertson v. Wyeth Inc., 2003 WL 21544488 (Pa.Com.Pl.).

New Jersey's consumer protection statue arguably offers greater protection to the consumer. However, the plaintiffs in this matter are not residents of New Jersey, and given the competing interests of Pennsylvania, New Jersey does not have a "compelling reason ... to extend to such non-

domiciliary plaintiffs the benefit of [its] decisional law." Deemer v. Silk City Textile Mach. Co., 193 N.J.Super. 643, 475 A.2d 648 (App.Div.1984). Consequently, the laws of Pennsylvania must govern.

## V. DISCUSSION

*13 Having determined that Pennsylvania law governs both the breach of implied warranty and consumer fraud claims, the Court turns to the merits of those claims. The Court will first address whether Plaintiff's "fraud on the market" theory is viable, and then whether the learned intermediary doctrine precludes the breach of implied warranty and consumer fraud claims.

### A. Plaintiffs' "Fraud on the Market" Theory

As a preliminary matter, the Court turns to Plaintiffs' problematic assertion that their claims "challenge Defendants' intentional failure to disclose the known cardiovascular risks of Celebrex and Vioxx to consumers and seek to recover some or all of the purchase price consumers paid for these drugs." Complaint at ¶¶ 2, 35-36, 44, 51, 59, 63-67. Their claim for economic damages caused by the payment of allegedly inflated prices for Defendants' products is based upon a vaguely articulated "fraud on the market" rationale. Because the "fraud on the market" theory is untenable as to both remaining claims, the Court will briefly address this issue at the outset.

### 1. Implied Warranty of Merchantability

Clearly, neither Plaintiff was personally injured by Celebrex or Vioxx. They do not claim to have suffered any bodily harm and, accordingly, have withdrawn their product liability and medical monitoring claims. This presents an issue which is at the core of this case, namely, if there is no "defect" at issue, and the drugs themselves caused no harm, how were Heindel and Kinmonth injured? Their apparent explanation is that, given the potential cardiovascular side effects, they simply paid too much for the drugs. By asserting economic loss, Plaintiffs "seek to move the suit out of the tort domain and into that of contract," because, allegedly, the drugs were not as they were "described and thus [were] not merchantable, a warranty theory." See In re Bridgestone/Firestone,



Inc., 288 F.3d 1012, 1017 (7th Cir.2002).

First, this 'shift' into the realm of contract is problematic because "if tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly means excess compensation." Id. at 1017. Moreover, breach of implied warranty claims are not intended to address hypothetical economic loss; they are meant to compensate a buyer who has not gotten the benefit of her bargain because the product in question does not meet generally accepted standards or disappoints consumer expectations. These plaintiffs would be hard pressed to claim that they did not get what they paid for. Indeed, the record unequivocally establishes that Celebrex and Vioxx were effective treatments for Heindel and Kinmonth's arthritis pain, and that both benefitted significantly from its use. Kinmonth testified that she found Vioxx more effective than other, non-narcotic medicines that she had used in the past, and that the relief it gave her from arthritis pain allowed her to function better and do things that had been made difficult by her condition, such as preparing food and lifting things. (Coronato Decl. at Exh. D, (hereinafter Kinmonth Dep .) p. 64-70). Kinmonth also testified that Celebrex gave her relief from her symptoms, and she reported to her doctor that she liked its results. Kinmonth Dep. at p. 119; Leventhal Dep. at p. 39-40. Likewise, Heindel "liked" the results she got from Celebrex, found it more effective than several other non-narcotic drugs she had tried, and even told her doctor that it was "as close to a panacea as is likely to be found." (Heindel Dep. at 46-48; Leventhal Dep. at 15-16). Both plaintiffs continued to use Vioxx and Celebrex after the complaint was filed in this lawsuit, and were taking it as of the time they were deposed.

