**TAB 5**

Not Reported in A.2d
(Cite as: 2001 WL 38781 (Del.Super.))
<KeyCite Red Flag>

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Arthur E. BENNING, Sr., Barbara Lee Benning, and Arthur E. Benning, Jr.,
Plaintiffs,
v.
WIT CAPITAL GROUP, INC., and Wit Capital Corp. d/b/a Wit Capital. Defendants.

No. 99C-06-157.

Submitted: Oct. 24, 2000.
Decided: Jan. 10, 2001.

Upon Plaintiffs' Motion for Class Certification. Denied.

MEMORANDUM OPINION

ALFORD, J.

*1 This 10th day of January, 2001 having read and considered Plaintiffs' and Defendants' Briefs, it appears that:

INTRODUCTION

Defendants are an internet brokerage firm that allows its customers to trade securities via the Internet or telephone. Plaintiffs were Internet customers. The primary basis of Plaintiffs' complaints is that they were not given the opportunity to purchase initial public offerings ("IPO") as Defendants advertised. Not every customer of Defendants would have the opportunity to purchase every IPO. Instead, Defendants set up an allocation procedure that essentially equated to a "first-come, first-served" approach with priority given to those who abstained from "flipping" (trading) IPO shares for at least sixty days following an IPO purchase. Plaintiffs allege the allocation procedure was set forth in the Account Agreement that they signed. Plaintiffs allege that no matter what they did they were never able to purchase IPOs. Plaintiffs also complain that Defendants failed to execute trades in a reasonable amount of

time. Plaintiffs claim that numerous customers of Defendant's have had similar negative experiences and all of them have been damaged by Defendants' conduct. This is Plaintiffs' Motion for Class Certification.

DECISION

Generally, in determining whether an action is appropriate for class certification the Court must determine if the prerequisites for class certification set forth in Superior Court Civil Rule 23 are met. However, since in the case sub judice the Defendants assert that this Court lacks subject matter jurisdiction, the Court must make a determination regarding this Courts' authority to retain a class action suit.

Defendants argue that this Court lacks subject matter jurisdiction over any class action suit. Defendants contend that Superior Court Rule 23 expands the jurisdiction of this Court "by creating an equitable remedy (i.e., class actions) to resolve legal issues." Defendants argue that where there was no approval from the legislature to expand Superior Court's jurisdiction, as is required, Rule 23 is violative of the Delaware Constitution. The Court finds that this argument has no merit. It is well settled that a class action is a procedural device. [FN1] Therefore, Superior Court Rule 23 does not violate the Delaware Constitution since it does not purport to enlarge the jurisdiction of this Court. "The Rule is procedural not jurisdictional." [FN2]

FN1. See Nottingham Partners v. Dana, Del.Supr., 564 A.2d 1089, 1094 (1989) (citing 7A.C. Wright, a. Miller & M. Kane, Federal Practice and Procedure § 1751, at 7 (1986)).

FN2. Wilmington Trust Co., et al. v. Schneider, Del.Supr., 320 A.2d 709, 710 (1974).

The Court may make a determination as to class certification regarding certain claims without engaging in a Rule 23 analysis. Plaintiffs raise fraud and negligent misrepresentation in their complaint. Common law fraud and negligent misrepresentation claims are not to be litigated via class action suits. [FN3] It has been held that such causes of action require plaintiffs to plead justifiable reliance for which "[a] purported class action is not the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2001 WL 38781, *1 (Del.Super.))

appropriate vehicle to advance such individually unique claims." [FN4]

> FN3. Oliver, et al. v. Boston University, et al., Del. Ch., C.A. No. 16570, 2000, Steele, V.C. (Jul. 18, 2000) (Mem. Op. at 10) (citing Dieter v. Prime Computer, Inc., Del. Ch., 681 A.2d 1068 (1996)).

> FN4. Id. at 11.

*2 Plaintiffs also allege a violation of the Delaware Consumer Fraud Act. Section 2522 of the Delaware Consumer Fraud Act provides that "[t]he purpose of this subchapter shall be to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade of commerce in part or wholly within this State." "Relief, therefore, can be granted under the Act only as to those unlawful practices occurring or performed partly or wholly within Delaware." [FN5]

> FN5. Goodrich v. E.F. Hutton Group, Inc., Del. Ch., 542 A.2d 1200, 1203 (1988).

In the case sub judice, Plaintiffs have failed to allege any facts which if true would constitute unfair deceptive conduct on the part of Defendants occurring wholly or in part within Delaware. Plaintiffs merely allege that Defendants are "registered and doing business in Delaware and elsewhere," and that Defendants' acts and/or omissions occurred within the meaning of Delaware Consumer Fraud Act. There is no allegation that a Delaware consumer was deceived by Defendants' trade practices, and therefore Plaintiffs cannot maintain a claim for violation of the Delaware Consumer Fraud. Therefore, the Court need not address the issue of federal preemption.

In order for Plaintiffs' remaining claims, to be certified as a class action in Superior Court, the Court must be satisfied that the prerequisites of Superior Court Civil Rule 23(a) are satisfied. [FN6] Rule 23(a) states:

> FN6. See Mentis v. Delaware American Life Ins. Co., Del.Super., C.A. No. 98C-12-023, Quillen, J. (May 30, 2000) (Let. Op. at 2).

One or more members of a class may sue or be sued as representative parties on behalf of all only

if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

If all of the prerequisites of rule 23(a) are satisfied, the moving party must then demonstrate that the action falls within one of the categories of Rule 23(b). Superior Court Civil Rule 23(b) provides that:

An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:

(1) The prosecution of separate actions by or against individual members of the class would create a risk of:

(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) The party opposing the class had acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

*3 (3) The court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matter pertinent to the findings include:

(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) The difficulties likely to be encountered in the management of a class action.

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2001 WL 38781, *3 (Del.Super.))

Page 870

Numerosity. There is no rigid numerical guideline for determining impracticability of joinder, though courts have found that more than forty members is adequate. [FN7] It has been pointed out that "[p]racticability of joinder depends on a number of factors including: the size of the class, ease of identifying members and determining addresses, ease of service on members if joined, geographical dispersion and whether proposed members of the class would be able to pursue remedies on an individual basis." [FN8]

> FN7. Mentis at 3 (citing 5 Moore's Federal practice 3d § 23.22[3] [a] ).

> FN8. Liberty Lincoln Mercury v. Ford Marketing Corp., 149 F.R.D. 65, 73 (D.N.J. May 14, 1993).

Plaintiffs allege that Defendant has approximately 41,000 customers accounts therefore joinder is impracticable. Defendants however argue that Plaintiffs merely speculate that all of the Defendants' account holders have been damaged but have not provided the Court with any evidence or reasonable estimate as to the actual number of customers that might bring a claim against Defendants.

The Court finds that the Rule 23(a)(1), numerosity, is not satisfied. Plaintiffs allege there are in excess of 41,000 customers who could potentially be situated all over the country which would make joinder impracticable. [FN9] However, Plaintiffs have only identified five customers who have had the type same problems with the purchase and/or selling of securities through Defendants' service. Although the representative plaintiff does not have to provide an exact number of members, "the movant must proffer some evidence of the number of members in the purported class, or at least a reasonable estimate of that number." [FN10] The representative plaintiff cannot rely on mere speculation regarding the size of the class nor conclusory allegations that joinder will be impracticable. [FN11] Plaintiffs allege that 41,000 customers signed the same contract but fail to allege, other than the 5 for which they have letters, the number who have had problems with IPO purchases or executing trades. The Court finds that Plaintiffs' allegations regarding the size of the purported class are merely speculative thus the numerosity prerequisite is not satisfied. [FN12]

> FN9. See Zimmerman v. Home Shopping Network, Inc., Del. Ch., C.A. Nos. 10911, 10919 Jacobs, V.C. (Aug. 14 1990) (Mem. Op. at 12).

> FN10. 5 Moore's Federal practice 3d § 23.22[3][b] (citations omitted).

> FN11. Id.

> FN12. See Lloyd v. City of Philadelphia, 121 F.R.D. 246, 249 (E.D.Pa. Aug. 22, 1988); Siles v. ILGWU National Retirement Fund, 783 F.2d 923, 930 (9th Cir.1986) (finding that numerosity was not met in a case alleging pension fund requirements violated ERISA because although evidence was presented that 31,000 employees were covered by the plan, the representative plaintiff failed to show how many employees were eligible for benefits and failed to receive them).

