did not obtain sufficient relief – experiences that were inconsistent with the representations allegedly made by the manufacturers' marketing campaigns. *See Rivera*, 283 F.3d at 320; *Williams*, 297 F. Supp. 2d at 173. Here, by contrast, Plaintiffs' economic injuries are not the by-product of the physical effects of a drug on non-litigants. Rather, ***all*** Nexium purchasers have experienced ***direct*** injury, *i.e.*, purchasing Nexium instead of an equivalent less-expensive competing product, as a result of AstraZeneca's efforts to mislead physicians and consumers.[17]

*Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), like *Warfarin Sodium*, is another case paralleling this one in important respects. Defendant Warner-Lambert, the maker of the prescription drug Rezulin, was sued under the New Jersey consumer-fraud statute for making false and misleading marketing claims before Rezulin's withdrawal from the market. The case was actually decided in the context of allegations brought by third-party payors, not individual purchasers, but the logic of the decision applies with equal force to all persons or entities who pay for deceptively marketed prescription drugs. *Desiano* confirms that when a drug company engages in deceptive marketing, "claims of damages [are] caused directly by Defendants' alleged fraud." *Id.* at 340. Moreover, in illustrating the soundness of its reasoning, the Second Circuit showed remarkable prescience, describing a hypothetical nearly parallel to this case:

> Consider, for example, a hypothetical in which a defendant
> drug company markets a "new," much more expensive
> drug claiming it is a great advancement (safer, more

---

[17] Defendant's remaining two cases, *NJCA* and *Heindel*, are even further afield. The plaintiffs in each case sought to allege a "fraud on the market" or "price inflation" theory of overpayment under the New Jersey Consumer Fraud Act, the allegation being that, as in the securities market, had the defendant drug manufacturers been more truthful with respect to the efficacy or side effects, there would have been a reduction in the market price paid by plaintiffs for the prescription drugs at issue. *See NJCA*, 367 N.J. Super. at 15; *Heindel*, 2004 WL 1398024, at \*14. Plaintiffs here do not allege that the price of Nexium was subject to market forces. To the contrary, the Nexium price points were the product of affirmative decision-making by AstraZeneca. *See, e.g.*, ¶¶ 103, 108.

> effective, etc. than metformin – the standard diabetes drug)
> when in fact the company is simply replicating the
> metformin formula and putting a new label on it. In other
> words, the only difference between metformin and the
> "new" drug is the new name and the higher prescription
> price (paid almost entirely by the insurance company). In
> that case, the "new" drug would be exactly as safe and
> effective as metformin, and thus there could be no
> [physical] injury to any of the insurance company's
> insured. Nevertheless, the insurance companies would be
> able to claim – precisely as they do here – that the
> defendants engaged in a scheme to defraud it, and that the
> company suffered ***direct economic losses*** as a result.

*Id.* at 349-50 (emphasis added). *Cf.*, *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517,

543 (D.N.J. 2004) (denying motions to dismiss third-party payors' antitrust claims

because they allegedly suffered "readily discernible" injuries in the form of supra-

competitive prices for K-Dur as a result of defendants' alleged wrongdoing).

Here, Nexium is the "new" drug that is in no meaningful way superior to Prilosec,

but that has not stopped AstraZeneca from positioning it as a medical advance. All

Plaintiffs, including individual purchasers and all members of the putative class, were

thus directly injured by AstraZeneca's unlawful conduct.

AstraZeneca also claims that the Individual Plaintiffs have failed to plead

causation. *Warfarin Sodium* definitively establishes that for purposes of determining

standing, there is a causal link between a pharmaceutical company's false and misleading

statements to differentiate its product from a less expensive alternative and the resulting

overpayments by consumers. The "higher prices paid" by consumers in *Warfarin Sodium*

were the "*raison d'etre*" of DuPont's unlawful conduct; the Third Circuit therefore

concluded that the consumer plaintiffs "plainly establish[ed] the required causal

connection between DuPont's exclusionary anticompetitive conduct and the direct harm

to Coumadin purchasers." 214 F.3d at 402.[18]   Here, the Shark Fin Project's ultimate goal

---

[18] On remand, this Court had the opportunity to consider not only the asserted antitrust claims, but
also the alleged "violations of ... the Delaware Consumer Fraud Act (6 Del. C. § 2513), and the

was not to develop a superior replacement product, but to preserve AstraZeneca's bottom line. ¶ 45. Despite its lack of superiority, "AstraZeneca's plan was to promote Nexium as an improvement over Prilosec to migrate its Prilosec business over to Nexium and to build brand loyalty for Nexium before the expiration of Prilosec's patents." ¶ 47. *See also* ¶ 89 (describing AstraZeneca's positioning of Nexium as a "significant clinical improvement[]" over Prilosec); ¶¶ 8, 87, 88, 90 (describing the expense and scope of AstraZeneca's marketing campaign); ¶¶ 91-103 (describing efforts to target physicians and consumers with deceptive marketing themes); ¶ 104 (describing the effect of the Nexium marketing campaign).

The Complaint thus establishes that the *raison d'etre* for Nexium's very existence as a marketed product is to generate profits with prices that are unjustifiably higher than those of therapeutically equivalent – and cheaper – alternatives. Importantly, the Complaint also makes clear that AstraZeneca's deceptive campaign had its intended effect: "Plaintiffs … have purchased Nexium and have been harmed by Defendants' misconduct *because they would not have purchased Nexium had they known the truth*." ¶ 149 (emphasis added). Plaintiffs have therefore sufficiently pleaded causation. *See Warfarin Sodium*, 214 F.3d at 400-01. *See also Desiano*, 326 F.3d at 350 (where defendants engage in illegal or deceptive marketing practices, drug purchasers "suffer[] direct economic losses *as a result*"; emphasis added).

---

consumer fraud and deceptive acts and practices statutes of the fifty states and the District of Columbia." *See In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 236 (D. Del. 2002) ("*Warfarin II*") (Robinson, C.J.). In examining the factors for class certification, this Court clearly recognized the causal nexus between DuPont's conduct and the alleged injury to the consumer plaintiffs, using language that could just as easily be applied here: "This case is clearly focused on the allegedly deceptive conduct of defendant *and the effect that conduct had* on market penetration by the generic substitute and the prices paid for warfarin sodium; *it is not focused on the conduct of individual class members*" (*id.* at 248 (citation omitted)); "The fact that plaintiffs alleged purely economic harm from a common cause (overpayment for warfarin sodium *that resulted from defendant's deceptive communications*) further supports certification of the class." *Id.* at 249.

Moreover, AstraZeneca sets the bar far too high for pleading causation. Claim One of the Complaint alleges violation of the DCFA, 6 Del. C. § 2513, a fact AstraZeneca conveniently ignores. Under Delaware law, Plaintiffs easily satisfy their burden and have established causation because the DCFA does not require that Plaintiffs plead or prove individual reliance on Defendant's advertisements in purchasing Nexium. *See Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983) ("[a]n unlawful practice under section 2513(a), however, is committed regardless of actual reliance by the plaintiff"); *S&R Assocs., L.P., III v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. Super. Ct. 1998) ("While a fraud action at common law requires the plaintiff to prove reliance, there is no corresponding reliance requirement in 6 Del. C. § 2513. The Plaintiff need only prove that the Defendant intentionally concealed material facts with the intent that others would rely upon such concealment. *Id.*"). *See also Warfarin II*, 212 F.R.D. at 248 (plaintiffs' DCFA claims "arise from an alleged broad-based communications campaign … [and] do not rely on the conduct or reliance of individual consumers or [third-party payors]").

AstraZeneca next invokes the learned-intermediary doctrine to argue that the Individual Plaintiffs failed to establish causation. The Company is wrong once again. As an initial matter, neither of AstraZeneca's principal learned-intermediary cases involved a claim under the DCFA or a comparable statute, and neither involved a motion to dismiss on the pleadings.[19] Moreover, here the Complaint specifically alleges that AstraZeneca's misleading marketing targeted doctors as well as consumers. *See, e.g.*, ¶ 91 ("AstraZeneca misleadingly promoted Nexium to doctors"); ¶ 95 ("In sales pitches to doctors, AstraZeneca employees also falsely conveyed the message that Nexium was the

---

[19] *See* Def. Br. at 34 (citing *Mazur v. Merck & Co.*, 964 F.2d 1348 (3d Cir. 1992) (learned-intermediary doctrine invoked at summary-judgment stage in product-liability action) and *Lacy v. G.D. Searle & Co.*, 567 A.2d 398 (Del. 1989) (learned-intermediary doctrine invoked at summary-judgment stage in medical-malpractice action)).

first to offer improvements over Prilosec"); ¶ 104 ("primary care physicians and specialists ... have been misled by the studies with unfair comparisons, continuing education lectures that are dominated by experts with financial ties to AstraZeneca, advertising, and deceptive drug detailing practices of AstraZeneca's drug sales representatives"). Even *Rivera*, which AstraZeneca also cites (*see* Def. Br. at 34), recognizes that the learned-intermediary doctrine, when invoked, merely shifts to the plaintiff "'the burden ... to adduce facts showing that [physician] choices have been or will be made in such a manner as to produce causation.'" 283 F.3d at 321 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992)). AstraZeneca improperly seeks to dismiss this case without accepting as true the Complaint's allegations and without giving Plaintiffs the opportunity to adduce the facts in discovery necessary to support their well-pleaded claims.

In addition, the continued validity of the learned-intermediary doctrine as a defense when a defendant pharmaceutical manufacturer engages in direct-to-consumer advertising has been called into question. *See, e.g., Perez v. Wyeth Lab.*, 734 A.2d 1245, 1257 (N.J. 1999) (rejecting application of learned-intermediary defense for drugs directly marketed to consumers). *See also Vitanza v. Upjohn Co.*, 214 F.3d 73, 78 (2d Cir. 2000) (describing New Jersey Supreme Court's *Perez* holding: "changing conditions in health care, including patient choice, managed care, and medical advertising, rendered obsolete the traditional model in which the omniscient doctor prescribes treatment for a trusting patient"). This provides yet another reason to reject AstraZeneca's learned-intermediary argument at this early stage of the litigation.

### 2.    The third-party payor plaintiffs have standing

AstraZeneca challenges the third-party-payor Plaintiffs' standing in much the same way it challenged the Individual Plaintiffs' standing – raising causation and the learned-intermediary doctrine. Their efforts therefore fail here for the same reasons as

described above. *See supra* 30-36; *Desiano*, 326 F.3d at 349-51 (third-party payors had standing to bring consumer-fraud claims based on defendant pharmaceutical company's deceptive marketing). *See also Solvay Pharms., Inc. v. Global Pharms.*, 298 F. Supp. 2d at 885 (recognizing actionability of claims under Minnesota law against drug company for false assertions about a drug); *Mylan Labs., Inc. v. Matkari*, 7 F.3d at 1136-38 (upholding state and federal claims against drug manufacturer for falsely marketing drug as bioequivalent to innovator drug and approved generic equivalents).

