# EXHIBIT 7

U.S. Food and Drug Administration
Center for Drug Evaluation and Research

# Division of Drug Marketing, Advertising and Communications

# Frequently Asked Questions (FAQs)

Click on a topic to link to questions and answers.

Prescription Drug Advertising and Promotional Labeling section of the CDER Handbook

**Consumer-Directed Advertisements**

**Drug of Choice**

**Drug Name Size**

**FDA Approved**

**"New"**

**Package Inserts**

**Post-marketing Reporting**

**Presentation of Information**

**Pre-distribution Submissions**

**Reminder Advertisements**

**Miscellaneous Questions**

---

**Consumer-Directed Advertisements**

**What are the general requirements for prescription drug advertisements directed toward consumers?**

The same statute and regulations apply regardless of the audience targeted by a prescription drug advertisement. The Federal Food, Drug, and Cosmetic Act (the act) requires that all drug advertisements contain (among other things) information in brief summary relating to

side effects, contraindications, and effectiveness. Because of this statutory wording, this requirement has become known as the Brief summary. The current advertising regulations specify that this information disclosure needs to include **all** the risk information in a product's approved labeling. Typically, print advertisements will include a reprinting of the risk-related sections of the product's approved labeling (also called full prescribing information or the package insert). Sponsors, however, can write this risk information in language appropriate for the targeted audience; FDA encourages this approach.

In addition to the specific disclosure requirements, advertisements cannot be false or misleading or omit material facts. They also must present a fair balance between effectiveness and risk information. FDA has consistently required that appropriate communication of effectiveness information includes any significant limitations to product use.

### How do prescription drug broadcast advertisements differ from print advertisements?

Current regulations specify two requirements that all prescription drug broadcast advertisements must meet. First, broadcast advertisements must include the product's most important risk-related information in the audio or audio and visual parts of the advertisement. This is sometimes called the major statement. This requirement is not addressed by the guidance. Second, broadcast advertisements must contain either a brief summary of the advertised product's risk information, or alternatively, make adequate provision for disseminating the product's approved labeling in connection with the ad. Thus, the regulations for broadcast advertisements recognize broadcast's inherent limitations by providing an alternative mechanism for meeting the act's information disclosure requirement.

### What needs to be included as part of the major statement requirement?

The major statement must include all of the most important risk information related to the product. Because risks vary from product to product, the amount of information disclosed for any particular product to meet this requirement will vary as well.

### How does a product's brief summary differ from its approved labeling?

The brief summary is generally shorter -- sometimes significantly so. The brief summary typically includes only the risk-related sections of the product's labeling. This is because the advertising text itself generally meets the requirement for including effectiveness information by giving the product's indication (i.e., what it is used for), and any limitations concerning how and when the product should be used. In contrast, product labeling includes non-risk-related information, including all effectiveness information (sometimes even about the clinical studies used as the basis for product approval), how it should be taken (dosage information), how the drug product is supplied (e.g., the quantity of drug in each pill), and information about how the product works in people's bodies.

### Does FDA intend to do anything about the brief summary information? I've heard a lot of concerns about its value for consumers.

FDA has also heard concerns about the lack of value of the required information from some individuals and groups. It has heard from others that consumers should get full disclosure

of risk information. The agency intends to address these concerns fully through the rulemaking process. In the interim, the agency encourages product sponsors to provide consumers with nonpromotional, consumer-friendly information consistent with product labeling, along with the information required by the act and the regulations. As mentioned above, in the case of print advertisements, FDA encourages sponsors to write their product brief summaries in consumer-friendly language.

Top

---

## Drug of Choice

**May the phrase "drug of choice" be used in advertising or labeling?**

The phrase "drug of choice," or any similar phrase or presentation, used in an advertisement or labeling would make a superiority claim and, therefore, the advertisement or labeling would require substantial evidence to support that claim.

Top

---

## Drug Name Size

**Does the full prescribing information or the brief summary type have to be any particular size?**

No, but the regulations specify size in sections 201.10(g)(2) and 202.1(b)(2) which state: "The established name shall be in printed letters that are at least half as large as the letters comprising the proprietary name or designation with which it is joined, and the established name shall have a prominence commensurate with the prominence with which such proprietary name or designation appears, taking into account all pertinent factors, including typography, layout, contrast and other printing features."

**Does "half as large" refer to point size or actual type size?**

DDMAC has interpreted "half as large" to be actual size, not point size, of upper and lower case letters in the proprietary and established drug names.

Top

---

## "FDA-Approved"

**May an advertisement or labeling piece include the phrase "FDA approved"?**

Yes, if the manufacturer or sponsor has received a letter stating that the product has been approved. Effective on the date of implementation, the Food and Drug Administration Modernization Act of 1997 eliminated Section 301(l) of the Federal Food, Drug, and

Cosmetic Act that prohibited "The using . . . of any representation or suggestion that approval of an application with respect to such drug or device is in effect . . . ."

Top

---

## "New"

**How long may the word "new" be used in promotional labeling and advertisements for a newly approved product, indication, or dosage form?**

DDMAC generally considers that "New" is an accurate description of the marketing phase for six months from the time a product is initially marketed. This should be distinguished from the time the product is cleared by FDA for marketing.

