IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PENNSYLVANIA EMPLOYEE BENEFIT TRUST FUND, on behalf of itself and all others similarly situated, JOSEPH MACKEN, and COMMISSIONER LINDA A. WATTERS<br><br>Plaintiffs,<br><br>v.<br><br>ZENECA, INC. and ASTRAZENECA PHARMACEUTICALS, LP,<br><br>Defendants. | Civ. No. 1:05-cv-75-ER<br>(Lead Case) |

**EXHIBIT B TO**
**DEFENDANTS' UNOPPOSED MOTION TO SEAL UNREDACTED PLAINTIFFS'**
**ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

McCARTER & ENGLISH, LLP
Michael P. Kelly (#2295)
Daniel M. Silver (#4758)
Renaissance Center
405 North King Street, 8th Floor
Wilmington, DE  19899
(302) 984-6300

SIDLEY AUSTIN LLP
Mark E. Haddad
Alycia A. Degen
Joshua E. Anderson
555 West Fifth Street, Suite 4000
Los Angeles, CA  90013
(213) 896-6000

SIDLEY AUSTIN LLP
John W. Treece
One South Dearborn
Chicago, IL  60603
(312) 853-7000

Dated:  October 23, 2009                    *Attorneys for Defendants*

ME1 9232942v.1

REDACTED

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PENNSYLVANIA EMPLOYEE BENEFIT TRUST FUND, on behalf of itself and all others similarly situated, JOSEPH MACKEN, and COMMISSIONER LINDA A. WATTERS, | : : : : : | |
| Plaintiffs, | : : | Civil Action No. I:05-cv-75 (ECR) (Lead Case) |
| v. | : : | |
| ZENECA, INC., et al., | : : | |
| Defendants. | : | |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Steve W. Berman
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA 98101
Telephone: (206) 623-7292

*Interim Lead Co-Lead Counsel for Plaintiffs*

Ellen Meriwether
Bryan L. Clobes
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
Telephone: (215) 864-2800

*Interim Lead Co-Lead Counsel for Plaintiffs*

Barbara J. Hart
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART
One North Broadway, 5th Floor
White Plains, NY 10601-2310

*Interim Lead Co-Lead Counsel for Plaintiffs*

Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4439)
CHIMICLES & TIKELLIS LLP
222 Delaware Ave., P.O. Box 1035
Wilmington, DE 19899
Telephone: (302) 656-2500

*Liaison Counsel for Plaintiffs*

Jeffrey L. Kodroff
Theodore M. Lieverman
SPECTOR, ROSEMAN & KODROFF, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300

*Interim Lead Co-Lead Counsel for Plaintiffs*

# TABLE OF CONTENTS

**PAGE**

I.   SUMMARY OF ARGUMENT ...................................................................................1

II.  STATEMENT OF FACTS ......................................................................................3

    A.   AstraZeneca's Profitable Prilosec Franchise ...........................................3

    B.   The FDA Found that Nexium is Not Superior to Prilosec.........................4

    C.   [redacted] 4

    D.   AstraZeneca Marketed Nexium As Superior To Prilosec Despite the FDA Findings ...................................................................................................5

        1.   AstraZeneca marketed Nexium to physicians as superior to Prilosec .........5

        2.   AstraZeneca's Consumer Marketing Touted Nexium As Superior To Prilosec...................................................................................................7

    E.   Causal link between Defendants' deceptive conduct and Plaintiffs' loss...............9

III. ARGUMENT...........................................................................................................10

    A.   Plaintiffs' Claims Are Governed By Delaware Law ...............................11

        1.   Delaware law has the most significant relationship with the parties and claims in this action ...............................................................................11

        2.   A qualitative evaluation of the factors set forth in Restatement section 148(2) points to the application of Delaware law ......................................16

    B.   Plaintiffs Allege Valid Claims Under Consumer Protection Statutes ..................18

        1.   The Complaint states a valid claim under the Delaware Consumer Fraud Act...........................................................................................................18

        2.   Like the other Plaintiffs, the Associational Plaintiffs have adequately alleged standing, causation and injury under Delaware law......................27

        3.   In the alternative, Plaintiffs state valid claims under the consumer protection laws of other States...................................................................28

    C.   Plaintiffs' Unjust Enrichment Claim Should Not Be Dismissed..........................37

    D.   The Complaint Should Not Be Dismissed, Let Alone With Prejudice..................38

IV.  CONCLUSION........................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*Alberton v. Commonwealth Land Title Ins. Co.,*
    247 F.R.D. 469 (E.D. Pa. 2008)....................................................................................32, 33

*In re Alpharma Sec. Litig.,*
    372 F.3d 137 (3d Cir. 2004) ........................................................................................40

*Alston v. Parker,*
    363 F.3d 229 (3d Cir. 2004) ........................................................................................39

*Ayers v. Quillen,*
    2004 Del. Super. Lexis 443 (Del. Sup. Ct. June 30, 2004)................................................22

*Balderston v. Medtronic Sofamor Danek,*
    285 F.3d 238 (3d Cir. 2002) ........................................................................................32

*Bell Atl. v. Twombly,*
    550 U.S. 544 (2007)........................................................................................10, 23, 24

*In re Bextra & Celebrex Mktg. Sales Prac. & Prod. Liab. Litig.,*
    495 F. Supp. 2d 1027 (N.D. Cal. 2007).......................................................................28, 29

*Blue Cross & Blue Shield of N.J., Inc., v. Phillip Morris, Inc.,*
    178 F. Supp. 2d 198 (E.D.N.Y. 2001), *aff'd in relevant part*, 344 F.3d 211 (2d
    Cir. 2003).............................................................................................................35

*Cantor Fitzgerald, L.P. v. Cantor,*
    724 A.2d 571 (Del. Ch. 1998) ......................................................................................37

*In re Cardizem CD Antitrust Litig.,*
    105 F. Supp. 2d 618 (E.D. Mich. 1999)...........................................................................38

*Champion Home Builders Co. v. ADT Sec. Servs., Inc.,*
    179 F. Supp. 2d 16 (N.D.N.Y. 2001)...............................................................................36

*Christidis v. First Pennsylvania Mortg. Trust,*
    717 F.2d 96 (3d Cir. 1983) ..........................................................................................10

*Common Cause of Pa. v. Pennsylvania,*
    558 F.3d 249 (3d Cir. 2009) ........................................................................................27

*Commonwealth v. TAP Pharm. Prods.,*
    885 A.2d 1127 (Pa. Commw. 2005) ...............................................................................31

*Conboy v. AT & T Corp.,*
    241 F.3d 242 (2d Cir. 2001) ........................................................................................36

*Creditors' Committee of Essex Builders, Inc. v. Farmers Bank,*
    251 A.2d 546 (Del. 1969) ......................................................................................38

*DCD Programs, Ltd. v. Leighton,*
    833 F.2d 183 (9th Cir. 1987) ................................................................................40

*Desiano v. Warner-Lambert Co.,*
    326 F.3d 339 (2d Cir. 2003) .................................................................................20

*District 1199P Health & Welfare Plan v. Janssen, L.P.,*
    2008 U.S. Dist. Lexis 103526 (D.N.J. Dec. 23, 2008) ........................................25

*Dix v. American Bankers Life Assurance Co.,*
    429 Mich. 410 (1987) .......................................................................................29, 30

*Emery v. American Gen. Fin., Inc.,*
    134 F.3d 1321 (7th Cir. 1998) .........................................................................39, 40

*Goode v. City of Philadelphia,*
    539 F.3d 311 (3d Cir. 2008) .................................................................................27

*Grant Thornton LLP v. Suntrust Bank,*
    133 S.W.3d 342 (Tex. App. 2004).........................................................................15

*Hill v. Galaxy Telecomm.,*
    184 F.R.D. 82 (N.D. Miss. 1999) .........................................................................38

*Hunt v. United States Tobacco Co.,*
    538 F.3d 217 (3d Cir. 2008) .................................................................................33

*Ironworkers Local Union No. 68  v. AstraZeneca Pharms. LP,*
    585 F. Supp. 2d 1339 (M.D. Fla. 2008)................................................................26

*Jackson Nat'l Life Ins. Co. v. Kennedy,*
    741 A.2d 377 (Del. Ch. 1999) ..............................................................................37

*K&S Tool & Dye Corp. v. Perfection Mach. Sales Inc.,*
    301 Wis. 2d 109 (2007) ....................................................................................34, 35

*Kelley v. Microsoft Corp.,*
    251 F.R.D. 544 (W.D. Wash. 2008) ............................................................13, 15, 17

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941)...............................................................................................11

*Lony v. E.I. Du Pont de Nemours & Co.,*
    886 F.2d 628 (3d Cir. 1989) .................................................................................14

*Lyon v. Caterpillar, Inc.,*
    194 F.R.D. 206 (E.D. Pa. 2000).......................................................................12, 17

*Marcus v. AT&T Corp.,*
    138 F.3d 46 (2d Cir. 1998) ...................................................................................36

*In re Mercedes-Benz Tele Aid Contract Litig.,*
　257 F.R.D. 46 (D.N.J. 2009)..........................................................................14, 15, 16, 17

*Molly v. Five Town Chrysler, Inc.,*
　2009 WL 440292 (E.D. Pa. Feb 18 2009) ........................................................................33

*New York v. Feldman,*
　210 F. Supp. 2d 294 (S.D.N.Y. 2002) .............................................................................35

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
　85 N.Y.2d 20, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995)................................................36

*Pa. Employees Benefit Trust Fund v. AstraZeneca Pharm. LP,*
　2009 U.S. Dist. Lexis 76555 (M.D. Fla. July 18, 2009)...................................................26

*Pa. Employees Benefit Trust Fund v. Zeneca, Inc.,*
　499 F.3d 239 (3d Cir. 2007) .............................................................................................1

*Parkinson v. Hyundai Motor Am.,*
　2008 U.S. Dist. Lexis 101098 (C.D. Cal. Dec. 12, 2008)................................................17

*Phillips Petroleum Co. v. Shutts,*
　472 U.S. 797 (1985)........................................................................................................13

*Phillips v. County of Allegheny,*
　515 F.3d 224 (3d Cir. 2008) ............................................................................................10

*Picus v. Wal-Mart Stores, Inc.,*
　256 F.R.D. 651 (D. Nev. 2009) .......................................................................................37

*Powers v. Lycoming Engines,*
　245 F.R.D. 226 (E.D. Pa. 2007)..................................................................................11, 12

*Prohias v. Pfizer, Inc.,*
　485 F. Supp. 2d 1329 (S.D. Fla. 2007) ...........................................................................28

*Revell v. Port Auth. of N.Y. & N.J.,*
　321 Fed. Appx. 113 (3d Cir. 2009)...................................................................................27

*S&R Assoc., LP v. Shell Oil Co.,*
　725 A.2d 431 (Del. Super. Ct. 1998)................................................................................22

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action,*
　2009 U.S. Dist. Lexis 58900 (D.N.J. July 10, 2009) ..................................................25, 26

*Shapiro v. Berkshire Life Ins. Co.,*
　212 F.3d 121 (2d Cir. 2000) ............................................................................................35