*14 Despite the irrefutable evidence that Plaintiffs got the effective arthritis remedy that they bargained for, they seek to recover "some or all of the purchase price" paid for Celebrex and Vioxx. Complaint at ¶¶ 2, 35-36. Clearly, the Plaintiffs would not be entitled to recover all of the purchase price of the drugs; this would amount to a claim for restitution, to which they are obviously not entitled. As the court in In re Rezulin Products Liability Litigation, 210 F.R.D. 61, 68 (S.D.N.Y.2002) (a case that, like this one, involved claims for purely economic losses alleged by otherwise unharmed consumers of a prescription drug) found:

In order to obtain restitution for the purchase price of [the drug], plaintiffs and class members would be obliged, at least in many jurisdictions, to prove some kind of harm. In other words, although theories presumably could differ, they would have to establish that ... that the defendants' retention of the price they paid for the drug would be unjust, that the value of the drug given its allegedly concealed defects was less than the purchase price, or some other variation that would warrant the transfer of money from the defendants to them. Plaintiffs contention is that everyone who took Rezulin sustained an ascertainable loss presumes that Rezulin was worthless. But that is not a defensible position. Even Plaintiff's experts acknowledge that Rezulin was enormously beneficial to many patients. Those patients got their money's worth and suffered no economic injury.

In re Rezulin Products Liability Litigation, 210 F.R.D. 61, 68 (S.D.N.Y.2002) (emphasis supplied).

This Court agrees with the above conclusions. Finding no other theory under which they would be entitled to reimbursement for some or all of the purchase price of the arthritis medicine whose benefits they clearly enjoyed, Plaintiffs attempt to explain away this deficiency with their "price inflation" or "fraud on the market" theory. In this context, though, such a theory is patently absurd. It depends on the totally implausible predicate that, had some adverse information about side effects derived from the VIGOR and CLASS studies been more widely disseminated, the Plaintiffs would have paid less for Celebrex and Vioxx. However, (at the risk of stating the obvious) there is no prescription drug "market," at least as that term is understood in the securities context. There, a "perfect market" or "efficient market" is assumed, and adverse information is expected to be quickly absorbed by the market, thus causing the price of the stock or commodity at issue to fluctuate. But the only "market" for a prescription drug is the potential group of patients who will be prescribed it by their physician, and if the side effects of the drug make it overly risky to ingest, the doctor will either not prescribe it or the patients will decide not to take it. The suggestion that consumers might be inclined to take a drug with certain side affects if they could pay less for it, or that drugs with certain side effects

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Page 515

should cost less, defies both reality and common sense. It is also out of place in this lawsuit, where it is clear that neither plaintiff suffered any adverse effects. In short, the decision to take a particular drug is a medical one, not one based on an comparative analysis of risk versus price.

2. Consumer Fraud

**\*15** For the same reasons, the fraud on the market theory is flawed with respect to Plaintiff's consumer fraud claims. Moreover, in Weinberg v. Sun Co., 565 Pa. 612, 777 A.2d 442 (2001) the Pennsylvania Supreme Court explicitly rejected an attempt by a class of consumers to employ the fraud on the market theory in a case arising under the UTPCPL. The plaintiffs in Weinberg were consumers of high octane gasoline who claimed that "the [defendants'] false marketing campaign increased the demand for Ultra(R) gasoline, raising the price for all consumers." The Court found that

> [t]here is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither deceived nor influenced ... Nothing in the legislative history suggest that the legislature ever intended the statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation. The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss as a result of the defendant's prohibited action.

Id. at 617-18, 777 A.2d 442 (emphasis in original).