Commonality. Rule 23(a)(2) requires that there be at least one question of law or fact common to the members of the class. [FN13] "It is not necessary that all questions of fact or law be common." [FN14] However, class certification is inappropriate if there is significant factual differences among the class members or "if it is a case of common legal questions dependant on divergent facts. [FN15] However, it has been held that Rule 23(a)2 is easily satisfied because only one single common issue is needed. [FN16]

> FN13. See Id.; Mentis at 3 (citations omitted).

> FN14. Id. (citations omitted).

> FN15. Mentis at 3 (citing Paine Webber R & D Partners, I.P. v. Centocor, Inc., Del.Super., C.A. No. 96C-04-194, Quillen (Oct. 9, 1997))

> FN16. Id. (citing Baby Neal v. Casey, 43 F.3d 48, 56 (3d Cir.1994) (citations omitted)).

*4 Plaintiffs argue that the commonality requirement has been easily met because there are a number of questions of law and fact that form the basis for the purported class members' claims which are identical. Such as:
(a) whether [Defendants] promised, in its Account Agreement, to execute [c]lass member orders to purchase IPO stock on a first-come, first-served basis with priority given to those customers who

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2001 WL 38781, *4 (Del.Super.))

Page 871

refrained from "flipping' their IPO shares for 60 days following the IPO; (b) whether [c]lass members received such benefits pursuant to their Account Agreements; (c) whether [Defendants] owed a duty to provide on-line brokerage services to all [c]lass members in a timely manner; whether such services were provided in a timely manner; and (d) whether the class members have suffered harm as a result of [Defendants'] wrongdoing. Defendants, on the other hand, argue that there are no common questions among the proposed class members. Defendants contend that assuming arguendo, Plaintiffs could prove a failure to provide adequate facilities in some circumstances, individual questions would still predominate. They argue that there will be members of this purposed class: (I) who did not request allocations of IPOs; and (ii) who requested the IPOs but did not receive them due to a variety of reasons such as their anti-flipping status and/or account funding status.

Because the commonality prerequisite only requires that there be one common question it is easily satisfied. Plaintiffs are seeking certification of a class that is linked by way of Defendants' Internet website and Account Agreement. The purported class is "all Wit capital customers who entered into a brokerage Account Agreement with Wit Capital before May 20, 1999, the form of which is and was posted on the Internet." Thus, the same representations and or promises were made to each of the purported class members. Therefore, the Court finds that Rule 23(a)(2) is satisfied.

Typicality. Rule 23(a)(3) requires that the claims asserted by plaintiffs on behalf of a proposed class be typical of the claims of the other members. [FN17] "The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." [FN18]

FN17. Super. Ct. Civ. R. 23(a)(3).

FN18. In re NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 493, 509 (S.D.N.Y. Nov. 26, 1996).

Plaintiffs argue that not only are their claims typical of the proposed class, they are identical. It is

argued that all proposed class members are entitled to timely brokerage service and the same IPO processing rights. Plaintiffs contend that their claims and the claims of the other class members stem from the same practices. Plaintiffs assert that they "anticipate proving on a system-wide basis that [Defendants] failed to perform its promises to fulfill IPO orders on a first-come, first-served basis, to prioritize those customers who refrained from 'flipping,' and failed to maintain adequate resources (computer, telephone, and personnel)."

*5 Defendants argue that Plaintiffs' assertions are over broad and that their claims are not typical of the proposed class. Defendants contend that there is clear conflict between class members, including Plaintiffs, who allege they were entitled to IPO allocations and those class members who did in fact receive the allocations. Defendants state that even among the Bennings there are claims that certain of them were unable to make a valid request for an allocation of IPO shares due to website problems while some of the Plaintiffs made valid requests but were denied because of Defendants' anti-flipping rules.

For this prerequisite, the Court will examine each cause of action separately to determine if the typicality requirement is met. With respect to Plaintiffs' breach of contract claim, the Court finds that typicality is not met. Plaintiffs allege in their complaint that Defendants breached the contract with Plaintiffs and the proposed class members by failing to uphold its promise to I) provide "access to and allocation of IPO shares in conformity with its first-come, first served policy"; and ii) comply with its anti-flipping policy. Although all of the proposed class members entered into identical agreements obtained via the Internet, Plaintiffs fail to allege that Defendants breached its contract with each of the 41,000 proposed class members. [FN19] The Court read and considered Plaintiffs' Complaint and Briefs, including the attached five letters to Defendants from purported class members which describe problems obtaining IPOs and with mail server connections. However, the Court does not find that the typicality prerequisite is satisfied as to Plaintiffs breach of contract claim. A mere eight people, including Plaintiffs, registering complaints about IPO allocations fails to constitute a class. While Plaintiffs contend that they intend to prove a system-wide failure to allocate IPOs on a first-come,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d                                                      **Page 872**
(Cite as: 2001 WL 38781, *5 (Del.Super.))

first-served basis, they fall short of alleging that the contract was breached as to even a small percentage of the 41,000 purported class members. Defendants argue that each of the 41,000 proposed members did not make offers for IPOs. Plaintiffs counter-argue that they do not need to allege the contract was breached as to each proposed member because of the "system-wide" failure of proper allocation. The Court disagrees with Plaintiffs' view and finds they do not satisfy the typicality prerequisite for their breach of contract claim. Plaintiffs do not allege that the 41,000 class members made timely offers for IPOs which were not filled nor that a forty members of the class made offers that were unfilled. Plaintiffs merely speculate, based on the letters of five other customers complaining of similar problems purchasing IPOs and executing trades, that the contract was breached as to the entire class. Five customers complaining of similar problems does not constitute evidence sufficient to support a finding that claims of the class as proposed are typical of Plaintiffs. Therefore the Court finds that Plaintiffs do not meet the typicality requirement with respect to their breach of contract claims.

> FN19. But cf. Heartland Communications v. Sprint Corp., 161 F.R.D. 111, 116 (D.Kan. Apr. 20, 1995) (finding that where the purported class is "all Sprint Partners who are entitled to commissions ...." and all members of the purported class signed entered into identical contracts with the defendant, plaintiffs claims are typical to the proposed class).

*6 Next, Plaintiffs allege that Defendants breached the implied covenant of good faith and fair dealing. In their complaint, Plaintiffs allege a laundry list of shortcomings on Defendants' part which they assert constitute a breach of the implied covenant of good faith and fair dealing. [FN20] The Court finds that Plaintiffs have the same problem with this cause of action as with breach of contract. Plaintiffs rely on allegations of a "system-wide" failure or breakdown concerning IPO allocations and support systems to support their argument that a breach of implied covenant is typical to all of Defendants' customers who executed the account agreement posted on the Internet, i.e., the 41,000 proposed class members. However, this is a mere allegation which even Plaintiffs' complaint fails to support. Plaintiffs have only alleged five customers with similar complaints which does not constitute claims of the proposed 41,000 member class.

Therefore the Court finds that Plaintiffs do not satisfy the typicality prerequisite with respect to their breach of implied covenant of good faith and fair dealing claim.

> FN20. Specifically, Plaintiffs allege that Defendants breached the covenant by: [F]ailing to maintain adequate computer, communications, personnel, accounting, bookkeeping, and/or other support systems and facilities necessary to provide plaintiffs with among other things: (a) IPO allocations on a first-come/first-served basis; (b) timely execution of orders; (c) access to IPOs; (d) timely notification of unexecuted orders so as to allow plaintiffs to make other arrangements to purchase the same or similar securities elsewhere; and (e) priority in future allocation in accordance with its anti-flipping policy.

In Count V of their Complaint, Plaintiffs allege breach of fiduciary duty. Plaintiffs allege that Defendants had a fiduciary duty to maintain its facilities, provide the services offered, fulfill its representations and comply with its policies. Stockbrokers have a fiduciary duty to "carry out the customer's instructions promptly and accurately," and "act in the customer's best interests ...." [FN21] The Court finds that the claims alleged by Plaintiffs with regard to Defendants' alleged breach of fiduciary duty are not typical of the purported 41,000 member class. The primary basis of this cause of action, as with the aforementioned, is Defendants' alleged failure to follow its IPO allocation policy of first-come, first-served. After reviewing the five complaint letters outlining problems with Defendants' IPO allocation with Plaintiffs allegations, the Court finds that Plaintiffs also fall short of satisfying the typicality prerequisite with regard to breach of fiduciary duty. Plaintiffs rely on the five complaint letters in alleging that Defendants breached their fiduciary duty to the entire proposed class of 41,0000 plus customers. However, the Court finds there is insufficient objective evidence to support this claim. Common sense dictates that some customers of an on-line brokerage service are bound to have some of the same difficulties in conducting business but that does not mean all customers or even many customers had the same problems. In addition, as to customers who may have had problems executing buy and/or sell orders, there are many variables regarding the circumstances and conditions for each customer's transaction. Variables such as, but not

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2001 WL 38781, *6 (Del.Super.))

limited to, account status, time of order, i.e., time of day and day of the week, and the customer's computer modem capabilities and internet service provider. Plaintiffs fail to allege sufficient evidence that this claim is typical of the proposed class under like or similar circumstances.