### 3.    The Associational Plaintiffs have standing

First, the Associational Plaintiffs assert claims as representatives for their injured members. *See* ¶¶ 23-25. AstraZeneca's argument that they lack standing because they "allege no injury to themselves" (Def. Br. at 36) is thus irrelevant. Second, AstraZeneca's challenge to the Associational Plaintiffs "associational standing" is misplaced, as it is based exclusively on the erroneous premise that the Associational Plaintiffs' respective members, *i.e.*, individual purchasers of Nexium, do not have standing. Because individuals who purchased Nexium have been economically injured and do have standing (*see supra* at 30-36), the Associational Plaintiffs have standing to sue in a representative capacity. *See Hunt* v. *Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1997). Finally, relying on *Warth v. Seldin*, 422 U.S. 490 (1975), and its progeny, AstraZeneca argues that the Associational Plaintiffs have no standing because they cannot sue for damages on behalf of their members. *See* Def. Br. at 37. But the Complaint seeks injunctive relief in addition to damages. *See, e.g.*, Complaint at p. 74 (requesting appropriate injunctive relief). AstraZeneca does not, and cannot, challenge the Associational Plaintiffs' standing to request this prospective relief.

### D.    Plaintiffs Plead Their Claims With The Requisite Specificity

AstraZeneca's Rule 9(b) argument fails on multiple fronts. Not only does AstraZeneca claim that Rule 9(b) applies, it further claims that because Plaintiffs "failed"

- 37 -

to meet its pleading requirements, Plaintiffs "in turn ... have failed to plead all the essential elements of their state law claims." Def. Br. at 38. AstraZeneca's argument fails for the simple reason that Rule 9(b) does not apply.

In *State v. Publishers Clearing House*, 787 A.2d 111 (Del. Ch. 2001), Vice Chancellor Lamb meticulously examined the language and purpose of the DCFA, and the Delaware Supreme Court's "nuanced approach" in determining whether and when to apply Rule 9(b) in different contexts, concluding that "the remedial goals of [the DCFA] are inconsistent with the application of the particularized pleading requirements of Rule 9(b)." *Id.* at 117. Moreover, as discussed above, the distinction between the pleading requirements in common-law fraud actions and DCFA actions is also recognized by the Delaware Supreme Court, which has held that it is not necessary to prove reliance under the DCFA. *See Stephenson*, 462 A.2d at 1074. *See also Warfarin II*, 212 F.R.D. at 248 (plaintiffs' DCFA claims "arise from an alleged broad-based communications campaign ... [and] do not rely on the conduct or reliance of individual consumers or [third-party payors]."). The applicable pleading standard here thus is that of Rule 8(a), which requires only that a plaintiff allege a "short and plain statement of the claim," a standard the Complaint easily meets.

AstraZeneca also lobs a drive-by statute-of-limitations argument, which appears to assume two facts, neither one of which is stated in or can reasonably be inferred from the Complaint, namely that AstraZeneca's unlawful conduct ended years ago, and that each Plaintiff had immediate reason to know that a wrong has been committed. Neither assumption is correct. First, the Complaint specifically alleges that AstraZeneca's deceptive conduct is ongoing. *See, e.g.*, ¶¶ 96, 117, 164. Second, in light of the Complaint's allegations that AstraZeneca sought to mislead physicians as well as consumers and third-party payors, it is unreasonable to assume that Plaintiffs could or should have known years ago that they were overpaying for a drug that AstraZeneca

- 38 -

falsely positioned as a better product than the alternatives. To the extent the statute of limitations is implicated at all, when construing the facts in Plaintiffs' favor as is required on this motion, the Court should find that Plaintiffs' DCFA claim was tolled. *Cf. Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 651 (Del. Super. Ct. 1985) ("plaintiff could discover ... only by hiring an independent ... specialist").

Finally, AstraZeneca contends that Plaintiffs cannot bring a DCFA claim because they do not have sufficient connections with Delaware. But the focus of the DCFA is on *Defendants'* conduct, which occurred in Delaware. *See* 6 Del. C. § 2512 (purpose CFA to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce *in part or wholly within this State*") (emphasis added). *See also* ¶¶ 26-27, 30-31 (alleging that both Defendants are Delaware corporations with principal places of business in Wilmington, and that they engaged in the conduct relevant to Plaintiffs' claims in Delaware). These facts are more than sufficient to permit Plaintiffs to seek relief pursuant to the DCFA. *See Lony v. E.I. DuPont de Nemours & Co.*, 821 F. Supp. 956, 961-62 (D. Del. 1993) (rejecting defendant's motion for summary judgment and permitting non-Delaware residents to assert DCFA claims: "Here, unlike in *Goodrich,* there is a sufficient connection to the State of Delaware that would provide standing to pursue this action. First, DuPont regularly conducts business in the State of Delaware and, second, the alleged misrepresentation commenced in Delaware.").

**E.      AstraZeneca's Request for Dismissal With Prejudice Should Be Rejected**

As the foregoing demonstrates, Plaintiffs believe the Complaint adequately alleges facts in support of the asserted claims. To the extent the Court disagrees, the solution would be to grant Plaintiffs leave to replead, which under the Federal Rules of Civil Procedure, "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Plaintiffs and the putative class they seek to represent have collectively incurred millions

if not billions of dollars in damages as a result of AstraZeneca's deceptive and unlawful conduct. The draconian measure of a dismissal with prejudice would be inconsistent with Rule 15 and controlling precedent. *See, e.g., Lundy v. Adamar of New Jersey*, 34 F.3d 1173, 1196 (3d Cir. 1994) ("[t]his Court has often held that, absent undue or substantial prejudice, an amendment should be allowed under Rule 15(a) unless 'denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment'") (quoting *Bechtel v. Robinson*, 886 F.2d 644, 652-53 (3d Cir. 1989); emphasis omitted); *Adams v. Gould, Inc.*, 739 F.2d 858, 867-68 (3d Cir. 1984) ("under the liberal pleading philosophy of the federal rules as incorporated in Rule 15(a), an amendment should be allowed whenever there has not been undue delay, bad faith on the part of the [movant], or prejudice to the [nonmovant] as a result of the delay"). AstraZeneca's cited cases where dismissal with prejudice was granted involved RICO claims subject to a heightened causation standard inapplicable to this case (*see Anderson v. Ayling*, 396 F.3d 265, 269-70 (3d Cir. 2005)), and claims under the PSLRA's "stringent pleading requirements" in which the plaintiffs failed to propose an amended pleading when provided with the opportunity to do so (*see In re Alpharma Sec. Litig.*, 372 F.3d 137, 153 (3d Cir. 2004)).

## V.    CONCLUSION

For the reasons set forth above, the Court should deny AstraZeneca's motion to dismiss.

- 40 -

DATED:  August 5, 2005

CHIMICLES & TIKELLIS LLP

By _A. Zachary N_____

Pamela S. Tikellis (#2172)
Robert J. Kriner, Jr. (#2546)
A. Zachary Naylor (#4439)
Robert R. Davis (#4536)
One Rodney Square
P.O. Box 1035
Wilmington, DE  19899
Telephone:  (302) 656-2500
Facsimile:  (302) 656-9053

*Interim Liaison Counsel for Plaintiffs*

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292

Barbara J. Hart
Christopher J. McDonald
GOODKIND LABATON RUDOFF &
    SUCHAROW, LLP
100 Park Avenue
New York, NY  10017
Telephone:  (212) 907-0700

Jeffrey L. Kodroff
Theodore M. Lieveman
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone:  (215) 496-0300

*Interim Co-Lead Counsel for Plaintiffs*

Thomas M. Sobol
HAGENS BERMAN SOBOL SHAPIRO LLP
One Main Street, 4th Floor
Cambridge, MA  02142
Telephone:  (617) 482-3700

- 41 -

James R. Malone, Jr.
Michael D. Gottsch
Daniel B. Scott
Timothy N. Mathews
CHIMICLES & TIKELLIS LLP
361 W. Lancaster Avenue
Haverford, PA 19041
Telephone: (610) 642-8500

Ellen Meriwether
Bryand L. Clobes
MILLER FAUCHER & CAFFERTY LLP
One Logan Square
18th & Cherry Streets, Suite 1700
Philadelphia, PA 19103
Telephone: (215) 864-2800

L. Kendall Satterfield
Richard M. Volin
FINKELSTEIN, THOMPSON &
LOUGHRAN
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000

Robert S. Schachter
Joseph Lipofsky
Paul Kleidman
ZWERLING, SCHACHTER &
ZWERLING, LLP
41 Madison Avenue, 32nd Floor
New York, NY 10010
Telephone: (212) 223-3900

Richard Kirschner
KIRSCHNER & GARTRELL
4910 Massachusetts Ave., NW, Suite 215
Washington, D.C. 20016
Telephone: (202) 775-0087

Ronald S. Goldser
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN 55402
Telephone: (612) 341-0400

Jason J. Thompson
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Avenue
Detroit, MI 48202
Telephone: (313) 875-8080

1798.13 0008 MTN.DOC

Jeffrey S. Goddess
ROSENTHAL MONHAIT GROSS &
  GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801
Telephone: (302) 656-4433

***Attorneys for Plaintiffs***



Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

Not Reported in F.Supp.2d, 2004 WL 1398024, 54
UCC Rep.Serv.2d 586
Briefs and Other Related Documents

United States District Court,D. New Jersey.
Dorothy HEINDEL and Jean Kinmoth Plaintiff,
v.
PFIZER INC., Pharmacia Corp., Monsanto Co., G.D.
Searle & Co. and Merck & Co., Inc., Defendants
**No. Civ.A. 02-3348(SRC).**

June 7, 2004.

Donna Siegel Moffa , Trujillo Rodriguez & Richards,
LLP, Haddonfield, NJ, for Plaintiff.

Steven A. Karg , Norris, McLaughlin & Marcus, PC ,
Somerville, NJ, Wilfred P. Coronato , Hughes,
Hubbard & Reed LLP, Jersey City, NJ, for
Defendants.

OPINION

CHESLER, J.

*1 This matter comes before the Court on the motion
of Defendants, Pfizer, Inc., Pharmacia Corporation,
the Monsanto Company, Searle & Co., and Merck &
Co., Inc. for summary judgment. The Court has opted
to adjudicate this motion on the papers, and renders
this opinion without oral argument pursuant to
Fed.R.Civ.P. 78. For the reasons set forth more fully
below, Defendants' motion is granted, and summary
judgment entered dismissing Plaintiff's complaint.