Top

---

## Package Inserts

**Does it matter where a package insert is placed on a labeling piece, such as on a calendar or a brochure with a pouch?**

The package insert can be anywhere as long as the labeling piece states clearly where the package insert is located and as long as the package insert accompanies the piece.

**Are package inserts required in all labeling pieces for products that are the same except for different strengths or dosages?**

Yes. Even though products may be very similar, package inserts may be different for different dosage forms or different delivery systems for the same drug. The regulations would require a package insert for each dosage form and delivery system for which claims appear in the promotional labeling piece. Some drug products, however, have multi-dosage form package inserts. In those cases, the same package insert could be attached to each piece, even if the dosage forms or delivery systems were different.

**Does a package insert in another language also have to be submitted in English?**

Yes. Package inserts have to be submitted in English and not only in the foreign language.

Top

---

## Postmarketing Reporting

**Where do the regulations state the requirement for submitting prescription drug advertisements and labeling?**

Under 21 C.F.R. 314.81(b)(3)(i):

### Section 314.81 Postmarketing reports.

*****

(b) *Reporting requirements*. The applicant shall submit to the Food and Drug Administration at the specified times two copies of the following reports:

*****

(3) *Other reporting--(i) Advertisements and promotional labeling.* The applicant shall submit specimens of mailing pieces and any other labeling or advertising devised for promotion of the drug product . . . .

(See Selected Provisions of the Act and Regulations for the entire paragraph.)

**When do promotional materials need to be submitted to DDMAC?**

Pursuant to 314.81(b)(3)(i), submissions must be made " . . . at the time of initial dissemination of the labeling and at the time of initial publication of the advertisement for a prescription drug product."

**Do all promotional materials for prescription drugs have to be submitted to DDMAC?**

The regulations for submitting materials apply to holders of NDAs, ANDAs, and antibiotic applications. Manufacturers of pre-1938 products and products that have declared "not new drugs" are not required to submit specimens. All products have labels and prescribing information, however, and products without approved labeling have permitted labeling. Permitted labeling indicates FDA agrees with the label or labeling and permits its use. A manufacturer of a product with permitted labeling is responsible for assuring that advertisements and promotional labeling pieces are consistent with the product labeling.

**What form should applicants use to submit materials to FDA?**

Form FDA 2253 Transmittal of Advertisements and Promotional Labeling for Drugs for Human Use.

**How can I obtain an Form FDA 2253?**

Address

**To whom should I send the materials?**

Two copies of all materials should be sent to:

Division of Drug Marketing, Advertising, and Communications
5600 Fishers Lane, HFD-40
Rockville, MD 20857

Upon arrival, the material will be logged in for tracking and assigned to a reviewer in DDMAC.

**Who is responsible for submitting a Form FDA 2253 if the manufacturer and distributor are different companies?**

Either company may submit the specimens, however, the applicant is ultimately responsible for compliance with 21 CFR 314.81(b)(3).

Top

---

## Presentation of Information

Can the layout or the way information is presented affect whether an advertisement or labeling piece is in compliance with the regulations?

Yes, 21 CFR 202.1(e)(7)(viii) states that an advertisement may be false, lacking in fair balance, or otherwise misleading if it:

"Fails to present information relating to side effects and contraindications with a prominence and readability reasonably comparable with the presentation of information relating to effectiveness of the drug, taking into account all implementing factors such as typography, layout, contrast, headlines, paragraphing, white space, and any other techniques apt to achieve emphasis."

For example, the presentation below of the word benefits and the word disadvantages would not be considered comparable. Although the words are the same point size, the color and contrast with the background make the word benefits much more noticeable than the word disadvantages.

*BENEFITS* disadvantages

Top

---

## Pre-distribution Submissions

Does FDA approve advertisements and promotional labeling before use by the company?

No, except for accelerated approval products and, in rare instances, when FDA may require pre-approval of promotional materials as part of an enforcement action. However, DDMAC provides opinions on proposed advertisements and labeling pieces before use upon request by an applicant.

Top

---

**Reminder Advertisements and Labeling**

**What is a reminder advertisement?**

Under 202.1(e)(2)(i), reminder advertisements are identified as an exemption to the advertisement regulations, including the provisions under 202.1(e) to provide a brief summary. Reminder advertisements " . . . call attention to the name of the drug product but do not include indications or dosage recommendations for use of the drug product. . . . and, optionally, information . . . containing no representation or suggestion relating to the advertised drug product." Reminder advertisements cannot make a representation about the product or suggest a use for the product.

**What is reminder labeling?**

Under 201.100(f), reminder labeling is " . . . labeling which calls attention to the name of the drug product but does not include indications or dosage recommendations for use. . . . and, optionally, information . . . containing no representation or suggestion relating to the drug product." Reminder labeling is exempted from the provisions under 201.100(d) to provide the full prescribing information.

**Can a reminder advertisement compare one product to another or say one product is an alternative for another?**

No. Such a comparison would imply the indication, and then the advertisement would no longer meet the exemption criteria.