*Sheldon v. Home Loan Servs. Inc.,*
　2009 WL 2394182 (E.D. Pa. Aug. 4, 2009) .....................................................................33

*Shiro v. Prudential Relocation,*
　2007 WL 675426 (M.D. Pa. 2007) ...................................................................................31

*Singer v. AT&T Corp.*,
    185 F.R.D. 681 (S.D. Fla. 1998)........................................................................................38

*Small v. Lorillard Tobacco Co., Inc.*,
    94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999)................................................35

*Somerville v. Stryker Orthopaedics*,
    2009 U.S. Dist. Lexis 80753 (N.D. Cal. Sept. 4, 2009)....................................................24

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.*,
    2009 U.S. Dist. Lexis 70491 (S.D. Fla. July 30, 2009) ....................................................26

*Stephenson v. Capano Dev. Inc.*,
    462 A.2d 1069 (Del. 1983) ................................................................................................11

*Stutman v. Chemical Bank*,
    95 N.Y.2d 24, 731 N.E.2d 608, 709 N.Y.S.2d 892 (2000)................................................35

*Sykes v. Jos. C. O'Neal & Sons Auctioneers & Appraisers*,
    2009 Del. C.P. Lexis 33 (Del. Ct. Common Pleas Aug. 11, 2009) ...................................22

*In re Tobacco II Cases*,
    46 Cal. 4th 298 (2009) ......................................................................................................21

*Toll Brothers, Inc. v. Township of Readington*,
    555 F.3d 131 (3d Cir. 2009) ..............................................................................................39

*Travelers Indem. Co. v. Lake*,
    594 A.2d 38 (Del. 1991) ....................................................................................................11

*Valente v. Sofamar, S.N.C.*,
    48 F. Supp. 2d 862 (E.D. Wis. 1999)............................................................................34, 35

*Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators*,
    574 A.2d 641 (Pa. Super. 1990)...................................................................................31, 32

*In re Warfarin Sodium Antitrust Litig.*,
    214 F.3d 395 (3d Cir. 2003) .........................................................................................18, 19

*In re Warfarin Sodium Antitrust Litig.*,
    391 F.3d 516 (3d Cir. 2004) .........................................................................................21, 22

## STATUTES

6. Del C. § 2512 ...................................................................................................................13

6. Del C. § 2513 ...................................................................................................................22

73 P.S. § 201-9.2(a) ............................................................................................................31

73 P.S. § 201-2(2) ...............................................................................................................31

NEV. REV. STAT. § 41.600 .......................................................................................................36, 37

NEV. REV. STAT. § 598.915 ...........................................................................................................37

## MISCELLANEOUS

RESTATEMENT (SECOND) OF CONFLICT OF LAWS ................................................................12, 16, 17

While Plaintiffs agree in large measure with AstraZeneca's description of the nature and stage of the proceedings, that description bears clarification on four points.

First, no court has ever addressed AstraZeneca's argument in this action that Plaintiffs must allege reliance and causation in support of their claims under the Delaware Consumer Fraud Act and the consumer protection statutes of other states, or AstraZeneca's argument that Plaintiffs have failed to allege reliance and causation under those statutes.

Second, in its decision in this action, the Third Circuit rejected AstraZeneca's argument that "FDA approval of prescription drug labeling and regulation of advertising brings the plaintiffs' claims within the [Delaware Consumer Fraud Act] exemption of 'any advertising or merchandising practice' that is compliant with Federal Trade Commission regulations." *Pa. Employees Benefit Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 242 (3d Cir. 2007). As the Court stated, "We will not rewrite the text of the exemption to include regulation of activities that are not within the FTC's authority. Accordingly, we hold that the District Court erred in ruling that the plaintiffs' claims were not actionable under the DCFA." *Id.* at 247.

Third, in the actions brought by other plaintiffs in state court in California and Massachusetts, both courts denied AstraZeneca's motions to dismiss and motions for judgment on the pleadings. The California court's grant of summary judgment in that case is the subject of a pending appeal. Fourth, in the Massachusetts action, Plaintiffs' motion for class certification has been argued and is under submission.

As AstraZeneca acknowledges, the motion to dismiss addresses issues that were not decided by Judge Robinson. As discussed below, Defendants' motion should be denied.

## I.    SUMMARY OF ARGUMENT

1.    Plaintiffs allege that Defendants purposefully created and launched a massive and deceptive campaign to convince doctors, patients and the medical community that Nexium was better, faster, and more efficient than Prilosec, even though the FDA had found and told Defendants that Nexium is not superior to Prilosec for any indication. The Complaint alleges that Defendants needed to create this impression so that doctors would switch their patients from

Prilosec to Nexium, because the Prilosec patent was expiring and Prilosec would be available in generic form. The Complaint alleges in detail that Defendants knew exactly what they were doing in creating and launching this deceptive campaign, and in fact, they evaluated its effectiveness, concluding that it achieved its purpose of positioning Nexium as a better alternative than Prilosec.

AstraZeneca did this to make money, and money it made. Worldwide Nexium sales climbed to over $4.6 *billion* in less than five years after its launch. At the same time, worldwide sales of Prilosec and its generic equivalent dropped from over $6 billion down to less than $2 billion, even though Prilosec was just as effective as Nexium and cost far less than Nexium.

2.     The Complaint sufficiently alleges under Delaware law that there was a causal link between the Defendants' deceptive marketing campaign and Plaintiffs' losses. Delaware law applies to the claims in this case. Delaware is the state in which this case was filed, the state where Defendants are incorporated and have their headquarters, the state where they conceived, launched and supervised their deceptive campaign, and the state where they enjoyed the fruits of that campaign. Therefore, Delaware has the "most significant relationship" to the claims in this case. Under the Delaware Consumer Fraud Act, Plaintiffs need only allege that Defendants misrepresented or concealed a material fact and that they intended that others rely on the misrepresentation or concealment. Here, the Complaint pleads facts sufficient to show that Plaintiffs were the target of Defendants' deceptive scheme, the object of which was to induce consumers and third-party payors to purchase and pay for high-priced Nexium instead of Prilosec, an equally-effective, cheaper alternative. Allegations that either Plaintiffs or their doctors were deceived by the promotional campaign and/or reasonably relied on the Defendants' misrepresentations are not required to state a claim for consumer fraud under Delaware law (nor the law of many other jurisdictions). Rather, it is sufficient to allege, as Plaintiffs have here, that Defendants intended to deceive Plaintiffs and Plaintiffs would not have purchased Nexium had they known the truth.

- 2 -

3.      Plaintiffs have not alleged fraud on the market, *i.e.*, that the price of Nexium was inflated because of Defendants' fraudulent scheme. Instead, Plaintiffs allege that they were injured by paying for high-priced, patent-protected Nexium when Prilosec, just as effective and available in a cheaper generic form, would have done have just as well.

4.      The Complaint alleges sufficient facts to demonstrate standing by the Associational Plaintiffs. Like the individual and TPP Plaintiffs, the Associational Plaintiffs need not allege individual reliance by their members and have adequately alleged the elements of their claims.

5.      Finally, leave to amend should be granted if this Court were to find the Complaint deficient in any manner. Defendants admit that the issues raised in their motion have not been addressed by any court in this action. Therefore, because leave to amend should be liberally granted, Plaintiffs should be permitted to correct any pleadings errors identified by the Court.

## II.      STATEMENT OF FACTS

### A.      AstraZeneca's Profitable Prilosec Franchise

Prilosec was AstraZeneca's flagship product during the 1990s, widely advertised and known as the "purple pill." ¶ 2.[1] It was the top-selling drug in the world by 2000, with annual sales of $6 billion. *Id.* But Prilosec's patent was set to expire in 2001, and AstraZeneca knew that competition from generic versions of Prilosec would be disastrous to its profits. ¶ 4. To put this in perspective, Prilosec sales of $5.9 billion in 2000 comprised 39% of AstraZeneca's revenue, with sales of the Company's next best-selling drug comprising 8% of revenue. ¶ 41.

As a result, AstraZeneca developed Nexium, which it intended to position as Prilosec's replacement. ¶¶ 5-6, 45-46. The active ingredient in Prilosec is omeprazole, a proton-pump inhibitor (PPI). ¶ 9, 38-39. The active ingredient in Nexium is esomeprazole, a PPI derived from the active ingredient in Prilosec. ¶¶ 9, 46. The omeprazole molecule has two mirror-image

---

[1] All citations in this brief to a "¶" are to the Amended Consolidated Class Action Complaint.

isomers, called S- and R-enantiomers, while esomeprazole is the S-enantiomer of that molecule. ¶ 38. Thus, AstraZeneca patented a "new" compound that is Prilosec without the R-enantiomer.

**B.      The FDA Found that Nexium is Not Superior to Prilosec**

AstraZeneca unsuccessfully tried to convince the FDA that Nexium is clinically superior to Prilosec. To obtain approval, AstraZeneca needed only to prove that Nexium is better than a placebo. ¶ 10. But AstraZeneca wanted the FDA to find that Nexium is clinically better than Prilosec to support its marketing campaign. Without such a finding, doctors would have no reason to prescribe (and consumers no reason to buy) Nexium, an expensive brand-name drug, when the generic version of Prilosec would be far less expensive and as effective.

AstraZeneca submitted eleven efficacy studies and three supportive trials to the FDA with its New Drug Application (NDA) for Nexium. ¶ 49. Only seven of the studies and trials compared Nexium with Prilosec. *Id.* The studies and trials addressed healing of erosive esophagitis, maintenance of healing of erosive esophagitis, and treatment of symptomatic gastro-esophageal reflux disease (GERD). ¶¶ 49-69. The Medical Reviewer found that *none* of the studies or trials supported AstraZeneca's assertion that Nexium is superior to Prilosec. Specifically, the Reviewer stated that "[t]here are no studies which demonstrate that H [Nexium] is superior to O [Prilosec], clinically or even statistically." ¶ 79. In the conclusion, the Medical Review stated that "it is recommended not to allow the sponsor to claim that [Nexium] has any significant clinical advantage over [Prilosec] in the first-line treatment of these acid-related disorders because no data in support of such a claim have been submitted." ¶ 69.

**C.**      █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████



Thus, the FDA consistently found

**D.      AstraZeneca Marketed Nexium As Superior To Prilosec Despite the FDA Findings**

**1.      AstraZeneca marketed Nexium to physicians as superior to Prilosec**

AstraZeneca implemented a successful marketing campaign to convince physicians that

Nexium is superior to Prilosec.  ¶ 90-112.



AstraZeneca made the same type of presentation to its detailers after Nexium reached the market.





**2.** **AstraZeneca's Consumer Marketing Touted Nexium As Superior To Prilosec**

AstraZeneca also developed a successful advertising campaign to convince consumers that Nexium is superior to Prilosec.  ¶¶ 113-169.

---

[2] As alleged in the Complaint, AstraZeneca initially priced Nexium below Prilosec to encourage switching.  ¶ 173.



By February 28, 2001, AstraZeneca had launched Nexium and had begun to set up print, radio and television ads for summer 2001. ¶ 121.