Clearly, Plaintiffs cannot use the fraud on the market theory to circumvent the reliance element of the UTPCPL. The suggestion that Defendants' failure to advertise potential side of effects of Celebrex and Vioxx boosted sales and caused price inflation is an attempt to do just that, and as such must fail. [FN7]

> FN7. Plaintiffs' claims would be similarly precluded under New Jersey law. In Kaufman v. i-Stat Corp., 165 N.J. 94, 754 A.2d 1188 (2000), the New Jersey Supreme Court rejected the use of the "fraud on the market" or "price inflation" theory to establish the causal nexus between the defendant's

alleged misrepresentations and their loss. While i-Stat considered the fraud on the market and price inflation theories only in the context of traditional common law fraud, where pleading and proving the element of reliance remains a part of plaintiff's burden, at least one other New Jersey court has concluded, relying on i-Stat' s reasoning, that those theories "have no place as a part of the proofs required of plaintiffs in the CFA [New Jersey Consumer Fraud Act] context either." New Jersey Citizen Action v. Schering Plough Corp., 367 N.J.Super. 8, 14-16, 842 A.2d 174 (App.Div.2003). Allowing plaintiffs to rely on those theories, the court held in New Jersey Citizen Action, would "virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered. Adopting plaintiff's theory ... would therefore fundamentally alter the concept of causation in the CFA context ... [and] the relationship between the alleged misstatement and the ascertainable loss suffered would become so attenuated that it would effectively disappear."

B. Learned Intermediary Doctrine

1. Implied Warranty of Merchantability

In Makripodis v. Merrell-Dow Pharmaceuticals, Inc., 361 Pa.Super. 589, 523 A.2d 374 (1987), the Superior Court of Pennsylvania addressed the question of whether a retail druggist who filled a prescription "with the proper and unadulterated drug prescribed," was "liable to the patient purchaser for breach of an implied warranty of merchantability if the drug caused harmful side effects." Id. at 592, 523 A.2d 374. The court found that he was not, and that

> As heretofore observed, [prescription] drugs are not available to the general public and but may be obtained only upon the prescription of a licensed physician. This restriction upon the availability of such drugs has been imposed because of the inherently dangerous properties of such drugs. Prescription drugs may pose a threat to the safety of certain identifiable segments of the public, or may be dangerous when used in conjunction with other drugs or substances, or may be harmful if taken by persons suffering from certain diseases or conditions.

Id. at 594, 523 A.2d 374. (emphasis supplied).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in F.Supp.2d
(Cite as: 2004 WL 1398024, *15 (D.N.J.))

The court's holding in Makripodis was based on Pennsylvania's adoption of the learned intermediary doctrine. That rule, articulated by the Supreme Court in Incollingo v. Ewing, 244 Pa. 263, 288 (1971), was formulated "with reference to comment k [of the Restatement (Second) of Torts § 402A] and the policies expressed therein." Coyle v. Richardson-Merrell, Inc., 526 Pa. 208, 213, 584 A.2d 1383 (1991). [FN8] It addresses the nature of a drug manufacturer's duty to warn of potentially dangerous side effects and provides that when a drug "is available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." Baldino v. Castagna, 505 Pa. 239, 244, 478 A.2d 807 (1984). This is so "because it is the duty of the prescribing physician to be fully aware of the (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug." Makripodis, 361 Pa.Super. at 596, 523 A.2d 374.

FN8. Comment k addresses whether a manufacturer of products that are inherently unsafe, but accompanied by proper warnings (such as prescription drugs) should be held strictly liable for the "unfortunate consequences attending the use of otherwise useful and desirable products which are attended with a known but apparently reasonable risk," and concludes that "such a manufacturer is liable only if he fails to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." Though comment k specifically addresses the imposition on drug-makers of strict liability, (as opposed to liability for negligence) the learned intermediary doctrine arises from its broader point regarding the adequacy and intended recipients of drug warnings.

*16 Moreover, warnings are directed to the physician rather than the patient-consumer because "[i]t is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug." Leibowitz v. Ortho Pharmaceutical Corp., 224 Pa.Super. 418, 431, 307 A.2d 449 (Pa.Super.1973). Hence, the "learned intermediary" stands between nearly every prescription drug manufacturer and the patient-consumer. For this reason, its application has been expanded to claims sounding in causes of action other than negligence. Recognizing this, the Makripodis court held

that the very nature of prescription drugs themselves precludes the imposition of a warranty of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient.