> FN21. O'Mally v. Boris, Del.Supr., 742 A.2d 845, 849 (1999).

**\*7** Plaintiffs also allege negligence in their Complaint. Plaintiffs assert that Defendants owed a duty of reasonable care to maintain the facilities and support systems necessary to provide the services offered its members.    Plaintiffs assert that Defendants failed to use reasonable care in managing customer orders in a fair, consistent, and reasonable manner as required by the governing professional standards. Plaintiffs assert that they and the proposed classed members suffered damages due to Defendants' negligence.

The Court finds that Plaintiffs have the same problem with their negligence claim as with the previous claims. Again, Plaintiffs have failed to show that the claims are typical to the class members. Assuming arguendo Defendants had a duty to all of the class members, Plaintiffs have failed to sufficiently allege a breach, causation, and damages as to the proposed 41,000 class members. In addition, Plaintiffs have another problem with their negligence claim in that they only seek economic damages. Plaintiffs fail to allege any conduct on the part of Defendants caused damage to their persons or property. Instead Plaintiffs allege they lost money because they were not able to purchase IPOs and their purchase and/or sell orders were not executed in a timely manner. Pursuant to Delaware law, purely economic losses are unrecoverable by way of a tort claim. Plaintiffs' negligence claim is not proper without personal, product, or property damage. [FN22]

> FN22. See Sterling v. Beneficial National Bank, N.A., Del.  Super ., C.A. No. 91C-12-005, Ridgely, P.J. (Apr. 13, 1994) (Order at 3) (citing Danforth v. Acorn Struct ures, Inc., Del.Supr., No. 479, 1991 (Jun. 18, 1992) (Order at 17)).

Adequacy of Representation.  The adequate representation prerequisite has two elements: (1) the class counsel must be qualified, experienced and generally able to conduct the proposed litigation; and (2) the class representatives must not have interests antagonistic to those of the class. In this case, there is no dispute between the parties that there is adequate representation and the Court does find a problem with the representation. Therefore, the Court finds that Rule 24(a)(4) is satisfied.

The Court finds that Plaintiffs' Motion for Class Certification must be denied because the Rule 23(a)(3) prerequisite is not satisfied. Even if some of the claims satisfied all of the Rule 23(a) prerequisites the case is not certifiable under Rule 23(b) [FN23].

> FN23. Super. Ct. Civ. R. 23(b).

Superior Court Civil Rule 23(b) states:
An action may be maintained as a class action if the prerequisites of paragraph (a) are satisfied, and in addition:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
**\*8** (2) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(3) The Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class actions is superior to other available methods for the fair and efficient adjudication of the controversy. The matter pertinent to the findings include:
(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
(B) The extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) The difficulties likely to be encountered in the management of a class action.

Plaintiffs contend that this case is certifiable under Rule 23(b)(1)(A). Plaintiffs submit that if individual actions were brought against Defendants the result may be inconsistent and varying adjudications thereby instituting incompatible standards of conduct for Defendants. Defendants contend that Delaware Courts and other courts have consistently held that it is inappropriate to certify a class under Rule 23(b)(1)(A) where the primary form of relief sought is monetary damages. Defendants argue that Plaintiffs seek only money damages for lost profits and the mere possibility that Defendants could be forced to pay lost profits in one case and not another does not satisfy the requirement of "incompatible standards of conduct," thus, certification under Rule 23(b)(1)(A) should be denied.

The Court agrees with Defendants and find that this case cannot be certifiable under Rule 23(b)(1). Where a plaintiff seeks only monetary damages, Rule 23(b)(1) is inappropriate because "inconsistent standards for future conduct are not created because a defendant might be found liable to some plaintiffs and not to others." [FN24] Plaintiffs claims are primarily for monetary damages therefore not certifiable under Rule 23(b)(1)(A).

   FN24. See Dieter v. Prime Computer, Inc., Del. Ch., 681 A.2d 1068, 1074 (1996) (citations omitted); 5 Moore's Federal practice 3d § 23.22 [5] ).

Plaintiffs also contend that their claims are certifiable under Rule 23(b)(3). Plaintiffs maintain that all members of the class executed the same Account Agreement which provided that New York law apply to all contract claims. It is the Court's understanding that Plaintiffs also argue that New York law will apply to the entire controversy, therefore "the common legal and factual questions ... will be virtually identical in all cases." Plaintiffs also contend that with regard to their negligence claim, there are common questions concerning Defendants' duty to maintain sufficient resources and facilities. Additionally, Plaintiffs contend that the amounts in controversy for individual class

members would not justify the expense of prosecuting a "complex action" such as this, so that there would be no interest in prosecuting individual claims. Finally, Plaintiffs argue that Delaware is a desirable forum for the litigation because Defendants are a Delaware corporation and prosecution as a class action is the most efficient way to determine Defendants' liability to the class members since the Court is already familiar with the issues.

*9 Defendants argue that Plaintiffs' claims are not certifiable under Rule 23(b)(3). Defendants submit that all proposed class members were not necessarily damaged due to Defendants' alleged conduct. For instance, Defendants submit that even if on a particular day the software would not recognize a certain stock symbol, account holders who did not buy or sell on that particular day or time would not have been damaged. Defendants argue that in order to determine whether the elements of the claims have been satisfied, evidence of the individual characteristics of each account holder must be examined. Defendants contend that the Court must make multiple determinations as to each individual account holder in order to ascertain whether the class member could meet the necessary elements of the claims. Defendants argue that the determinations the Court would have to make include, but are not limited to: (1) whether each class member requested and received or did not receive IPO allocations; (2) whether the members who requested but did not receive allocations had sufficient funds in their accounts; (3) whether the members who did not receive allocations were subject to the anti-flipping policy and whether the policy was correctly applied; and (4) whether those members who chose not to sell IPO shares did so in reliance on the anti-flipping policy or because of an investment decision unrelated to the anti-flipping policy. Defendants contend that since New York law applies to any contract claims based on the Account Agreement, each proposed class member will have to allege more than the fact that he or she was an account holder. Defendants argue that each individual class member will have to provide evidence that he or she suffered an injury caused by the problems alleged by Plaintiffs.

Defendants argue that New York law applies only to contract claims and not to breach of fiduciary duty and negligence claims. With regard to Plaintiffs' breach of fiduciary duty and negligence



Not Reported in A.2d
(Cite as: 2001 WL 38781, *9 (Del.Super.))

claims, Defendants argue that Plaintiffs have failed to support their claim that New York law will apply thereby resulting in a common question of law versus the application of the law of the states of each of the proposed class members. Defendants contend that Plaintiffs avoid the issue by summarily asserting that the common question to the class members is whether Defendants' facilities were sufficient. Defendants' argue that in order to apply the law of one state to all the class action claims, Plaintiffs must show a significant contact or aggregation of contacts with respect to the claims asserted by each individual member of the proposed class. Defendants submit that Plaintiffs have failed to satisfy this burden.

A class action suit may be maintained under Rule 23(b)(3) if the Court finds that i) questions of law or fact common to the class predominate over any questions affecting individual members and ii) a class action is superior to other available methods for the fair and efficient adjudication of the controversy. [FN25] Satisfaction of the commonality requirement does not guarantee certification under Rule 23(b)(3) because this rule is far more demanding. [FN26]

    FN25. Super Ct. Civ. R. 23(b)(3).

    FN26. Mentis, at 7 (citing Amchem Products, Inc. v. Windsor, et al., 521 U.S. 591, 623-24, 117 S.Ct 2231, 2249 (1997)).

*10 The Court finds that this case is suited better for individualized inquiries into the circumstances of each of the particular claims. There are many different scenarios as to each of the 41,000 proposed class members. Assuming arguendo that each of the proposed members have viable claims against Defendant, as asserted by Plaintiffs, the factual circumstances of the claims are too varied to be maintained as a class. The issues and circumstances as they relate to Defendants' alleged wrongful conduct have to be examined individually in order to determine damages. For instance, Defendants are correct in stating that even if Defendants failed to follow its first-come, first-served policy as to a particular IPO, not all 41,000 members of the proposed class were necessarily injured since not all made offers. Also, even if on a particular day and time Defendants' Internet servers were down and trading could not be accomplished, not all 41,000

were necessarily injured. The Court finds that the factual issues are too individualized; and therefore, not proper for class certification under Rule 23(b)(3).