I. Introduction

Plaintiffs in this matter are two consumers who suffer
from pain associated with osteoarthritis and other
conditions. Both took prescription drugs to treat their
conditions and both got relief from the drugs they
took. Though neither plaintiff suffered any physical
injury from either of the drugs at issue, both now
claim that they are entitled to damages for the
"economic injuries" they suffered due to Defendants'
failure to publicize the results of two clinical studies
that revealed possible risks associated with the use of
the drugs. Plaintiffs assert claims arising under the
consumer fraud statutes of New Jersey or "other
states," claims for breach of implied warranty of

merchantability, and claims for injunctive/equitable
relief requiring Defendants to issue revised
advertising statements, marketing materials, and
product packaging. FN1

> FN1. Plaintiffs have also withdrawn several
> additional claims, which are therefore not
> addressed in this opinion.

For the reasons adduced more fully below, the Court
finds that Plaintiffs' claims lack merit under the laws
of Pennsylvania. Moreover, the Court finds that since
the Plaintiffs suffered no injury, there is no theory
under which they are entitled to recover, and that
Defendants are therefore entitled to summary
judgment as to all claims.

II. Background

A. Facts

The Defendants in this matter manufactured and
marketed two prescription pain medications which
belong to a class of medications known as "non-
steroidal anti-inflammatory drugs," or "NSAIDs."
Pfizer, Inc., Pharmacia Corporation, Monsanto Co.,
and G.D. Searle & Co. (collectively the "Celebrex
Defendants") are (or were) the makers of Celebrex,
while Vioxx is made by Merck & Co. ("hereinafter
"Merck"). Non-steroidal anti-inflammatory drugs
reduce pain by blocking the body's production of
enzymes called cyclooxygenase, or "COX," of which
there are two forms: COX-1 and COX-2. Most
traditional NSAIDs, (such as ibuprofen) work by
blocking the COX-1 enzyme, which reduces pain but
may lead to gastrointestinal perforations and bleeds.
Celebrex and Vioxx, it is believed, block the COX-2
enzyme that triggers pain and inflamation while
sparing the (COX-1) enzyme that helps maintain
normal stomach lining. Both drugs are indicated for,
inter alia, treating the signs symptoms of
osteoarthritis, and rheumatoid arthritis, management
of acute pain in adults, and treatment of primary
dysmenorrhea.

Plaintiffs Heindel and Kinmonth both suffer from
pain associated with osteoarthritis. Both women, who
are citizens of Pennsylvania, were treated by the

Case 1:05-cv-00075-SLR    Document 43-2    Filed 08/05/2005    Page 15 of 29
Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

same rheumatologist, Dr. Lawrence Leventhal, and both were prescribed (and took) traditional NSAIDs. Among other things, Heindel had survived esophageal cancer by having part of her stomach removed (and her stomach thereby raised); and Kinmonth had a history of G.I. complications associated with her ingestion of other drugs used to treat her musculoskeltal aches and pains. These factors put both at risk for serious gastrointestinal side effects, including non-steroidal induced ulcers and ulcer complications because "people that are at risk for developing non-steroidal induced ulcers are: people over the age of 60, individuals with a history of G.I. bleed, [and] individuals with concomitant medical problems." (Deposition of Dr. Lawrence J. Leventhal (hereinafter "Leventhal Dep.) at p. 7-8; 24-26.)

### Plaintiff Heindel

*2 Heindel first took Celebrex in February of 1999 when Dr. Leventhal provided her with samples of the drug. (Deposition of Dorothy Heindel (hereinafter "Heindel Dep.") at 44-46; Leventhal Dep. at 14). Heindel responded favorably to Celebrex, which apparently gave her tremendous relief from her arthritis pain and other symptoms, and she did not experience any adverse side effects. (Heindel Dep. at 44-48). She continued to take Celebrex until July of 1999, when she read an article in a consumer newsletter that questioned the utility and safety of new drugs like Celebrex. (Heindel Dep. at 60-63, 99-100). Dr. Leventhal told Heindel that Celebrex was the best treatment for her, and advised her to continue using it. (Heindel Dep. at 63-64; Leventhal Dep. at 18-19). Thereafter she resumed taking Celebrex, and apparently used it until February 2001, when, at Dr. Leventhal's suggestion, she switched to Vioxx. (Heindel Dep. at 76-77; Leventhal Dep. at). Vioxx apparently caused her to experience stomach upset, and after a few months she switched back to Celebrex. (Heindel Dep. at 77; Leventhal Dep. at 55). FN2 In February of 2002, Dr. Leventhal provided Heindel with another prescription drug, Bextra, to "see if it [was] better than Celebrex." (Heindel Dep. At 80). Finding that it was not, Heindel switched back to Celebrex in November of 2002. (Heindel Dep at 84). Heindel does not claim that she suffered ill effects from or was personally injured by Celebrex. It appears that, at least as of the filing of Defendants' motion for summary judgment, she was still taking Celebrex and planned to continue using it in the future. All of Heindel's treatment took place in Pennsylvania, where Dr. Leventhal is located, where

she lives, and where she purchased Celebrex and Vioxx.

> FN2. Heindel and Dr. Leventhal testified that Heindel was prescribed and ingested Vioxx. However, Heindel has not made any claims against Defendant Merck & Co., the manufacturers of Vioxx.

### Plaintiff Kinmonth

Kinmonth was first prescribed Celebrex in May or June of 1999. (Deposition of Jean Kinmonth (hereinafter "Kinmonth Dep.") at 16-18, 95-96; Leventhal Dep. at 28). Some time in the spring of 2000, she switched to Vioxx, which Dr. Leventhal thought might provide her with a greater degree of relief. (Leventhal Dep. at 33-34). Though Vioxx initially provided Kinmonth with more complete relief from her symptoms than Celebrex had, its efficacy declined over time, and she eventually switched back to Celebrex.

Kinmonth does not claim that she suffered ill effects from or was personally injured by Celebrex or Vioxx. It appears that, at least as of the time of her deposition, she was still using Celebrex. (It is not clear whether she was still taking Vioxx or had any plans to do so.)All of Kinmonth's treatment took place in Pennsylvania, where Dr. Leventhal is located, where she lives, and where she purchased Celebrex and Vioxx.

### B. Plaintiff's Claims

Plaintiffs brought this consumer class action on behalf of the purchasers and users of Celebrex and Vioxx, claiming that they are entitled to recover economic damages they sustained due to Defendants' "unconscionable marketing conduct." Plaintiff's Brief (hereinafter "Pl.'s Br.") at 1. They are pursuing claims under the New Jersey Consumer Fraud Act (Count III) and for breach of implied warranty of merchantability (Count I). FN3

> FN3. Plaintiff's Complaint also contains claims under the New Jersey Product Liability Act (Count II) and for Medical Monitoring (Count V). *See* Complaint ¶ ¶ 83-91, 109-117. Plaintiffs agreed, in a consent order dated September 22, 2003, to dismiss their medical monitoring claim and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

to refrain from seeking certification of their products liability claim. Because they were not physically harmed by ingesting Celebrex and Vioxx and are not seeking damages for physical injury, Plaintiffs agreed, in a consent order signed April 28, 2004, to withdraw their individual products liability claims. Finally, Plaintiffs have acknowledged that their claim for injunctive relief is not a separate cause of action, and that accordingly consideration by the Court of that claim would be appropriate only in the event that Plaintiffs were to prevail on the breach of implied warranty and consumer fraud claims.

\*3 Plaintiffs claim that Defendants knew, by 1998, that their "selective COX-2 inhibitors posed serious cardiovascular risks for anyone who took them," but nonetheless made a marketing decision to "push these drugs to market on claimed improvements in gastrointestinal safety while downplaying their cardiovascular dangers." Complaint at ¶ ¶ 23, 24. Plaintiffs contend that Defendants funded two significant clinical trials to justify their advertising claims and demonstrate that Celebrex and Vioxx had greater gastrointestinal safety than traditional NSAIDs-the Celecoxib Long-Term Arthritis Safety Study ("CLASS") and the Vioxx Gastrointestinal Outcomes Research Study ("VIGOR"). Complaint at ¶ 25.

The CLASS study compared gastrointestinal toxicity in arthritis patients taking Celebrex, ibuprofen, and dicofenac. It included patients with heart problems, who were allowed to take low prophylactic doses of aspirin to reduce the risk of adverse cardiovascular events. The VIGOR study-which compared gastrointestinal toxicity in patients taking VIOXX with those taking naproxen to treat arthritisexcluded patients with heart problems. Complaint at ¶ 26, 27. Plaintiffs claim that Defendants' attention to cardiac factors establishes their "secret acknowledgment of the likelihood cardiovascular events." *Id.* at ¶ 28. Plaintiffs further allege that once the studies were concluded the Defendants tried to divert attention from cardiovascular risks by either not publishing cardiovascular data they had gathered or publishing partial information. (Presumably this allegation refers to publication in medical journals or other media traditionally used for the purpose of disseminating the results of clinical trials; it is not clear from the briefing.)

The results of both studies were submitted to the FDA's Arthritis Drugs Advisory Committee ("the Committee") as part of requests to exempt Celebrex and Vioxx from gastrointestinal safety warning in their package inserts. Plaintiffs state that the Committee did not consider the cardiovascular safety of Celebrex, but they do not discuss whether this would have been a normal consideration given the scope of the exemption sought. They also state that, because patients in the VIGOR study suffered significantly more adverse cardiovascular events than those taking naproxen, the Committee suggested that "Merck add a warning to its package insert advising that Vioxx lacked the cardio-protective properties of traditional NSAIDs." *Id.* at 34. However, it is not clear what Merck's obligation was to warn of a protective quality that Vioxx did not have, as opposed to warning of side effects that may have affirmatively caused.

Thereafter, Defendants "initiated extensive pre-release marketing campaigns" that emphasized Vioxx and Celebrex's efficacy without gastrointestinal side effects. This, Plaintiffs claim, was an attempt to "avoid negative publicity from the VIGOR report and the Committee's decisions. *Id.* at 36. Subsequently, Celebrex and Vioxx were approved by the FDA and released for sale. According to the Plaintiffs, Defendants should have (at this point), used their exponential profits to fund further studies to quantify cardiovascular risks, but instead poured money into advertising campaigns that emphasized the gastrointestinal safety of the drugs. As a "result of" these "misleading advertising campaigns, Celebrex and Vioxx were wildly successful." *Id.* at 42-44.