**Does FDA limit the amount of money that can be spent on reminder advertisements or reminder labeling pieces or regulate the types of objects (such as pens, cups, calendars, etc.) that can be used as reminder advertisements or reminder labeling pieces?**

FDA regulations do not limit how much money companies may spend on reminder advertisements and labeling pieces, nor do the regulations limit the types of objects that can be used. The regulations, however, limit the type of information that can be presented in reminder advertisements and labeling pieces, and not just the written information, but information that may be portrayed though graphics, design, or some other visual representation.

Top

---

**Miscellaneous Questions**

**Are the advertising and labeling procedures for orphan drugs and regular NDA products the same?**

Yes.

Top

CDER Home Page | Search | Comment | What's New

Information for Industry | DDMAC Home

*Revised Wednesday, May 28, 2003*

**EXHIBIT 8**

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

_____

Food and Drug Administration
Rockville, MD  20857

**TRANSMITTED BY FACSIMILE**


Cary Rayment, President and Chief Executive Officer
Alcon Laboratories, Inc.
6201 South Freeway
Fort Worth, TX 76134-2099

**Re:     NDA 20-805**
    **CIPRO® HC OTIC (ciprofloxacin hydrochloride and hydrocortisone otic suspension)**
    **MACMIS # 13122**

# WARNING LETTER

Dear Mr. Rayment:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed the Alcon website (URL: http://www.alconlabs.com/us/aj/products/RxTher/CiproHC_ProdPRO.jhtml) for CIPRO® HC OTIC (ciprofloxacin hydrochloride and hydrocortisone otic suspension) through routine monitoring and surveillance.  The website is misleading because it makes unsubstantiated superiority claims, fails to reveal important risk information associated with the use of CIPRO® HC OTIC, and overstates the efficacy of the drug.  Therefore, the website misbrands CIPRO® HC OTIC within the meaning of the Federal Food, Drug, and Cosmetic Act (the Act), 21 U.S.C. §§ 352(a) & (n), 321(n), and FDA implementing regulations.  See 21 CFR 202.1(e)(5)(i).

DDMAC has previously objected, in an untitled letter dated July 18, 2003, to your dissemination of CIPRO® HC OTIC promotional material that made unsubstantiated superiority claims, omitted important risk information, and overstated the efficacy of the drug.  We are concerned that you are continuing to promote CIPRO® HC OTIC in a violative manner.

**Background**

The Indications and Usage section of the approved product labeling (PI) for CIPRO® HC OTIC states:

> **"CIPRO® HC OTIC is indicated for the treatment of acute otitis externa in adult and pediatric patients, one year and older, due to susceptible strains of _Pseudomonas aeruginosa, Staphylococcus aureus_, and _Proteus mirabilis._"**

CIPRO® HC OTIC is associated with several important contraindications, warnings, and precautions. For example, the PI for CIPRO® HC OTIC contains the following important risk information:

Cary Rayment
Alcon Laboratories, Inc.                                              Page 2
NDA# 20-805 MACMIS#13122

## CONTRAINDICATIONS

CIPRO® HC OTIC is contraindicated in persons with a history of hypersensitivity to hydrocortisone, ciprofloxacin or any member of the quinolone class of antimicrobial agents. This nonsterile product should not be used if the tympanic membrane is perforated. Use of this product is contraindicated in viral infections of the external canal including varicella and herpes simplex infections.

## WARNINGS

**NOT FOR OPHTHALMIC USE. NOT FOR INJECTION.**
CIPRO® HC OTIC should be discontinued at the first appearance of a skin rash or any other sign of hypersensitivity. Serious and occasionally fatal hypersensitivity (anaphylactic) reactions, some following the first does, have been reported in patients receiving systemic quinolones. Serious acute hypersensitivity reactions may require immediate emergency treatment.

## PRECAUTIONS

**GENERAL:** If the infection is not improved after one week of therapy, cultures should be obtained to guide further treatment.

### Unsubstantiated Superiority Claims -- Efficacy

Your website implies that CIPRO® HC OTIC provides faster relief of the pain associated with acute otitis externa than other available treatment options. For example, the following claims appear on the first page of your website:

- "What a difference a day makes."
- "YOU DON'T WANT 19 EXTRA HOURS OF THIS. OR OF OTITIS EXTERNA."
- "CIPRO® HC OTIC Ends The Pain 19 Hours Sooner"

These claims suggest that use of CIPRO® HC OTIC is superior to other products in the treatment of otitis externa in that it ends the pain 19 hours sooner. Your website does not specify what comparison products require 19 additional hours to "end pain." There is, however, a footnote that contains a reference for a clinical trial conducted by Pistorius et al.[1], the description of which indicates that the trial compared CIPRO® HC OTIC and an investigational otic preparation of ciprofloxacin alone to an otic suspension of polymyxin B-neomycin-hydrocortisone (Cortisporin). The website also contains the following reference at the end of the section entitled "Combination Strength Delivers Results" -- "**Clinical success defined as resolution and improvement in a controlled, nonblinded, multicenter U.S. trial comparing CIPRO® HC OTIC with a polymyxin B-neomycin-hydrocortisone combination [Cortisporin] in patients with acute otitis externa." The description of this reference fails to mention that the trial also compared CIPRO® HC OTIC to an investigational otic preparation of ciprofloxacin alone.