AstraZeneca consistently used the phrases "new purple pill," "today's purple pill," and "from the makers of Prilosec" (often in combination) to carry out the marketing plan expressed in its advertising agency's Creative Briefs and Creative Workplans, at the direction of Astra-Zeneca. ¶ 139. Paragraph 139 of the Complaint sets forth a chart that summarizes a plethora of AstraZeneca advertisements that used those phrases.

**E.    Causal link between Defendants' deceptive conduct and Plaintiffs' loss.**

Nexium purchasers, including consumers and third-party payors, are the "target" of AstraZeneca's deception because switching patients to high-priced Nexium was and is the aim of its marketing campaign. *See, e.g.*, ¶ 175 ("AstraZeneca's Nexium promotional and advertising campaign has resulted in billions of dollars of unnecessary drug expenditures"); ¶ 146 ("The end result is that prescribers and consumers clearly act differently than they otherwise would in the absence of AstraZeneca's false and misleading marketing campaign – they [prescribe] and purchase Nexium when a cheaper, clinically equivalent alternative product is available"); ¶ 163 ("The net effect of this misleading campaign was to establish Nexium in the minds of doctors and consumers as a superior drug for acid relief and as such to allow it to command a price substantially in excess of generic Prilosec"). The campaign worked.

AstraZeneca's deceptive campaign had its intended effect: "Plaintiffs ... have purchased Nexium and have been harmed by Defendants' misconduct *because they would not have purchased Nexium had they known the truth*." ¶ 178 (emphasis added). Plaintiffs were injured by those purchases because Nexium, after its initial launch period, was priced significantly higher than an equally effective alternative. ¶¶ 168, 173. Indeed, all Plaintiffs allege that they have been injured by AstraZeneca's wrongful conduct, which plainly means that they paid more for Nexium than they would have paid for Prilosec in its generic or brand-name form. *See* ¶¶ 16-25.

## III. ARGUMENT

AstraZeneca argues that the elements of causation, reliance and/or injury are inadequately pled either under Rule 9(b) or the more liberal Rule 8 standards.[3] To the contrary, plaintiffs have satisfied the pleadings requirements of Rule 8(a) and, where applicable, Rule 9(b). In *Bell Atl. v. Twombly,* 550 U.S. 544 (2007), the Supreme Court stated that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Id.* at 555 (citation omitted). Further, when ruling on a motion to dismiss, a court must "'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (citation omitted). Indeed, as stated in *Twombly*, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" 550 U.S. 556 (citation omitted). Even where Rule 9(b) applies, "focusing exclusively on its 'particularity' language 'is too narrow an approach and fails to take account of the general simplicity and flexibility contemplated by the rules.'" *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 100 (3d Cir. 1983).

---

[3] Defendants do not argue that the "facts constituting the fraud" are insufficiently pled under Rule 9(b).

Regardless of whether Rule 8 or Rule 9(b) applies, the Complaint adequately alleges all causes of action. As demonstrated below, Delaware law governs the claims made by Plaintiffs, regardless of their residence or principal place of business. *See infra*, § III(A). As the Delaware Supreme Court has explained, "the only intent requirement of the [Delaware Consumer Fraud] Act is that in omitting or concealing a material fact, the defendant must have intended that others rely on the omission or concealment." *Stephenson v. Capano Dev. Inc.*, 462 A.2d 1069, 1074 (Del. 1983). Further, an "unlawful practice ... is committed regardless of actual reliance by the plaintiff." *Id.* Plaintiffs' allegations readily meet those standards, because they allege in detail that AstraZeneca developed and implemented a nationwide campaign by which it misrepresented or concealed material facts with the intention that others rely on the omissions and concealments. ¶¶ 89-170. The requisite causal link between the misconduct and the injury has been alleged as well. ¶ 175. "Plaintiffs ... have purchased Nexium and have been harmed by Defendants' misconduct *because they would not have purchased Nexium had they known the truth*." ¶ 178 (emphasis added). Plaintiffs have therefore sufficiently pleaded causation and injury, as discussed in greater detail below.

## A.   **Plaintiffs' Claims Are Governed By Delaware Law**

### 1.   **Delaware law has the most significant relationship with the parties and claims in this action**

In a diversity action such as this, a district court generally applies the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Thus, the Court must apply Delaware choice of law rules. In determining choice of law issues in most cases, Delaware has adopted the "most significant-relationship" test as set out in Restatement (Second) of Conflict of Laws ("Restatement"). *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 40 (Del. 1991). The general "most significant relationship" test is set out in section 6 of the Restatement, while section 148 applies with respect to fraud or misrepresentation. *Powers v. Lycoming Engines*, 245 F.R.D. 226, 229 (E.D. Pa. 2007). As the court stated in *Powers*, this "flexible inquiry" uses the Restatement "as a guide to evaluate the significance of the contacts,

- 11 -

and the relationship of the states to the parties and the dispute." *Id.* Contacts are "weighed

qualitatively within the context of the competing policies and interests of each state." *Id.* at 230.

The analysis begins with Restatement section 6 which states in pertinent part:

> (1)  A court, subject to constitutional restrictions, will follow a statutory directive
> of its own state on choice of law.
>
> (2)  When there is no such directive, the factors relevant to the choice of
> applicable rule of law include (a) the needs of the interstate and international
> systems, (b) the relevant policies of the forum, (c) the relevant policies of other
> interested states and the relative interests of those states in the determination of
> the particular issue, (d) the protection of justified expectations, (e) the basic
> policies underlying the particular field of law, (f) certainty, predictability and
> uniformity of result, and (g) ease in the determination and application of the law
> to be applied.

A Comment to section 6 explains:

> The court should give a local statute the range of application intended by the
> legislature when these intentions can be ascertained and can constitutionally be
> given effect.  If the legislature intended that the statute should be applied to the
> out-of-state facts involved, the court should so apply it unless constitutional
> considerations forbid.  . . .  When the statute is silent as to its range of application,
> the intentions of the legislature on the subject can sometimes be ascertained by a
> process of interpretation and construction.  *Provided that it is constitutional to do
> so, the court will apply a local statute in the manner intended by the legislature
> even when the local law of another state would be applicable under usual choice-
> of-law principles.*

*Id.* at cmt a (emphasis added).  Thus, "'[s]ubject to constitutional limitations, a court will gener-

ally apply the statutory law of the forum.'" *Lyon v. Caterpillar, Inc.*, 194 F.R.D. 206, 212 (E.D.

Pa. 2000) (citation omitted).  Where, as here, Defendants' deceptive scheme was conceived and

launched from Delaware, which is the state in which Defendants are incorporated and have their

principal places of business, Delaware has the most significant interest in the application of its

statute to the claims asserted in this case.

The Delaware legislature intended the DCFA to apply to claims by citizens of Delaware

and out-of-state plaintiffs.  The DCFA states:

> The purpose of this subchapter shall be to protect consumers and legitimate
> business enterprises from unfair or deceptive merchandising practices in the
> conduct of any trade or commerce in part or wholly within this State.  It is the
> intent of the General Assembly that such practices be swiftly stopped and that this

> subchapter shall be liberally construed and applied to promote its underlying purposes and policies.

6 Del. C. § 2512. The statute expressly states that its purpose is to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices *which take place in part* or wholly within the State of Delaware. It is the express intent of the legislature that such practices be swiftly stopped, and the statute be liberally constructed to promote the underlying purposes and polices. *Id.* Thus, the legislature intended that the DCFA be used to check the abuses of Delaware's corporate citizens, and to protect consumers and business located both within the state and outside of it from deceptive practices emanating from the state. As comment b to Restatement section 6 states, "provided that it is constitutional to do so, the court will apply a local statute in the manner intended by the legislature *even when the local law of another state would be applicable under usual choice-of-law principles.*" (Emphasis added.)

A forum state's substantive law may apply constitutionally in a class action if the forum state has "a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821-22 (1985) (citation omitted). Further, the "Constitution places only 'modest restrictions' on application of a forum's law." *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 550 (W.D. Wash. 2008) (*citing Shutts*, 472 U.S. at 818). In this case, application of Delaware law does not violate the Constitution. Delaware has substantial contacts to the Plaintiffs' claims. Defendants created the deceptive and unfair marketing scheme in Delaware, and they are incorporated, do business, and have their principal headquarters in the state. Defendants' Delaware contacts are significant and not merely casually related to the action.[4]

---

[4] The Complaint alleges that Defendants Zeneca Inc. and AstraZeneca Pharmaceuticals are Delaware entities with their principal places of business in Wilmington, Delaware. ¶¶ 26-27. To the extent that Defendants raise a factual dispute as to the location where the Nexium marketing plan was conceived, supervised and launched, that dispute should not be resolved on a motion to dismiss, because Defendants possess knowledge of that issue, which has not been the subject of discovery in other actions, in which the plaintiffs have not sought to apply Delaware law.

Defendants erroneously argue that because the misrepresentations were published from national broadcasting centers in places such as New York City, or were *repeated* by their army of pharmaceutical sales representatives throughout the country (Def. Br. at 14), the misrepresentations did not occur in Delaware. While Plaintiffs' injuries may have occurred outside of Delaware, Defendants' fraud occurred where the scheme was developed, launched and supervised, i.e., at corporate headquarters in the State of Delaware. Application of Delaware's law to protect those injured by the deceptive conduct of a Delaware corporation would not be arbitrary, unfair or unforeseeable; thus, the Constitution permits application of Delaware's law. *See, e.g., Lony v. E.I. Du Pont de Nemours & Co.*, 886 F.2d 628, 643 (3d Cir. 1989) ("In this case, the place of injury was Germany, but the place of the alleged wrongful conduct, the misrepresentation that allegedly caused the injury, was Delaware. Therefore, Delaware law will apply to Lony's claim of intentional misrepresentation.").

Even assuming that the legislature had been less clear about its desire to apply Delaware law to curb deceptive practices by its own citizens that injure those within and outside of the state, a consideration of the additional factors outlined in Restatement section 6 supports the application of Delaware law. The Restatement § 6 lists the following six factors as relevant to the choice of the choice of law question, where a state has not given a statutory directive: (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of law to be applied. To the extent relevant, each of these factors inclines towards the application of Delaware law.

With respect to factors (a) through (c), only Delaware law could both provide redress to injured Plaintiffs and deter Defendants' conduct.[5] *See, e.g., In re Mercedes-Benz Tele Aid*

---

[5] Indeed, Defendants argue that Plaintiffs would lack any redress at all under the laws of the various states the Defendants claim apply. If Defendants' arguments were correct, application of those states' laws would not only leave Plaintiffs without a remedy but also leave Defendants'

*Contract Litig.*, 257 F.R.D. 46, 68 (D.N.J. 2009) (while all states have an interest in assuring that their citizens would be compensated, only New Jersey has the additional interest in regulating a corporation within its borders). This is particularly true here where no other single state has a significant interest in the application of its laws to this dispute. With respect to factor (d), the protection of justified expectations, Delaware law would protect the expectations of innocent consumers, who expect good faith and fair dealing in their commercial transactions with Delaware-based entities. Moreover, AstraZeneca, a Delaware corporation, cannot argue that its justified expectations are violated by the application of the law of their own state. *See Mercedes-Benz*, 257 F.R.D. at 69.