Makripodis, 361 Pa.Super. at 594, 523 A.2d 374. Makripodis, which involved a pharmacist, has subsequently been applied to claims against a manufacturer of prescription drugs, see Lennon v. Wyeth-Ayerst Laboratories, Inc., 2001 WL 755944 (Pa.Super.2001); Luke v. American Home Products Corp., 1998 WL 1781624 (Pa.Com.Pl.1998); and the makers of prescription medical devices, see Rosci v. Acromed, Inc., 447 Pa.Super. 403, 422-424, 669 A.2d 959 (Pa.Super.1995).

From the foregoing it is clear that manufacturers have duty to warn doctors of potentially dangerous side effects, and can be held liable for their failure to exercise reasonable care in doing so. While Plaintiffs here contend that Defendants "downplayed" or "failed to disclose" known cardiovascular risks posed by Celebrex and Vioxx, they do not (and, indeed, can not) couch their argument as one arising from a negligent failure to warn. Even if they were to do so, the argument would still fail. It is clear, under Pennsylvania law, that "the information supplied by the drug manufacturer is only one source a physician must consult, and he is expected to make an independent medical judgment in determining whether a given drug is appropriate for a particular patient." Brecher v. Cutler, 396 Pa.Super. 211, 218-20, 578 A.2d 481 (Pa.Super.1990) (emphasis supplied). Neither is a prescription drug manufacturer's failure to warn actionable "where the prescribing physician did not rely on the package insert, has full information from other sources, and made his own independent medical judgment to prescribe it." Leibowitz, 224

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Pa.Super. at 432 n. 3, 307 A.2d 449; Stottlemire v.
Cawood, 213 F.Supp. 897 (D.C.D.C.1963).

The information that Plaintiffs claim the
Defendants downplayed (or did not readily disclose)
was contained in the results of published,
presumably peer reviewed studies. The record
before this Court establishes that Dr. Leventhal, the
Plaintiffs' treating physician, first learned of
Celebrex through medical meetings and literature
even before its approval by the FDA, and that he
had stayed abreast of the scientific literature
analyzing the potential risks posed by COX-2's. It
further establishes that Merck released the results of
the VIGOR study, comparing patients taking Vioxx
to those taking a traditional NSAID, on March 23,
2000. Dr. Leventhal testified that he read the
VIGOR study when it was published in the New
England Journal of Medicine in November of 2000.
Dr. Leventhal also testified that he read an article in
the Journal of the American Medical Association in
August of 2000 which purported to analyze the
combined results of different studies of Celebrex and
Vioxx. He asserted that the study referred to in the
JAMA article was "extremely flawed," and "used a
control group from a completely different study
which is not considered scientifically sound." Based
on the available information and data analyzing the
risk of cardiovascular events associated with COX-2
inhibitors, Dr. Leventhal "did not feel that there was
evidence ... that convinced [him] that there was an
increased risk of myocardial infarction or thrombal
embolic phenomenon with the COX-2's" and
therefore saw no reason to stop prescribing Celebrex
or Vioxx to his patients. Dr. Leventhal did not rely
on advertising to physicians or to the public when he
determined that Celebrex and Vioxx were
appropriate treatments for Heindel and Kinmonth,
but he did consider sources such as the FDA
approved package insert, the Physician's Desk
Reference, and his own clinical experiences.

*17 In short, it is clear that Dr. Leventhal (1)
based his decision to prescribe Celebrex and Vioxx
on information from a variety of sources and (2) that
he certainly did not rely exclusively on information
provided by the Defendants. For these reasons, as
well as those discussed at length above, Defendants
are entitled to summary judgment on Plaintiffs'
implied warranty claim.