## CONCLUSION

In summary, the Court finds that (1) pursuant to Delaware law, Plaintiffs claims of common law fraud and negligent misrepresentation are barred from being brought as class action claims; (3) Plaintiffs' claim of Violation of the Delaware Consumer Fraud Act cannot be maintained since Plaintiffs fail to allege that any deceptive conduct occurred in Delaware; and (4) Plaintiffs claims of breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, and negligence are not typical of the claims of the proposed 41,000 class members, and therefore fail to satisfy the Rule 23(a) prerequisites for class certification.

For the foregoing reasons, Plaintiffs' Motion for Class Certification is hereby DENIED.

IT IS SO ORDERED.

2001 WL 38781 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



.

**TAB 6**

Not Reported in A.2d                                                    **Page 711**
 Fed. Sec. L. Rep. P 96,996
(Cite as: 1992 WL 181024 (Del.Ch.),  18 Del. J. Corp. L. 619)
<KeyCite Citations>

UNPLUISHED OPINION.  CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware, New Castle
County.

In re CHRYSLER CORPORATION
SHAREHOLDERS LITIGATION.

Civ. A. No. 11873.

Submitted: March 17, 1992.
Decided: July 27, 1992.

**621 Joseph A. Rosenthal, Rosenthal, Monhait
& Gross, P.A., Wilmington, and Stephen D.
Oestreich, Wolf Popper Ross Wolf & Jones, New
York City, for plaintiffs.

R. Franklin Balotti, Gregory V. Varallo, Helen
M. Richards, and Chris J. Pietrafitta, Richards,
Layton & Finger, Wilmington, for defendants.

MEMORANDUM OPINION

JACOBS, Vice Chancellor.

*1  The plaintiffs, who are shareholders of
Chrysler Corp., ("Chrysler"), commenced these
class actions against Chrysler and its directors
beginning on December 14, 1990.      After the
actions were consolidated on January 9, 1991, the
plaintiffs amended their complaint on March 11,
1991 to include a derivative claim on behalf of
Chrysler.   On July 25, 1991, the defendants moved
to dismiss the amended complaint pursuant to
Chancery Court Rules 12(b)(6) and 23.1.      The
parties briefed that motion, and orally argued it on
March 17, 1992.   This is the Opinion of the Court
on the defendants' motion to dismiss the amended
complaint.

I.

The following facts, all derived from the amended
complaint, are assumed to be true for purposes of
this motion.   Grobow v. Perot, Del.Supr., 539 A.2d
180, 187 (1988).

**622  In February, 1988, Chrysler's board of

directors adopted a Shareholder Rights Plan (the
"Rights Plan").      As originally adopted, the Rights
Plan provided for the distribution of a dividend of
one preferred stock purchase right (a "right") per
share of common stock.      If any person, or
combination of persons, acquired 30% of Chrysler's
common stock, the rights would be "triggered,"
thereby entitling Chrysler's shareholders (excluding
the acquiror) to purchase $240 worth of Chrysler
common stock for $120. [FN1]  Thus, the rights, if
triggered, would cause an immediate and substantial
dilution of the acquiror's investment in Chrysler.
On September 8, 1989, the board of directors
amended the Rights Plan to reduce that trigger
threshold from 30% to 20% of Chrysler's
outstanding common stock.

Between October 11 and December 7, 1990, Kirk
Kerkorian ("Kerkorian"), through Tracinda Corp.,
his    wholly-owned     company,     purchased
approximately   5%  of  Chrysler's  outstanding
common stock.       After becoming aware of
Kerkorian's stock purchases, defendant Lee Iacocca
("Iacocca"), Chrysler's President and Chairman, met
with Kerkorian on December 7, 1990.   During that
meeting, Iacocca asked Kerkorian to enter into a
standstill agreement that would have limited his
investment to 5% of Chrysler's outstanding stock,
but Kerkorian refused.   Instead, between December
7 and December 12, 1990, Kerkorian increased his
Chrysler holdings to approximately 9.8% of its
outstanding common stock.

In response to Kerkorian's Chrysler stock
purchases, Chrysler's board of directors held an
"emergency session" on December 14, 1990.    At
that meeting the board adopted several amendments
to the Rights Plan, including a second reduction of
the trigger threshold, this time from 20% to 10% of
Chrysler's outstanding common stock.

Thereafter, Kerkorian took no steps to mount a
hostile takeover of Chrysler.   Rather, on December
17, 1990, Kerkorian reiterated his position that he
was a "passive investor" in Chrysler.   He also filed
a Schedule 13D with the Securities and Exchange
Commission, publicly disclosing his purchase of
Chrysler shares, and stating that:
     The acquisition by Tracinda of the Shares is solely
     for the purpose of investment.   The shares were

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



acquired, in part, as a result of the high regard held by Mr. Kerkorian and **\*\*623** Tracinda for the Company's Chairman of the Board and Chief Executive Officer Lee A. Iacocca.

\* \* \*

**\*2** Except to the extent indicated above, Mr. Kerkorian and Tracinda ... presently have no plans or proposals which relate to or would result in: (a) the acquisition by any person of additional securities of the Company or the disposition of securities of the Company; (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving the Company or any of its subsidiaries; (c) a sale or transfer of a material amount of assets of the Company or any of its subsidiaries; (d) any change in the present Board of Directors or management of the Company, including any plans or proposals to change the number or term of Directors or to fill any existing vacancies on the Board of Directors; (e) any material change in the present capitalization or dividend policy of the Company; (f) any other material change in the Company's business or corporate structure ... (Am.Comp., ¶ 24.)

This litigation followed.

## II.

The amended complaint contains two counts: (i) individual and class claims and (ii) derivative claims. In both counts the plaintiffs challenge the December 14, 1990 amendments to the Rights Plan (including the reduction of the trigger threshold from 20% to 10%), and claim that those actions were taken to entrench the directors in office, and were not the product of a valid exercise of business judgment. For relief, the plaintiffs seek court-ordered rescission of those December 14, 1990 amendments, as well as money damages.

In support of their entrenchment claims the plaintiffs argue that the reduction of the Rights Plan trigger impairs a third party's ability to effectuate a successful tender offer for Chrysler, and the Chrysler shareholders' ability to associate freely with one another to oppose management or influence corporate policy through the proxy process. According to the plaintiffs, the Rights Plan

effectively deters Chrysler shareholders, individually or in concert, from increasing their ownership level above 10% of Chrysler's common stock, and thereby severely limits their ability to wage proxy contests. (See Am.Comp., **\*\*624** ¶ 40(a).)  In support of their due care claims, the plaintiffs argue that the directors' decision to reduce the Rights Plan trigger was not the product of a valid exercise of business judgment because that decision was unreasonable, hasty, and uninformed.

The defendants argue that the Court should dismiss this action for the following reasons: (i) the individual and class claims cannot stand because the alleged injury is solely derivative in nature; (ii) the plaintiffs lack standing to pursue a derivative claim because they have not excused their failure to make a pre-litigation demand upon the board of directors; (iii) even if the plaintiffs' claim is not solely derivative, their individual and class allegations present no claim upon which relief can be granted; and (iv) in all events, the plaintiffs' individual and class claims are not ripe for adjudication.

**\*3** For the reasons that follow, I conclude that the motion to dismiss must be granted as to (a) the plaintiffs' claims for money damages, (b) their due care claim, and (c) defendant Greenwald. [FN2]  In all other respects the motion will be denied.

## III.

The defendants argue that the individual and class claims must be dismissed because they are not ripe for adjudication.  The defendants point out that the plaintiffs do not allege that Kerkorian or anyone else is presently engaged in a proxy contest, or that anyone would have engaged in a proxy contest but for the reduction of the trigger threshold to 10%. Therefore, the defendants argue, any claim that the reduction in the Rights Plan trigger threshold caused individual harm to Chrysler's shareholders is entirely speculative.