\*4 Persistent concern within the medical community about possible links between COX-2 inhibitors and increased blood clotting (with related incidence of cardiovascular events) eventually led to further research and study. In 2001 independent doctors from the Cleveland Clinic published a meta-analysis of the CLASS and VIGOR trials that concluded that COX-2 inhibitors posed an increased risk of adverse cardiovascular events compared to naproxen. Defendants did not modify their package inserts to reflect the results of the Cleveland Clinic study. Though Plaintiffs contend that the FDA sent both Defendants cautionary letters reflecting its concern about their failure to include warn of cardiovascular side effects in direct-to-consumer advertising, it is far from clear that the FDA's letters addressed this issue. Vioxx and Celebrex have not been taken off the market, and remain popular treatments for osteoarthritis and other types of pain.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

Plaintiffs admit that they are not pursuing any claims for physical injury, either for themselves or for the two sub-classes they seek to represent. Rather, their claims are based on the economic injury that Defendants' marketing practices have allegedly caused them. (Pl.'s Br. at 2). Specifically, they posit that Defendants' "uniform failure to disclose known cardiovascular risks associated with Celebrex and Vioxx caused consumers to pay artificially inflated prices for them." Id. Plaintiffs seek to recover some or all of the purchase price consumers paid for these drugs. Pl.'s Br. at 4-5.

Though this suit arises out of economic injuries allegedly suffered by the Plaintiffs, both Heindel and Kinmonth denied, when deposed, that they had suffered economic harm. Both plaintiffs also testified that they took Celebrex and Vioxx at the suggestion of their physicians, and did not rely on advertising or marketing materials created or distributed by Defendants.

### III. Summary Judgment Standard

Summary judgment is appropriate only if all of the probative materials in the record, viewed in the light most favorable to the non-moving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c) ; *Brooks v. Kyler*, 204 F.3d 102, 105, n. 5 (3d Cir.2000) ; *Celotex v. Catrett*, 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) *Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir.1989). An issue is "genuine" if a reasonable jury could possibly hold in the non-movant's favor with regard to that issue. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it influences the outcome under the applicable law. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating either (1) that there is no genuine issue of fact and that, as a matter of law, the moving party must prevail, or (2) that the non-moving party has not shown facts relating to an essential element of the issue for which he bears the burden of proof. *Celotex*, 477 U.S. at 331. Once either showing is made, the burden shifts to the non-moving party, who must demonstrate facts which support each element of the for which he bears the burden, and establish the existence of genuine issues of material fact. *Id.* To satisfy this burden, the non-moving party "may not rest on mere allegations or denial of his pleading."

Fed.R.Civ.P. 56(e). Rather, he must produce sufficient evidence from which a reasonable jury might find in his favor, and may not simply create some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co. V. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### IV. Choice of Law

*5 The parties disagree as to which state's law this Court should apply in considering Plaintiff's claims. Plaintiffs claim that, because Defendants have failed to establish specific conflicts between the laws of New Jersey and Pennsylvania, the laws of this forum (New Jersey) should apply. They also contend that the objectives underlying the consumer warranty laws of New Jersey and Pennsylvania are identical, thus requiring the application of New Jersey law to Plaintiff's claims. Turning to the governmental interest analysis, Plaintiffs argue that New Jersey has the greatest interest in having its law govern these claims because (1) the New Jersey legislature has expressed a specific intent to protect the citizens of other states from the deceptive practices of businesses located within its boundaries (even if some aspect of the transaction took place outside New Jersey); (2) many of the corporate decisions and actions that form the basis for Plaintiff's claims—including the development, production, and marketing of Celebrex and Vioxx—took place in New Jersey; and (3) because "Defendants have other significant contacts with New Jersey that give this state an express interest in having its laws apply to their conduct." Among the contacts mentioned are Defendants' large corporate presence in the state, the considerable number of people it employs, the tax breaks it receives from New Jersey, and the number of lawsuits (unrelated to this one) filed by Defendants in New Jersey courts.

The Defendants contend, for essentially the same reasons, that Pennsylvania law should apply. They stress that both Plaintiffs live in Pennsylvania; that the conduct alleged occurred in Pennsylvania; and that the alleged financial injuries were suffered in Pennsylvania. All Defendants argue that the mere fact of a corporate presence (a minimum threshold which some of these defendants do not even meet, since only one of the four Celebrex Defendants has headquarters in New Jersey) does not give New Jersey an interest in the adjudication of these claims which overrides that of the Plaintiffs' home state. Thus, they argue, New Jersey has neither sufficient

Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

contacts with this litigation nor the requisite governmental interest in having its laws applied.

Federal courts sitting in diversity must apply the choice of law rules of the forum in which they sit. _Klaxon Co. v. Stentor Electrical Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)_ ; _Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)_. Accordingly, New Jersey's choice of law rules govern this Court's analysis. _Chin v. Chrysler Corp., 182 F.R.D. 448, 457 (D.N.J.1998)_. New Jersey's rule "applies a flexible 'governmental interest' standard, which requires application of the law of the state with the greatest interest in resolving the particular issue that is raised in the underlying litigation." _Gantes v. Kason, 145 N.J. 478, 484, 679 A.2d 106 (1996)_.

The initial prong of a government interest analysis entails an inquiry into whether there is an actual conflict between the laws of the respective states, a determination that is made on an issue-by-issue basis. _Gantes, 145 N.J. at 484, 679 A.2d 106; see also Veazy v. Doremus, 103 N.J. 244, 248, 510 A.2d 1187 (1986)_. Hence, the Court's inquiry addresses potential conflicts between (1) the laws pertaining to implied warranty of merchantability; and (2) the consumer fraud statutes of New Jersey and Pennsylvania.

### A. Whether a Conflict Exists

\*6 In addition to not agreeing on which state's laws should apply, the parties do not agree as to how the Court should go about making such a determination. Plaintiffs, citing _Boyes v. Greenwich Boat Works, 27 F.Supp.2d 543, 547 (D.N.J.1998)_, contend that "[w]here the parties fail to point out or establish any difference in the laws of the various jurisdictions involved in a particular case, its proper for the court to apply the law of the forum." They then point out that, while Defendants may have identified areas of potential differences between the laws of New Jersey and Pennsylvania, these differences are immaterial because the underlying policies of both laws are the same. This approach assumes that the initial determination as to whether a conflict exists should be based on whether the policies underlying the respective laws differ. However, it is clear that under the governmental interest test a court must _"first_ determine whether a conflict exists between the laws of the interested states," _Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187 (1986)_ and, _if_ the court finds a conflict, _then_ determine "the state with the greatest interest in governing the particular issue." _Veazey,_

_103 N.J. at 251, 510 A.2d 1187_ (emphasis added). To do this, the court must "identify the governmental policies underlying the law of each state and how these policies are affected by each state's contacts to the litigation and the parties." _Id._ Hence, the Court should turn to an evaluation of the underlying policies only after determining that there indeed exists a conflict between the laws of the two states.

None of the parties have conducted a conflict analysis that follows this model, perhaps because aspects of each state's laws are unsettled as to one or another of the claims presented. Complicating matters is the somewhat novel application of implied warranty and consumer fraud remedies to claims that are predicated only on "economic injury." Nonetheless, the Court finds that the parties have indeed pointed out differences between the laws of New Jersey and Pennsylvania, and thus proceeds with the analysis.

### 1. Breach of Implied Warranty of Merchantability

Defendants argue that Pennsylvania law conflicts with New Jersey law in that, under Pennsylvania law, a claim for breach of implied warranty of merchantability may not be maintained against a seller of prescription drugs. The implied warranty of merchantability, "as described in the Uniform Commercial Code ("U.C.C.") and adopted by Pennsylvania, is 'a warranty that the goods will pass without objection in the trade and are fit for the ordinary purposes for which such goods are used." ' _Davenport v. Medtronic, Inc., 2004 WL 193197 (E.D.Pa.2004)_ ; _13 Pa.C.S. § 2314_. In order to prevail under Pennsylvania law on a claim for breach of implied warranty, a plaintiff must show that the product was "defective." _Thomas v. Carter-Wallace Inc., 27 Pa. D & C. 4th 146, 149 (C.P. Monroe 1994)_ (citing _Dambacher by Dambacher v. Mallis, 336 Pa.Super. 23, 485 A.2d 408 (1984)), aff'd, 449 Pa.Super. 711, 673 A.2d 412 (1995)_(finding that "a breach of implied warranty of merchantability theory in Pennsylvania states that a merchant is 'only liable for harm caused by a defect in their product." '); _Altronics of Bethlehem, Inc. v. Repco, Inc., 957 F.2d 10012, 1005 (3d Cir.1992)_ (an implied warranty of merchantability plaintiff must establish, inter alia, 'that the product malfunctioned.') _Grant v. Bridgestone Firestone, Inc. 2002 WL 372941 (Pa.Com.Pl.)_. New Jersey's uniform commercial code provides, as pertinent, that "[g]oods to be merchantable must be at least such as ... are fit for the ordinary purposes for which such goods are used."

Case 1:05-cv-00075-SLR    Document 43-2    Filed 08/05/2005    Page 19 of 29
Not Reported in F.Supp.2d
Page 6
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

The exact showing required to establish a breach of implied warranty of merchantability claim is somewhat more amorphous in New Jersey, and the New Jersey courts have used various terms to describe it. *See Yost v. General Motors Corp.*, 651 F.Supp. 656, 658 (D.N.J.1986) ("[d]amage is a necessary element of ... breach of warranty" claims); *Hollinger v. Shoppers Paradise of New Jersey, Inc.*, 134 N.J.Super. 328, 332, 340 A.2d 687 (Law Div.1975), ("[l]iability is established if the evidence shows that the product was not reasonably fit for the ordinary purposes for which it was sold and [the] defect proximately caused injury to the ultimate consumer."). *See also Kaspirowitz v. Schering Plough Corp.*, 70 N.J.Super. 397, 403-04, 175 A.2d 658 (App.Div.1961) (finding that, where a prescription dandruff shampoo caused the plaintiff to have an adverse reaction "we are not dealing with a Defective product on the sale of which a claim of breach of an implied warranty of merchantability must necessarily rest."); *Adams v. Peter Tramontin Motor Sales, Inc.*, 42 N.J.Super. 313, 325, 126 A.2d 358 (App.Div.1956) (finding that product at issue "met the test of merchantability," where "[i]t was reasonably suitable for ordinary use ... [and] possessed no remarkable defect."). FN4

> FN4. While Pennsylvania's requirement of a manifest defect or malfunction is slightly different than New Jersey's more amorphous standard, which refers variously to "injury" and "defect," this Court finds that there is no actual conflict between the laws of the two states.

*\*7 (a) Whether a Claim for Breach of Implied Warranty can be Maintained Against a Manufacturer of Prescription Drugs*

Defendants    contend-    and    Plaintiff's concedePennsylvania law bars claims for breach of implied warranty against a manufacturer of prescription drugs. Defendants rely on *Makropidis v. Merrell-Dow Pharmaceuticals, Inc.*, 361 Pa.Super. 589, 593, 523 A.2d 374 (1987) (and its progeny), which holds that

> the very nature of prescription drugs themselves precludes the imposition of a warrant of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient.