---

[1] Pistorius B, Westberry K, Drehobl M, et al. Prospective, randomized, comparative trial of ciprofloxacin otic drops, with or without hydrocortisone, vs. polymyxin B-neomycin-hydrocortisone otic suspension in the treatment of acute diffuse otitis externa. *Infect Dis in Clin Pract*. 1999;8:387-395.

Cary Rayment
Alcon Laboratories, Inc.                                                    Page 3
NDA# 20-805 MACMIS#13122

The claims, together with the references, suggest that CIPRO® HC OTIC ends ear pain 19 hours
sooner than Cortisporin (the referenced polymyxin B-neomycin-hydrocortisone combination) and
ciprofloxacin alone. While it is true that CIPRO HC OTIC ends pain 19 hours sooner than
ciprofloxacin alone, it does not end pain 19 hours sooner than Cortisporin. In fact, in the trial that is
referenced, CIPRO® HC OTIC and Cortisporin were not statistically significantly different in their
effect on ear pain. The difference in time to end ear pain in the trial of CIPRO HC OTIC® and
Cortisporin was 7 hours. FDA is not aware of substantial evidence or substantial clinical experience to
support the 19-hour claim. Therefore, these claims are false or misleading in that they suggest that
CIPRO® HC OTIC ends pain 19 hours sooner than Cortisporin. It should be noted that FDA found
this trial (Pistorius et al.) to be inadequate to support such claims in a previous untitled letter dated July
18, 2003.

**Failure to Reveal Important Risk Information**

Your website fails to reveal material facts in light of representations made and with respect to
consequences that may result from the use of the drug as recommended or suggested in the materials.
Specifically, the main part of the website presents numerous effectiveness claims for CIPRO® HC
OTIC, such as:

1.  "What a difference a day makes."
2.  "YOU DON'T WANT 19 EXTRA HOURS OF THIS. OR OF OTITIS EXTERNA."
3.  "CIPRO® HC OTIC Ends The Pain 19 Hours Sooner"

Your website fails to present any risk information within the body of the main CIPRO® HC OTIC
page on the website. One must navigate to other pages titled "CIPRO HC Otic Comparative
Information," "CIPRO HC Otic Prescribing Information," and "Frequently Asked Questions / Contact
Us" to obtain risk information. Furthermore, once the viewer reaches the "CIPRO HC Otic
Comparative Information" page, the risk information is listed at the end of the page without any
headers or other signals to indicate to the reader that it is important risk information. The website
therefore misleadingly fails to reveal important risk information necessary for context on the pages
containing information about the efficacy of CIPRO® HC OTIC, including the following important
Contraindication and Warning information:

> CIPRO® HC OTIC is contraindicated in persons with a history of
> hypersensitivity to hydrocortisone, ciprofloxacin or any member of the
> quinolone class of antimicrobial agents. This nonsterile product should
> not be used if the tympanic membrane is perforated. Use of this product
> is contraindicated in viral infections of the external canal including
> varicella and herpes simplex infections.
>
> **NOT FOR OPHTHALMIC USE.  NOT FOR INJECTION.**
> CIPRO® HC OTIC should be discontinued at the first appearance of a
> skin rash or any other sign of hypersensitivity. Serious and occasionally
> fatal hypersensitivity (anaphylactic) reactions, some following the first
> does, have been reported in patients receiving systemic quinolones.

Cary Rayment
Alcon Laboratories, Inc.                                                              Page 4
NDA# 20-805 MACMIS#13122

>Serious acute hypersensitivity reactions may require immediate
>emergency treatment.

Furthermore, in the main body of the CIPRO HC Otic page on the website you fail to include important precautions such as "If the infection is not improved after one week of therapy, cultures should be obtained to guide further treatment." The failure to present this important risk information may lead to serious health risks because failure to improve may represent a fungal superinfection or a resistant bacterial infection.

**Overstatement of Efficacy**

Your website includes the claims "Fewer drops to total pain relief" and "Shorter course to total pain relief." These claims are misleading because they overstate the efficacy of CIPRO® HC OTIC. The phrase "total pain relief" suggests that patients have 100% pain relief when using the product. FDA is not aware of substantial evidence or substantial clinical experience demonstrating 100% pain relief. We note that in the Pistorius et al. study cited on the website, CIPRO® HC OTIC had a clinical response rate at the end of therapy (defined as resolution of infection or improvement) of 90%. Resolution of infection or improvement of 90% is not evidence of "total pain relief." Therefore, the phrase "total pain relief" is misleading because it overstates the efficacy of CIPRO® HC OTIC.

**Conclusion and Requested Action**

Your website makes unsubstantiated superiority claims, fails to reveal important risk information included in the labeling of CIPRO® HC OTIC, and overstates the efficacy of the drug in violation of 21 U.S.C. §§ 352(a) & (n), 321(n); 21 CFR 202.1(e)(5)(i).