With regard to factor (e), the basic policies underlying consumer protection statutes incline towards providing greater protection, rather than none at all for deceived consumers and businesses. And finally, application of Delaware law would be certain, predictable, and uniform, as well as easy to apply in the case going forward (factor(f)). Should numerous different state laws apply, there is a danger that different class members, all of whom suffered harm on the basis of the same alleged wrongdoing, would have their claims decided inconsistently. *Id.* at 69. *See also Grant Thornton LLP v. Suntrust Bank*, 133 S.W.3d 342, 361 (Tex. App. 2004) ("After considering all the factors under section 6 of the Restatement, we conclude that Texas – as the state where the headquarters of Bollinger are located, the state where Grant Thornton performed the audit at issue, the state where the registration statement with the alleged misrepresentations and omissions at issue was prepared, and the state of residence of some of the class members – is the state with the most significant relationship to the litigation."). Similarly, this Court should apply Delaware law to the consumer fraud claims in the case.

---

conduct undeterred. Thus, Defendants cannot claim that any other state has an interest equal to Delaware's in applying its law.

### 2. A qualitative evaluation of the factors set forth in Restatement section 148(2) points to the application of Delaware law

In cases involving intentional misconduct by an in-state defendant, courts often apply the law of the forum, because "the state in which the fraudulent conduct arises has a stronger relationship to the action," *Kelley v. Microsoft Corp.*, 251 F.R.D. at 522. Indeed, in this circuit and elsewhere, courts have repeatedly applied the forum state's law in claims involving fraud against an in-state defendant. As noted above, this is particularly appropriate where applying the laws of all fifty states may effectively preclude recovery by any plaintiff.

In an exhaustive analysis of similar issues, a New Jersey district court recently concluded that a qualitative weighing of the factors relevant under Restatement § 148(2)[6] required the application of New Jersey law to claims of consumer fraud and unjust enrichment against a New Jersey defendant. *In Re Mercedes-Benz Tele Aid Contract Litig.*, 257 F.R.D. at 67. The plaintiff, on behalf of a class, alleged that Mercedes-Benz made fraudulent statements and omissions in connection with the promotion of vehicles equipped with Tele Aid, an emergency roadside assistance program. The plaintiff argued that New Jersey law applied, but the defendant urged that the law of the home state of each plaintiff applied.

In resolving the dispute, the district court evaluated the six factors in section 148(2). The court noted that "the company's purported misconduct and any reliance on the part of Plaintiffs' occurred, at least partially, in different states." *Id.* at 66. But the court explained that "alleged misrepresentations which form the basis of Plaintiffs' claim took place in New Jersey. Plaintiffs contend that all of Mercedes's actions relating to Tele Aid were planned and implemented by a

---

[6] Restatement section 148(2) lists the following factors: "When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties: (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations, (b) the place where the plaintiff received the representations, (c) the place where the defendant made the representations, (d) the domicile, residence, nationality, place of incorporation and place of business of the parties, (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant."

'Telematics team' based in Montvale, New Jersey." *Id.* Therefore, the court turned to the six factors in section 148(2) to decide which law applied. *Id.*

In evaluating those factors, the court noted that "since plaintiffs presumably received and relied on Mercedes' alleged misrepresentations in their home states," four factors pointed to the application of the laws of each plaintiff's state of residence.[7] However, the court determined that the remaining two factors – the place where the misrepresentations were made and the domicile, residence, place of incorporation and place of business of the parties – pointed to the application of New Jersey law. Thus, a qualitative weighing of the six factors convinced the court that the factor regarding "'the place where the defendant made the representations' – outweighs those that support applying the law of each class member's home state." *Id.* at 68.[8]

Similarly, in *Kelley v. Microsoft Corp.*, the court applied Washington law to plaintiffs' claims against Microsoft in a class action challenging deceptive marketing of the Windows operating system. The court determined that Washington law applied under Restatement sections 145 and 148, because "the most significant contacts in the context of Plaintiffs' claims are to Washington, where Defendant resides and created the allegedly unfair or deceptive marketing scheme. Moreover, because the place of injury is fortuitous the Court gives greater weight to Washington, the location of the source of the injury." 252 F.R.D. at 552. The court also explained that "[a]s it must, the Court gives greater weight to the fact that the allegedly deceptive and unfair acts originated in Washington given that the location of the injury is fortuitous. *See* Restatement § 148 cmt. e." *Id.* at 553. *See also Parkinson v. Hyundai Motor*

---

[7] These four factors are: (1) the place plaintiff acted in reliance upon defendant's representations (2) the place where the plaintiff received the representations (3) the place where the plaintiff is to render performance under a contract which it has been induced to enter by the false representations of the defendant, and (4) the place where a tangible thing which is the subject of the transaction between the parties was situated.

[8] *Lyon v. Caterpillar, Inc.*, 194 F.R.D. at 212, is distinguishable. There, plaintiffs did not urge the application of the forum state's law (Pennsylvania) to the claims of the nationwide class, but instead urged the application of Illinois law, the place of business of the defendant. ("Plaintiff has chosen to pursue his claim in Pennsylvania yet assert that the ICFA applies to the entire putative class.") Thus, the added interest that the forum has in applying its own law to a controversy in its courts, was not present there.

*Am.*, 2008 U.S. Dist. Lexis 101098, at *48 (C.D. Cal. Dec. 12, 2008) (certifying nationwide class and applying consumer protection laws of California to claims of all class members, because "Plaintiffs allege that the wrongful acts underlying those claims emanated from defendant's California headquarters; defendant does not adequately rebut plaintiffs' showing that the representations or omissions made regarding the Tiburon emanated from California").

In sum, an analysis of the relevant factors in Restatement sections 6 and 148, clearly point towards the application of Delaware's law. In this case, Defendant's deceptive acts caused injury throughout the country. The location of such harm is fortuitous and disbursed, and no one state has a greater interest than any other in the application of its laws to the controversy. Only Delaware, the law of the forum, can claim a significant interest in the application of its laws as only it can claim the added interest of regulating a corporation within its borders.

**B.     Plaintiffs Allege Valid Claims Under Consumer Protection Statutes**

      **1.     The Complaint states a valid claim under the Delaware Consumer Fraud Act**

In two related cases involving deceptive marketing of a prescription drug, the Third Circuit has explained that the DCFA does not require proof of reliance, and that any requirement of causation may be established by allegations that plaintiffs paid higher prices because of the defendant drug manufacturer's campaign of deception. In *In re Warfarin Sodium Antitrust Litig.*, 214 F.3d 395, 397 (3d Cir. 2003) ("*Warfarin I*"), defendant DuPont Pharmaceuticals was "anticipating a loss of market share resulting from the introduction of a cheaper generic substitute" for its brand-name product, Coumadin. DuPont "orchestrated a campaign" that included the "publication and dissemination of false and misleading information" to the public and "feeding misinformation to doctors and other medical professionals," in an effort to differentiate its brand-name product from a competing equivalent product. *Id.* The district court had found that the consumer plaintiffs lacked standing to seek injunctive relief, finding that they had not alleged "a causal connection between DuPont's alleged unlawful activity and the supposed injury of Coumadin users." *Id.* at 397.

The Third Circuit reversed, holding that the individual purchaser plaintiffs had in fact alleged injury-in-fact:

> Coumadin purchasers *were the target* of DuPont's antitrust violation …. The excess amount paid by Coumadin users not only is inextricably intertwined with the injury DuPont aimed to inflict, *the overcharge was the aim of DuPont's preclusive conduct. It is difficult to imagine a more formidable demonstration of antitrust injury.*

*Id.* at 401 (emphasis added; internal quotes omitted).

Similarly, the Complaint here details a formidable demonstration of consumer injury. Nexium purchasers, including consumers and third-party payors, are the "target" of Astra-Zeneca's deception because inducing consumers to pay for high-priced Nexium was and is the aim of its marketing campaign. *See, e.g.,* ¶ 175 ("AstraZeneca's Nexium promotional and advertising campaign has resulted in billions of dollars of unnecessary drug expenditures"); ¶ 146 ("The end result is that prescribers and consumers clearly act differently than they otherwise would in the absence of AstraZeneca's false and misleading marketing campaign – they [prescribe] and purchase Nexium when a cheaper, clinically equivalent alternative product is available"); ¶ 163 ("The net effect of this misleading campaign was to establish Nexium in the minds of doctors and consumers as a superior drug for acid relief and as such to allow it to command a price substantially in excess of generic Prilosec"). Importantly, the Complaint also makes clear that AstraZeneca's deceptive campaign had its intended effect: "Plaintiffs … have purchased Nexium and have been harmed by Defendants' misconduct *because they would not have purchased Nexium had they known the truth*." ¶ 178 (emphasis added).

Moreover, the Complaint alleges that Plaintiffs purchased or paid for Nexium, which after its initial launch period was priced significantly higher than an equally effective alternative. (¶¶ 168, 173). Indeed, all Plaintiffs allege that they have been injured by AstraZeneca's wrongful conduct, which plainly means that they paid more for Nexium than they would have paid for Prilosec in its generic or brand-name form. *See* ¶¶ 16-25. Specific allegations as to what each Plaintiff paid for each Nexium prescription, at each point in the class period, are not

required to state a claim, nor do Defendants' cases stand for that proposition.[9]  In short, there is absolutely *no support* for the proposition that a *complaint* must "get to the issue of how much it would cost a particular TPP to reimburse for a particular drug versus another at a particular time" as AstraZeneca argues is required.  Def. Br. at 31.  Such evidence is for submission at trial, not for inclusion in a complaint.[10]

 *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003), also parallels this case in important respects.  Defendant Warner-Lambert, the maker of the prescription drug Rezulin, was sued under the New Jersey consumer-fraud statute for making false marketing claims before Rezulin's withdrawal from the market.  The Second Circuit held that when a drug company engages in deceptive marketing, "claims of damages [are] caused directly by Defendants' alleged fraud."  *Id.* at 340.  Indeed, the Court described a hypothetical nearly parallel to this case:

> Consider, for example, a hypothetical in which a defendant drug company markets a "new," much more expensive drug claiming it is a great advancement (safer, more effective, etc. than metformin – the standard diabetes drug) when in fact the company is simply replicating the metformin formula and putting a new label on it. In other words, the only difference between metformin and the "new" drug is the new name and the higher prescription price (paid almost entirely by the insurance company). In that case, the "new" drug would be exactly as safe and effective as metformin, and thus there could be no [physical] injury to any of the insurance company's insured. Nevertheless, the insurance companies would be able to claim – precisely as they do here – that the defendants engaged in a scheme to defraud it, and that the company suffered ***direct economic losses*** as a result.

---

[9] *See* Def. Br. at 31, *citing In Re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 601-04 (E.D.N.Y. 2005) (discussing record evidence of pharmaceutical drug pricing in the summary judgment context) and *In Re Pharm. Indus. Average Wholesale Price Litig.*, 230 F.R.D. 61, 71-73 (D. Mass. 2005) (discussing evidence in the record regarding the private reimbursement system for self-administered versus physician-administered drugs in the class certification context).  Neither of these cases says *anything* about what facts are required to allege injury in a complaint.