2. Claims arising under the Unfair Trade Practices

and Consumer Protection Law

For reasons similar to those adduced above,
Defendants are entitled to summary judgment on
Plaintiffs' consumer fraud claims. The Court turns
briefly to the particular application of the learned
intermediary doctrine to claims arising under the
UTPCPL.

Plaintiffs claim that the Defendants knew of
cardiovascular risks posed by Celebrex and Vioxx,
but spent "millions of dollars on direct-to-consumer
advertising that portrayed these drugs as safer than
other available treatments while uniformly omitting
to disclose any risk of cardiovascular harm." Pl.'s
Opp. Br. at 1; Complaint at ¶¶ 2, 21-24, 36, 42-44,
51, 67. This "deceptive marketing scheme" caused
their alleged economic injury and, they claim,
violated the UTPCPL. [FN9] Defendants claim that
Plaintiffs' UTPCPL claim is barred by the learned
intermediary doctrine. For several reasons, the
Court finds that Plaintiffs' claims are indeed barred
by the learned intermediary doctrine.

> FN9. Plaintiffs brought their consumer fraud claim
> as one arising under the New Jersey Consumer
> Fraud Act and the consumer protection statutes of
> "other states." Though their pleadings and briefing
> focus on the New Jersey Consumer Fraud Act, they
> contend that the Pennsylvania law would require the
> same outcome.

First, since the manufacturer of prescription drugs
need only direct information and warnings to
prescribing physicians, there "can be no cause of
action based on Defendants' alleged omissions
because [they] had no duty to disclose any
information to the plaintiff[s]." Albertson v. Wyeth,
Inc. 2003 WL 21544488 at * 12 (Pa.Com.Pl.2003);
Luke v. American Home Products, 1998 WL
1781624 at *8 (Pa.Com.Pl.1998). Second, "to
permit a cause of action under the under the
UTPCPL in this case would effectively make a drug
manufacturer the absolute guarantor of the
anticipated results and effects of a prescription drug.
Pennsylvania law, however, recognizes that some
prescription drugs by their nature can never be made
safe." See Makripodis, 361 Pa.Super. 589, 523
A.2d 374; Luke, 1998 WL 1781624 at *8.

Third, both the learned intermediary doctrine and
the record before the Court establish that the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Plaintiffs did not rely on any representations (or misrepresentations) by Defendants, and reliance is, of course, a necessary element of a UTPCPL claim. First, Heindel and Kinmonth both testified that they took Celebrex and Vioxx based on the advice of their treating physician. Kinmonth testified that she did not read information about Vioxx or material provided with Vioxx prior to taking it, and that she relied her on her physician's advice regarding whether or not to take it. Heindel's testimony also reveals that she relied on her doctor's professional advice, rather than information supplied by Defendants, regarding Celebrex. She claimed not to have read any print advertisements for Celebrex, and though she said she had seen Celebrex television commercials, she asserted that she was not influenced by them. However, even if Heindel and Kinmonth had offered evidence indicating that they had relied in some way on Defendants' misrepresentations, it would ultimately be of no consequence. The learned intermediary breaks the chain in terms of reliance, since the patient cannot obtain prescription drugs without the physician no matter what they believe about them.

*18 Finally, the economic loss doctrine further mandates the entry of summary judgment dismissing Plaintiffs' consumer fraud claims. Pennsylvania has adopted the economic loss doctrine, [FN10] as well as its mirror image, the "gist of the action doctrine," in order to "place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law." Werwinski v. Ford Motor Co., 286 F.3d 661, 680 (3d Cir.2002). The parties have spilled a great deal of ink debating whether, under the UPTCPL, there is an "intentional tort" exception that would allow the plaintiffs to recover in tort for purely economic losses. Defendants contend that there is not, relying on the Third Circuit's decision, in Werwinski, to "reject[ ] ... an intentional fraud exception" to the economic loss doctrine. Relying on O'Keefe v. Mercedes-Benz USA, LLC, 214 F.R.D. 266 (E.D.Pa.2003) (in addition to some Pennsylvania cases decided both before and after Werwinski ), Plaintiffs argue that the economic loss doctrine has not been extended to cover intentional torts.