Insofar as the defendants equate "individual harm" with monetary damages, I agree.  The plaintiffs have pled no facts indicating that the plaintiffs have suffered specific economic harm.  Moreover, even if there were a cognizable damage claim, it is not ripe.  To cause financial harm to the plaintiffs, the trigger threshold reduction must have precluded a specific transaction, or tangible opportunity for a



Not Reported in A.2d                                                          **Page 713**
**\*3 (Cite as: 1992 WL 181024 (Del.Ch.), 18 Del. J. Corp. L. 619, \*\*624)**

specific transaction, that would have yielded a financial benefit **\*\*625** to them. As the complaint alleges no such transaction, the plaintiffs' money damage claim (see Am.Comp. at 26, ¶ (D)), whether individual or derivative, is not ripe for adjudication and must be dismissed. See Stroud v. Milliken Enterprises, Inc., Del.Supr., 552 A.2d 476 (1989); Schick Inc. v. ACTWU, Del.Ch., 533 A.2d 1235, 1239 (1987).

By so ruling, I do not intend to suggest that there is no ripe claim for non-monetary relief. Clearly ripe is the complaint's claim for rescission of the board's December 14, 1990 amendments to the Rights Plan (including the trigger reduction), even absent an actual or threatened proxy contest. (See Am.Comp. at 26, ¶ (C).) The plaintiffs may be viewed as complaining of "the [Rights] Plan's present effect on their entitlement to receive and consider takeover proposals and to engage in a proxy fight for control of [Chrysler]." Moran v. Household Intern., Inc., Del.Ch., 490 A.2d 1059, 1072, aff'd, Del.Supr., 500 A.2d 1346 (1985) (emphasis added). Thus, the complaint fairly alleges an injury from the December 14, 1990 amendments that has a present and continuing adverse effect upon the shareholders' interests, and makes their claim for rescission of those amendments ripe for adjudication.

Consequently, what remains in this case are the plaintiffs' claims for rescission, and what remains to be decided is whether those claims have been pleaded sufficiently to survive a dismissal motion under Rules 12(b)(6) and 23.1. That question is addressed in Part IV, infra, of this Opinion (which treats the plaintiffs' entrenchment claims), and Part V, infra (which considers the plaintiffs' due care claims).

## IV.

The defendants also contend that the plaintiffs' claims are solely derivative in nature (for which reason the individual and class claims must be dismissed), and that the plaintiffs have not excused their failure to make a pre-litigation demand upon the board of directors (for which reason the derivative claims must be dismissed under Rule 23.1).

**\*4** In response the plaintiffs argue that: (i) the complaint states cognizable individual and class claims; (ii) their derivative claims should not be dismissed because the reduction of the trigger threshold to 10% was a defensive measure requiring the application of the Unocal standard, and the defendants have failed to meet the burden imposed on them by that standard; [FN3] and (iii) even if Unocal is not **\*\*626** the applicable standard, the complaint pleads facts that are sufficient in all events to excuse demand under the traditional, and more rigorous, pleading standards of Aronson v. Lewis, Del.Supr., 473 A.2d 805 (1984), and Pogostin v. Rice, Del.Supr., 480 A.2d 619 (1984).

The Court need not (and therefore does not) decide whether the plaintiffs' rescission claims are solely derivative, [FN4] or whether the Unocal standard is applicable on a Rule 23.1 dismissal motion. For even if the rescission claims were wholly derivative, I am satisfied that the present complaint meets the more stringent demand excusal pleading requirements established by Aronson and Pogostin. Therefore, for purposes of deciding the present motion the Court will assume (but not decide) that the plaintiffs' claims are completely derivative.

The Rule 23.1 standard for demand futility is well-settled. The inquiry is whether the particularized factual allegations of the complaint, taken as true, create a reasonable doubt either that: (i) the directors are disinterested and independent; or (ii) the challenged transaction was otherwise the product of a valid exercise of business judgment. Levine v. Smith, Del.Supr., 591 A.2d 194, 205 (1991); Grobow v. Perot, 539 A.2d 180, 186 (1988); Pogostin, 480 A.2d at 624; Aronson, 473 A.2d at 814. If the plaintiffs satisfy either prong of that test, demand is excused and the Rule 23.1 dismissal motion will be denied. Levine, 591 A.2d at 206. To establish a reasonable doubt as to the first prong of the Aronson test, the plaintiffs here must plead particularized facts demonstrating that the directors had either a financial interest or an entrenchment motive in reducing the Rights Plan trigger threshold. Grobow, 539 A.2d at 188.

**\*\*627** The plaintiffs maintain that the factual allegations of their complaint create a reasonable doubt that the directors, in deciding to reduce the Rights Plan trigger, were motivated to entrench themselves in office. The appropriate analysis for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



claims of that kind is articulated in Pogostin, supra, as follows:

> Where ... allegations detail the manipulation of corporate machinery by directors for the sole or primary purpose of perpetuating themselves in office, the test of Aronson is met and demand is excused.

480 A.2d at 627.   Because the complaint must create a reasonable doubt that entrenchment was the directors' "sole or primary purpose," demand is not excused if from the complaint it appears that the challenged action "could, at least as easily, serve a valid corporate purpose as an improper purpose, such as entrenchment."   Cottle v. Standard Brands Paint Co., Del.Ch., C.A. No. 9342, Berger, V.C., Mem.Op. at 20 (Mar. 22, 1990).

*5 I am persuaded that the present complaint creates a reasonable doubt that the directors were motivated solely or primarily by entrenchment concerns.   (See Am.Comp., ¶ 4.)   In Moran v. Household Intern., Inc., Del.Ch., 490 A.2d 1059, aff'd, Del.Supr., 500 A.2d 1346 (1985), then-Vice Chancellor (now Justice) Walsh held that the following pleaded facts created a reasonable doubt as to entrenchment motivation:

> [T]he plaintiffs' complaints, which set forth particularized facts alleging that the Rights Plan deters all hostile takeover attempts through its limitation on alienability of shares and the exercise of proxy rights, sufficiently pleads a primary purpose to retain control, and thus casts a reasonable doubt as to the disinterestedness and independence of the board at this stage of the proceedings.

490 A.2d at 1071 (emphasis in original).

This case is analogous to Moran, in that the complaint here similarly alleges that the Rights Plan deters all hostile takeover attempts by limiting the exercise of proxy rights.   Specifically, the plaintiffs allege that:

> Among other things, the amendments significantly impair and hinder a third party's ability to effectuate a successful tender offer for the Company by substantially reducing the number of shares which can be acquired prior to triggering the Rights.   The amendments further impair the ability of Chrysler shareholders to oppose management or otherwise influence corporate policy by preventing shareholders from **628 owning individually or collectively more than

10% of Chrysler's common stock thereby limiting concerted action through proxy contests or contests for control.

(Am.Comp., ¶ 40(a);  emphasis added.) [FN5]

The allegation that the trigger threshold reduction limits the exercise of proxy rights is enhanced by the pleaded fact that the Rights Plan will be triggered even if a group or combination of shareholders (as distinguished from a single shareholder) collectively crossed the 10% threshold.   (See id.) These pleaded facts, when combined with the allegations that (i) the board reduced the Rights Plan trigger in direct response to Kerkorian's purchase of Chrysler shares, and that (ii) Kerkorian was a "passive investor" who constituted no threat to Chrysler or its shareholders [FN6] (see id., ¶¶ 3, 20;  Def.Rep.Br. at 7), create, in my view, a reasonable doubt that the board took this action solely or primarily for entrenchment purposes.   Those pleaded facts also rebut the defendants' assertion that the directors' defensive response is as easily explained by a valid corporate purpose (to protect shareholders from the perceived deleterious threat of a takeover by Kerkorian) as by an improper motive (entrenchment).

I hasten to add that I have not concluded, and intimate no view, that the Chrysler directors were in fact so motivated or that the plaintiffs will be able to prove their entrenchment claims.   The Court concludes only that the complaint pleads particularized facts **629 that create a reasonable doubt as to whether the directors were disinterested when they adopted the December 14, 1990 Rights Plan amendments.   Finally, because the Court has found that the plaintiffs' entrenchment claims satisfy the more stringent Rule 23.1 (reasonable doubt) pleading standard, those claims are, a fortiori, also sufficient under the more liberal Rule 12(b)(6) (notice pleading) standard.   Chrysogelos v. London, Del.Ch., C.A. No. 11910, Jacobs, V.C., Mem.Op. at 15-16 (Mar. 25, 1992).

## V.

*6 Although the plaintiffs' entrenchment allegations are found sufficient to survive the pending dismissal motion, their due care averments are not.   Those latter allegations appear in the following single paragraph of the 26-page complaint:

> In addition to being self-interested, the Individual

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d                                                      **Page 715**
**\*6 (Cite as: 1992 WL 181024 (Del.Ch.), 18 Del. J. Corp. L. 619, \*\*629)**

Defendants--in taking the actions described above--fundamentally failed to exercise sound and proper business judgment. These defendants, inter alia, acted unreasonably and improperly in precipitously adopting the Challenged Amendments given that Chrysler already possesses an entire panapoly [sic] of standard anti-takeover defenses which are more than sufficient to repel any viable threat to the corporation and its constituencies, and further given that Kerkorian poses no genuine threat to the Company or its shareholders. The Individual Defendants further acted with undue haste and were uninformed in connection with their implementation of the Challenged Amendments.
(Am.Comp., ¶ 40(d).)