The reasoning in *Makripodis*, which involved a claim against a pharmacist, has subsequently been applied to bar breach of implied warranty claims against pharmaceutical manufacturers and makers of medical devices. *See Luke v. Am. Home Prods. Corp.*, 1998 WL 1781624 at *6 (Pa.Com.Pl.1998) ; *Murray v. Synthes (U.S.A.), Inc.*, 1999 WL 672937 at * 9 (E.D.Pa.1999). *See also Hahn v. Richter*, 543 Pa. 558, 673 A.2d 888, 891 (Pa.1996) (holding that "where the adequacy of warnings associated with prescription drugs is at issue, the failure of the manufacturer to exercise reasonable care to warn of dangers, i.e., the manufacturer's negligence, is the only recognized basis of liability.")

It is uncontested that New Jersey law contemplates no such limitation on breach of implied warranty claims against prescription drug manufacturers. Accordingly, the Court finds that there is an actual conflict between the laws of New Jersey and Pennsylvania as they pertain to this issue, and proceeds to the next step of the analysis.

## 2. Consumer Fraud Claims

Plaintiffs assert (on behalf of the payer sub-class) a claim arising under the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1(c) and "other states' consumer protection statutes." Compl. ¶ ¶ 93-100. Defendants argue that the Plaintiff's consumer fraud claims should be governed by Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2 *et seq.*

The UTPCPL provides, as pertinent, that

> Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act [73 P.S. § 201-3], may bring a private action to recover actual damages or one hundred dollars (\$100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars, and may provide such additional relief as it deems necessary or proper.

The NJCFA provides, as pertinent, that

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud,    false    pretense,    false    promise,

Not Reported in F.Supp.2d                                                                          Page 7
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
**(Cite as: Not Reported in F.Supp.2d)**

misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has been damaged thereby, is declared to be an unlawful practice.

**\*8** N.J.S.A. 56:8-2.

As Defendants point out, the private remedy provisions of both statutes require a plaintiff to have suffered an ascertainable loss. See *Weinberg v. Sprint Corp.,* 173 N.J. 233, 801 A.2d 281 (2002) (holding that, in order "to have standing under the Act a private party must plead a claim of ascertainable loss that is capable of surviving a motion for summary judgment."); *Weinberg v. Sun Co., Inc.,* 565 Pa. 612, 618, 777 A.2d 442 (2001) ("[t]he statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action.")(emphasis in original).

However, the New Jersey and Pennsylvania laws differ in several important respects. First, reliance is an element of claims arising under the UTPCPL, but not the NJCFA. The Pennsylvania Supreme Court "has held expressly that successful prosecution of a private cause of action under the UTPCPL is dependant upon pleading and proof by the plaintiff that he or she suffered an ascertainable loss 'as a result of' the defendant's prohibited conduct. The Court has interpreted this language to mean that a plaintiff must establish his specific reliance on some conduct or representation by the defendant that caused him to incur the loss in question." *Sexton v. PNC Bank,* 792 A.2d 602, 607 (2002) (citation omitted). The New Jersey statute, on the other hand, "requires only a causal nexus between the 'method, act, or practice declared unlawful' and the consumer's 'ascertainable loss.' The [New Jersey] Supreme Court has taken pains to point out that this element is significantly distinct from the requirement of reliance in a common law fraud claim. A defendant who violates the Act because of an unlawful 'method, act, or practice' that results from an omission of a material fact with the 'intent that others rely upon such concealment, suppression, or omission,"... is liable for [such] representations whether 'any person has in fact been misled, deceived, or damaged thereby.' " *Varacallo v. Mass. Mutual Life Insurance Co.,* 332 N.J.Super. 31, 48, 752 A.2d 807 (2000) (*internal citations omitted*).

Second, the New Jersey and Pennsylvania laws have different damages and attorney's fees provisions. In "New Jersey the assessment of treble damages and attorney's fees is mandatory when a violation of the Consumer Fraud Act has been proved." *Huffmaster v. Robinson,* 221 N.J.Super. 315, 320, 534 A.2d 435 (Law Div.1986) (*citing Skeer v. EMK Motors, Inc.,* 187 N.J.Super. 465, 455 (App.Div.1982). In Pennsylvania those assessments are discretionary. See *Pennsylvania Unfair Competition and Practice Act,* 73 Pa.Cons.Stat. § 201-9.2.

Finally, under Pennsylvania law, the learned intermediary doctrine may bar Plaintiff's UTPCPL claims for reasons similar to those discussed above in relation to the implied warranty claims. Pennsylvania courts that have addressed this issue in the context of claims brought against a maker of prescription drugs have ruled that, "[t]here can be no cause of action based on Defendants' alleged omission because Defendants had no duty to disclose any information directly to Plaintiff. Further, to permit a cause of action under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription drug." *Luke v. American Home Products Corp.,* 1998 WL 1781624, \* 8 (Pa.Com.Pl.1998). Because New Jersey Courts have not articulated such a doctrinal obstacle to recovery under the state's consumer fraud act, the laws of the states are in conflict in this respect as well.

**\*9** Based on the foregoing, the Court is satisfied that there is an actual conflict between the UTPCPL and the NJCFA. Accordingly, the Court proceeds to the next stage of the analysis.

## B. Underlying Governmental Policies and their Relationship to the Parties' Contacts

### I.

Having determined that there is an actual conflict between the laws of Pennsylvania and New Jersey, the "next step is to identify the governmental policies underlying the law of each state and how those policies are affected by each state's contacts to the litigation and to the parties." *D'Agostino v. Johnson & Johnson, Inc.,* 133 N.J. 516, 523, 628 A.2d 305 (1993) (*citing Veazy,* 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)). With respect to both implied warranties of merchantability and consumer

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 8
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
**(Cite as: Not Reported in F.Supp.2d)**

fraud statutes, New Jersey and Pennsylvania have similar (and in some respects identical) policy objectives. In both states, the implied warranty of merchantability is "designed to protect the buyer of goods from bearing the burden of loss where merchandise, though not violating a promise expressly guaranteed, does not conform to the normal commercial standards or meet the buyer's particular purpose, a condition upon which he had the right to rely." *Vlases v. Montgomery Ward. & Co.,* 377 F.2d 846, 849 (3d Cir.1967) (applying Pennsylvania law). Moreover, the enforcement of implied warranties of merchantability is intended to address potential imbalances in the bargaining position of and knowledge possessed by respective parties to a transaction, and reduce the risk that in the absence of an express warranty the party in the greater bargaining position will be able to sell a substandard product with impunity.

Likewise, the consumer fraud statutes of both states are premised on similar legislative goals. The UTPCPL's " 'underlying foundation is fraud prevention," ' *Weinberg v. Sun Company, Inc.,* 565 Pa. 612, 618, 777 A.2d 442 (2001), and in passing it the legislature intended to protect consumers against unfair or deceptive business practices, *see Pirozzi v. Penske Olds-Cadillac-GMC, Inc.,* 413 Pa.Super. 308, 605 A.2d 373, (1992) *appeal denied,* 532 Pa. 665, 616 A.2d 985, and place the seller and consumer on more equal terms, *see Com. by Packel v. Ziomek,* 145 Pa.Cmwlth. 675, 352 A.2d 235 (1976). The New Jersey statute was conceived to protect the consumer against imposition and loss as a result of fraud and fraudulent practices by sellers of goods and services. *See Scibeck v. Longette* 339 N.J.Super. 72, 770 A.2d 1242 (App.Div.2001). Its three main purposes are generally described as (1) compensating the victim for his or her actual loss; (2) punishing the wrongdoer through the award of treble damages; and (3) attracting competent counsel to counteract the "community scourge" of fraud by providing an incentive for an attorney to take a case involving a minor loss to the individual. *See Lettenmaier v. Lube Connection, Inc.,* 162 N.J. 134, 741 A.2d 591 (1999).

## II.

The next stage of the choice of law inquiry examines the relationship of each state's contacts to the policies underlying the respective laws. "If a state's contacts are not related to the policies underlying its law, then that state does not possess an interest in having its law apply. Consequently, the qualitative, not the quantitative, nature of a state's contacts ultimately determines whether its law should apply." *D'Agostino,* 133 N.J. at 523, 628 A.2d 305 (*citing Veazy,* 103 N.J. 244, 510 A.2d 1187 (1986) (citations omitted)).

**\*10** The parties' contacts are as follows. Plaintiffs Heindel and Kinmonth live in Pennsylvania, are residents of Pennsylvania, and were treated by their physicians in Pennsylvania. They were prescribed- and purchased-Celebrex and Vioxx in Pennsylvania. To the extent that they saw advertising about Celebrex or Vioxx, or read any package inserts, warnings, or informational newsletters, they appear to have done so in Pennsylvania. (*See* Merck's 56.1 Statement at ¶ ¶ 16-26; Celebrex Def.'s 56.1 Statement at ¶ ¶ 7-54). Moreover, their physicians were based in, and worked from offices or hospitals in Pennsylvania.

With respect to the Defendants, Plaintiffs contend that Merck's pharmaceutical business is conducted through its divisional headquarters located in New Jersey. (Pl.'s 56.1 Statement at ¶ 12). Furthermore, they claim that a vast majority of Merck's corporate functions, including those related to Vioxx, are located in New Jersey; that Merck provided the source information for the VIGOR trial from its New Jersey offices; that New Jersey residents participated in the VIGOR study; and that Merck conducted various public relations functions from its New Jersey headquarters. (Id.). However, the record establishes that Merck employees stationed in Pennsylvania had responsibility for much of the interaction with the FDA regarding Vioxx. Declaration of Wilfred Coronato ("Coronato Dec .") at Exh. B, ¶ 10. The department of Merck Research Laboratories responsible for collecting adverse events and reporting them to the FDA is also located in Pennsylvania, as is the headquarters of Merck's United States Human Health Division, which markets Vioxx in the U.S. (Id. at ¶ ¶ 11, 12, 510 A.2d 1187). The head of the U.S. Human Health Division had his primary office in Pennsylvania during the time period relevant to this lawsuit, and his subordinate directly responsible for marketing Vioxx was also in Pennsylvania. (Id. at ¶ ¶ 13, 510 A.2d 1187). The groups within the U.S. Human Health division in charge of training its U.S.-based professional representatives, and which have responsibility for advertising Vioxx in the U.S., are based in Pennsylvania. (Id. at ¶ ¶ 14, 15, 510 A.2d 1187). Finally, the committee at Merck Research Laboratories that is responsible for the drafting and editing of the Product Circular (containing warnings,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

precautions, and other information concerning adverse effects and contraindications) is comprised of employees located in both Pennsylvania and New Jersey. (Id. at ¶ 9, 510 A.2d 1187).