DDMAC requests that Alcon immediately cease the dissemination of violative promotional materials for CIPRO® HC OTIC such as those described above. Please submit a written response to this letter on or before May 11, 2005, stating whether you intend to comply with this request, listing all violative promotional materials for CIPRO® HC OTIC such as those described above, and explaining your plan for discontinuing use of such materials. Because the violations described above are serious, we request, further, that your submission include a comprehensive plan of action to disseminate truthful, non-misleading, and complete corrective messages about the issues discussed in this letter to the audience(s) that received the violative promotional materials. Please direct your response to me at the Food and Drug Administration, Division of Drug Marketing, Advertising, and Communications, HFD-42 Room 8B-45, 5600 Fishers Lane, Rockville MD 20857, facsimile at 301-594-6771. In all future correspondence regarding this matter, please refer to MACMIS ID # 13122 in addition to the NDA number. We remind you that only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is your responsibility to ensure that your promotional materials for CIPRO® HC OTIC comply with each applicable requirement of the Act and FDA implementing regulations.

Cary Rayment
Alcon Laboratories, Inc.                                                                    Page 5
NDA# 20-805 MACMIS#13122

Failure to correct the violations discussed above may result in FDA regulatory action, including
seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
  Advertising, and Communications

**EXHIBIT 9**

**DEPARTMENT OF HEALTH & HUMAN SERVICES**          Public Health Service

Food and Drug Administration
Rockville, MD  20857

Mr. Michael W. Bonney
President & CEO
Cubist Pharmaceuticals
65 Hayden Avenue
Lexington, MA  02421

Re:   **NDA # 21-572**
      **Cubicin™ (daptomycin for injection)**
      **MACMIS # 12433**

# WARNING LETTER

Dear Mr. Bonney:

The Division of Drug Marketing, Advertising, and Communications (DDMAC) has reviewed a professional journal advertisement (ad) for Cubicin™ (daptomycin for injection), submitted by Cubist Pharmaceuticals (Cubist) under cover of Form FDA 2253.  The ad fails to reveal important risk information associated with the use of Cubicin and, therefore, misbrands the drug within the meaning of the Federal Food, Drug, and Cosmetic Act (the Act) and FDA implementing regulations. See 21 U.S.C. 321(n), 352(n); 21 C.F.R. 202.1(e)(3)(i).  Additionally, DDMAC has reviewed promotional statements for this drug that appear on a website (URL: http://www.cubicin.com) maintained by Cubist, and also submitted on Form FDA 2253.  The website is misleading because it broadens the indication for Cubicin, fails to reveal important risk information associated with the use of Cubicin, and makes an unsubstantiated comparative claim.  Therefore, the website misbrands Cubicin. See 21 U.S.C. 321(n), 352(a), (n).  Your broadening of the indication for Cubicin and failure to reveal important risk information associated with the use of Cubicin poses serious public health and safety concerns because the inappropriate use of Cubicin can result in therapeutic failure, and increases in morbidity and mortality in infections for which Cubicin has not been proven safe and effective.

**Background**

The Indications and Usage section of the approved product labeling (PI) for Cubicin states:

> "CUBICIN (daptomycin for injection) is indicated for the treatment of complicated skin and skin structure infections caused by susceptible strains of the following Gram-positive microorganisms (see also **DOSAGE AND ADMINISTRATION**): *Staphylococcus aureus* (including methicillin-resistant strains), *Streptococcus pyogenes, Streptococcus agalactiae, Streptococcus dysgalactiae* subsp. *equisimillis* and *Enterococcus faecalis* (vancomycin-susceptible strains only).  Combination therapy may be clinically indicated if

Michael Bonney                                                                                       Page 2
Cubist Pharmaceuticals
NDA 21-572/MACMIS #12433

> the documented or presumed pathogens include Gram-negative or anaerobic organisms
> (see **CLINICAL STUDIES**).

> Daptomycin is not indicated for the treatment of pneumonia.

Cubicin is associated with several important contraindications, warnings, precautions, and adverse
events. For example, the Precautions section of the PI for Cubicin contains the following important
risk information:

> "***Skeletal Muscle:*** In Phase 3 complicated skin and skin structure infection (cSSSI) trials,
> elevations in serum creatine phosphokinase (CPK) were reported as clinical adverse
> events in 15/534 (2.8%) daptomycin-treated patients, compared to 10/558 (1.8%)
> comparator-treated patients. Skeletal muscle effects associated with daptomycin were
> observed in animals (see **ANIMAL PHARMACOLOGY**).

> Patients receiving CUBICIN should be monitored for the development of muscle pain or
> weakness, particularly of the distal extremities. CPK levels should be monitored weekly in
> patients who receive CUBICIN. Patients who develop unexplained elevations in CPK
> while receiving daptomycin should be monitored more frequently. Among patients with
> abnormal CPK (>500 U/L) at baseline, 2/19% (10.5%) treated with CUBICIN and 4/24
> (16.6%) treated with comparator developed further increases in CPK while on therapy. In
> this same population, no patients developed myopathy. Daptomycin-treated patients with
> baseline CPK >500 U/L (n=19) did not experience an increased incidence of CPK
> elevations or myopathy relative to those treated with comparator (n=24).

> CUBICIN should be discontinued in patients with unexplained signs and symptoms of
> myopathy in conjunction with CPK elevation >1000U/L (~5x ULN), or in patients without
> reported symptoms who have marked elevations in CPK ($\geq$10x UNL). In addition,
> consideration should be given to temporarily suspending agents associated with
> rhabdomyolysis, such as HMG-CoA reductase inhibitors, in patients receiving CUBICIN."