[10] AstraZeneca challenges Plaintiffs' allegations of injury by referring to the fact that after discovery was completed in the California action, Plaintiffs narrowed the class period to exclude the early period of Nexium's launch. Def. Br. at 32. These facts, however, are *consistent* with what is alleged in the Complaint. As the Complaint alleges, when it was first launched, Nexium was priced lower than Prilosec in order to encourage the switch. ¶ 168. Once Nexium was entrenched, however, the price climbed precipitously, reaching a level more than 7 times that of its equally effective rival Prilosec. ¶ 173. The fact that the class period was narrowed to reflect these facts neither undermines Plaintiffs' claim, nor renders Plaintiffs' allegation of injury "implausible."

*Id.* at 349-50 (emphasis added). Here, Nexium is the "new" drug that is in no meaningful way superior to Prilosec, but that did not stop AstraZeneca from deceptively claiming that it is a medical advance. All Plaintiffs, including individual purchasers and all members of the putative class, were directly injured by paying a higher price for this "new drug" when the old drug was much cheaper and worked just as well. All Plaintiffs, by purchasing the higher-priced new drug, suffered "direct economic losses as a result."

Moreover, Plaintiffs need not allege reliance in order to state a claim under the DCFA. In a subsequent decision in the *Warfarin* litigation, the Third Circuit affirmed a nationwide class settlement of claims under antitrust laws and the DCFA. The Court explained that "[t]o prove a violation of the Delaware Consumer Fraud statute, plaintiffs must show that DuPont committed fraud or misrepresentation in connection with the sale of Coumadin; no proof of individual reliance on the fraud or misrepresentation is required." *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 528 n.11 (3d Cir. 2004) ("*Warfarin II*"). The Third Circuit also stated:

> [P]roof of liability does not depend on evidence that DuPont made deceptive communications to individual class members or of class members' reliance on those communications; to the contrary, DuPont's alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability.

*Id.* at 528-29.[11]

---

[11] It is inappropriate for AstraZeneca to base any of its arguments on findings by another court, in the summary judgment context, about the purchasing behavior of different plaintiffs. These "findings" are not alleged in the Complaint and are, in any event, the subject of a pending appeal. The California trial court focused exclusively on the evidence presented by AstraZeneca as to why the four plaintiffs' doctors affirmatively decided to prescribe Nexium while disregarding contrary evidence presented by plaintiffs that either their doctors would *not* have prescribed Nexium or they would *not* have purchased it, had AstraZeneca disclosed that it was no better than Prilosec. This evidence presented by plaintiffs there demonstrates causation under a recent California Supreme Court case. *See In re Tobacco II Cases,* 46 Cal. 4th 298, 326 (2009) (holding that causation can be shown where but for the deception "the plaintiff 'in all reasonable probability' would *not* have engaged in the injury-producing conduct") (emphasis added).

Here, just as in *Warfarin*, "proof of liability does not depend on evidence that [AstraZeneca] made deceptive communications to individual class members or of class members' reliance on those communications; to the contrary, [AstraZeneca's] alleged deceptive conduct arose from a broad-based, national campaign conducted by and directed from corporate headquarters, and individual reliance on the misrepresentations was irrelevant to liability," 391 F.3d at 528-29. The complaint adequately alleges the elements of the claim. *See also S&R Assoc., LP v. Shell Oil Co.*, 725 A.2d 431, 440 (Del. Super. Ct. 1998) ("Count nine of S&R's complaint alleges that Shell committed consumer fraud as defined by 6 Del. C. § 2513. Shell counters by asserting that S&R never relied on Shell's representations in choosing the polybutylene plumbing system. While a fraud action at common law requires the plaintiff to prove reliance, there is no corresponding reliance requirement in 6 Del. C § 2513. The Plaintiff need only prove that the Defendant intentionally concealed material facts with the intent that others would rely upon such concealment. *Id.*; *see also Ayers v. Quillen*, 2004 Del. Super. Lexis 443, at *16 (Del. Sup. Ct. June 30, 2004), the court explained that the DCFA "requires that the person making the statement intend others to rely upon the deception, false promise or misrepresentation. [Citation omitted.] However, the consumer need not prove that she herself relied upon the false statement, only that the defendant made the statement with the intent that someone would rely upon it."); *Sykes v. Jos. C. O'Neal & Sons Auctioneers & Appraisers*, 2009 Del. C.P. Lexis 33, at *15 (Del. Ct. Common Pleas Aug. 11, 2009) ("the consumer claiming consumer fraud need not prove personal reliance upon the false statement, only that the defendant made the statement with the intent that someone would rely upon it").

Despite the *Warfarin* decisions, the bulk of AstraZeneca's brief is devoted to the erroneous argument that Plaintiffs have failed to adequately allege "causation and/or reliance and injury" under the applicable pleading standards. Def. Br. at 16. As to these elements of their claims, the Complaint alleges facts sufficient to show that: (1) AstraZeneca planned and implemented a massive and deceptive marketing campaign designed to convince prescribing physicians and their patients that Nexium was better than Prilosec (¶ 7); (2) AstraZeneca did so with

- 22 -

the intention of causing doctors to switch their patients from Prilosec to Nexium or to proscribe Nexium instead of Prilosec (¶ 47); and (3) as a result, the Plaintiffs bought or paid for Nexium rather than Prilosec, when cheaper Prilosec would have worked just as well. ¶ 175.   The Complaint provides factual support for each of these allegations, often with statements from AstraZeneca's own documents.   Specifically, the Complaint alleges that:

- The intention of AstraZeneca's marketing campaign was to position Nexium as a "next generation," superior product to Prilosec. ¶¶ 7, 47, 90.

- AstraZeneca trained its sales force to deliver this message to prescribing physicians. ¶¶ 91-95.

- The sales force in fact delivered this message, successfully convincing doctors that Nexium was better than Prilosec, when it wasn't. ¶ 112.

- AstraZeneca also directed advertisements directly to consumers, ███████████

- The marketing campaign was successful: ████████████

- While initially, AstraZeneca priced Nexium lower than Prilosec so as to facilitate the switch, AstraZeneca later raised the price of Nexium, which now sells for almost 7 times more per pill than Prilosec. ¶¶ 168, 173.

- AstraZeneca's marketing campaign had the result that it intended; Plaintiffs either purchased, or paid for the purchase of Nexium, when they could have purchased Prilosec or its generic equivalent for much less money. ¶ 175, 191.

These allegations are more than sufficient to "plausibly suggest[]"[12] that AstraZeneca made misrepresentations of fact and intended to deceive consumers (either directly or through their physicians), and that consumers and TPPs who paid for Nexium were injured by that

---

[12] *See Twombly*, 550 U.S. at 557.

deception as a result of paying more than they would have paid for Prilosec. Allegations that AstraZeneca's conduct caused Plaintiffs to pay seven times more for Nexium than they could have paid for an equally effective alternative therapy (Prilosec or its generic equivalent), adequately alleges causation and injury. *See* ¶ 174. *See also Somerville v. Stryker Orthopaedics*, 2009 U.S. Dist. Lexis 80753, at \*6, 10 (N.D. Cal. Sept. 4, 2009) (denying motion to dismiss claim under California's Unfair Competition Law, because "Plaintiff alleges that the price she paid out of pocket for reimbursement of the costs of her surgery was inflated due to Stryker's alleged business practices. Therefore, Plaintiff has sufficiently alleged that she suffered an injury in fact and lost money.").

AstraZeneca also erroneously contends that the Complaint "asks this court to assume that *every* doctor that prescribed Nexium to them or their members violated [his or her] duty and instead prescribed Nexium on the basis of AstraZeneca's Nexium marketing." Def. Br. at 22. *See also id.* at 23 ("Nowhere does the Amended Complaint plead factual content that allows the court to draw the reasonable inference that the individual plaintiffs' doctors failed to exercise their independent medical judgment when they prescribed Nexium to the individual plaintiffs.") (*quoting Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009)). This is incorrect. Plaintiffs do not have to prove – and have no intention of proving – that the prescribing physicians violated their duties in switching their patients from Prilosec to Nexium. To the contrary, the Complaint alleges that prescribing physicians were *misled* by Defendants, and purposefully so, into believing that Nexium was better, and thus worth the higher price. *See* Complaint at ¶ 169 ("physicians and specialists . . . have been mislead by the studies with unfair comparisons, continuing education lectures that are dominated by experts with financial ties to AstraZeneca, advertising and deceptive drug detailing practices of AstraZeneca drug sales representatives"). The Complaint also alleges that the AstraZeneca did this as part of a successful campaign to migrate patients from blockbuster Prilosec to soon-to-be blockbuster Nexium. These facts, viewed in the totality of the facts alleged in the Complaint, are more than adequate "to nudge these claims across the line from conceivable to plausible." *See Twombly*, 550 U.S. at 570.

Finally, instead of addressing *Warfarin* and *Desiano*, AstraZeneca relies on a series of inapposite district court decisions, most arising out of claims, unlike here, involving improper off-label promotion of pharmaceuticals. For example, AstraZeneca relies on *District 1199P Health & Welfare Plan v. Janssen, L.P.*, 2008 U.S. Dist. Lexis 103526, at *4 (D.N.J. Dec. 23, 2008), in which the plaintiffs alleged that the defendants "engag[e] in improper off-label promotion of Risperdal." The court dismissed the claims because "Plaintiffs do not plead a concrete financial loss in the form of overpayment, absent allegations that the drug was inferior on some level and worth less than what they paid for it." *Id.* at *32.[13] In contrast, here Plaintiffs allege that Nexium is worth less than they paid for it because an equally effective alternative was available at a significantly lower price. Further, the *District 1199P* court distinguished the plaintiffs' RICO claim from the claims that the Third Circuit assessed in *Warfarin*:

> Plaintiffs cite *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 531 (3d Cir. 2004), in which the Third Circuit held that "[third-party payors], like individual consumers, suffered direct economic harm when, as a result of [the pharmaceutical companies'] alleged misrepresentations, they paid supracompetitive prices for [the brand drug] instead of purchasing lower-priced generic [drug]," but no RICO claims were alleged. Plaintiffs also direct the Court to the Second Circuit's recognition of the right of health benefit providers to recover from drug companies amounts that were overpaid due to illegal or deceptive marketing practices. *Desiano v. Warner-Lambert Co.*, 326 F.3d 339, 349-50 (2d Cir. 2003). In *In re Warfarin* and *Desiano*, however, the plaintiffs sought relief under federal antitrust laws and consumer fraud claims, which are distinct from the RICO allegations brought here.

*Id.* at *20-21. Thus, this case, which alleges claims under consumer fraud statutes and not under RICO, is like *Warfarin* and *Desiano*, not *District 1199P*.