FN10. New Jersey also recognizes the economic loss doctrine, although New Jersey courts have not addressed its application in a context similar to the one presented here. However, in Alloway v.

General Marine Indus., 149 N.J. 620, 627-630, 695 A.2d 264 (1997), the New Jersey Supreme Court found that contract remedies are better suited than tort law to resolve claims for economic loss, whether the sale at issue was characterized as a consumer purchase or a commercial transaction. It's decision rested on a finding that purchasers who fall victim to fraud or unconscionable conduct will have "substantial rights to recover for common law fraud and for violation of various state and federal statues such as the New Jersey Consumer Fraud Act." Boyes v. Greenwich Boat Works, Inc., 27 F.Supp.2d 543, 550 (D.N.J.1998). "In sum," the Court concluded in Alloway, judicial decisions and statutory encasements, including the U.C.C., protect consumers from overreaching. Against this background, a tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive." Alloway, 149 N.J. at 641, 695 A.2d 264.

The Supreme Court of Pennsylvania has not decided this question, and the lower Pennsylvania appellate courts are not in agreement on the matter. However, the job of this Court is greatly simplified by the Third Circuit's exhaustive treatment of this issue in Werwinski, in which the Court upheld a district court's prediction as to how the Pennsylvania Supreme Court would rule on this question. In doing so, the Court of Appeals explained that

The district court applied the economic loss doctrine to the fraudulent concealment claims after recognizing the willingness of Pennsylvania courts to restrict intentional tort claims that overlap with contract claims. In the absence of any pertinent case law on the subject, the district court aptly predicted that the Supreme Court of Pennsylvania would apply the economic loss doctrine to intentional fraud cases by drawing an analogy from Pennsylvania's acceptance of the "gist of the action" doctrine. Such a conclusion is congruent with our past recognition that Pennsylvania state courts have exhibited a "lack of hospitality to tort liability for purely economic loss."

Werwinski, 286 F.3d at 680.

Moreover, the court held, "even if we were torn between two competing yet sensible interpretations of Pennsylvania law ... we should opt for the interpretation that restricts liability, rather than

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



expands it, until the Supreme Court of Pennsylvania decides differently." Id. (citations omitted). Consequently, the court held that there is no intentional fraud exception to the economic loss doctrine, whether the claim is one for common law fraud or arises under the UTPCPL.

This Court is bound by the Third Circuit's prediction of Pennsylvania law. Itzkoff v. F & L Realty of New Jersey Corp., 890 F.Supp. 351, 356 (D.N.J.1995). The decision of the district judge who decided O'Keefe, who clearly agreed with neither the Third Circuit's prediction nor the rationale upon which it rested, is not binding on this Court, and, since the Court of Appeals has predicted how the Pennsylvania Supreme Court will rule, the lower (Pennsylvania) courts' decisions are also irrelevant for the purposes of this discussion. In short, this Court holds, pursuant to Werwinski, that economic loss doctrine bars Plaintiffs' UTPCPL claim seeking recovery for their purely economic damages.

### C. Remaining Claims

*19 Plaintiffs' claims for injunctive and equitable relief do not constitute separate causes of action. Accordingly, consideration by the Court of those claims would only be appropriate in the event that Plaintiffs had prevailed on their warranty and consumer fraud claims. Since they have not, the Court need not discuss the issue further.

### VI. CONCLUSION

For the foregoing reasons, Defendants are entitled to summary judgment dismissing Plaintiffs' claims. An appropriate order will issue.

2004 WL 1398024 (D.N.J.), 54 UCC Rep.Serv.2d 586

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