These averments fail to state a claim upon which relief can be granted, for several reasons. Essentially, the allegations are legal conclusions without pleaded factual support. Weinberger v. UOP, Inc., Del.Ch., 409 A.2d 1262, 1264 (1979) ("[A] motion [to dismiss] does not concede pleaded conclusions of law or fact where there are no allegations of specific fact that would support such conclusions."). Here, the facts that are pleaded would tend to establish that the directors' actions were deliberate, not the product of gross negligence. Moreover, those legal conclusions are insufficient on their face: they amount at best to simple negligence, but do not state a claim for \*\*630 gross negligence, which is the applicable due care standard. [FN7] Aronson, 473 A.2d at 812.

For the above reasons, the amended complaint shall be dismissed (a) insofar as it alleges claims for relief other than rescission, (b) insofar as it alleges claims that the directors acted without appropriate due care, and (c) in its entirety as to defendant Greenwald. In all other repsects the motion to dismiss is denied. Counsel for the parties shall submit an appropriate form of order implementing the rulings herein.

> FN1. There is also a "flip-over" provision that permits Chrysler shareholders to purchase shares of an acquiring company at a discount, but that provision is not at issue.

> FN2. In their opening brief the defendants argue (based upon a supporting affidavit) that this action should be dismissed as to defendant Gerald

Greenwald because he resigned from Chrysler's board before the directors adopted the complained-of amendments to the Rights Plan. (See Def.Op.Br. at 2 n. 2; Micale Aff., ¶ 2.) The plaintiffs have not challenged this contention in their briefs or at oral argument, nor have they offered any reason why Mr. Greenwald should remain in the case as a defendant. Accordingly, Mr. Greenwald will be dismissed from this action.

> FN3. Under the standard set forth in Unocal Corp. v. Mesa Petroleum Co., Del.Supr., 493 A.2d 946 (1985), the defendants have the burden of establishing the reasonableness of their response to a threat to corporate policy and effectiveness posed by Kerkorian before they can be cloaked with the presumptions of the business judgment rule. Although the Unocal burden is evidentiary, the plaintiffs are arguing that it imposes the pleading burden on this Rule 23.1 motion to dismiss upon the defendants, contrary to the dictates of Aronson v. Lewis, Del.Supr., 473 A.2d 805 (1984), which imposes the pleading burden upon the plaintiffs.

> FN4. "[C]laims of entrenchment may be either individual or derivative or both depending on the circumstances. An entrenchment claim will be an individual claim when the shareholder alleges that the entrenching activity directly impairs some right she possesses as a shareholder, such as the right to vote her shares." Avacus Partners, L.P. v. Brian, Del.Ch., C.A. No. 11001, Allen, C., Mem.Op. at 13 (Oct. 24, 1990) (footnote omitted) (citing Lipton v. News Intern., PLC, Del.Supr., 514 A.2d 1075, 1078-79 (1986), and Williams v. Geier, Del.Ch., C.A. No. 8456, Berger, V.C. (May 20, 1987)).

> FN5. This case differs from Moran in that there the plaintiffs claimed that the rights plan deterred all hostile takeover attempts by reason of two mechanisms: the limitation on the exercise of proxy rights and the limitation on the alienability of shares. Here, the plaintiffs also allege that the Rights Plan deters all hostile takeover attempts, but only through the mechanism of limiting the exercise of proxy rights. Conceptually speaking, I do not regard this distinction as critical, because as I read Moran, what was important was not the specific quantity of deterrent mechanisms employed, but that the plaintiffs alleged with particularity that the rights plan deterred all hostile takeovers

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d                                                                 **Page 716**
*6 (Cite as: 1992 WL 181024 (Del.Ch.),  18 Del. J. Corp. L. 619, **630)

FN6. Kerkorian's Schedule 13D statement disclosing his "passive" investment in Chrysler was admittedly filed after the board adopted the December 14, 1990 Rights Plan amendments. However, it is inferable from the complaint that Kerkorian had made his intentions known beforehand: the complaint alleges that "[i]n connection with [his] purchases [of Chrysler shares], Kerkorian described himself as a 'passive investor' ... [and] despite [his] stated passivity [the board adopted the December 14, 1990 amendments]." (Am.Comp., ¶¶ 2, 3.) The plaintiffs also allege that "[i]n conjunction with the 13D filing, Kerkorian reiterated that he intended to be a 'passive investor' in Chrysler...." (Id., ¶ 25; emphasis added.) If Kerkorian was "reiterating" that position, it is inferable that he made his intentions known before the board decided to act. Whether that inference can be established by persuasive evidence is a separate issue that must await a later stage and another day.

FN7. Since the due care claim is legally insufficient under Rule 12(b)(6), it fails, a fortiori, to satisfy the more stringent reasonable doubt pleading standard applicable to Rule 23.1 dismissal motions. The due care allegations, apart from being legally insufficient on their face, are contradicted by the plaintiffs' inconsistent allegations that the directors were purposefully acting to perpetuate themselves in office. The true thrust of the complaint is that the directors acted deliberately and with an improper motive, as opposed to acting negligently and without adequate information as to the consequences of their actions. That inconsistency is fatal, because the due care allegations are not pleaded as an alternative claim, but, rather, are "[i]n addition to" the entrenchment claims. (Am.Comp., ¶ 40(d).)

1992 WL 181024 (Del.Ch.), Fed. Sec. L. Rep. P 96,996, 18 Del. J. Corp. L. 619

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



**TAB 7**

Not Reported in A.2d
(Cite as: 2000 WL 1610750 (Del.Super.))
<KeyCite Citations>

Page 877

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Michael T. JAMGOCHIAN and PKR Enterprises, Inc., a Maryland Corporation, d/b/a Advanced Weight Control Institute, Plaintiffs,
v.
Thomas T. PROUSALIS, Jr., Esq., Defendant.

No. 99C-10-022.

Submitted May 9, 2000.
Decision Aug. 31, 2000.

Mark D. Olson, Wilson, Halbrook & Bayard, Georgetown, Delaware, and David G. Whitworth, Jr., Whitworth, Smith, and Trunnell, P.A., Crofton, Maryland, for Plaintiff.

Wayne N. Elliott, Prickett, Jones & Elliott, Dover, Delaware, and Lisa M. Mezzetti, and Leslie C. Esposito, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, D.C., for Defendant.

MEMORANDUM OPINION

GRAVES, J.

*1 This matter is before the Court upon the Defendant's motion to dismiss the allegations of a violation of the Delaware Consumer Fraud Act as recited in Count IV of the Plaintiff's Complaint. For the reasons set forth below, the Court finds that regulation of attorneys is not contemplated by the Act. Count IV of the Complaint is therefore dismissed.

NATURE AND STATUS OF THE PROCEEDINGS AND STATEMENT OF FACTS

The present action arises out of an attorney-client relationship involving Michael Jamgochian ("Jamgochian") as President, Chairman of the Board and 100% stockholder in PKR Enterprises, Inc. ("PKR"), a Maryland corporation, and Thomas Prousalis, Jr. ("Prousalis"), an attorney licensed to practice in the District of Columbia. Jamgochian hired Prousalis to assist in preparing the company for a both a private placement and an initial public offering ("IPO") of stock in the company by obtaining an underwriter for the issuance of securities and performing other legal work associated with this transaction.

According to the allegations of the Complaint, Prousalis assured Jamgochian that the IPO could be realized within a six-month period, which was necessary due to Jamgochian's financial status. Prousalis secured the services of a brokerage firm, Stratton Oakmont, Inc. of New York to underwrite and effectuate the IPO. Upon the counsel of Prousalis and Stratton Oakmont, Inc, Jamgochian consented to reincorporating PKR in Delaware and changing the name of the company to NuRx, Inc. for purposes of the IPO.

Apparently unknown to PKR and Jamgochian, the brokerage firm was under investigation by the Securities and Exchange Commission ("SEC") at the time and had been sanctioned by the National Association of Securities Dealers ("NASD") for dealings unrelated to the current matter. Eventually, the SEC upheld the NASD's sanction and suspended Stratton Oakmont's trading status. This eliminated any opportunity for PKR's planned private and public offerings of stock within the proposed period.