With respect to the Celebrex Defendants, Plaintiffs contend that Pfizer conducts corporate functions (such as those related to the development, distribution, manufacture, research, and sale of Celebrex) in New Jersey; that Pfizer broadcast and published Celebrex ads in New Jersey; and that Pfizer sent "Dear Doctor" letters to New Jersey physicians downplaying the cardiovascular risks of Celebrex. They also contend that Pharmacia maintains headquarters in New Jersey and hired a marketing consultant with a New Jersey based office to handle the global promotion of Celebrex. However, the record establishes that both Plaintiffs started taking Celebrex in 1999, when the drug was manufactured and marketed by corporate predecessors of Pfizer that were neither incorporated nor headquartered in New Jersey. (Celebrex Defendant's Brief in Support of it's Motion for Summary Judgment (hereinafter "Celebrex Def.'s Br.) at 17). Celebrex was developed by Searle, a Delaware Corporation with its principal place of business in Illinois. (Compl. at ¶ 10). In June of 1998 Searle, then a subsidiary of the Missouri-based Monsanto, submitted the marketing application for Celebrex to the FDA, which granted its approval in December of 1998. (Celebrex Def.'s Br. at 17). Celebrex was co-promoted from the time of FDA marketing approval by Searle and Pfizer, a Delaware corporation with its principal place of business in New York, pursuant to a co-promotion agreement between Pfizer and Searle. (Id.) In March of 2000, Searle's parent corporation, Monsanto, merged with Pharmacia & Upjohn to form Pharmacia. According to Defendants, promotional activities were coordinated out of Pharmacia's headquarters in New Jersey and Pfizer's headquarters in New York for some period of time after the March 2000 merger, but the Searle regulatory personnel responsible for Celebrex remained in Illinois. (Id.) In April of 2003, Pfizer acquired Pharmacia, and Celebrex promotional activities are apparently now coordinated out of Pfizer's headquarters in New York. Celebrex is, and was at all relevant times, manufactured in Puerto Rico. (Id.) Hence, only one of the four Celebrex Defendants (Pharmacia) has headquarters in New Jersey.

*11 Finally, Plaintiffs list a number of ancillary contacts that both companies have with the state of New Jersey, such as the length of their corporate presences, the number of people they employ, the tax breaks and businesses incentives they enjoy, and their availment of the courts of this jurisdiction over the course of a year.

In short, it appears that Defendants' contacts with New Jersey can be summarized as (1) the presence of Merck's principal place of business in the state (though the division that markets and advertises Vioxx is headquartered in Pennsylvania); and (2) the presence of Pharmacia's principal place of business in the state between March of 2003 and April of 2003 (though many marketing, advertising, and regulatory functions appear to have been conducted elsewhere). FN5

> FN5. For the purposes of this discussion, factors such as the number of people employed in New Jersey by the Defendants are not relevant, just as Defendants' filing of unrelated lawsuits in the District of New Jersey bears no relation to the inquiry at hand.

III.

At the outset, it bears noting that the parties have engaged in assiduous parsing of particular marketing and advertising functions and where they took place. While some corporate and marketing functions clearly took place in New Jersey, it appears that just as many others took place in other states. Generally, courts weighing the competing interests of the state where a corporation is domiciled against those of the consumer's home state do not engage in a microanalysis of specific marketing and promotional practices and their relative significance. This is not to say that courts do not consider where marketing or advertising originated, especially where (as here) the underlying allegations are based on fraud or misrepresentation, as to which advertising and marketing are of course relevant. However, examining in depth which individual functions or phases in the marketing and advertising process are more significant than others would constitute a lengthy and ultimately unproductive digression. With respect to Merck, the marketing and promotional activities that occurred in Pennsylvania appear to outweigh or at the very least equal in significance those that took place in New Jersey. The case for considering the marketing and promotional activities of the Celebrex Defendants is even less compelling, as it appears that there was only a brief period during which these activities took place in New Jersey, and

Case 1:05-cv-00075-SLR     Document 43-2     Filed 08/05/2005     Page 23 of 29
Not Reported in F.Supp.2d
Page 10
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

that at all other times marketing and promotion primarily took place elsewhere. In short, this Court finds that the performance of various marketing and promotional activities in New Jersey is not a compelling interest as it pertains to either the warranty claim or the consumer fraud claim.

Hence, as is often the case in conflicts analysis, the determination of which state's law bears the more compelling relationship to the underlying policies turns on the relative interests of the corporation's home state and the consumer's home state. The facts of this case and the nature of the Plaintiff's claim present what have been called "often difficult issues with respect to conduct regulating laws [which] include, but are by no means limited to ... the scope and impact of the learned intermediary doctrine, and the rules governing disclosure in the advertising of ethical pharmaceuticals." *In re Rezulin Products Liability Litigation,* 210 F.R.D. 61, 70 (S.D.N.Y.2002). To be certain, New Jersey has a interest in governing the conduct of its corporate citizens and encouraging truthful marketing and advertising of products. However, with respect to both the warranty and consumer fraud claims, Pennsylvania has a competing interest in ensuring that its own citizens "are compensated for their injuries, that the standards its [sic] sets for product sales within its borders are complied with, and that the rules it establishes to govern physician and pharmacist are upheld." *Id.* at 70-71. These interests are not outweighed by New Jersey's interest in regulating the conduct of its pharmaceutical companies.

*12 The "particular configuration of the state interests to be balanced, and the relative weight of those interests as dictated by the relevant contacts with the parties" require that "the deterrence interest of New Jersey as the domicile and locus of the defendant manufacturer must yield in this case to the compensation interest" of Pennsylvania. *See Gantes v. Kason Corp.,* 145 N.J. 478, 496-97, 679 A.2d 106 (1996). Here, the only real contacts that Defendants had with New Jersey-the state with the deterrent interestare somewhat attenuated. Moreover, since Celebrex and Vioxx were marketed, advertised, distributed, prescribed, and purchased in Pennsylvania, that state has both a deterrent interest in *and* a compensation interest.

Other factors require this outcome. First, while a number of New Jersey courts have chosen to apply the NJCFA over the consumer protection law of another state, finding that New Jersey law "should be

construed liberally in favor of protecting consumers," *Levin v. Lewis,* 179 N.J.Super. 193, 200, 431 A.2d 157 (App.Div.1981) and its mandatory treble damages and fee provisions provide a heightened level of protection, it is important to distinguish the particular transactions at issue in those cases from the one involved here. Obviously, this case does not involve the sale of a boat, a car, or a house. *See Boyes v. Greenwich Boat Work, Inc.,* 27 F.Supp.2d 543 (D.N.J.1998) ; *Huffmaster v. Robinson,* 221 N.J.Super. 315, 534 A.2d 435 (Law Div.1986) ; *Gennari v. Weichert,* 148 N.J. 582, 691 A.2d 350 (N.J.1997). The "transaction" at issue here is Plaintiffs' ingestion of prescription medicines that were prescribed, purchased, paid for, and allegedly damaged the Plaintiffs in their home state. None of these things could have occurred without the involvement of a physician.

In *Incollingo v. Ewing,* 444 Pa. 263, 282 A.2d 206 (1971), the Pennsylvania Supreme Court adopted the learned intermediary doctrine, which, among other things, circumscribes the liability of prescription drug manufacturers. Though originally the basis for eliminating the imposition of strict products liability against drug manufacturers, the rule has evolved to apply to other causes of action, including implied warranty and consumer fraud. The learned intermediary doctrine clearly reflects the determination by the Pennsylvania courts to preserve the primacy of the physician's role in making treatment decisions for Pennsylvania patients-including the making of informed choices about prescription drugs. FN6 In light of this, the most important aspects of the transaction underlying this lawsuit are the decisions of the physician and the relationship between doctor and patient, all of which occurred in Pennsylvania.

> FN6. In fact, the Pennsylvania courts have even declined to abrogate the learned intermediary doctrine in cases involving direct to consumer marketing, holding that despite these practices the decision to take a particular drug is still dependant on the judgment of a physician. *See Lennon v. Wyeth-Ayerst Laboratories, Inc.,* 2001 WL 755944 (Pa.Super.2001) ; *Albertson v. Wyeth Inc.,* 2003 WL 21544488 (Pa.Com.Pl.).

New Jersey's consumer protection statue arguably offers greater protection to the consumer. However, the plaintiffs in this matter are not residents of New

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

Jersey, and given the competing interests of Pennsylvania, New Jersey does not have a "compelling reason ... to extend to such non-domiciliary plaintiffs the benefit of [its] decisional law." *Deemer v. Silk City Textile Mach. Co.,* 193 N.J.Super. 643, 475 A.2d 648 (App.Div.1984). Consequently, the laws of Pennsylvania must govern.

## V. Discussion

**\*13** Having determined that Pennsylvania law governs both the breach of implied warranty and consumer fraud claims, the Court turns to the merits of those claims. The Court will first address whether Plaintiff's "fraud on the market" theory is viable, and then whether the learned intermediary doctrine precludes the breach of implied warranty and consumer fraud claims.

### A. *Plaintiffs' "Fraud on the Market" Theory*

As a preliminary matter, the Court turns to Plaintiffs' problematic assertion that their claims "challenge Defendants' intentional failure to disclose the known cardiovascular risks of Celebrex and Vioxx to consumers and seek to recover some or all of the purchase price consumers paid for these drugs." Complaint at ¶ ¶ 2, 35-36, 44, 51, 59, 63-67. Their claim for economic damages caused by the payment of allegedly inflated prices for Defendants' products is based upon a vaguely articulated "fraud on the market" rationale. Because the "fraud on the market" theory is untenable as to both remaining claims, the Court will briefly address this issue at the outset.

### 1. Implied Warranty of Merchantability

Clearly, neither Plaintiff was personally injured by Celebrex or Vioxx. They do not claim to have suffered any bodily harm and, accordingly, have withdrawn their product liability and medical monitoring claims. This presents an issue which is at the core of this case, namely, if there is no "defect" at issue, and the drugs themselves caused no harm, how were Heindel and Kinmonth injured? Their apparent explanation is that, given the potential cardiovascular side effects, they simply paid too much for the drugs. By asserting economic loss, Plaintiffs "seek to move the suit out of the tort domain and into that of contract," because, allegedly, the drugs were not as they were "described and thus [were] not merchantable, a warranty theory." *See In re*

*Bridgestone/Firestone, Inc.,* 288 F.3d 1012, 1017 (7th Cir.2002).