### Broadening of Indication

Your website implies that Cubicin is safe and effective, and FDA-approved, for the treatment of all
infections caused by *Staphylococcus aureus* (including methicillin-resistant strains).

For example, the following claims appear on the first page of your website:

- "CUBICIN is the only once-daily, rapidly bactericidal antibiotic proven effective against
  both MRSA [methicillin-resistant Staphylococcus aureus]and MSSA [methicillin-
  susceptible Staphylococcus aureus]"
- "Serious against Staph"
- "Proven clinically successful against MRSA and MSSA"
- "Bactericidal against MRSA and MSSA"
- "Once a day—the only QD agent approved for treatment of MRSA and MSSA"

These claims are misleading because they imply that Cubicin is safe and effective, and FDA-approved, for all infections caused by MRSA and MSSA (e.g., endocarditis and pneumonia), when this has not been demonstrated by substantial evidence or substantial clinical experience. The PI specifically states that Cubicin is indicated for "the treatment of complicated skin and skin structure infections [cSSSI] caused by susceptible strains of the following Gram-positive microorganisms: *Staphylococcus aureus* (including methicillin-resistant strains), *Streptococcus pyogenes*, *Streptococcus agalactiae, Streptococcus dysgalactiae* subsp. *equisimillis* and *Enterococcus faecalis* (vancomycin-susceptible strains only) (emphasis added). Also, the PI specifically states that "Daptomycin is not indicated for the treatment of pneumonia" (emphasis added). The Adverse Reactions section of the PI also describes an important reason for this limitation: "In Phase 3 studies of community-acquired pneumonia (CAP), the death rate and rates of serious cardiorespiratory adverse events were higher in daptomycin-treated patients than in comparator-treated patients. These differences were due to lack of therapeutic effectiveness of daptomycin in the treatment of CAP in patients experiencing these adverse events" (emphasis added).

FDA is not aware of substantial evidence or substantial clinical experience to support the efficacy of Cubicin in non-cSSSI infections. Blurring the distinction between cSSSI and non-cSSSI infections by statements that combine and generalize all *Staphylococcus aureus* infections, such as "Proven clinically successful against MRSA and MSSA," and suggesting that Cubicin is proven safe and effective, and approved by FDA, to treat all such infections is misleading and poses a significant public health risk because such practice could lead to therapeutic failure and death.

**Failure to Reveal Important Risk Information**

The ad and website fail to reveal material facts in light of representations made and with respect to consequences that may result from the use of the drug as recommended or suggested in the materials. Specifically, the main part of the ad presents effectiveness claims for Cubicin, such as "New AGAINST STAPH" and "The only once-daily bactericidal antibiotic---with a distinct mechanism of action---proven effective against both MRSA and MSSA," but fails to provide any risk information. For example, you fail to include information on the risk of increased CPK levels and the risk for development of muscle pain or weakness, which is described in the precautions section of the PI for Cubicin. This information is necessary to qualify the effectiveness claims appearing in the main part of the ad. The main part of the ad includes a reference to the brief summary of prescribing information; however, this statement is not sufficient to provide the appropriate qualification or pertinent information for the claims made in the main part of the ad. See 21 CFR 202.1(e)(3)(i).

The website is similarly misleading because it fails to reveal important risk information necessary for context on pages containing information about the efficacy of Cubicin. For example, you fail to include information on the risk of increased CPK levels and the risk for development of muscle pain or weakness, which is described in the Precautions section of the PI for Cubicin.

DDMAC had previously objected, in an untitled letter dated November 22, 2000, to your failure to disclose facts that are material in light of the representations made in promotion about CUBICIN. Specifically, Cubist failed to disclose important risk information about Cubicin on your website. We are concerned that you are continuing to promote Cubicin in a similarly violative manner.

Michael Bonney                                                                     Page 4
Cubist Pharmaceuticals
NDA 21-572/MACMIS #12433

**Misleading Comparative Claim**

Promotional materials are false or misleading if they suggest that a drug is superior to other products when such has not been demonstrated by substantial evidence or substantial clinical experience. Your website includes the claim "Bactericidal antibiotics are generally regarded as superior to bacteriostatic agents for the treatment of most infections." This claim implies that, because Cubicin is a bactericidal antibiotic, it is superior to other antibiotics intended for the same conditions when such has not been demonstrated by substantial evidence or substantial clinical experience. Furthermore, as noted in the Adverse Reactions section of the PI and previously described, Cubicin was determined to be inferior to comparator agents in the treatment of CAP. FDA is not aware of substantial evidence or substantial clinical experience to support the superior efficacy of bactericidal antibiotics compared to bacteriostatic agents. Furthermore, the statement in your website, "However, clinical data to support this position are lacking except in specific indications," does not adequately correct this misleading presentation.

**Conclusion and Requested Action**

Your ad and website fail to reveal material facts regarding important risk information associated with the use of Cubicin in accordance with 21 U.S.C. 321(n), 352(a), (n); 21 C.F.R. 202.1(e)(3)(i). Furthermore, your website suggests that Cubicin is useful in all infections caused by MRSA and MSSA when such has not been demonstrated by substantial evidence or substantial clinical experience and makes an unsubstantiated comparative claim in violation of  21 U.S.C. 201(n), 352(a), (n).