The other four cases cited by AstraZeneca are also inapposite. AstraZeneca relies on *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, 2009 U.S. Dist. Lexis 58900 (D.N.J. July 10, 2009), stating that the court dismissed the complaint because the plaintiffs "do

---

[13] AstraZeneca misstates the holding in *District 1199P*, erroneously contending that the district court dismissed the claim "for lack of causation because 'the independent and individualized decision-making of physicians prescribing Risperdal breaks any chain of causation....'" *See* Motion at 24 (quoting *District 1199P*). Although the court stated there was a "substantial question as to whether Plaintiffs could ever properly plead proximate causation" because of physicians' decision-making, it explicitly did *not* dismiss the case on that ground. *Id.* at *35.

not plead a single instance in which they, themselves, or any of their prescribing doctors received a misrepresentation of fact from Defendants and relied upon that misrepresentation in deciding to prescribe one of the Subject Drugs to Plaintiffs." *Id.* at *117 (quoted in Motion at 23). Astra-Zeneca fails to reveal that in making that statement, the court was addressing the plaintiffs' claim for common law fraud under New Jersey law, which requires a showing of reasonable reliance. *Id.* at *116. In contrast, the Delaware Consumer Fraud Act does not require proof of reliance, as the Third Circuit made clear in *Warfarin*.

Similarly, the remaining three cases cited by AstraZeneca did not involve a claim under the Delaware Consumer Fraud Act for deceptively marketing a drug as superior when it is not but instead involved claims under other laws for deceptively marketing a drug for off-label purposes, which raises issues far different than those raised by this case. Thus, those cases are like *District 1199P*, not like *Warfarin* or *Desiano*. *See Ironworkers Local Union No. 68 v. AstraZeneca Pharms. LP*, 585 F. Supp. 2d 1339, 1341 (M.D. Fla. 2008) (dismissing RICO claim on proximate causation ground where defendants "'illegally marketed and promoted Seroquel for unapproved or 'off-label' uses'") (quoting complaint); *Pa. Employees Benefit Trust Fund v. AstraZeneca Pharm. LP*, 2009 U.S. Dist. Lexis 76555, at *2 (M.D. Fla. July 18, 2009) (the same judge that dismissed the *Ironworkers* complaint dismissed the plaintiffs claim that the defendants had unlawfully marketed the drug Seroquel "'for unapproved uses in several populations where the efficacy and safety of the drug had not been established'"); *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 2009 U.S. Dist. Lexis 70491 (S.D. Fla. July 30, 2009) (dismissing RICO claim for failure to allege proximate causation).

In short, the Complaint alleges the required elements to prove liability under the Delaware CFA. Plaintiffs need not allege, nor prove that either they or their physicians saw a fraudulent Nexium ad or reasonably relied on its truth in making their purchases. Defendants' motion should be denied.

**2.    Like the other Plaintiffs, the Associational Plaintiffs have adequately alleged standing, causation and injury under Delaware law.**

AstraZeneca incorrectly contends that the Associational Plaintiffs must allege "facts respecting causation and/or reliance and injury that would establish [their] members' standing." *See* Def. Brief at 44. As explained above, Plaintiffs are not required to allege reliance under the DCFA, and they have adequately alleged causation and injury under the Act. Therefore, the Associational Plaintiffs need not allege reliance by their members, and the Complaint adequately alleges causation and injury for members of the associations, just as it does for other Plaintiffs. *See* ¶¶ 23-25 (alleging that members of the Associational Plaintiffs have used and paid for Nexium and have been injured by the unlawful conduct alleged in the Complaint). *See Common Cause of Pa. v. Pennsylvania*, 558 F.3d 249, 261-62 (3d Cir. 2009) ("Because the standing of the two Plaintiff associations thus rests on the standing of their members, and because Plaintiffs allege that the associations' members suffered the same injury as the individual plaintiffs, save perhaps Representative Vitali, we will address the associations' standing together with that of the individual plaintiffs.").

AstraZeneca's argument is not supported by its citation to *Goode v. City of Philadelphia*, 539 F.3d 311 (3d Cir. 2008). In *Goode*, the plaintiffs alleged that the City of Philadelphia acted unlawfully when it entered into a settlement agreement with billboard operators. In pertinent part, the Third Circuit held that community organizations did not have associational standing. The Court held that those organizations failed to allege that their members suffered any injury:

> All that we can discern from the complaint is that the organizations have members that live in or own property in the City -- we know nothing about how the billboards covered by the Agreement or the billboards' alleged noncompliance with the applicable zoning laws injures those members. Indeed, the complaint merely states that the members either live in or own property that "would potentially be affected by the outcome of this action." *Id.* That nonspecific statement is nothing more than a generalized grievance insufficient under *Russell* to establish standing.

*Id.* at 325. In contrast, the Associational Plaintiffs in this case allege that members purchased Nexium and, thus, that they suffered the same injuries that the other Plaintiffs suffered. *See* ¶¶

23-25. *See Revell v. Port Auth. of N.Y. & N.J.*, 321 Fed. Appx. 113, 116 (3d Cir. 2009) (reversing dismissal of association for lack of standing, where association alleged "injury in the form of its non-resident members currently refraining from transporting a firearm and ammunition through New Jersey pursuant to 18 U.S.C. § 926A due to a fear of arrest and prosecution by the Port Authority pursuant to Port Authority policy").[14]

The cases cited by AstraZeneca are inapposite. Similarly, AstraZeneca's argument is not supported by its citation to *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007). In that case, the court concluded that an association lacked standing, because its "members have not been injured *just* because they purchased Lipitor; they have been injured only if they purchased Lipitor specifically for its coronary benefits. Therefore the HCFA cannot simply prove its members' damages through their prescription records -- rather, to be entitled to damages, each member will need to testify that he or she purchased Lipitor for its alleged heart benefits, and not for its cholesterol reducing benefits." *Id*. at 1339-40. In contrast, Plaintiffs contend in this action that *all* purchasers of Nexium suffered compensable injury to the extent they paid more than they would have paid for Prilosec in its prescription or generic form.

Finally, AstraZeneca cites *In re Bextra & Celebrex Mktg. Sales Prac. & Prod. Liab. Litig.*, 495 F. Supp. 2d 1027 (N.D. Cal. 2007), for the proposition that associations lack standing if their members must make individualized showings of injury. But here, the Associational Plaintiffs will not need to make such a showing for its members under the DCFA. Instead, the members' losses may be demonstrated through their prescription records. Thus, the Associational Plaintiffs have standing.

### 3. In the alternative, Plaintiffs state valid claims under the consumer protection laws of other States

As demonstrated above, Delaware law is appropriately applied for the claims of each of the named Plaintiffs and the members of the class in this case. However, even assuming that the

---

[14] Plaintiffs may cite *Revell* under Fed. R. App. P. 32.1.

laws of the States in which Plaintiffs reside govern their claims, the Complaint state valid causes of action under those laws.

> **a.** **Plaintiffs state a valid claim under the Michigan Consumer Protection Act**

Plaintiff Linda A. Watters suing in her capacity as Rehabilitator of The Wellness Plan ("Wellness Plan") and Liquidator of Michigan Health Maintenance Organization Plans, Inc., formerly known as OmniCare Health Plan, Inc. ("OmniCare") alleges a valid claim under the Michigan Consumer Protection Act ("MCPA"). As discussed below, the claim under the MCPA is validly stated.

> **(1)** **Third party payors may sue under the MCPA**

Ms. Watters may bring a claim on behalf of OmniCare and Wellness Plan. In *In re Bextra and Celebrex Mktg. Sales Prac. and Prod. Liab. Litig.*, the court held that third party payors could sue under the MCPA for losses suffered as a result of the deceptive marketing of the prescription drugs Celebrex and Bextra. The court stated:

> According to the allegations of the operative complaints, defendants provided Celebrex and Bextra to the patients for personal purposes. The plaintiff TPPs allege they were damaged by false advertising of those goods because they paid more than they would have otherwise paid. Thus, the TPPs' claims fit squarely within the statutory language: they allege damages arising from defendants "unfair, unconscionable or deceptive acts" in the course of providing goods for personal purposes.... [T]he Michigan statute does not require a transaction between the plaintiff and the defendant that involves the sale of goods primarily for personal, family or household purposes; rather, it requires only that the plaintiff's damages arise from defendant's provision of such goods. In other words, the statute does not require the plaintiff to be the consumer who purchased the goods primarily for personal purposes.

495 F. Supp. 2d at 1033. For the same reasons, Ms. Watters may bring a claim on behalf of third party payors under the MCPA.

> **(2)** **Plaintiffs sufficiently allege a violation of the MCPA**

Ms. Watters' claim on behalf of the third party payors under the MCPA does not require proof of reliance. In *Dix v. American Bankers Life Assurance Co.*, 429 Mich. 410 (1987), the plaintiffs were school employees who purchased annuity policies from the defendant insurer.

They alleged a violation of the MCPA, among other wrongs, and sought to represent a class of

school employees who had purchased such policies. The trial court granted the defendants'

motion for summary judgment and denied the request for class certification. An intermediate

appellate court affirmed those rulings, but the Michigan Supreme Court reversed the dismissal of

the MCPA cause of action and ordered the trial court to try that claim as a class action. The

Court first stated:

> The Consumer Protection Act was enacted to provide an enlarged remedy for
> consumers who are mulcted by deceptive business practices, and it specifically
> provides for the maintenance of class actions. This remedial provision of the
> Consumer Protection Act should be construed liberally to broaden the consumers'
> remedy, especially in situations involving consumer frauds affecting a large
> number of persons.

> We hold that members of a class proceeding under the Consumer Protection Act
> need not individually prove reliance on the alleged misrepresentations. It is
> sufficient if the class can establish that a reasonable person would have relied on
> the representations. Further, a defendant's intent to deceive through a pattern of
> misrepresentations can be shown on a representative basis under the Consumer
> Protection Act.

*Id.* at 417-18 (footnotes omitted). The Complaint states a valid claim under the MCPA

under these standards. As was the case with Plaintiffs' claim under the Delaware

Consumer Fraud Act, Plaintiffs adequately allege that a reasonable person would have

relied on AstraZeneca's misrepresentations and omissions, and that AstraZeneca intended

to deceive Plaintiffs and all members of the putative class.

### b. Plaintiffs state a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

#### (1) Third party payors have standing under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

Defendants argue that the Pennsylvania TPP plaintiffs lack standing to bring a claim

under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")

because TPPs are not "consumers" within the meaning of the statute, and because the purchases

are not "primarily for personal, family or household purposes." Def. Br. at 29-30. Both of these arguments fail.

First, the UTPCPL does not confer standing only on "consumers." To the contrary, the statute specifically authorizes a private action by "any *person* who purchases or leases goods or services primarily for personal, family or household purposes" (emphasis added). *See* 73 P.S. § 201-9.2(a). A "person," in turn, is specifically defined in the statute as "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entities." 73 P.S. § 201-2(2). Under a plain reading of the act, the TPP plaintiffs are "persons," legal entities organized under the laws of Pennsylvania. There is no support, in either the language of the statute or the cases interpreting it, for Defendants' assertion that standing under the Act is limited to either individuals or consumers.[15]

Second, the purchases made here by the TPP's were for "personal, family or household purposes." The key factor in this analysis is not *who* makes the purchase, but rather the *purpose* of the purchase. *See Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators*, 574 A.2d 641, 648 (Pa. Super. 1990) (holding that condominium association's purchase of a roof membrane for a condominium building was for residential purposes even though purchased by the association because it would be used primarily for residential use by unit owners). Since these purchase we made by the TPPs for the "personal use" of their members, they have standing to bring a private action under the UTPCPL.