Following the collapse of the deal, Jamgochian, individually and on behalf of PKR, brought this suit. Jurisdiction is seated within the State of Delaware as a result of a forum selection and choice of law clause in the retainer agreement between PKR and Prousalis. Among the causes of action brought in this case are allegations of common law fraudulent and negligent misrepresentation, and legal malpractice. In addition, the Plaintiff sought recovery under the District of Columbia Consumer Protection Act and the Delaware Consumer Fraud Act.

Defendant, Prousalis, moved for dismissal of the Jamgochian's claims as an individual, as well as the allegations under the D.C. Consumer Protection Act and the Delaware Consumer Fraud Act. Following oral argument, the Court dismissed the action brought in an individual capacity, ruling that the attorney-client relationship existed only between PKR and Prousalis. In addition, the Court dismissed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2000 WL 1610750, *1 (Del.Super.))

Page 878

the putative claim under the D.C. Consumer Protection Act, but requested briefing on the issue of whether the Delaware Act is applicable. This is my decision on the issue.

## STANDARD OF REVIEW

**\*2** Where a motion to dismiss is supported by materials outside the pleadings, such a motion is reviewed as though it was a motion for summary judgment. Brown v. Colonial Chevrolet Co., Del.Super., 249 A.2d 439 (1968). In this case, since the Court requested briefing on the issue raised by the motion, it is incumbent upon the Court to examine the matter under the summary judgment standard of review.

Summary judgment is appropriate where there are no issues of material fact and the moving party is entitled to judgment as a matter of law. Super. Ct. Civ. R. 56(c). The moving party bears the burden of establishing the lack of any material fact issue. Moore v. Sizemore, Del.Super., 405 A.2d 679 (1979). The Court, after viewing the record in the light most favorable to the non-moving party and finding no issue of material fact, may grant summary judgment. Camac v. Hall, Del.Super., 698 A.2d 394 (1996). A material factual dispute exists when the parties disagree on the factual predicates necessary for the legal theory supporting a claim or providing a defense. Merrill v. Crothall-American, Inc., Del.Super., 606 A.2d 96 (1992).

## DISCUSSION

### I. Applicability of the Act in General

The purpose of the Consumer Fraud Act is stated in 6 Del. C. § 2512. The Act is intended to protect consumers from unfair trade practices while engaged in the "conduct of any trade or commerce in part or wholly within this State." Therefore, relief is only available under the Act for unlawful practices occurring or performed partially or fully within Delaware. Goodrich v. E.F. Hutton Group, Inc., Del. Ch., 542 A.2d 1200 (1988). Bolstering this view is additional statutory language that requires the Attorney General to bring action against those involved in fraudulent practices in the Court of Chancery in the county in which the acts are alleged to have occurred. 6 Del. C. § 2522.

In support of its claim under the Act, plaintiff alleges in its Complaint that it was induced to reincorporate in the State of Delaware. The entire allegation reads: "Through, among other things, the incorporation of NuRx, Inc. in the State of Delaware, Defendant conducted trade or commerce in part within the State of Delaware." Complaint at Paragraph 68. Plaintiff levels no allegations that the incorporation process was performed fraudulently or resulted in anything less than the desired result--a properly and legally incorporated Delaware entity.

Thus, the present situation is analogous to that faced by the Hutton Court, wherein the Court noted the plaintiff alleged "only one connection between Hutton and Delaware: that Hutton 'actively conducts business' here. There are no allegations, however, that any Delaware customer received any checks from Hutton, that any Delaware bank account was involved, or that any E.F. Hutton branch office was located in Delaware." Id at 1203. The Chancery Court concluded that because none of these allegedly fraudulent transactions occurred within this State, the Act could not apply, and the plaintiff's claim under the Act was dismissed. Id.

**\*3** Similarly, the plaintiff in the instant case has not alleged any facts, which, if accepted as true, would establish that any unfair or deceptive act occurred wholly or in part within this State. Without any information providing additional nexus with the State of Delaware, this Court could find an adequate basis to dismiss Count V of the Complaint. Although this Court may well be within its authority to do so, considering the fact that the parties did not brief the issue, I decline to dismiss the Count on this basis alone. [FN1] Therefore, I turn to the question of whether or not the attorney-client relationship is contemplated by the Act's protections.

> FN1. A number of potential issues would have to be considered by the Court if it were to rely upon this basis alone. For example, Plaintiff could assert that the existence of the forum selection and choice of law clause in the retainer agreement establishes the necessary additional support for application of the Act. Deciding this matter in accord with Hutton without allowing the parties the benefit of making their case in this regard would not serve the interests of fairness.

Applicability of Act to Attorney Conduct

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



While other jurisdictions have faced the same or similar circumstances interpreting their Consumer Fraud and Deceptive Trade Practices Acts with respect to their applicability to attorney conduct, this is an issue of first impression for the Delaware Courts. The paths of other jurisdictions have been divergent. A few have ruled that their Act does not apply to attorney conduct at all. See Cripe v. Leiter, Ill.Supr., 703 N.E.2d 100 (1998); Frahm v. Urkovich, Ill.App., 447 N.E.2d 1007 (1983); Vort v. Hollander, N.J.Super., 607 A.2d 1339 (1992); Rousseau v. Eshleman, N.H.Supr., 519 A.2d 243 (1986). Some states, such as Maryland, have statutorily excluded the practice of law, along with other professions requiring the use of discretion in their practice, from the purview of their Acts. Md.Code Ann., Com. Law § 13-104 (1990 & Supp.1994); N.C. Gen.Stat. § 75-1.1(b) (1994); Ohio Rev.Code Ann. § 1345.01(A) (Baldwin 1988). At least one has taken the view that one section of its Deceptive Trade Practices Act applies to attorney conduct across the board. See DeBakey v. Staggs, Tex.App., 605 S.W.2d 631 (1980). Finally, a growing majority of jurisdictions have taken the position that some activities of attorneys may be governed by their consumer fraud acts. More often than not the courts draw a distinction between the commercial or entrepreneurial aspects of the profession and the "pure" practice of law. See Short v. Demopolis, Wash.Supr., 691 P.2d 163 (1984); Ivey v. Indian Harbor Properties, Inc., Conn.Supr., 461 A.2d 1369 (1983); Heslin v. Connecticut Law Clinic, Conn Supr., 461 A.2d 938 (1983); Matthews v. Berryman, Mont.Supr., 637 P.2d 822 (1981); Reed v. Allison & Perrone, La. Ct.App., 376 So.2d 1067 (1979).

These jurisdictions have examined a number of factors in ruling on the applicability of their statutes to lawyer activity. While every state has enacted some sort of consumer protection act, these statutes can vary greatly in how they provide their safeguards. As such, the factors that Courts in other jurisdictions have made the basis of their decisions on this issue, while having some weight, are not necessarily definitive of the situation at hand.

Other states have looked to whether attorneys are engaged in "trade or commerce' under their applicable statute. Frahm, supra; Vort, supra. Some have examined the definition of consumers and how clients of attorneys fit within that definition. LJS

Co. v. Marks, S.D. Fla., 480 F. Supp 241 (1979); Roach v. Mead, Ore.Supr., 722 P.2d 1229 (1986). Still others have reviewed the issue with an eye toward whether the attorney-client relationship entails a "public wrong" or a "private conflict." [FN2] Ivey, supra. A number have viewed the applicability of their respective Acts as a distinction between a lawyer engaged in the "actual practice of law" as opposed to "entrepreneurial aspects" that a law practice shares with other commercial enterprises. Short, supra.

> FN2. Delaware's Supreme Court has adopted this distinction in other types of consumer transactions. In Young v. Joyce, Del.Supr., 351 A.2d 857 (1975), the Court ruled that an isolated, private real estate transaction was not covered by the Act. Subsequently, in Stephenson v. Capano Dev. Inc., Del.Supr., 462 A.2d 1069 (1983), the Court clarified the matter by applying the Act to those transactions between consumers and "those involved in the sale of real estate as a business or occupation." Id at 1073.

*4 Each of these approaches has merit and helps shine some light upon the issue. None of them, however, gives divine guidance for this Court in this jurisdiction. The differences in consumer protection legislation, other statutory provisions, constitutional standards and underlying case law between this and all the jurisdictions that have faced the issue demand that Delaware's approach fit Delaware's statutory and constitutional standards. This Court could well decide this matter upon one or more of the factors above; however, my analysis rests upon a more fundamental ground. The Constitutional and statutory framework of the regulation of attorneys in this state preclude application of the Act, as written, to the conduct of lawyers.