First, this 'shift' into the realm of contract is problematic because "if tort law fully compensates those who are physically injured, then any recoveries by those whose products function properly means excess compensation." *Id.* at 1017. Moreover, breach of implied warranty claims are not intended to address hypothetical economic loss; they are meant to compensate a buyer who has not gotten the benefit of her bargain because the product in question does not meet generally accepted standards or disappoints consumer expectations. These plaintiffs would be hard pressed to claim that they did not get what they paid for. Indeed, the record unequivocally establishes that Celebrex and Vioxx were effective treatments for Heindel and Kinmonth's arthritis pain, and that both benefitted significantly from its use. Kinmonth testified that she found Vioxx more effective than other, non-narcotic medicines that she had used in the past, and that the relief it gave her from arthritis pain allowed her to function better and do things that had been made difficult by her condition, such as preparing food and lifting things. (Coronato Decl. at Exh. D, (hereinafter Kinmonth Dep .) p. 64-70). Kinmonth also testified that Celebrex gave her relief from her symptoms, and she reported to her doctor that she liked its results. Kinmonth Dep. at p. 119; Leventhal Dep. at p. 39-40. Likewise, Heindel "liked" the results she got from Celebrex, found it more effective than several other non-narcotic drugs she had tried, and even told her doctor that it was "as close to a panacea as is likely to be found." (Heindel Dep. at 46-48; Leventhal Dep. at 15-16). Both plaintiffs continued to use Vioxx and Celebrex after the complaint was filed in this lawsuit, and were taking it as of the time they were deposed.

**\*14** Despite the irrefutable evidence that Plaintiffs got the effective arthritis remedy that they bargained for, they seek to recover "some or all of the purchase price" paid for Celebrex and Vioxx. Complaint at ¶ ¶ 2, 35-36. Clearly, the Plaintiffs would not be entitled to recover *all* of the purchase price of the drugs; this would amount to a claim for restitution, to which they are obviously not entitled. As the court in *In re Rezulin Products Liability Litigation,* 210 F.R.D. 61, 68 (S.D.N.Y.2002) (a case that, like this one, involved claims for purely economic losses alleged by otherwise unharmed consumers of a prescription drug) found:

> In order to obtain restitution for the purchase price of [the drug], plaintiffs and class members would be obliged, at least in many jurisdictions, to prove

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

some kind of harm. In other words, although theories presumably could differ, they would have to establish that ... that the defendants' retention of the price they paid for the drug would be unjust, that the value of the drug given its allegedly concealed defects was less than the purchase price, or some other variation that would warrant the transfer of money from the defendants to them. Plaintiffs contention that everyone who took Rezulin sustained an ascertainable loss presumes that Rezulin was worthless. But that is not a defensible position. Even Plaintiff's experts acknowledge that Rezulin was enormously beneficial to many patients. Those patients *got their money's worth* and suffered no economic injury.

*In re Rezulin Products Liability Litigation,* 210 F.R.D. 61, 68 (S.D.N.Y.2002) (emphasis supplied).

This Court agrees with the above conclusions. Finding no other theory under which they would be entitled to reimbursement for some or all of the purchase price of the arthritis medicine whose benefits they clearly enjoyed, Plaintiffs attempt to explain away this deficiency with their "price inflation" or "fraud on the market" theory. In this context, though, such a theory is patently absurd. It depends on the totally implausible predicate that, had some adverse information about side effects derived from the VIGOR and CLASS studies been more widely disseminated, the Plaintiffs would have paid *less* for Celebrex and Vioxx. However, (at the risk of stating the obvious) there is no prescription drug "market," at least as that term is understood in the securities context. There, a "perfect market" or "efficient market" is assumed, and adverse information is expected to be quickly absorbed by the market, thus causing the price of the stock or commodity at issue to fluctuate. But the only "market" for a prescription drug is the potential group of patients who will be prescribed it by their physician, and if the side effects of the drug make it overly risky to ingest, the doctor will either not prescribe it or the patients will decide not to take it. The suggestion that consumers might be inclined to take a drug with certain side affects if they could pay less for it, or that drugs with certain side effects should cost less, defies both reality and common sense. It is also out of place in this lawsuit, where it is clear that neither plaintiff suffered any adverse effects. In short, the decision to take a particular drug is a medical one, not one based on an comparative analysis of risk versus price.

### 2. Consumer Fraud

*15 For the same reasons, the fraud on the market theory is flawed with respect to Plaintiff's consumer fraud claims. Moreover, in *Weinberg v. Sun Co.,* 565 Pa. 612, 777 A.2d 442 (2001) the Pennsylvania Supreme Court explicitly rejected an attempt by a class of consumers to employ the fraud on the market theory in a case arising under the UTPCPL. The plaintiffs in *Weinberg* were consumers of high octane gasoline who claimed that "the [defendants'] false marketing campaign increased the demand for Ultra(R) gasoline, raising the price for all consumers." The Court found that

[t]here is no authority which would permit a private plaintiff to pursue an advertiser because an advertisement might deceive members of the audience and might influence a purchasing decision when the plaintiff himself was neither deceived nor influenced ... Nothing in the legislative history suggest that the legislature ever intended the statutory language directed against consumer fraud to do away with the traditional common law elements of reliance and causation. The statute clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result* of the defendant's prohibited action.

*Id.* at 617-18, 777 A.2d 442 (emphasis in original).

Clearly, Plaintiffs cannot use the fraud on the market theory to circumvent the reliance element of the UTPCPL. The suggestion that Defendants' failure to advertise potential side of effects of Celebrex and Vioxx boosted sales and caused price inflation is an attempt to do just that, and as such must fail. FN7

> FN7. Plaintiffs' claims would be similarly precluded under New Jersey law. In *Kaufman v. i-Stat Corp.,* 165 N.J. 94, 754 A.2d 1188 (2000), the New Jersey Supreme Court rejected the use of the "fraud on the market" or "price inflation" theory to establish the causal nexus between the defendant's alleged misrepresentations and their loss. While *i-Stat* considered the fraud on the market and price inflation theories only in the context of traditional common law fraud, where pleading and proving the element of reliance remains a part of plaintiff's burden, at least one other New Jersey court has concluded, relying on *i-Stat'*s reasoning, that those theories "have no

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                      Page 13
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

place as a part of the proofs required of plaintiffs in the CFA [New Jersey Consumer Fraud Act] context either." *New Jersey Citizen Action v. Schering Plough Corp.,* 367 N.J.Super. 8, 14-16, 842 A.2d 174 (App.Div.2003). Allowing plaintiffs to rely on those theories, the court held in *New Jersey Citizen Action,* would "virtually eliminate the requirement that there be a connection between the misdeed complained of and the loss suffered. Adopting plaintiff's theory ... would therefore fundamentally alter the concept of causation in the CFA context ... [and] the relationship between the alleged misstatement and the ascertainable loss suffered would become so attenuated that it would effectively disappear."

### B. *Learned Intermediary Doctrine*

#### 1. Implied Warranty of Merchantability

In *Makripodis v. Merrell-Dow Pharmaceuticals, Inc.,* 361 Pa.Super. 589, 523 A.2d 374 (1987), the Superior Court of Pennsylvania addressed the question of whether a retail druggist who filled a prescription "with the proper and unadulterated drug prescribed," was "liable to the patient purchaser for breach of an implied warranty of merchantability if the drug caused harmful side effects." *Id.* at 592, 523 A.2d 374. The court found that he was not, and that

> As heretofore observed, [prescription] drugs are not available to the general public and but may be obtained only upon the prescription of a licensed physician. This restriction upon the availability of such drugs has been imposed because of the inherently dangerous properties of such drugs. Prescription drugs may pose a threat to the safety of certain identifiable segments of the public, or may be dangerous when used in conjunction with other drugs or substances, or may be harmful if taken by persons suffering from certain diseases or conditions.

*Id.* at 594, 523 A.2d 374. (emphasis supplied).

The court's holding in *Makripodis* was based on Pennsylvania's adoption of the learned intermediary doctrine. That rule, articulated by the Supreme Court in *Incollingo v. Ewing,* 244 Pa. 263, 288 (1971), was formulated "with reference to comment k [of the Restatement (Second) of Torts § 402A] and the policies expressed therein." *Coyle v. Richardson-Merrell, Inc.,* 526 Pa. 208, 213, 584 A.2d 1383

(1991). FN8 It addresses the nature of a drug manufacturer's duty to warn of potentially dangerous side effects and provides that when a drug "is available only upon prescription of a duly licensed physician, the warning required is not to the general public or to the patient, but to the prescribing doctor." *Baldino v. Castagna,* 505 Pa. 239, 244, 478 A.2d 807 (1984). This is so "because it is the duty of the prescribing physician to be fully aware of the (1) the characteristics of the drug he is prescribing, (2) the amount of the drug which can be safely administered, and (3) the different medications the patient is taking. It is also the duty of the prescribing physician to advise the patient of any dangers or side effects associated with the use of the drug as well as how and when to take the drug." *Makripodis,* 361 Pa.Super. at 596, 523 A.2d 374.

> FN8. Comment k addresses whether a manufacturer of products that are inherently unsafe, but accompanied by proper warnings (such as prescription drugs) should be held strictly liable for the "unfortunate consequences attending the use of otherwise useful and desirable products which are attended with a known but apparently reasonable risk," and concludes that "such a manufacturer is liable only if he fails to exercise reasonable care to inform those for whose use the article is supplied of the facts which make it likely to be dangerous." Though comment k specifically addresses the imposition on drug-makers of strict liability, (as opposed to liability for negligence) the learned intermediary doctrine arises from its broader point regarding the adequacy and intended recipients of drug warnings.

*16 Moreover, warnings are directed to the physician rather than the patient-consumer because "[i]t is for the prescribing physician to use his own independent medical judgment, taking into account the data supplied to him from the drug manufacturer, other medical literature, and any other source available to him, and weighing that knowledge against the personal medical history of his patient, whether to prescribe a given drug." *Leibowitz v. Ortho Pharmaceutical Corp.,* 224 Pa.Super. 418, 431, 307 A.2d 449 (Pa.Super.1973). Hence, the "learned intermediary" stands between nearly every prescription drug manufacturer and the patient-consumer. For this reason, its application has been expanded to claims sounding in causes of action

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

Page 14

other than negligence. Recognizing this, the *Makripodis* court held

that the very nature of prescription drugs themselves precludes the imposition of a warranty of fitness for "ordinary purposes," as each individual for whom they are prescribed is a unique organism who must be examined by a physician who is aware of the nature of the patient's condition as well as the medical history of the patient.

*Makripodis,* 361 Pa.Super. at 594, 523 A.2d 374. *Makripodis,* which involved a pharmacist, has subsequently been applied to claims against a manufacturer of prescription drugs, *see Lennon v. Wyeth-Ayerst Laboratories, Inc.,* 2001 WL 755944 (Pa.Super.2001) ; *Luke v. American Home Products Corp.,* 1998 WL 1781624 (Pa.Com.Pl.1998); and the makers of prescription medical devices, *see Rosci v. Acromed, Inc.,* 447 Pa.Super. 403, 422-424, 669 A.2d 959 (Pa.Super.1995).