DDMAC requests that Cubist immediately cease the dissemination of violative promotional materials for Cubicin such as those described above. Please submit a written response to this letter on or before August 31, 2004, stating whether you intend to comply with this request, listing all violative promotional materials for Cubicin such as those described above, and explaining your plan for discontinuing use of such materials. Because the violations described above are serious, we request that your submission include a plan of action to disseminate truthful, non-misleading, and complete information to the audience(s) that received the violative promotional materials. Please direct your response to me at the Food and Drug Administration, Division of Drug Marketing, Advertising, and Communications, HFD-42 Room 8B-45, 5600 Fishers Lane, Rockville MD 20857, facsimile at 301-594-6771. In all future correspondence regarding this matter, please refer to MACMIS ID # 12433 in addition to the NDA number. We remind you that only written communications are considered official.

The violations discussed in this letter do not necessarily constitute an exhaustive list. It is your responsibility to ensure that your promotional materials for Cubicin comply with each applicable requirement of the Act and FDA implementing regulations.

Michael Bonney                                                                    Page 5
Cubist Pharmaceuticals
NDA 21-572/MACMIS #12433

Failure to correct the violations discussed above may result in FDA regulatory action, including seizure or injunction, without further notice.

Sincerely,

*{See appended electronic signature page}*

Thomas W. Abrams, R.Ph., MBA
Director
Division of Drug Marketing,
  Advertising, and Communications

-------------------------------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
-------------------------------------------------------------------------------------------------------

```
 /s/
--------------------
Barbara Chong
8/17/04 03:37:37 PM
```

NEW **AGAINST STAPH**

The only once-daily bactericidal antibiotic—with a distinct mechanism of action—proven effective against both MRSA and MSSA.

Once-A-Day **CUBICIN**™ (daptomycin for injection)

CUBICIN is indicated for the treatment of complicated skin and skin structure infections caused by susceptible strains of the following Gram-positive microorganisms: *Staphylococcus aureus* (including methicillin-resistant strains), *Streptococcus pyogenes*, *Streptococcus agalactiae*, *Streptococcus dysgalactiae* subsp *equisimilis*, and *Enterococcus faecalis* (vancomycin-susceptible strains only).

To reduce the development of drug-resistant bacteria and maintain the effectiveness of CUBICIN and other antibacterial drugs, CUBICIN should be used only to treat or prevent infections caused by bacteria.

CUBICIN is not indicated for the treatment of pneumonia.

Please see brief summary of prescribing information on previous page.

**CUBIST** PHARMACEUTICALS



# CUBICIN™
## (daptomycin for injection)

Brief summary of prescribing information

## INDICATIONS AND USAGE
## CONTRAINDICATIONS
## WARNINGS
## PRECAUTIONS
## ADVERSE REACTIONS
## OVERDOSAGE
## DOSAGE AND ADMINISTRATION



CUBICIN is a trademark of Cubist Pharmaceuticals, Inc.
©2003 Cubist Pharmaceuticals, Inc.



- FACTS ABOUT CUBICIN
- FULL PRESCRIBING INFORMATION
- SUSCEPTIBILITY TESTING INFORMATION
- INFECTIOUS DISEASES NEWS
- EVENTS & EDUCATIONAL OPPORTUNITES
- CLINICAL TRIALS

This site is provided by Cubist Pharmaceuticals for prescribing health-care professionals.



## SERIOUS AGAINST STAPH

CUBICIN is the only once-daily, rapidly bactericidal antibiotic proven effective against both MRSA and MSSA.

- New class, distinct mechanism of action
- Proven clinically successful against MRSA and MSSA
- Bactericidal against MRSA and MSSA
- Generally well tolerated in clinical trials
- Once a day--the only QD agent approved for treatment of MRSA and MSSA



View our recently launched ad campaign (PDF, 858k)

### NEW ON THE SITE
Welcome to the CUBICIN Web site. Here you can find our package insert and information on susceptibility testing guidelines.

### FULL PRESCRIBING INFORMATION
Download Large Version
16 pages (PDF, 328k)

Download Compact Version
3 pages (PDF, 95k)

To view PDF files use the free Adobe Acrobat Reader.

Copyright © 2003
Cubist Pharmaceuticals, Inc. Lexington, MA, USA
All rights reserved
CUBICIN is a trademark of Cubist Pharmaceuticals, Inc.



FACTS ABOUT CUBICIN
  Approved Pathogens
  Mechanism of Action
  Dosage and Administration
  Bactericidal Activity
  Pharmakokinetic Profile
  cSSSI Trials
  Safety

FULL PRESCRIBING
INFORMATION

SUSCEPTIBILITY TESTING
INFORMATION

INFECTIOUS DISEASES NEWS

EVENTS & EDUCATIONAL
OPPORTUNITES

CLINICAL TRIALS

This site is
provided by Cubist
Pharmaceuticals
for prescribing
health-care
professionals.





## Bactericidal Action

Bactericidal antibiotics are generally regarded as superior to bacteriostatic agents for the treatment of most infections. However, clinical data to support this position are lacking except in specific indications. This slide set highlights the clinical implications of bactericidal versus bacteriostatic antibiotics.