Defendants' argument that an insurer, which pays for or purchases drugs for its member-insureds, lacks standing under the UTPCPL has been rejected by other courts. In *Commonwealth v. TAP Pharm. Prods.*, 885 A.2d 1127, 1131 (Pa. Commw. 2005), the Commonwealth sued a drug manufacturer, alleging, among other things, violations of the UTPCPL. The Commonwealth brought the suit both in its sovereign capacity and in its proprietary capacity as

---

[15] Additionally, courts interpreting the UTPCPL require that language of the act be construed broadly to affect its underlying remedial purposes. *Shiro v. Prudential Relocation*, 2007 WL 675426, *5 (M.D. Pa. 2007).

the purchaser and end-payor for certain drugs on behalf of current and former Commonwealth employees, as well as persons covered by certain state-related insurance programs. *Id.* at 1132. The defendants, relying on *Balderston v. Medtronic Sofamor Danek*, 285 F.3d 238 (3d Cir. 2002), the same case relied on by the Defendants here,[16] argued that the Commonwealth was acting as an employer or administrator when making the reimbursements, so the purchases were not for "personal, family or household purposes." *Id.* at 1142. The Court rejected this argument.

In evaluating whether the purchases were for personal, family or household purposes, the court, relying on *Valley Forge Towers*, 574 A.2d 641, specifically rejected the argument that the focus is on the type of product involved. Rather, the court found "the UTPCPL restricts suits not on the basis of the type of product, but rather the purpose of the purchase." *Id.* (*quoting Valley Forge Towers*, 574 A.2d 641.) Because the "ultimate purpose of buying defendants' drugs is the personal benefit of the end user," the drugs purchased by the Commonwealth were used for personal, family or household purposes." *Id.* at 1142-43.

Like the Commonwealth in *TAP Pharm.*, the drugs purchased by the TPPs were for the "personal benefit of the end user." Thus Plaintiff PEBTF has standing under the act.

### (2)   Plaintiffs have adequately alleged the elements of a violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law

Defendants argue that in order to state a claim under the UTPCPL, plaintiffs must allege and prove justifiable reliance on defendants' fraud. *See* Def. Br. at 30 n.15 (*citing Hunt v. United States Tobacco Co.*, 538 F.3d 217, 221(3d Cir. 2008). Following an amendment to the statute in 1996 which added a "catch-all" provision prohibiting "deceptive" conduct, the Pennsylvania State Courts have divided on the question of whether plaintiffs are still required to

---

[16] *Balderston* is easily distinguishable. There, the plaintiff was a surgeon who placed screws in patients' spines and filed suit against the screw manufacturers for concealment and misrepresentation of the FDA approval of the screws. 285 F.3d at 239. The UTPCPL claim was dismissed because, unlike in the present case, the plaintiff did not purchase the screws, he simply prescribed them and the patient would purchase them. *Id.* at 241-42. As the district court found and Third Circuit affirmed, the plaintiff was not attempting to bring suit in a representative capacity on behalf of his patients but on his own behalf for his own losses. Because he never made the purchases, however, there were no losses. *Id.* at 242.

prove all of the elements of common law fraud. *See Alberton v. Commonwealth Land Title Ins. Co.,* 247 F.R.D. 469, 481 n. 10 (E.D. Pa. 2008) (Robreno J.) (recognizing split among Pennsylvania Courts and concluding "that the addition of 'deceptive' conduct to the UTPCPL signals the legislature's intent that plaintiffs proceeding under the UTPCPL no longer be required to establish the elements of common law fraud."). Even following the Third Circuit's decision in *Hunt v. American Tobacco Co.,* 538 F.3d 217 (3d Cir. 1998), on which Defendants heavily rely,[17] district courts in the Eastern District of Pennsylvania have concluded that where plaintiffs allege *deceptive* conduct under the UTPCPL, they do not need to allege all of the elements of common law fraud. *Sheldon v. Home Loan Services Inc.,* 2009 WL 2394182, at *15 (E.D. Pa. August 4, 2009) ("for plaintiffs' claim under the UTPCP's catchall provision, to the extent plaintiffs allege deceptive conduct, plaintiffs do not need to allege the elements of common law fraud") (Yohn. J.). *See also Molly v. Five Town Chrysler, Inc.,* 2009 WL 440292 (E.D. Pa. Feb 18 2009) ("Clearly there is uncertainty within the Circuit as to what type of conduct falls within the 'catchall provision' of the UTPCPL.") In short, in the wake of the 1996 amendments to the statute, and lacking a determination on this point by the Pennsylvania Supreme Court, this Court has held that "proof of justifiable reliance is no longer required to succeed on a claim under the UTPCPL." *Alberton,* 247 F.R.D. at 481.

As discussed above, Plaintiffs alleged that Defendant intentionally set out to deceive patients, physicians and the public at large that Nexium was better than Prilosec so that doctors would prescribe and patients and insurers would pay for Nexium when cheaper Prilosec would work just as well. The Complaint alleges that Plaintiffs were injured by the deception, having purchased Nexium when they would not otherwise have. These "alleged facts are more than sufficient to give rise to a reasonable expectation that discovery will reveal evidence of . . . . a

---

[17] In *Hunt,* the Third Circuit, while noting disagreement among the intermediate appellate courts in Pennsylvania, concluded that the Pennsylvania Supreme Court would find that all of the elements of common law fraud needed to be proven, even where plaintiffs allege deceptive conduct, rather than fraud under the UTPCPL.

viable UTPCPL claim." *See Molly v. Five Town Chrysler, Inc.*, 2009 WL 440292 (E.D. Pa. Feb. 18, 2009).

### c. The Complaint states a valid claim for violation of the Wisconsin Deceptive Trade Practices Act

Defendants are also wrong when they argue that reliance is an element of a claim under the Wisconsin Deceptive Trade Practices Act ("DTPA"). Def. Br. at 26. To the contrary, however, This issue was squarely addressed by the Supreme Court of Wisconsin in *K&S Tool & Dye Corp. v. Perfection Mach. Sales Inc.*, 301 Wis.2d 109, 121-22 (2007). There, the Court held that in order to prevail on a claim under the Wisconsin DPTA, a plaintiff must prove three elements: "First, that with the intent to induce an obligation, the defendant made a representation to 'the public.' . . . Second, that the representation was untrue, deceptive, or misleading. . . . Third, that the misrepresentation caused plaintiff a pecuniary loss." *Id.* (citations omitted). The Supreme Court expressly rejected defendant's argument that there was insufficient evidence of a causal connection between defendants' deceptive representation and plaintiff's loss stating:

> Because the purpose of the DTPA includes protecting Wisconsin residents from untrue, deceptive, or misleading representation made to induce action, *see* § 100.181); *Kailin*, 252 Wis.2d 676, P44, 643 N.W.2d 132 (citing *Bonn*, 123 Wis.2d at 173 n. 4, 366 N.W.2d 503), proving causation in the context of § 1001.8(1) requires a showing of material inducement. *See* Wis JI-Civil 2418.
>
> *A plaintiff does not have the burden of proving reasonable reliance.* Unlike common law causes of action for misrepresentations, reasonable reliance is not the standard for a DTPA claim because the legislature created a distinct cause of action.

*Id.* at 129 (emphasis added).

Citing an Eastern District of Wisconsin case decided more than 8 years prior to *K-S Tool & Die*, AstraZeneca argues that reliance is an element of Plaintiffs' claim. Def. Br. at 26, (*citing Valente v. Sofamar*, S.N.C. 48 F. Supp. 2d 862 (E.D. Wis. 1999)). To the extent that *Valente* held that in order to establish causation under the act, reliance on the deceptive conduct must be proven, the subsequent decision by the Supreme Court of Wisconsin shows that that holding was in error. *Valente*, however, was not dismissed at the pleadings stage. Rather, after excluding

plaintiffs' expert evidence as scientifically unsound under *Daubert*, the court entered summary judgment in favor of defendants on all counts because plaintiffs could submit *no evidence at all* on the issue of causation. *Id.* at 877.

### d. The complaint states a valid claim for violation of New York's General Business Law

Section 349 of New York's General Business Law makes unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service" and was intended to be broadly applicable, extending far beyond the reach of common law fraud, to apply to virtually "all economic activity," whether or not the allegedly deceptive activity is covered by other laws. *New York v. Feldman,* 210 F. Supp. 2d 294, 300-01 (S.D.N.Y. 2002); *see also Small v. Lorillard Tobacco Co., Inc.,* 94 N.Y.2d 43, 698 N.Y.S. 2d 615, 720 N.E.2d 892 (1999). The statute is to be liberally construed in order to carry out intended reforms and to promote justice. *Blue Cross & Blue Shield of N.J., Inc., v. Phillip Morris, Inc.*, 178 F. Supp. 2d 198, 231 (E.D.N.Y. 2001), *aff'd in relevant part*, 344 F.3d 211 (2d Cir. 2003). In addition, the New York consumer protection statute eliminates the reliance and scienter requirements necessary to bring an action for common law fraud, and permits recovery for attorneys' fees, costs, and punitive damages. *Blue Cross*, 178 F. Supp. 2d at 231.

To state a claim for deceptive practices under New York's General Business Law, a plaintiff "must prove three elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." *Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29, 731 N.E.2d 608, 709 N.Y.S.2d 892, 895 (2000). Additionally, there is no requirement of privity to maintain an action under N.Y. Gen. Bus. Law § 349 and victims of indirect injuries are permitted to sue under statute. *Blue Cross, Inc.,* 178 F. Supp. 2d at 232.

As to the first requisite element, the claimant must demonstrate that the complained of acts are "consumer-oriented," having an impact on consumers at large. *Shapiro v. Berkshire Life Ins. Co.,* 212 F.3d 121, 126 (2d Cir. 2000). The threshold requirement of consumer-oriented

conduct is met by proof that the acts or practices have a broader impact on the consumer at large in that they are directed to consumers or potentially affect similarly situated consumers. *See Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26-27, 647 N.E.2d 741, 623 N.Y.S.2d 529 (1995) ("plaintiffs have satisfied the threshold test in that the acts they complain of are consumer-oriented in the sense that they potentially affect similarly situated consumers"). Additionally, a violation requires defendant to mislead the claimant in some material way. *Conboy v. AT & T Corp.*, 241 F.3d 242, 258 (2d Cir. 2001). An act is "deceptive" under the statute if it is likely to mislead a reasonable consumer. *Marcus v. AT&T Corp.*, 138 F.3d 46, 64 (2d Cir. 1998). The reasonable consumer standard is an objective one and the test to determine if a representation or an omission is a "deceptive act" within the meaning of the statute, lies in whether such act is likely to mislead a reasonable consumer acting reasonably under the circumstances. *Champion Home Builders Co. v. ADT Sec. Servs., Inc.*, 179 F. Supp. 2d 16, 27 (N.D.N.Y. 2001).