A. Constitutional and Inherent Power Basis

The Supreme Court is granted the authority to regulate the court system for the efficient administration of justice, including the attorneys who practice before the bench. Constitution of the State of Delaware (1897), Art. IV, § 13; 10 Del. C. § 1906. [FN3] Control of the Bar by the Court is an ancient vestige of our legal system, derived from the common law of England. In Re Green, Del.Supr., 464 A.2d 881 (1983); Delaware State Bar Assoc'n v. Alexander, Del.Supr., 386 A.2d 652 (1978);

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2000 WL 1610750, *4 (Del.Super.))

Page 880

Delaware Optometric Corporation v. Sherwood, Del.Supr., 128 A.2d 812 (1957). This power to regulate admission to and discipline of the Bar is inherent in the highest court of this state, "independent of any statutory grant of authority." In Re Member of the Bar, Del.Supr., 257 A .2d 382 (1969). According to the Supreme Court, the provisions of 10 Del. C. § 1906 "are nothing more than legislative recognition of the inherent powers of this Court." Id at 383. In deference to the long tradition and further recognition of the intrinsic powers of the Court, the legislature has not undertaken regulation of the Bar by statute.

> FN3. This Code section states, in pertinent part: "There may be a competent number of persons of honest disposition and learned in the law, admitted by the Supreme Court of the State to practice as attorneys in the State. Attorneys, so admitted, shall behave themselves justly and faithfully in their practice; and if they misbehave themselves therein they shall be subject to such disciplinary measures as the Supreme Court, in its discretion, may determine." This statute was first enacted as part of our organic laws derived from the Constitution of 1792. 1 Del. Laws 133 (1797).

> [FN4]Sherwood at 816.

> FN4. Past attempts to convey authority over the Bar to legislative or executive control have met with failure. One of the latest examples is "The Neal Bill" (S.B. 303 of the 132 nd General Assembly), introduced and defeated in 1983. Winslow, Helen L. (ed.), The Delaware Bar in the Twentieth Century 155 (1994).

Pursuant to this authority, the Court has promulgated rules governing the admission and conduct of attorneys as well as providing for the sanctioning of lawyers in violation of these regulations. See generally Supreme Court Rules, Part V--Attorneys; Board of Bar Examiners Rules; Delaware Lawyer's Rules of Professional Conduct; Rules of the Board of Professional Responsibility of the Supreme Court of Delaware; Rules of the Lawyer's Fund for Client Protection. Every aspect of a lawyer's practice is encompassed by these rules. Everything from admission procedures to responsibilities of an attorney leaving practice are regulated. Advertising, [FN5] accounting of client funds, communication with clients, dealings with

third parties, competence of the attorney, conflicts of interest, and the unauthorized practice of law are among the myriad subjects that these comprehensive rules contemplate. The penalty for attorney misconduct in violation of these rules may range from censure to fines to disbarment, subject to the recommendations of the Office of Disciplinary Counsel.

> FN5. Advertising is one of the targeted areas of the Consumer Fraud Act. 6 Del. C. § 2511-13.

*5 Clearly, the Supreme Court has an outstanding tradition of upholding its obligation of controlling the activities of the Bar. As evidenced by the promulgation of far-reaching and thorough rules and the efficient enforcement of them, the Supreme Court has guarded the public trust inherently implicated by the lawyer-client relationship. Its goal has been to "protect the public from incompetent and dishonest lawyers, and to assure that those admitted to the Bar possess the requisite attributes of good moral character, learning and ability." Green, supra, at 819.

This diligent protection of the public trust is mirrored by the stated intent of the Consumer Protection Act. Those purposes are set forth in 6 Del. C. § 2512, which states:
> The purpose of this subchapter shall be to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State. It is the intent of the General Assembly that such practices be swiftly stopped and that this subchapter shall be liberally construed and applied to promote its underlying purposes and policies.

It is clear to this Court that the strictures of the Supreme Court's regulation of attorneys more than satisfies this stated intent. That body moves swiftly and efficiently in the protection of clients and the greater public trust. The Supreme Court more closely controls the conduct of attorneys than the Consumer Fraud Act affects other business enterprises through its dictates.

A criticism has arisen in other jurisdictions that, although the Supreme Court may sanction an attorney for misbehavior, malfeasance directed toward a client resulting in the defrauding of that client is not satisfactorily assuaged by reprimanding,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
(Cite as: 2000 WL 1610750, *5 (Del.Super.))

suspending or disbarring an attorney. The client is not made whole by such administrative action.

While this initially appears to have some merit, it is not particularly compelling upon further examination. First, there are other actionable remedies available to the client. He or she may pursue a malpractice action or a common law fraud action, as the plaintiff has done in other counts of this case. Second, the Supreme Court of Delaware has already made provision for returning ill-gotten attorney gains to defrauded clients. Supreme Court Rule 66 establishes a Lawyer's Fund for Client Protection. Attorneys contribute to the Fund as part of their annual dues. A client may make a claim on the Fund, subject to the established procedures, in instances where an attorney has defrauded him or her and the attorney is unable to make reparations.

B. Statutory Basis

There is, however, a caveat to this proposition that the Supreme Court holds ultimate sway over all things related to the admission and discipline of attorneys. The legislature certainly has the authority to enact laws that, in covering a broader range of interests, have an effect on the legal system. This is not so much of a usurpation of the Court's power as it is an incidental consequence of the enactment. For example, lawyers and law firms are required to pay taxes and purchase workers compensation insurance, are subject to anti-discrimination laws, and are liable for criminal activity. The question that confronts this Court is whether the Consumer Fraud Act is such a statute of broader application.

*6 Even assuming, arguendo, that the Court's authority to regulate the Bar is not absolute. [FN6] ample evidence exists to indicate that the legislature did not intend the strictures of the Act to apply to attorney conduct. Statutory construction precedent instructs that where a later statute is enacted and calls into question another act, it is assumed that the legislature had in mind the prior statute. Thus, each statute is to be read in such a manner to give full effect to every provision. Green v. County Council of Sussex County, Del. Ch., 415 A.2d 481 (1980). Further, where a provision is included in one statute, but omitted from the other, the Court must assume that the legislature intended the omission. Giuricich v. Emtrol Corp., Del.Supr., 449 A.2d 232 (1982) (en banc). Therefore, where the

legislature has absolved itself of the responsibility and placed the duty of control upon the Supreme Court, it follows that, unless the legislature specifically notes otherwise in the subsequent enactment, the Supreme Court's authority remains unrestricted and controlling.

FN6. The legislature has enacted a handful of statutes affecting attorney conduct. For example, the General Assembly has mandated that attorneys take an oath before practicing and attorneys are granted notary power by statute. 10 Del. C. § 1907; 29 Del. C. 4323(a)(3). By and large, though, the legislature has taken a hands-off attitude toward attorney conduct and delegated the majority of any authority it may have retained under the Constitution through passage of 10 Del. C. § 1906.

Further, the very nature of the Act itself weighs heavily against any inference that the General Assembly intended it to apply to the conduct of attorneys in their practice. The Consumer Fraud Act, while nominally a "protective" enactment for the benefit of consumers, has the effect of being a "punitive" statute. This alone would not necessarily preclude application to lawyers. After all, lawyers are subject to the criminal code. However, the disciplinary nature of this Act is specifically targeted toward the conduct of a business enterprise. The business of an attorney is his or her practice.

The grant of authority to the Supreme Court calls for attorneys to "behave themselves justly and faithfully in their practice, and if they misbehave themselves therein, they shall be subject to such disciplinary measures as the Supreme Court, in its discretion, may determine." 10 Del. C. § 1906 (Emphasis added.) In light of this language, it is clear to this Court that lawyers, engaged in the practice of law, are subject to discipline only by the Supreme Court. Since the Supreme Court holds at least a statutory monopoly over the discipline of attorneys, had the General Assembly wished to include attorney conduct under the Act's purview, that body would have specifically inserted such language to override the provisions of 10 Del. C. § 1906.

CONCLUSION

In light of the Supreme Court's inherent, Constitutional, and statutory authority to discipline

(C) 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo



Not Reported in A.2d
**(Cite as: 2000 WL 1610750, \*6 (Del.Super.))**

members of the Bar, the punitive provisions of Delaware's Consumer Fraud Act are not applicable to attorney conduct occurring within the practice of law. As such, dismissal of the allegation of a violation of the Consumer fraud Act is warranted.

IT IS SO ORDERED.

2000 WL 1610750 (Del.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Wo