From the foregoing it is clear that manufacturers have duty to warn doctors of potentially dangerous side effects, and can be held liable for their failure to exercise reasonable care in doing so. While Plaintiffs here contend that Defendants "downplayed" or "failed to disclose" known cardiovascular risks posed by Celebrex and Vioxx, they do not (and, indeed, can not) couch their argument as one arising from a negligent failure to warn. Even if they were to do so, the argument would still fail. It is clear, under Pennsylvania law, that "the information supplied by the drug manufacturer is only *one* source a physician must consult, and he is expected to make an independent medical judgment in determining whether a given drug is appropriate for a particular patient." *Brecher v. Cutler,* 396 Pa.Super. 211, 218-20, 578 A.2d 481 (Pa.Super.1990) (emphasis supplied). Neither is a prescription drug manufacturer's failure to warn actionable "where the prescribing physician did not rely on the package insert, has full information from other sources, and made his own independent medical judgment to prescribe it." *Leibowitz,* 224 Pa.Super. at 432 n. 3, 307 A.2d 449; *Stottlemire v. Cawood,* 213 F.Supp. 897 (D.C.D.C.1963).

The information that Plaintiffs claim the Defendants downplayed (or did not readily disclose) was contained in the results of published, presumably peer reviewed studies. The record before this Court establishes that Dr. Leventhal, the Plaintiffs' treating physician, first learned of Celebrex through medical meetings and literature even before its approval by the FDA, and that he had stayed abreast of the scientific literature analyzing the potential risks posed by COX-2's. It further establishes that Merck released the results of the VIGOR study, comparing patients taking Vioxx to those taking a traditional NSAID, on March 23, 2000. Dr. Leventhal testified that he read the VIGOR study when it was published in the New England Journal of Medicine in November of 2000. Dr. Leventhal also testified that he read an article in the Journal of the American Medical Association in August of 2000 which purported to analyze the combined results of different studies of Celebrex and Vioxx. He asserted that the study referred to in the JAMA article was "extremely flawed," and "used a control group from a completely different study which is not considered scientifically sound." Based on the available information and data analyzing the risk of cardiovascular events associated with COX-2 inhibitors, Dr. Leventhal "did not feel that there was evidence ... that convinced [him] that there was an increased risk of myocardial infarction or thrombal embolic phenomenon with the COX-2's" and therefore saw no reason to stop prescribing Celebrex or Vioxx to his patients. Dr. Leventhal did not rely on advertising to physicians or to the public when he determined that Celebrex and Vioxx were appropriate treatments for Heindel and Kinmonth, but he did consider sources such as the FDA approved package insert, the Physician's Desk Reference, and his own clinical experiences.

**\*17** In short, it is clear that Dr. Leventhal (1) based his decision to prescribe Celebrex and Vioxx on information from a variety of sources and (2) that he certainly did not rely exclusively on information provided by the Defendants. For these reasons, as well as those discussed at length above, Defendants are entitled to summary judgment on Plaintiffs' implied warranty claim.

### 2. Claims arising under the Unfair Trade Practices and Consumer Protection Law

For reasons similar to those adduced above, Defendants are entitled to summary judgment on Plaintiffs' consumer fraud claims. The Court turns briefly to the particular application of the learned intermediary doctrine to claims arising under the UTPCPL.

Plaintiffs claim that the Defendants knew of cardiovascular risks posed by Celebrex and Vioxx, but spent "millions of dollars on direct-to-consumer advertising that portrayed these drugs as safer than

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

other available treatments while uniformly omitting to disclose any risk of cardiovascular harm." Pl.'s Opp. Br. at 1; Complaint at ¶¶ 2, 21-24, 36, 42-44, 51, 67. This "deceptive marketing scheme" caused their alleged economic injury and, they claim, violated the UTPCPL. FN9 Defendants claim that Plaintiffs' UTPCPL claim is barred by the learned intermediary doctrine. For several reasons, the Court finds that Plaintiffs' claims are indeed barred by the learned intermediary doctrine.

> FN9. Plaintiffs brought their consumer fraud claim as one arising under the New Jersey Consumer Fraud Act and the consumer protection statutes of "other states." Though their pleadings and briefing focus on the New Jersey Consumer Fraud Act, they contend that the Pennsylvania law would require the same outcome.

First, since the manufacturer of prescription drugs need only direct information and warnings to prescribing physicians, there "can be no cause of action based on Defendants' alleged omissions because [they] had no duty to disclose any information to the plaintiff[s]." *Albertson v. Wyeth, Inc.* 2003 WL 21544488 at * 12 (Pa.Com.Pl.2003) ; *Luke v. American Home Products,* 1998 WL 1781624 at *8 (Pa.Com.Pl.1998). Second, "to permit a cause of action under the under the UTPCPL in this case would effectively make a drug manufacturer the absolute guarantor of the anticipated results and effects of a prescription drug. Pennsylvania law, however, recognizes that some prescription drugs by their nature can never be made safe." *See Makripodis,* 361 Pa.Super. 589, 523 A.2d 374; *Luke,* 1998 WL 1781624 at *8.

Third, both the learned intermediary doctrine and the record before the Court establish that the Plaintiffs did not rely on any representations (or misrepresentations) by Defendants, and reliance is, of course, a necessary element of a UTPCPL claim. First, Heindel and Kinmonth both testified that they took Celebrex and Vioxx based on the advice of their treating physician. Kinmonth testified that she did not read information about Vioxx or material provided with Vioxx prior to taking it, and that she relied her on her physician's advice regarding whether or not to take it. Heindel's testimony also reveals that she relied on her doctor's professional advice, rather than information supplied by Defendants, regarding Celebrex. She claimed not to have read any print advertisements for Celebrex, and though she said she

had seen Celebrex television commercials, she asserted that she was not influenced by them. However, even if Heindel and Kinmonth had offered evidence indicating that they had relied in some way on Defendants' misrepresentations, it would ultimately be of no consequence. The learned intermediary breaks the chain in terms of reliance, since the patient cannot obtain prescription drugs without the physician no matter what they believe about them.

*18 Finally, the economic loss doctrine further mandates the entry of summary judgment dismissing Plaintiffs' consumer fraud claims. Pennsylvania has adopted the economic loss doctrine, FN10 as well as its mirror image, the "gist of the action doctrine," in order to "place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law." *Werwinski v. Ford Motor Co.,* 286 F.3d 661, 680 (3d Cir.2002). The parties have spilled a great deal of ink debating whether, under the UPTCPL, there is an "intentional tort" exception that would allow the plaintiffs to recover in tort for purely economic losses. Defendants contend that there is not, relying on the Third Circuit's decision, in *Werwinski,* to "reject[ ] ... an intentional fraud exception" to the economic loss doctrine. Relying on *O'Keefe v. Mercedes-Benz USA, LLC,* 214 F.R.D. 266 (E.D.Pa.2003) (in addition to some Pennsylvania cases decided both before and after *Werwinski* ), Plaintiffs argue that the economic loss doctrine has not been extended to cover intentional torts.

> FN10. New Jersey also recognizes the economic loss doctrine, although New Jersey courts have not addressed its application in a context similar to the one presented here. However, in *Alloway v. General Marine Indus.,* 149 N.J. 620, 627-630, 695 A.2d 264 (1997), the New Jersey Supreme Court found that contract remedies are better suited than tort law to resolve claims for economic loss, whether the sale at issue was characterized as a consumer purchase or a commercial transaction. It's decision rested on a finding that purchasers who fall victim to fraud or unconscionable conduct will have "substantial rights to recover for common law fraud and for violation of various state and federal statues such as the New Jersey Consumer Fraud Act." *Boyes v. Greenwich Boat Works, Inc.,* 27 F.Supp.2d 543, 550 (D.N.J.1998). "In

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586
(Cite as: Not Reported in F.Supp.2d)

sum," the Court concluded in *Alloway,* judicial decisions and statutory encasements, including the U.C.C., protect consumers from overreaching. Against this background, a tort cause of action for economic loss duplicating the one provided by the U.C.C. is superfluous and counterproductive." *Alloway,* 149 N.J. at 641, 695 A.2d 264.

The Supreme Court of Pennsylvania has not decided this question, and the lower Pennsylvania appellate courts are not in agreement on the matter. However, the job of this Court is greatly simplified by the Third Circuit's exhaustive treatment of this issue in *Werwinski,* in which the Court upheld a district court's prediction as to how the Pennsylvania Supreme Court would rule on this question. In doing so, the Court of Appeals explained that

> The district court applied the economic loss doctrine to the fraudulent concealment claims after recognizing the willingness of Pennsylvania courts to restrict intentional tort claims that overlap with contract claims. In the absence of any pertinent case law on the subject, the district court aptly predicted that the Supreme Court of Pennsylvania would apply the economic loss doctrine to intentional fraud cases by drawing an analogy from Pennsylvania's acceptance of the "gist of the action" doctrine. Such a conclusion is congruent with our past recognition that Pennsylvania state courts have exhibited a "lack of hospitality to tort liability for purely economic loss."

*Werwinski,* 286 F.3d at 680.

Moreover, the court held, "even if we were torn between two competing yet sensible interpretations of Pennsylvania law ... we should opt for the interpretation that restricts liability, rather than expands it, until the Supreme Court of Pennsylvania decides differently." *Id.* (citations omitted). Consequently, the court held that there is no intentional fraud exception to the economic loss doctrine, whether the claim is one for common law fraud or arises under the UTPCPL.

This Court is bound by the Third Circuit's prediction of Pennsylvania law. *Itzkoff v. F & L Realty of New Jersey Corp.,* 890 F.Supp. 351, 356 (D.N.J.1995). The decision of the district judge who decided *O'Keefe,* who clearly agreed with neither the Third Circuit's prediction nor the rationale upon which it rested, is not binding on this Court, and, since the Court of Appeals has predicted how the Pennsylvania Supreme Court will rule, the lower (Pennsylvania)

courts' decisions are also irrelevant for the purposes of this discussion. In short, this Court holds, pursuant to *Werwinski,* that economic loss doctrine bars Plaintiffs' UTPCPL claim seeking recovery for their purely economic damages.

### C. Remaining Claims

*19 Plaintiffs' claims for injunctive and equitable relief do not constitute separate causes of action. Accordingly, consideration by the Court of those claims would only be appropriate in the event that Plaintiffs had prevailed on their warranty and consumer fraud claims. Since they have not, the Court need not discuss the issue further.

### VI. Conclusion

For the foregoing reasons, Defendants are entitled to summary judgment dismissing Plaintiffs' claims. An appropriate order will issue.

D.N.J.,2004.
Heindel v. Pfizer, Inc.
Not Reported in F.Supp.2d, 2004 WL 1398024, 54 UCC Rep.Serv.2d 586

Briefs and Other Related Documents (Back to top)

• 3:02cv03348 (Docket) (Jul. 10, 2002)

END OF DOCUMENT