**BACTERICIDAL ACTION DOWNLOADS**
Download Bactericidal v. Bacteriostatic Slide Kit
(PDF, 62k)

To view PDF files use the free Adobe Acrobat Reader.

Copyright © 2003
Cubist Pharmaceuticals, Inc. Lexington, MA, USA
All rights reserved
CUBICIN is a trademark of Cubist Pharmaceuticals, Inc.

**EXHIBIT 10**

**Compliance Policy Guide**
**Sec. 120.500**
**Health Fraud - Factors in Considering Regulatory Action**
**(CPG 7150.10)**

BACKGROUND:

Health Fraud products are articles of unproven effectiveness that are promoted to improve health, well being, or appearance. They can be drugs, devices, foods or cosmetics for human or animal use.

The previous CPG 7150.10 (See Sec. 120.500), Quackery - Priorities for Initiating Legal Action, established agency priorities based on categorizing the violative articles as a "direct health hazard", "indirect health hazard", or "major economic cheat". While such descriptions served the purpose of communicating the general impact of different types of health fraud products on the public, they did not take into account a number of factors which influence the initiation of a regulatory action.

This revision of the CPG establishes practical definitions for "direct health hazard", and "indirect health hazard". Because all health fraud products are in fact economic cheats, a separate definition for major economic cheat has been eliminated. The revised CPG also describes factors the agency will consider prior to initiating regulatory actions against health fraud products.

DEFINITIONS:

*HEALTH FRAUD: The deceptive promotion, advertisement, distribution or sale of articles, intended for human or animal use, that are represented as being effective to diagnose, prevent, cure, treat, or mitigate disease (or other conditions), or provide a beneficial effect on health, but which have not been scientifically proven safe and effective for such purposes. Such practices may be deliberate, or done without adequate knowledge or understanding of the article.*

A health fraud product presents a direct health hazard if it is likely to cause injury, death or other serious adverse effect when used as directed or in a customary manner.

A health fraud product presents an indirect health hazard if, as a result of reliance on the product, the consumer is likely to delay or discontinue appropriate medical treatment. The health hazard is indirect when it does no direct harm to the person as a result of its use, but rather denies, delays, or interferes with effective treatment. Consumers who purchase these products are misled by exaggerated or false claims that are made for the products.

POLICY:

Products that pose a direct health hazard to the user shall receive the agency's highest priority attention, regardless of whether they are health fraud products. Documented cases of such products should be expedited and referred to the appropriate center for regulatory follow-up. Health fraud products for which there is not a documented direct health hazard (i.e. indirect health hazard products) will still be considered for regulatory action but on a lower priority.

In evaluating regulatory actions against indirect health hazard products, the following factors should be considered by districts and the centers:

1. Whether the therapeutic claims or conditions to be treated are significant as interpreted by the

appropriate center;

2. Whether there are scientific data or specific information to support the safety or effectiveness of the product for its intended or customary use;

3. The degree of vulnerability of the prospective user group, e.g., the elderly, persons with illnesses for which there is no recognized effective treatment;

4. The availability of other administrative or regulatory alternatives to bring the product or firm into compliance, e.g., education, referral or cooperation with local, state or other federal agencies;

5. The amount of agency resources required and whether they are sufficient to pursue the action to its conclusion;

6. The source of the product, size of the industry distributing the same or similar products, and the impact of the action on that source and industry;

7. The cost of the product, the economic impact of this case on the target user group, as well as the profit (per sale) realized from the sale of the product;

8. The amount (dollar and volume) of product sold, and the geographical scope of its distribution;

In most cases, the seriousness of the therapeutic claims and the nature of the indirect hazard will be obvious. We recognize that when a product with unproven therapeutic claims is first introduced, it is difficult to predict its economic impact because, whether or not a regulatory action is taken, the product may not be accepted in the marketplace. Generally, new health fraud products with undetermined economic impact and limited health significance should result in a *Warning* Letter to the promoter. *Further* regulatory action should be considered for products ** when it appears there is a growing national or substantial regional market for them. The office of compliance in each center will designate a contact and a back-up person for primary consultation on health fraud action.

Foods for human use, nutritional supplements and cosmetics with therapeutic claims will generally be treated as drugs and should be referred to the *CBER or CDER*, Health Fraud Staff, which will coordinate these issues with the Center for Food Safety and Applied Nutrition.

Health fraud products that are the statutory responsibility of another agency should generally be referred to that agency for follow-up. For example, a strictly mail order operation, or one which principally uses media advertising should be referred to the U.S. Postal Service or the Federal Trade Commission and assistance provided, as needed. Local and state health departments and other federal agencies should be consulted because they may be sources of possible corrective action. If the health fraud practice or operation has been legalized (or its practical equivalent) in a certain locality, it is unlikely that a referral for a regulatory action against that practice or operation would be approved in that locality unless there are compelling reasons to do so. This does not preclude action in other jurisdictions. Referral of information on fraudulent products to the appropriate home district and headquarters units should be done as a matter of course.

In general, regulatory action will continue to be deferred on products that are covered by the OTC Review, pending the publication of final monographs.

*Material between asterisks is new or revised*

Revised: 6/5/87, 3/95