Plaintiffs have properly alleged in ¶¶ 155-164, and 166-172 of the Complaint (¶ 166(ee) with regards to New York state law) that Defendants' conduct was consumer-oriented, as the advertisements and deceptive practices in question were targeted at consumers broadly, causing consumer injury and harm to the public interest as customers had to pay inflated prices for what they thought was a superior product. Plaintiffs also set forth in their Complaint that Defendants' representations were misleading in a material way. Thus, Defendants' "deceptive acts" misled reasonable consumers acting under reasonable circumstances, as these consumers simply wanted what they thought was the best medication on the market. As alleged in ¶¶ 161-164 of the Complaint, Defendants' deceptive conduct caused Plaintiffs to suffer injury.

### e. The complaint states a valid claim for violation of Nevada law

Under the Nevada Deceptive Trade Practices Act ("NDTPA"), "[a]n action may be brought by any person who is a victim of consumer fraud." Nev. Rev. Stat. § 41.600(1). If the claimant prevails, the Court shall award that party "[a]ny damages that he has sustained," as well as costs and attorney's fees. *Id.*, § 41.600(3). Consumer fraud includes deceptive trade practices

as defined in Nevada Revised Statutes §§ 598.915 to 598.925. *Id.*, § 41.600(2)(e). Consumer fraud will be found if a party knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith. *Id.*, § 598.915(4). The Nevada Supreme Court has not specified the elements of an NDTPA private cause of action, including whether causation and reliance are required. But in *Picus v. Wal-Mart Stores, Inc.,* 256 F.R.D. 651, 657 (D. Nev. 2009), the court predicted that the Nevada Supreme Court would require that a victim of consumer fraud to prove that (1) an act of consumer fraud by the defendant (2) caused (3) damage to the plaintiff.

In the case at hand, Plaintiffs have properly alleged in ¶¶ 155-164 and 166-172 of the Complaint (specifically, ¶ 166(aa) with regards to Nevada state law) that they were harmed as a result of the Defendants' marketing of Nexium as a superior alternative to Prilosec, when in fact, it was not at all superior. This marketing created an artificial market for Nexium that would not have existed but for these fraudulent marketing efforts. Thus, these "deceptive acts" caused consumers – who obviously wanted what they thought was the leading medication on the market – to purchase Nexium at an inflated price that was not warranted. These purchases therefore caused economic harm to the Plaintiffs, as but for these deceptive advertisements, consumers would have purchased Prilosec or other medications at a reduced cost.

## C.    Plaintiffs' Unjust Enrichment Claim Should Not Be Dismissed

Under Delaware law, the elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification and (5) the absence of a remedy provided by law. *Cantor Fitzgerald, L.P. v. Cantor,* 724 A.2d 571, 585 (Del. Ch. 1998); *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch. 1999). The Complaint alleges that the cumulative effect of the Defendants' conduct directed at physicians and consumers was to artificially create demand for high-priced Nexium, when cheaper Prilosec would work just as well. Therefore, the Defendants were unjustly enriched by their deceptive acts, satisfying the first element of unjust enrichment. Likewise, the

Plaintiffs were impoverished by the same deceptive acts, satisfying the second element. There was also a relation between the enrichment and impoverishment in question, because Plaintiffs alleged that they paid higher prices as a result of the wrongdoing. There is also no justification for the higher price, as the FDA found that Nexium is not superior to Prilosec for any indication. Lastly, Plaintiffs have no other adequate remedy provided by law.

Additionally, the law of unjust enrichment is virtually identical in all fifty states and the District of Columbia. *Singer v. AT&T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998) (certifying nationwide unjust enrichment class because "prevailing case law holds that … unjust enrichment [is a] universally recognized cause of action that [is] materially the same throughout the United States"); *Hill v. Galaxy Telecomm.*, 184 F.R.D. 82, 86 (N.D. Miss. 1999) (certifying 15-state unjust enrichment class); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 669-671 (E.D. Mich. 1999) (describing elements of several states' unjust enrichment causes of action). Thus, choice of law issues are inconsequential with regards to unjust enrichment.

Moreover, courts in at least 37 other states and the District of Columbia, including those in Delaware, have followed or cited with approval the Restatement (First) of Restitution's definition of unjust enrichment. *Creditors' Committee of Essex Builders, Inc. v. Farmers Bank*, 251 A.2d 546, 549 (Del. 1969). Section 1 of the Restatement provides that "[a] person who has been unjustly enriched at the expense of another is required to make restitution to the other." Under Comment (a) to Section 1, the Restatement further explains: "[a] person is enriched if he has received a benefit. A person is unjustly enriched if the retention of the benefit would be unjust." Comment (b) further provides that "[a] person confers a benefit upon another if he gives to the other possession of or some interest in money, land, chattels, or chooses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage."

**D.      The Complaint Should Not Be Dismissed, Let Alone With Prejudice**

If this Court were to conclude that Plaintiffs do not adequately allege reliance or causa-tion on behalf of one or more Plaintiffs, the Complaint should be dismissed without prejudice,

- 38 -

because AstraZeneca admits that its Motion presents an "issue that neither Judge Robinson nor the Third Circuit reached in the context of AstraZeneca's prior motions to dismiss, namely the Amended Complaint's failure to adequately plead the essential elements of causation and/or reliance and injury." *See* Def. Br. at 9. Because no court has ever dismissed any complaint in this action for failure to allege causation or reliance, Plaintiffs should be given leave to amend the Complaint if any portion of it is dismissed on those grounds. *See Toll Bros., Inc. v. Twp. of Readington*, 555 F.3d 131, 144 n.10 (3d Cir. 2009) (citation omitted) ("Under Federal Rule of Civil Procedure 15(a), leave to amend should be 'freely given when justice so requires,' and we have recognized that 'a district court must permit a curative amendment unless such an amendment would be inequitable or futile.'"); *Alston v. Parker*, 363 F.3d 229, 236 (3d Cir. 2004) ("Dismissal without leave to amend is justified only on the grounds of bad faith, undue delay, prejudice, or futility.").

There is no merit to AstraZeneca's contention that Plaintiffs should not be given even *one* opportunity to amend the Complaint with respect to causation because they have received discovery in other cases and because they have the "guidance provided by the Supreme Court in *Twombly* and *Iqbal*." *See* Def. Br. at 39. As explained in detail above, Plaintiffs contend that they have adequately alleged claims against AstraZeneca under *Twombly* and *Iqbal*. If the Court disagrees, then Plaintiffs should be given the opportunity to correct any deficiencies this Court might identify. Moreover, the fact that Plaintiffs' attorneys have received discovery in other cases does not have the slightest bearing on whether *these* Plaintiffs adequately alleged reliance or causation, to the extent they are even required to allege those elements.

Indeed, the cases cited by AstraZeneca undermine its argument that the Complaint must be dismissed with prejudice. In *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321 (7th Cir. 1998), the district court ruled three times that the plaintiffs failed to state a RICO claim with the particularity required by Fed. R. Civ. P. 9(b). The Seventh Circuit held that the district court did not err in finally dismissing the action with prejudice, because "the plaintiff has had three chances over the course of three years to state a claim and the district judge was not required to

give her another chance." *Id.* at 1322-23. In contrast to *Emery*, no court has ever ruled that Plaintiffs have failed to allege causation. Thus, the Complaint should not be dismissed with prejudice.

The other two cases cited by AstraZeneca are similarly inapposite. In *In re Alpharma Sec. Litig.*, 372 F.3d 137, 154 (3d Cir. 2004), the Third Circuit explained that the district court properly denied a motion for leave to amend their complaint, because "plaintiffs (1) failed to satisfy the stringent pleading requirements of the PSLRA, and thus failed to state a claim under federal securities law, and (2) failed to propose an amendment that would satisfy these requirements." Thus, the plaintiffs in *Alpharma* had an opportunity to present an amended complaint but failed to do so, despite being given "'significant extensions of time.'" *Id.* at 153-54. Here, in contrast, Plaintiffs have never had any reason to amend the Complaint as to causation, because no court has ruled that they have failed to allege causation. And in *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186 n.3 (9th Cir. 1987), the Court stated that a "court's discretion over amendments is especially broad 'where the court has already given a plaintiff one or more opportunities to amend his complaint....'" (Citation omitted). In this litigation against AstraZeneca, no court has ever addressed, let alone agreed with, AstraZeneca's causation argument. As a result, Plaintiffs have never had any reason to amend their complaint with respect to causation.

Finally, AstraZeneca misses the mark when it contends that Plaintiffs should not be given leave to amend because the facts "are all uniquely within the knowledge of plaintiffs or their doctors." *See* Motion at 39. As discussed above, Plaintiffs contend that they are not required to allege or prove reliance, and that they have sufficiently alleged all other elements of their causes of action. If the Court disagrees with Plaintiffs' position in any respect, then Plaintiffs should be given an opportunity to amend the Complaint.

## IV.   CONCLUSION

Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied.

DATED: October 16, 2009     CHIMICLES & TIKELLIS LLP

Pamela S. Tikellis (#2172)
A. Zachary Naylor (#4439)
222 Delaware Avenue
P.O. Box 1035
Wilmington, DE  19899
Telephone:  (302) 656-2500
Facsimile:  (302) 656-9053

*Interim Liaison Counsel*

Steve W. Berman
Craig R. Spiegel
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA  98101
Telephone:  (206) 623-7292

*Interim Lead Co-Counsel*

Barbara J. Hart
Gerald Lawrence
LOWEY DANNENBERG COHEN & HART, P.C.
One North Broadway, 5th Floor
White Plains, NY 10601-2310

*Interim Lead Co-Counsel*

Jeffrey L. Kodroff
Theodore M. Lieverman
SPECTOR, ROSEMAN, KODROFF &
   WILLIS, P.C.
1818 Market Street, Suite 2500
Philadelphia, PA  19103
Telephone: (215) 496-0300

*Interim Lead Co-Counsel*

Ellen Meriwether
Bryan L. Clobes
CAFFERTY FAUCHER LLP
1717 Arch Street, Suite 3610
Philadelphia, PA  19103
Telephone:  (215) 864-2800

*Interim Lead Co-Counsel*

L. Kendall Satterfield
Richard M. Volin
FINKELSTEIN THOMPSON LLP
1050 30th Street, N.W.
Washington, D.C.  20007
Telephone:  (202) 337-8000

Robert S. Schachter
Joseph Lipofsky
Paul Kleidman
ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue, 32nd Floor
New York, NY  10010
Telephone:  (212) 223-3900

Richard Kirschner
KIRSCHNER & GARTRELL
4910 Massachusetts Ave., NW, Suite 215
Washington, D.C.  20016
Telephone:  (202) 775-0087

Brian Gudmundson
ZIMMERMAN REED, PLLP
651 Nicollet Mall, Suite 501
Minneapolis, MN  55402
Telephone:  (612) 341-0400

Jason J. Thompson
CHARFOOS & CHRISTENSEN, P.C.
5510 Woodward Avenue
Detroit, MI  48202
Telephone:  (313) 875-8080

Jeffrey S. Goddess (DE Bar No. 630)
ROSENTHAL MONHAIT &
  GODDESS, P.A.
919 Market Street, Suite 1401
Wilmington, DE  19801
Telephone:  (302) 656-4433

*Attorneys for Plaintiffs*