IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|   |   |   |
|---|---|---|
| PENNSYLVANIA EMPLOYEE, | : | CIVIL ACTION |
| BENEFIT TRUST FUND, | : | NO. 05-075-ER |
| et al., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| ZENECA, INC., et al., | : | |
| | : | |
| Defendants. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          May 6, 2010

TABLE OF CONTENTS

I.   INTRODUCTION...........................................2
II.  BACKGROUND.............................................2
     A.   Factual Background................................2
          1.   Parties......................................2
          2.   Facts........................................4
     B.   Procedural History................................7
III. DISCUSSION.............................................8
     A.   Choice of Law.....................................9
          1.   Delaware Choice of Law Process...............9
          2.   Application of Delaware's Choice of Law Rules...18
          (a) Consumer Protection Claims...................19
               (i) Delaware verus Pennsylvania............19
               (ii) Delaware versus New York..............25
               (iii) Delaware versus Michigan.............31
          (b)  Unjust Enrichment..........................34
          (c) Negligent Misrepresentation.................36
     B.   Failure to State a Claim under Rule 12(b)(6)........36
          1.   Motion to Dismiss Standard..................37
          2. Consumer Protection Claims...................41
               (a)  Plaintiffs PEBTF, AFSCME, Scofield....41
               (b)  Plaintiff Macken......................43
               (c)  Plaintiff Watters/Wellness Plan.......47
          3. Unjust Enrichment............................53
          4.   Negligent Misrepresentation................55
     C.   Dismissal with Prejudice/Leave to Amend..........57
IV.  CONCLUSION............................................59

## I.   INTRODUCTION

Before the Court is a motion to dismiss with prejudice filed by Defendants AstraZeneca Pharmaceuticals LP and Zeneca, Inc. (collectively, "Defendants").  This matter involves a putative class action asserting that Defendants engaged in deceptive business practices by orchestrating a misleading marketing campaign with respect to the prescription drug Nexium.

Based on the factual deficiencies in Plaintiffs' amended complaint concerning the relationship between Defendants' alleged misrepresentations and Plaintiffs' purchase of Nexium, the Court will grant Defendants' motion to dismiss.  The Court further concludes, however, that dismissal with prejudice is not warranted under the circumstances and will allow Plaintiffs leave to amend to cure these deficiencies.

## II.   BACKGROUND

### A.   Factual Background

#### 1.   Parties

As this case involves several different plaintiffs from various jurisdictions, thereby implicating choice of law issues, a brief recitation of the relevant parties' backgrounds is helpful to the Court's analysis.

• Pennsylvania Employee Benefit Trust Fund ("PEBTF") is a labor management trust which provides healthcare benefits,

including prescription drug coverage, to approximately 70,000 participants and beneficiaries.  (Am. Compl. ¶ 16.)  Its members are located in Pennsylvania and Delaware, among several other states.  (<u>Id.</u>)  PEBTF is organized under the laws of the Commonwealth of Pennsylvania.  (<u>Id.</u>)

&bull; AFSCME District Council 47 Health & Welfare Fund ("AFSCME") is a welfare benefit plan organized under Pennsylvania law.  (<u>Id.</u> ¶ 18.)  Its members include roughly 4,000 active city employees and 700 retirees, and it serves to pay a portion of the purchase price for prescription drugs, including Nexium, for its participants.  (<u>Id.</u>)

&bull; Victoria Scofield ("Scofield") is a resident of Pennsylvania who made co-payments for Nexium during the applicable class period.  (<u>Id.</u> ¶ 20.)

&bull; Joseph Macken ("Macken") is an individual residing in New York who purchased Nexium for personal consumption during the applicable class period.  (<u>Id.</u> ¶ 19.)

&bull; Linda A. Watters ("Watters") is the Commissioner of Financial and Insurance Services for the State of Michigan and serves as Rehabilitator of The Wellness Plan, a third party payor (the "Wellness Plan").  (<u>Id.</u> ¶ 17.)[1]  Watters' role is to collect

---

[1]  Watters also served as the Liquidator of Michigan Health Maintenance Organization Plans, Inc., formerly known as Omnicare Health Plan, Inc. ("Omnicare"), which was an original plaintiff in this action.  (<u>Id.</u>)  On April 19, 2010, a voluntary notice of dismissal was filed with respect to Watters in her

and liquidate the assets and liabilities of the Wellness Plan. (Id.)[2]

• Defendants Zeneca, Inc. and AstraZeneca Pharmaceuticals LP are organized under the laws of the state of Delaware. (Id. ¶¶ 26, 27.)  Defendants maintain research and manufacturing facilities throughout the United States.  (Id. ¶ 29.)

2. Facts

Defendants produced and sold the drug Prilosec, which is known as a proton pump inhibitor ("PPI") used to treat gastroesophegal reflux disease ("GERD") and erosive esophagitis ("EE").  (Id. ¶¶ 32-35.)  These conditions are commonly associated with acid reflux disease and heartburn.  (Id.) Defendants engaged in substantial marketing of Prilosec,

_____

capacity as Liquidator of Omnicare.

[2]  The following additional parties were originally Plaintiffs to this action: (1) Wisconsin Citizen Action, a nonprofit corporation located in Wisconsin; (2) United Senior Action of Indiana, a nonprofit organization located in Indiana whose members purchased Nexium; (3) North Carolina Fair Share, a nonprofit corporation located in North Carolina whose members purchased Nexium; (4) Janet McGorty, a resident of Nevada who purchased Nexium for personal use; and (5) Richard Tikkuri, a Wisconsin resident who purchased Nexium for personal use.  (Id. ¶¶ 17, 21-25.)  On April 5, 2010, a voluntary notice of dismissal was filed pursuant to Fed. R. Civ. P. 41(a)(1)(A)(I) with respect to Wisconsin Citizen Action, United Senior Action of Indiana, and North Carolina Fair Share.  Similarly, notices of dismissal were filed with respect to Janet McGorty and Richard Tikkuri on April 27, 2010, and April 29, 2010, respectively.  Therefore, the claims of these Plaintiffs are not addressed in this Memorandum.

resulting in it being known colloquially as the "purple pill" and generating sales of approximately $6 billion in 2000.  (Id. ¶¶ 40-44.)  The patent for Prilosec was set to expire in 2001, at which point it could be sold in its generic form (known as omeprazole).  (Id. ¶ 40.)[3]  According to Plaintiffs, in response to this expiring patent for Prilosec, Defendants developed Nexium for the purpose of converting its market share from Prilosec to Nexium.  (Id. ¶¶ 45-47.)

On February 14, 2001, Defendants obtained approval from the Food and Drug Administration ("FDA") for final labeling of Nexium for treatment of EE and GERD.  (Id. ¶ 11.)  Defendants engaged in extensive studies comparing Prilosec and Nexium in the period leading up to its FDA approval.  One published clinical study used to obtain FDA approval of Nexium compared both 20mg and 40mg doses of Nexium to the approved 20 mg dose of Prilosec. (Id. ¶¶ 71-76.)  The data from this study showed that 40mg of Nexium had a statistically significant healing rate over 20mg of omeprazole (i.e., Prilosec).  (Id.)  The FDA later determined that Nexium should be approved at recommended dosages of 20mg or 40mg once daily, for four to eight weeks, for the healing of EE, and at 20mg for healing of both EE and symptomatic GERD.  (Id. ¶¶ 79-83.)  Plaintiffs' position is that this distinction is

_____

[3]     Omeprazole is the chemical name of the compound which makes up Prilosec and is also the generic name of the drug.

illusory since the differing dosages would not affect most patients, such that Nexium, in fact, provides no real benefits over Prilosec.  (Id. ¶¶ 73-77.)  In other words, Plaintiffs allege that Nexium merely constitutes Prilosec "repackaged" in a slightly altered chemical form.[4]

Defendants engaged in a large-scale marketing campaign, which included both physician-directed marketing ("PD Marketing") and direct-to-consumer advertising ("DTC Advertising"), in order to boost the sales of Nexium over the comparable product of Prilosec.  (Id. ¶¶ 84-88.)  Plaintiff's theory is that since Defendants knew that Nexium was not more effective than Prilosec on the whole, their misleading advertising campaign cost

---

[4]    Plaintiffs explain the similarities between Prilosec and Nexium as follows:

> Prilosec (i.e., omeprazole) contains equal proportions of two "mirror image" isomers called enantiomers.  Based on a system of mapping and prioritizing the configuration of chemical compounds, the different chemical groupings in enantiomers are priority-ordered in either a clockwise of counter-clockwise direction.  Those ordered clockwise are called "R-enantiomers" (from the Latin, "rectus," or right) and those ordered counter-clockwise are called "S-enantiomers" (from the Latin "sinister," or left).  A 20 mg dose of Prilosec is really 10mg dose of the S-enantiomer and a 10mg dose of the R-enantiomer.  However, in humans, the S-enantiomer is more active than the R-enantiomer, in part due to its better metabolization. Thus, when faced with the expiration of its patent on Prilosec, Astrazeneca patented as a "new" chemical compound the S-enantiomer of omeprazole under the name esomeprazole.  Nexium is simply Prilosec without the less active R-enantiomer.

(Id. ¶ 74.)

individual consumers and third party payors billions in
unnecessary drug expenditures by inducing buyers of Nexium, such
as Plaintiffs, to purchase Nexium when the less-expensive, but
equally-effective, alternative of omeprazole/Prilosec was readily
available.

   B.   Procedural History

      On February 11, 2005, PEBTF filed a putative class
action alleging that Defendants deceptive marketing of Nexium
caused consumer injury.  On April 5, 2005, and April 14, 2005,
Watters and Macken, respectively, filed complaints mirroring the
substantive allegations contained in PEBTF's complaint.  On May
27, 2005, PEBTF, Watters, and Macken filed a consolidated class
action complaint on behalf of an alleged nationwide class of
consumers and third party payors that purchased or paid for
Nexium.

      On July 21, 2005, Defendants moved to dismiss PEBTF,
Watters and Macken's consolidated complaint on the grounds that
the claims were preempted by federal law and barred by state law,
plaintiffs lacked standing under Article III, and failed to
satisfy Fed. R. Civ. P. 9(b).  On November 8, 2005, Judge
Robinson granted Defendants' motion to dismiss on preemption
grounds and because the claims were exempted under the Delaware
Consumer Fraud Act.  The Third Circuit affirmed Judge Robinson's
decision, but after granting a petition for certiorari, the

Supreme Court remanded the case in light of its decision in <u>Wyeth v. Levine</u>, --- U.S. ----, 129 S. Ct. 1187 (2009).  On May 5, 2009, the Third Circuit remanded the case for further proceedings "consistent with <u>Wyeth v. Levine</u>."  On May 27, 2009, the case was reassigned to this Court sitting by designation.

On July 16, 2009, this Court entered Pretrial Order No. 2.  Pursuant to this Order, Plaintiffs filed an amended consolidated class action complaint (the "Amended Complaint") on August 14, 2009.  The Amended Complaint asserts four causes of action: (1) violation of the Delaware Consumer Fraud Act ("DCFA"); (2) violations of the consumer protection statutes of the 50 states; (3) unjust enrichment; and (4) negligent misrepresentation.  On September 15, 2009, Defendants filed a motion to dismiss the Amended Complaint with prejudice pursuant to Fed. R. Civ. 12(b)(6).  The Court held a hearing on the motion to dismiss on January 14, 2010.


## III. DISCUSSION

In order to address the issues raised in Defendants' motion to dismiss, the Court must first resolve the choice of law question to determine the applicable law relevant to each Plaintiff's claims.  Second, the Court will address Defendants asserted deficiencies with respect to the Amended Complaint in order to determine whether Fed. R. Civ. P. 12(b)(6) requires

dismissal.  Finally, the Court will determine whether dismissal with prejudice is warranted based on the procedural posture of the case.

    A.   <u>Choice of Law</u>

       The parties dispute the appropriate law to be applied to each of the claims asserted in the Amended Complaint. Defendants' position is that the law of the home states of the respective named Plaintiffs should apply, whereas Plaintiffs contend that Delaware law should control.

    1.   <u>Delaware Choice of Law Process</u>

       When jurisdiction is based upon diversity of citizenship, a district court must apply the forum state's choice of law rules.  <u>Kaneff v. Del. Title Loans, Inc.</u>, 587 F.3d 616, 621 (3d Cir. 2009) (citing <u>Berg Chilling Sys., Inc. v. Hull Corp.</u>, 435 F.3d 455, 462 (3d Cir. 2006)).  As this case was commenced in Delaware, the Court will apply Delaware's choice of law rules.

       Delaware's choice of law approach entails a two-pronged inquiry.  First, it is necessary to compare the laws of the competing jurisdictions to determine whether the laws actually conflict on a relevant point.  While no reported Delaware cases establish that an actual conflict must exist, the Third Circuit, as well as other federal and state courts within Delaware, have concluded that Delaware's choice of law rules require that an

actual conflict exist prior to engaging in a complete conflict of laws analysis. <u>See</u> <u>In re Teleglobe Commc'ns Corp.</u>, 493 F.3d 345, 358 (3d Cir. 2007) (noting the absence of controlling precedent on this point but predicting that "Delaware would follow the practice of the federal system and most states, and decide a choice-of-law dispute only when the proffered legal regimes actually conflict on a relevant point"); <u>Underhill Inv. Corp. v. Fixed Income Discount Advisory Co.</u>, 319 F. App'x 137, 140-41 (3d Cir. 2009) (non-precedential opinion) (applying Delaware choice of law rules and noting that where the laws of the two jurisdictions would produce an identical result, a "false conflict" exists and a court should eschew a conflict analysis); <u>Pig Imp. Co., Inc. v. Middle States Holding Co.</u>, 943 F. Supp. 392, 396 (D. Del. 1996) (Robinson, J.) (finding that where the laws of the relevant forums do not conflict, the court need not undergo a choice of law analysis) (citing <u>Lucker Mfg. v. Home Ins. Co.</u>, 23 F.3d 808, 813 (3d Cir. 1994)); <u>Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC</u>, No. 3718, 2010 WL 338219, at *8 (Del. Ch. Jan. 29, 2010) ("Accordingly, because the laws of the several interested states relevant to the issues in this case all would produce the same decision no matter which state's law is applied, there is no real conflict and a choice of law analysis would be superfluous."); <u>Parlin v. Dyncorp Intern., Inc.</u>, No. 08-01-136, 2009 WL 3636756, at *3 n.16 (Del.

Super. Ct. Sept. 30, 2009) (citing <u>Berg</u> for the proposition that
where a "false" conflict exists, a choice of law analysis is
unnecessary); <u>Lagrone v. Am. Mortell Corp.</u>, No. 04-10-1162008, WL
4152677, at *5 (Del. Super. Ct. Sept. 4, 2008) (same); <u>Kronenberg
v. Katz</u>, No. 19964, 2004 WL 5366649, at *16 (Del. Ch. May 19,
2004) ("Where the choice of law would not influence the outcome,
the court may avoid making a choice."); <u>ABB Flakt, Inc. v. Nat'l
Union Fire Ins. Co. of Pittsburgh, P.A.</u>, No. 94-11-024, 1998 WL
437137, at *5 (Del. Super. Ct. June 10, 1998) ("When a choice of
law analysis does not impact the outcome of the court's decision,
no choice of law analysis need be made."), <u>aff'd</u>, 731 A.2d 811
(Del. 1999).  With this guidance in mind, the Court concludes
that the first step in applying Delaware's choice of law rules
requires an examination of the competing laws proposed by the
parties to determine whether an actual conflict exists.

Second, if it is determined that an actual conflict
exists, Delaware employs the "most significant relationship"
test, as set forth in the Restatement (Second) of Conflict of
Laws (the "Restatement"), in order to determine which law should
apply.  <u>Travelers Indemnity Co. v. Lake</u>, 594 A.2d 38, 47 (Del.
1991) (adopting the most significant relationship test); <u>see
David B. Lilly Co., Inc. v. Fisher</u>, 18 F.3d 1112, 1117 (3d Cir.
1994); <u>In re W.R. Grace & Co.</u>, 418 B.R. 511, 518-19 (D. Del.
2009); <u>Corning Inc. v. SRU Biosystems, LLC</u>, 292 F. Supp. 2d 583,
584  (D. Del. 2003) ("Delaware courts apply the most significant
relationship test.") (citation omitted).  In the instant case,

- 11 -

the most significant relationship test implicates three sections

of the Restatement - § 6, § 145, and § 148.

First, § 6 provides the general principles underlying

the Restatement's choice of law approach.  Section 6 states:

> (1) A court, subject to constitutional restrictions, will
> follow a statutory directive of its own state on choice
> of law.
>
> (2) When there is no such directive, the factors relevant
> to the choice of the applicable rule of law include
>
>> (a) the needs of the interstate and international
>> systems,
>> (b) the relevant policies of the forum,
>> (c) the relevant policies of other interested
>> states and the relative interests of those states
>> in the determination of the particular issue,
>> (d) the protection of justified expectations,
>> (e) the basic policies underlying the particular
>> field of law,
>> (f) certainty, predictability and uniformity of
>> result, and
>> (g) ease in the determination and application of
>> the law to be applied.

Restatement § 6.  These general principles form the foundation of

the most significant relationship test.

Second, § 145 provides the general framework of the

most significant relationship test with respect to tort actions.

Section 145 provides:

> (1) The rights and liabilities of the parties with
> respect to an issue in tort are determined by the local
> law of the state which, with respect to that issue, has
> the most significant relationship to the occurrence and
> the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the
> principles of § 6 to determine the law applicable to an
> issue include:

> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.
>
> These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Id. § 145.  The commentary to § 145 states that "[t]he rule of this Section states a principle applicable to all torts and to all issues in tort and, as a result, is cast in terms of great generality."  Id. cmt. a.  Notably, § 145 expressly incorporates the general principles of § 6 in determining the forum with the most significant relationship for tort actions.

Third, § 148 recasts the rule set forth in § 145 with greater precision with respect to fraud or misrepresentation claims.  In other words, § 148 provides a more specific application of the general approach enunciated in § 145 where fraud or misrepresentation is at issue.  See id. § 145 cmt. a. (noting that § 148 is designed to address a particular tort with greater precision).  "For cases involving fraud or misrepresentation claims, Section 148 of the Restatement (Second) of Conflicts lists contacts that are relevant to a choice of law determination."  Chase Manhattan Mortg. Corp. v. Advanta Corp., No. 01-507, 2005 WL 2234608, at *12 (D. Del. Sept. 8, 2005) (citing Brown v. SAP Am., Inc., No. 98-507, 1999 WL 803888, at *6

- 13 -

(D. Del. Sept. 13, 1999)); see In re Orion Refining Corp., 341 B.R. 476, 484 (Bankr. D. Del. 2006) ("Section 148 of the Restatement governs the choice of law for torts alleging fraud and misrepresentation.").

Section 148 of the Restatement is structured with two alternative subparts.  The first subpart, § 148(1), provides that where the plaintiff's action in reliance occurred in the same state where the false representation was made, that state's law controls.  Restatement § 148.  The second subpart, § 148(2), provides that where the plaintiff's reliance occurred in a state other than where the false representation occurred, the court should consider six factors to determine which state has the "most significant relationship."  Id.  The text of § 148 provides as follows:

> (1) When the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations **and when the plaintiff's action in reliance took place in the state where the false representations were made and received,** the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

> (2) **When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts,** among others, as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

- 14 -

> (a) the place, or places, where the plaintiff acted in reliance upon the defendant's representations,
> (b) the place where the plaintiff received the representations,
> (c) the place where the defendant made the representations,
> (d) the domicil, residence, nationality, place of incorporation and place of business of the parties,
> (e) the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and
> (f) the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Id. § 148 (emphasis added).  Comment j to § 148 provides the general analytical approach with respect to the weighing of these factors.  It states:

> j. The general approach. No definite rules as to the selection of the applicable law can be stated, except in the situation covered by Subsection (1). If any two of the above-mentioned contacts, apart from the defendant's domicil, state of incorporation or place of business, are located wholly in a single state, this will usually be the state of the applicable law with respect to most issues. So when the plaintiff acted in reliance upon the defendant's representations in a single state, this state will usually be the state of the applicable law, with respect to most issues, if (a) the defendant's representations were received by the plaintiff in this state, or (b) this state is the state of the plaintiff's domicil or principal place of business, or (c) this state is the situs of the land which constituted the subject of the transaction between the plaintiff and the defendant, or (d) this state is the place where the plaintiff was to render at least the great bulk of his performance under his contract with the defendant. The same would be true if any two of the other contacts mentioned immediately above were located in the state in question even though this state was not the place where the plaintiff received the representations.

Id. cmt. j.

Delaware's choice of law rules with respect to claims for fraud or misrepresentation requires an understanding of the interplay between § 148 and § 6.  Although § 148 provides a specific rule to be applied, the application of this rule is informed by the factors enumerated in § 6.  One commentator has explained this relationship as follows:

> From a methodological viewpoint, Section 6 is important in that it establishes the test that should guide the application of almost all other sections of the Restatement, most which incorporate § 6 by reference. The test consists of multiple and diverse factors that, by themselves, will not enable a court to make a choice because they are not listed in any order of priority and because they will often point in different directions in a given case . . . While the Restatement calls for the application of the law of the state with the "most significant relationship" – a term that evokes jurisdiction-selecting notions - and while the Restatement often designates that state through specific rules, most of these rules are presumptive or tentative and can be displaced through a reference to § 6.

Eugene F. Scoles, et al., Conflict of Laws, 60 (4th ed. 2004) (footnotes and internal citation omitted).

Recently this Court addressed the interplay between § 148 and § 6 in resolving choice of law questions in Atlantic City Elec. Co., Inc. v. Estate of Riccardo, --- F. Supp. 2d ----, 2010 WL 395963, at *5-6 (E.D. Pa. Feb. 4, 2010), albeit under New Jersey rather than Delaware law.  As the Court explained there, "once the § 148 factors have been applied and the analysis points to a particular jurisdiction, courts must consider if 'the section 6 considerations gin up or diminish the values ascribed

to the contacts relative to the issue presented[.]'" <u>Id.</u> at *5 (quoting <u>P.V. v. Camp Jaycee</u>, 962 A.2d 453, 463 (N.J. 2008)). The Court will employ a consistent approach here and measure the tentative conclusion reached by applying the § 148 factors against the principles of § 6 to determine whether that forum actually has the most significant relationship to the underlying tort.  <u>See</u> <u>Nafar v. Hollywood Tanning Sys., Inc.</u>, 339 F. App'x 216, 221 (3d Cir. 2009) (non-precedential opinion) (recognizing that the considerations set forth in § 6 can rebut the conclusion provided by §148 that each prospective plaintiff's home state had the most significant relationship in litigating claims under the New Jersey Consumer Fraud Act); <u>Kubasko v. Pfizer, Inc.</u>, No. 98-04-003, 2000 WL 1211219, at *2 (Del. Super. Ct. June 30, 2000) (recognizing that under the Restatement a court should apply the law of the state where a tortious injury occurred, but that despite this principle, a court is compelled to utilize section 6 in making a choice of law determination); <u>Ison v. E.I. DuPont de Nemours and Co., Inc.</u>, 729 A.2d 832, 844 (Del. Super. Ct. 1999) (acknowledging that in the choice of law context, the Restatement provides that a rebuttable presumption exists that the law of the place of the injury should apply, but that this can be defeated by a showing that Delaware has a more significant relationship to the action); <u>McBride v. Whiting-Turner Contracting Co.</u>, No. 91-01-179, 1993 WL 489487, at *2-3 (Del. Super. Ct. Oct. 21,

1993) (explaining that Restatement § 146 dictates that the law of
the place of the injury will be the appropriate law unless
consideration of the principles set forth in Restatement § 6
demonstrate that another forum as a more significant
relationship).

     2.  <u>Application of Delaware's Choice of Law Rules</u>

Before embarking on this conflict analysis, the Court
must make a threshold determination of whether subsection (1) or
subsection (2) of § 148 applies.  Where both the
misrepresentation and the action taken in reliance on the
misrepresentation occurred in the same state, subsection (1)
applies, otherwise subsection (2) applies.  Defendants argue that
the alleged misrepresentations - statements made through PD
Marketing and DTC Advertising - were made in the Plaintiffs' home
states.  The Court disagrees.  The more appropriate view is that
the alleged misrepresentations underlying Plaintiffs' claims were
"made" in Delaware because that is the place where the substance
of the factual statements comprising the alleged
misrepresentations emanated.  In other words, the alleged
misrepresentations at issue were made in Delaware and then
repeated in the Plaintiffs' home states.  Therefore, the Court
concludes that subsection (2) applies.

As this case involves Plaintiffs from several different
home states, the Court will apply the Restatement's choice of law

- 18 -

analysis to Delaware and the Plaintiffs' respective home states -
Pennsylvania (PEBTF, AFSCME, and Scofield), New York (Macken) and
Michigan (Watters/Wellness Plan).  The Court will proceed with
the choice of law analysis by: (1) determining whether an actual
conflict exists, (2) applying the factors set forth in § 148(2)
to determine the law to be applied, and (3) weighing this
tentative conclusion in accordance with the factors enumerated in
§ 6.  Each of the claims asserted by Plaintiffs is addressed in
turn.

(a) <u>Consumer Protection Claims</u>

(i)  <u>Delaware verus Pennsylvania</u>

First, the Court concludes that an actual conflict
exists between the laws of Delaware and Pennsylvania on the issue
of whether reliance is a necessary element under the respective
consumer fraud statutes.

The DCFA provides in pertinent part:

> The act, use or employment by any person of any
> deception, fraud, false pretense, false promise,
> misrepresentation, or the concealment, suppression, or
> omission of any material fact with intent that others
> rely upon such concealment, suppression or omission, in
> connection with the sale, lease or advertisement of any
> merchandise, whether or not any person has in fact been
> misled, deceived or damaged thereby, is an unlawful
> practice.

6 Del. C. § 2513.  Courts consistently have recognized that
reliance is not a required element in establishing a claim under
the DCFA.  <u>See</u> <u>Johnson v. Geico Cas. Co.</u>, 673 F. Supp. 2d 255,

276 (D. Del. 2009)(finding that plaintiffs need not prove
individual reliance under 6 Del. C. § 2513); Eames v. Nationwide
Mut. Ins. Co., 412 F. Supp. 2d 431, 437 (D. Del. 2006) (a
violation of the DCFA occurs regardless of whether actual
reliance is shown); S&R Assocs., L.P. v. Shell Oil Co., 725 A.2d
431, 440 (Del. Super. Ct. 1998) ("While a fraud action at common
law requires the plaintiff to prove reliance, there is no
corresponding reliance requirement in 6 Del. C. § 2513."); Ayers
v. Quillen, No. 02-004, 2004 WL 1965866, at *6 (Del. Super. Ct.
June 30, 2004) (noting that "the consumer claiming consumer fraud
[under the DCFA] need not prove personal reliance upon the false
statement, only that the defendant made the statement with the
intent that someone would rely upon it.").

Pennsylvania's consumer protection law, the Unfair
Trade Practices and Consumer Protection Law (the "UTPCPL"),
provides for a private right of action for "[a]ny person who
purchases or leases goods or services primarily for personal,
family or household purposes and thereby suffers any
ascertainable loss of money or property, real or personal."  Pa.
C.S. § 201-9.2(a).  In contrast to the DCFA, the UTPCPL has been
interpreted to require a plaintiff to establish justifiable
reliance as an element of the claim.  In Hunt v. U.S. Tobacco
Co., 538 F.3d 217, 221 (3d Cir. 2008), the Third Circuit held
that the Pennsylvania Supreme Court would require a plaintiff to

- 20 -

prove justifiable reliance in alleging deceptive conduct under the UTPCPL.  Under Hunt, therefore, reliance is a required element under the UTPCPL.

In light of this contradiction between the relevant consumer protection statutes, an actual conflict exists.

Second, applying the factors set forth in § 148(2), the Court finds that Pennsylvania law should control the claims of the Pennsylvania Plaintiffs.  The following § 148(2) factors militate in favor of finding that the Plaintiffs' home state law applies: (1) Plaintiffs "received" any allegedly deceptive statements in Pennsylvania; (2) Plaintiffs "acted in reliance upon" the allegedly deceptive statements in Pennsylvania because that is where they purchased Nexium; (3) each of these Plaintiffs has a "residence" or "place of business" in Pennsylvania;[5] and (4) the "tangible thing which is the subject of the transaction between the parties," i.e., Nexium, was located in Pennsylvania at the time of each Plaintiff's purchase.[6]

Furthermore, comment j. to § 148, while not controlling, sets forth a basic framework to be followed, and

---

[5]     Although Defendants' maintained a place of business in Delaware, comment i. to § 148 provides that "[t]he domicil, residence and place of business of the plaintiff are more important than are similar contacts on the part of the defendant."   Restatement § 148 cmt. i.

[6]     Subsection (f) of § 148 is irrelevant to the instant matter as there was no contract between the parties.

favors application of Pennsylvania law.  In short, comment j.
provides that when a plaintiff acted in reliance in one
jurisdiction, "this state will usually be the state of the
applicable law, with respect to most issues, if (a) the
defendant's representations were received by the plaintiff in
this state, or (b) this state is the state of the plaintiff's
domicil or principal place of business, or (c) this state is the
situs of the land which constituted the subject of the
transaction between the plaintiff and the defendant, or (d) this
state is the place where the plaintiff was to render at least the
great bulk of his performance under his contract with the
defendant."  Id. cmt. j.  Adopting this approach, Pennsylvania
law controls in that this is the forum where each Plaintiff
relied upon the alleged misrepresentations by buying Nexium, as
well as the place where (a) the alleged misrepresentations were
received and (b) each Plaintiff's residence or place of business
is located.

        In contrast, the only factors militating in favor of
Delaware law are that it is the state where the representations
were made, and that it is the place where Defendants are
incorporated.  The location of Defendants' principal place of
business stands, at best, in equipoise with the residence/place
of business of the Plaintiffs.  The fact that Defendants "made"
the alleged misrepresentations, i.e., orchestrated the allegedly

deceptive marketing campaigns, in Delaware does not weigh more strongly than the other factors militating in favor of application of Pennsylvania law.

Applying the factors in § 148(2), the Court concludes that Pennsylvania is the presumptive forum with the most significant relationship to these Plaintiffs' claims.[7]

---

[7]     In similar choice of law contexts, several cases have applied the factors in § 148 and concluded that the home state of the plaintiff should apply to claims under state consumer protection statutes.  See, e.g., In re Grand Theft Auto Video Game Consumer Litig., 251 F.R.D. 139, 150-54 (S.D.N.Y. 2008) (applying § 148 factors in light of conflicts among various consumer protection statutes and applying the laws of the state where the putative class member purchased the product which was the subject of the alleged misrepresentations); Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1365-66 (S.D. Fla. 2007) (considering § 148 contacts and concluding that the court "should apply the law of the state in which each Plaintiff rented a vehicle, rather than the law of New Jersey, the state in which [defendant] is headquartered" and despite the fact that alleged fraudulent scheme emanated from New Jersey); In re Pharm. Indus. Average Wholesale Price Litig., 230 F.R.D. 61, 82-83 (D. Mass. 2005) (addressing class action brought by consumers and third-party payors against pharmaceutical manufacturers alleging that manufacturers fraudulently inflated drug prices by misstating average wholesale prices of their drugs in industry publications, and rejecting that the law of the state where the defendants' principal place of business is located and where misrepresentations were made should apply, instead concluding that the home state of the consumer had a more significant relationship to the controversy).  Cf. In re Mercedes-Benz Tele Aid Contract Litig., 257 F.R.D. 46, 66-68 (D.N.J. 2009) (applying the "most significant relationship" test and the factors of § 148(2) and finding that four of the relevant six factors favored application of each plaintiffs home states' law; including place of plaintiff's residence, place where misrepresentations were received, place where misrepresentations were relied upon, and place where the tangible object of the transaction was located; electing to apply the law of defendants' home state as it was their principal place of business and the location from which all the conduct underling the consumer fraud claim took place).

Third, application of the general principles enumerated in § 6 does not dictate that Delaware law should control the Pennsylvania Plaintiffs' claims.  Plaintiffs' position is that the DCFA contains a legislative intent to encompass consumer injuries occurring outside of the state, such as the case here. The stated purpose of the DCFA "to protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State."  6 Del. C. § 2512. Plaintiffs contend that this far-reaching statement represents sufficient indicia of legislative intent to extend the reach of the DCFA into Plaintiffs' home states, such as Pennsylvania, thereby giving Delaware the most significant relationship to the instant controversy.  The Court disagrees.

As with the DCFA, "[t]he general purpose of the UTPCPL is to protect the public from fraud and unfair or deceptive business practices."  Neal v. Bavarian Motors Inc., 882 A.2d 1022, 1029 (Pa. Super. Ct. 2005).  Therefore, Pennsylvania has at least as strong an interest, if not more so, in utilizing the UTPCPL to protect consumers located within its jurisdiction from deceptive commercial practices.  Therefore, the relevant policies and interests of the respective forums favor application of Pennsylvania law.

Moreover, application of Pennsylvania law better

protects the "justified expectations" of the parties.  It would not upset Defendants' expectations by being sued under Pennsylvania law as Defendants were acutely aware that its marketing campaigns were being executed in Pennsylvania and that Pennsylvania residents were purchasing Nexium.  Certainly, it could not upset these Plaintiffs' expectations to apply the law of their home state as their only justified expectation would be for an opportunity for redress under the laws of their own jurisdiction.  Stated differently, these Plaintiffs would not be justified in expecting Delaware law to apply to their claims when purchasing Nexium in Pennsylvania.

Under the circumstances, the Court concludes that the factors presented under § 6 dictate that Pennsylvania has the most significant relationship with respect to these Plaintiffs' claims.

Based on the above, the Court finds that Pennsylvania law shall apply to the consumer fraud claims asserted by Plaintiffs PEBTF, AFSCME, and Scofield.

(ii) <u>Delaware versus New York</u>

First, a conflict exists between the laws of these jurisdictions.  New York State General Business Law Section 349 ("GBL 349") prohibits misleading and deceptive business practices.  To state a <u>prima facie</u> case under GBL 349, plaintiffs must show: "first, that the challenged act or practice was

- 25 -

consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act." Vitolo v. Mentor H/S, Inc., 426 F. Supp. 2d 28, 33 (E.D.N.Y. 2006) (internal quotation marks and citation omitted).  In order for an act to be deceptive within the meaning of GBL 349, it must be likely to mislead a reasonable consumer. See Marcus v. AT & T Corp., 138 F.3d 46, 63-64 (2d Cir. 1998) (declaring that to state a claim under the deceptive acts statute a plaintiff is required to allege a material deceptive act or practice directed to consumers that caused actual harm, and that such an act is deceptive only if it is likely to mislead a reasonable consumer).

New York courts have recognized that a plaintiff is not required to prove individual reliance upon a defendant's deceptive practice independently in order to state a claim under GBL 349.  See, e.g., Stutman v. Chemical Bank, 731 N.E.2d 608, 612 (N.Y. 2000); Wilner v. Allstate Ins. Co., 893 N.Y.S. 2d 208, 214 (N.Y. App. Div. 2010); Cambridge v. Telemarketing Concepts, Inc., 655 N.Y.S. 2d 795, 802 (N.Y. City Ct. 1997); BNI N.Y., Ltd. v. DeSanto, 675 N.Y.S.2d 752, 755 (N.Y. City Ct. 1998); see also Pelman v. McDonald's Corp., 396 F.3d 508, 512 (2d Cir. 2005) (noting that reliance is not an essential element of a claim under GBL 349).  Therefore, authority from New York is clear that reliance is not a necessary element under GBL 349.

- 26 -

It is true, however, that in order to state a claim
under GBL 349, a plaintiff must show that the defendant's
deceptive act caused the complained-of injury.  See <u>Stutman</u>, 731
N.E.2d at 611; <u>Gaidon v. Guardian Life Ins. Co. of Am.</u>, 725
N.E.2d 598, 604 (N.Y. 1999); <u>Oswego Laborers' Local 214 Pension
Fund v. Marine Midland Bank, N.A.</u>, 647 N.E.2d 741, 745 (N.Y.
1995) ("a plaintiff seeking compensatory damages must show that
the defendant engaged in a material deceptive act or practice
that caused actual, although not necessarily pecuniary, harm");
<u>Nealy v. U.S. Surgical Corp.</u>, 587 F. Supp. 2d 579, 585 (S.D.N.Y.
2008) ("The causation element is essential: 'The plaintiff ...
must show that the defendant's "material deceptive act" caused
the injury.'") (quoting <u>In re Currency Conversion Fee Antitrust
Litig.</u>, 230 F.R.D. 303, 310 (S.D.N.Y. 2004)).  In interpreting
this causation requirement, courts have held that where a
plaintiff alleges that a defendant has engaged in deceptive
advertising, but does not allege to have seen or been aware of
such advertising, the plaintiff has not sufficiently pled a claim
under GBL 349 at the motion to dismiss stage.  In <u>Gale v. Int'l
Bus. Mach. Corp.</u>, 781 N.Y.S.2d 45, 45 (N.Y. App. Div. 2004), the
court dismissed plaintiff's claim under GBL 349 concerning
deceptive statements by a defendant regarding the reliability of
a hard disk drive.  The court reasoned that

> [a]lthough the plaintiff cites particular misleading
> statements by IBM regarding the reliability of the IBM

> Deskstar 75GXP, he nowhere states in his complaint that
> he saw any of these statements before he purchased or
> came into possession of his hard drive.  If the plaintiff
> did not see any of these statements, they could not have
> been the cause of his injury, there being no connection
> between the deceptive act and the plaintiff's injury.

Id. (internal citation omitted).  Therefore, the court held that
the claim under GBL 349 could not withstand dismissal.  Id.

Similarly, in Pelman v. McDonald's Corp., 396 F. Supp.
2d 439, 444-46 (S.D.N.Y. 2005), the court found that a putative
class action complaint alleging that a fast food restaurant had
engaged in a deceptive marketing campaign was pleaded with
insufficient particularity.  The court found that in order to
meet the causation requirement under GBL 349, it was not
necessary for the plaintiffs to confirm that each plaintiff saw
or heard each allegedly deceptive advertisement.  Id. at 446.
The court did find, however, that in order to establish the
element of causation, "plaintiffs must provide a brief
explanation of how plaintiffs were aware of the nutritional
schemes they allege to have been deceptive."  Id. (emphasis
added).  Therefore, under New York law, a plaintiff alleging a
claim for deceptive advertising under GBL 349 must plead some
awareness of the advertising itself in order to state a claim.

In contrast, Delaware courts have found that a
plaintiff can assert a cognizable claim under the DCFA even where
allegations of reliance are wholly lacking.  See Ayers, 2004 WL
1965866, at *6 (finding that a plaintiff can validly state a

- 28 -

claim under the DCFA where reliance on the false representations cannot be shown).

Based on the conflicting outcomes that would result from applying the respective laws of these states, the Court concludes that an actual conflict exists.

Second, as is the case with Pennsylvania,[8] the Court finds that applying the factors set forth in § 148(2) dictates that New York has a more significant relationship to Plaintiff Macken's claim than Delaware.  Macken resided in New York and this is the forum where he relied on Defendants' alleged misrepresentations by purchasing Nexium.  Therefore, § 148(2) militates in favor of applying New York law to the instant claim.

Third, consideration of the factors enumerated in § 6 does not undermine the Court's conclusion that New York has the most significant relationship to the instant dispute.  GBL 349 is "a creature of statute based on broad consumer-protection concerns."  Gaidon, 725 N.E.2d at 603.  It is designed to further New York's public interest in protecting consumers from deceptive business practices.  See Maurizio v. Goldsmith, 230 F.3d 518, 522

---

[8]     As the Court's analysis of the second and third prongs of the conflict of laws issue are essentially identical with respect to each Plaintiff's home state, it is unnecessarily repetitive for the Court to engage in a comprehensive analysis of these prongs with respect to the remaining states.  Therefore, for the purpose of judicial efficiency, the Court will employ a truncated analysis of these factors, while incorporating the rationale set forth above by reference.

(2d Cir. 2000) (explaining that for a claim under GBL 349, "the gravamen of the complaint must be consumer injury or harm to the public interest") (quoting <u>Azby Brokerage, Inc. v. Allstate Ins. Co.</u>, 681 F. Supp. 1084, 1089 n.6 (S.D.N.Y. 1988).  The New York Legislature enacted GBL 349 to augment the Attorney General's enforcement power to curtail deceptive practices aimed at the consuming public, and this enforcement power was later expanded by allowing a private cause of action.  <u>See</u> <u>Oswego</u>, 647 N.E.2d at 744.  Based on its remedial nature, GBL 349 is to be "liberally construed to carry out the reforms intended and to promote justice."  <u>Hart v. Moore</u>, 587 N.Y.S.2d 477, 479 (N.Y. App. Div. 1992) (internal quotations and citation omitted).  In light of the strong governmental interest in shielding consumers from fraudulent practices embodied in GBL 349, New York has at least as strong an interest as Delaware in having its law apply. Therefore, a balancing of the relevant policies of the respective forums supports the conclusion that New York maintains the most significant relationship to the instant dispute.

Similarly, application of New York law better comports with the "justified expectations" of the respective parties.  As both parties could have anticipated that New York law would apply to a consumer fraud claim concerning sales of Nexium to consumers in that state, applying New York law is consistent with the principles of § 6.

- 30 -

For these reasons, the Court will apply the substantive law of New York to Macken's consumer protection claim.

(iii) <u>Delaware versus Michigan</u>

As to the first issue, the Court finds that an actual conflict exists between the laws of these jurisdictions, albeit on different grounds than those discussed above.  The Michigan Consumer Protection Act ("MCPA") prohibits the use of unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce.  MCL § 445.903(1).  It defines the term "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." <u>Id.</u> § 445.902(d).  The intent of the act is "to protect <u>consumers</u> in their purchases of goods which are primarily used for <u>personal, family or household purposes</u>." <u>Noggles v. Battle Creek Wrecking, Inc.</u>, 395 N.W.2d 322, 323 (Mich. Ct. App. 1986) (emphasis added).  Therefore, the MCPA is limited to transactions concerning goods used for "personal, family or household purposes."

In contrast, the DCFA does not contain a similar restriction limiting its scope to goods purchased for "personal, family or household purposes."  In fact, the statute provides

that the stated purpose of the DCFA is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State."  6 Del. C. § 2512 (emphasis added).  This provides a clear statement of legislative intent that the DCFA is not to be read as limited to transactions concerning only personal, family or household goods, and extends to purchases made by businesses.

Based on the "personal, family or household" purpose restriction contained in the MCPA, but not in the DCFA, it is clear that the DCFA is broader in scope than the MCPA.  These laws conflict since a plaintiff who purchased goods not used for a personal, family or household purpose would be eligible to assert a claim under the DCFA, but would be precluded from bringing a claim pursuant to the MCPA under an identical set of facts.  Thus, an actual conflict exists.

Second, consideration of the factors enumerated in § 148(2) militates in favor of applying Michigan law, as this is the forum where (1) the Wellness Plan "received" the allegedly deceptive statements; (2) the Wellness Plan "acted in reliance upon" the allegedly deceptive statements by purchasing Nexium; (3) the Wellness Plan is located; and (4) the "tangible thing which is the subject of the transaction between the parties," i.e., Nexium, was purchased.   Other than Defendants being

headquartered in Delaware and creating the PD Marketing and DTC
Advertising campaigns there, Plaintiffs point to no other
contacts with Delaware that indicate that it has a more
significant relationship than Michigan to the instant claim.

Third, weighing the interests of Delaware and Michigan,
in light of the factors set forth in § 6, does not dictate that
Delaware law should apply to Watters' claim as Delaware's
interest in applying the DCFA does not eclipse Michigan's
interest in enforcing the MCPA.  Although Delaware has a strong
state interest in monitoring the behavior of businesses operating
within its forum, Michigan has a significant interest in
protecting its consumers from misrepresentations that induce
fraudulent sales.  Courts have recognized that the MCPA is to be
construed broadly in order to effectuate its purpose of
protecting consumers against unfair trade practices.  See, e.g.,
Newton v. West, 686 N.W.2d 491, 493 (Mich. Ct. App. 2004)
(instructing that the MCPA is to be construed liberally in
achieving its intended goal of prohibiting unfair trade
practices) (citation omitted); Forton v. Laszar, 609 N.W.2d 850,
853 (Mich. Ct. App. 2000), overruled on other grounds by Liss v.
Lewiston-Richards, Inc., 732 N.W.2d 514 (Mich. 2007) (same);
Price v. Long Realty, Inc., 502 N.W.2d 337, 342 (Mich. Ct. App.
1993) (MCPA is a remedial statute that is to be broadly
construed); State Farm Mut. Auto. Ins. Co. v. BMW of N. Am., LLC,

- 33 -

No. 08-12402, 2009 WL 2447612, at *6 (E.D. Mich. Aug. 7, 2009)
(MCPA is designed to prevent unconscionable trade practices that
cause consumer loss and must be construed in accordance with that
purpose) (citation omitted).  The Court concludes that Michigan's
interest in protecting its citizens from fraudulent practices
pursuant to the MCPA trumps Delaware's interest in regulating the
behavior of businesses within its jurisdiction.  In other words,
as the underlying purpose of each of these statutes is to protect
consumers, it is more appropriate to apply the MCPA to the claim
of a Michigan resident rather than apply the DCFA to a non-
resident.

        The Court finds that the general principles of § 6
support the conclusion that Michigan has the most significant
relationship to Watters' claims.  Therefore, Michigan law will
apply.

                (b)  <u>Unjust Enrichment</u>

        With respect to Plaintiffs' unjust enrichment claims,
neither party has raised an issue as to an actual conflict
between the laws of the potentially applicable jurisdictions, and
the Court <u>sua sponte</u> has determined that the basic elements
required under the relevant states' laws do not create an actual
conflict.  <u>See</u> <u>Powers v. Lycoming Engines</u>, 245 F.R.D. 226, 231
(E.D. Pa. 2007) (examining the laws of unjust enrichment of the
50 states and concluding that "[a]lthough there are numerous

                            - 34 -

permutations of the elements of the cause of action in the
various states, there are few real differences"); In re
Mercedes-Benz, 257 F.R.D. at 58 ("While there are minor
variations in the elements of unjust enrichment under the laws of
the various states, those differences are not material and do not
create an actual conflict.");   Therefore, the Court need not
engage in a choice of law analysis as to these unjust enrichment
claims.  See Lucker, 23 F.3d at 813 (avoiding choice of law
question where neither party pressed the issue and there was no
apparent conflict between the laws of the forums) (citing
Melville v. Am. Home Assur. Co., 584 F.2d 1306, 1311 (3d Cir.
1978) (warning courts to avoid dicta on conflicts questions when
not put in issue)); On Air Entm't Corp. v. Nat'l Indem. Co., 210
F.3d 146, 149 (3d Cir. 2000) (where parties cannot point to any
differences between the applicable law, no conflict exists and
the court should avoid the choice of law question).  In the
absence of an actual conflict, the Court will refer to the laws
of the Plaintiffs' respective home states interchangeably with
Delaware law for purposes for this Memorandum.  See Hammersmith
v. TIG Ins. Co., 480 F.3d 220, 229 (3d Cir. 2007) ("If there is a
false conflict under this definition, the court does not have to
engage in a choice of law analysis, and may refer to the states'
laws interchangeably.") (citation omitted); Huber v. Taylor, 469
F.3d 67, 74 (3d Cir. 2006) ("If there is no conflict, then the

district court sitting in diversity may refer interchangeably to the laws of the states whose laws potentially apply."); Underhill Inv. Corp. v. Fixed Income Discount Advisory Co., 540 F. Supp. 2d 528, 536 n.15 (D. Del. 2008) (where the parties agree that the underlying elements of a claim are the same, the court may refer to the laws of the competing jurisdictions interchangeably).[9]

### (c)   Negligent Misrepresentation

As with Plaintiffs' unjust enrichment claims, the parties have failed to raise the existence of an actual conflict of the laws of the respective states concerning negligent misrepresentation.  Therefore, the Court will forego a choice of law analysis on this issue and refer to the law of the applicable jurisdictions interchangeably.  See Berg Chilling, 435 F.3d at 462; Rimmax Wheels LLC v. RC Components, Inc., 477 F. Supp. 2d 670, 674 n.12 (D. Del. 2007) (stating that when there is no material difference between two states' laws, a court need not address choice of law inquiry); see also Huber, 469 F.3d at 74.

### B.   Failure to State a Claim under Rule 12(b)(6)

Having determined the relevant substantive law to be applied to each Plaintiff's claims, the Court will proceed to

---

[9]   Some cases have suggested that when the choice of law involves the forum in which the court sits and another state, and no conflict exists, it is appropriate to default to the law of the court's home forum.  Essentially, this is another way of stating that applying the law of the foreign jurisdiction is unnecessary as the substance of the law is consistent with the home forum.

determine whether sufficient allegations are contained within the Amended Complaint in order to withstand Defendants' challenge pursuant to Rule 12(b)(6).

      1.   <u>Motion to Dismiss Standard</u>

Rules 8(a)(2) and 9(b) of the Federal Rules of Civil Procedure provide the relevant pleading standards to be applied to the Amended Complaint. Fed. R. Civ. P. 8(a)(2) provides for a more liberal pleading standard but "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.' That is to say, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 234-35 (3d Cir. 2008).

Fed. R. Civ. P. 9(b) provides a heightened pleading standard when the complaint asserts a cause of action for fraud. <u>See</u> <u>F.D.I.C. v. Bathgate</u>, 27 F.3d 850, 876 (3d Cir. 1994) (applying the particularity requirement of Rule 9(b) to a consumer fraud claim). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). "Rule 9(b) serves to give defendants 'notice of the claims against them, provide[ ] an increased measure of protection for their reputations, and reduce[ ] the number of frivolous suits brought solely to extract settlements.'" <u>In re</u>

Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 270 (3d Cir. 2006) (quoting In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997)).

Pursuant to Rule 9(b) a complaint must include (1) a specific false representation of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff acted upon it to his [or her] damage." Id. (quoting Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992)).  Courts apply Rule 9(b) to every element of a fraud claim, including reliance, causation and injury.  See, e.g., Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 472-73 (E.D. Pa. 2009) (Yohn, J.); ScanSource, Inc. v. Datavision--Prologix, Inc., No. 04-4271, 2005 WL 974933, at *2 (E.D. Pa. Apr. 26, 2005) (Surrick, J.) ("Moreover, the clear weight of authority requires that the detrimental reliance element of a fraud claim be pleaded with particularity under Rule 9(b)."); Cooper v. Bristol-Myers Squibb Co., No. 07-885, 2009 WL 5206130, at *9 (D.N.J. Dec. 30, 2009) (Wolfson, J.) (applying Rule 9(b) to claim for consumer fraud claim relating to marketing of pharmaceutical product and dismissing complaint on ground that plaintiff "failed to allege any specific facts establishing a connection between the alleged conduct of Defendants and the alleged injury claimed"); Guilbealt v. R.J. Reynolds Tobacco Co.,

84 F. Supp. 2d 263, 269 (D.R.I. 2000) (when a plaintiff claims
that a product advertisement or promotion led to injuries, he or
she must "identify specific advertising he [or she has] seen and
how it ha[s] affected" him or her to comply with Rule 9(b)'s
requirements).

Prior to the Supreme Court's recent decision in <u>Bell
Atlantic Corporation v. Twombly</u>, 550 U.S. 544 (2007), dismissal
of a complaint under Rule 12(b)(6) was appropriate only when it
appeared the plaintiff could prove "no set of facts" in support
of the claims that would entitle him to relief.  In <u>Twombly</u>, the
Supreme Court articulated a new "plausibility" standard, under
which a complaint must include "enough facts to state a claim to
relief that is plausible on its face."  <u>Id.</u> at 570.  This
represented a radical change in the long-thought to have been
settled pleading requirements derived from <u>Conley v. Gibson</u>, 355
U.S. 41, 47 (1957).  <u>See</u> <u>Moss v. U.S. Secret Serv.</u>, 572 F.3d 962,
972 (9th Cir. 2009) (noting that the plausibility standard in
<u>Twombly</u> was "a significant change, with broad-reaching
implications"); Stephen B. Burbank, et al., <u>Plausible Denial:
Should Congress Overrule Twombly and Iqbal</u>, 158 U. Pa. L. Rev.
141, 148 (2009) (arguing that <u>Twombly</u> did not merely clarify the
pleading standard of <u>Conley</u>, rather it significantly changed this
long-standing approach); Robert G. Bone, <u>Twombly, Pleading Rules,
and the Regulation of Court Access</u>, 94 Iowa L. Rev. 873, 875

(2009) ("Many judges and academic commentators read the decision as overturning fifty years of generous notice pleading practice, and critics attack it as a sharp departure from the 'liberal ethos' of the Federal Rules, favoring decisions 'on the merits, by jury trial, after full disclosure through discovery."); Edward D. Cavanagh, <u>Twombly, the Federal Rules of Civil Procedure and the Courts</u>, 82 St. John's L. Rev. 877, 878-79 (2008) (arguing that <u>Twombly</u> changed the law "dramatically", "put [ting] an end to notice pleading as it has been understood in the seventy years since the enactment of the Federal Rules of Civil Procedure").

The Supreme Court recently revisited <u>Twombly</u> and expounded further on the development of the standard for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) in <u>Ashcroft v. Iqbal</u>, --- U.S. ----, 129 S. Ct. 1937 (2009). <u>Iqbal</u> established that in order "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Id.</u> at 1949 (citing <u>Twombly</u>, 550 U.S. at 570). The <u>Iqbal</u> opinion emphasized that "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Id.</u> at 1950. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> (citation omitted). This determination of whether a plausible claim exists

is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citation omitted).  Where the facts provided in the complaint "do not permit the court to infer more than the mere possibility of misconduct," the complaint has failed to meet the requirement under Rule 8(a)(2) of showing that the "pleader is entitled to relief." Id.

A court confronted with a Rule 12(b)(6) motion must accept the truth of all factual allegations in the complaint and must draw all reasonable inferences in favor of the non-movant. Revell v. Port Auth. of N.Y., N.J., 598 F.3d 128, 134 (3d Cir. 2010) (citing Gross v. German Found. Indus. Initiative, 549 F.3d 605, 610 (3d Cir. 2008)); Max v. Republican Comm. of Lancaster County, 587 F.3d 198, 200 (3d Cir. 2009); see also DeBenedictis v. Merrill Lynch & Co., Inc., 492 F.3d 209, 215 (3d Cir. 2007).

2.   Consumer Protection Claims

In light of the fact that the law of the home state of each of the Plaintiffs shall apply to the consumer protection claims, the Court will address the Plaintiffs' claims in accordance with the applicable state law.

(a)   Plaintiffs PEBTF, AFSCME, Scofield[10]

---

[10]   Defendants have argued in the alternative, that PEBTF and AFSCME do not have standing under the UTPCPL as their purchases of Nexium would not qualify as the type of "consumer" transactions which are protected by the statute.  As explained below, it is unnecessary for the Court to address this issue in

As Pennsylvania law applies to the claims of Plaintiffs PEBTF, AFSCME, and Scofield, the Court has little difficulty in concluding that these claims cannot withstand dismissal.  In Hunt, the Third Circuit instructed that a plaintiff asserting a private cause of action under the UTPCPL must prove justifiable reliance.  538 F.3d at 221; see also Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 465-66 (E.D. Pa. 2009) (recognizing that a plaintiff asserting a cause of action under the UTPCPL must prove justifiable reliance on the unlawful conduct and not merely that the unlawful conduct occurred); Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004) ("To bring a private cause of action under the UTPCPL, a plaintiff must show that he justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of that reliance."); Weinberg v. Sun Co., Inc., 777 A.2d 442, 446 (Pa. 2001) (holding that a plaintiff bringing an action under the UTPCPL must prove the common law fraud elements of reliance and causation with respect to all subsections of the UTPCPL).  Therefore, absent some allegations of justifiable reliance on Defendants' alleged misrepresentations concerning Nexium, these Plaintiffs claims fail as a matter of law.

---

order to resolve Defendants' motion to dismiss.  Therefore, for purposes of this Memorandum, the Court will assume, without deciding, that Plaintiffs PEBTF and AFSCME are entitled to assert a claim under the UTPCPL.

As Defendants aptly note, the Amended Complaint is devoid of any allegations showing that Plaintiffs PEBTF, AFSCME, or Scofield relied upon, or even were aware of, the PD Marketing and/or DTC Advertising campaigns which form the basis for these Plaintiffs UTPCPL claims.  In fact, Plaintiffs do not argue that any allegations of reliance are included in the Amendment Complaint, but simply argue that justifiable reliance is not required under the UTPCPL.  (Pls.'Resp. Defs.' Mot. Dismiss 32-34.)

In light of the clear precedent under Pennsylvania law and the complete absence of any allegations of justifiable reliance in the Amended Complaint, Plaintiffs PEBTF, AFSCME, and Scofield's UTPCPL claims will be dismissed.

(b)   Plaintiff Macken

Under New York law, the Amended Complaint must allege that the injury complained of was the result of the deceptive act, practice, or advertisement.  See Nealy, 587 F. Supp. 2d at 585 (noting that the element of causation is essential to a claim under GBL 349).  Again, the Amended Complaint is devoid of any allegations to show that Macken purchased Nexium in response to Defendants' representations concerning the quality of Nexium in relation to Prilosec.  Instead, Plaintiffs contend that the Amended Complaint sufficiently states a claim under GBL 349 because it is not necessary to plead reliance under New York law.

- 43 -

Plaintiffs' argument is inapposite.

Plaintiffs' argument misunderstands the concept of reliance as it relates to causation in the context of a claim for consumer fraud under GBL 349.  See Stutman, 731 N.E.2d at 612 (recognizing that reliance and causation are "twin concepts," which are not "identical" but are "often intertwined").  It is true that courts have uniformly held that justifiable or reasonable reliance need not be shown in order to establish a claim under GBL 349.  See id.; Small v. Lorillard Tobacco Co., Inc., 720 N.E.2d 892, 897 (N.Y. 1999) ("Intent to defraud and justifiable reliance by the plaintiff are not elements of the statutory claim.") (emphasis added); Oswego, 647 N.E.2d at 745 (GBL 349 does not require a plaintiff to prove justifiable reliance).

These cases do not stand for the proposition that a plaintiff's reliance on a defendant's misrepresentations are wholly irrelevant to the analysis of causation under GBL 349.  Rather, these cases instruct that a plaintiff is relieved from the burden of showing that she would not have taken the action which caused her injury absent the defendant's statements and that her reliance on defendant's misrepresentations was justified or reasonable.  This subtle distinction was best explained by the Court of Appeals of New York in Stutman.  The plaintiffs in Stutman brought a class action on behalf of mortgagors alleging

that a $275 bank fee assessed in connection with the refinancing

of a homeowner's loan constituted a deceptive practice under GBL

349.  731 N.E.2d at 610.  The Appellate Division had dismissed

the plaintiffs' claim, holding that justifiable reliance was not

shown because the plaintiffs did not show that the loan documents

failure to disclose the $275 fee had any effect on a plaintiff's

decision to borrow from the defendant.  Id. at 612.  The New York

Court of Appeals reversed on the ground that the Appellate

Division had improperly read a reliance requirement into the

statute, i.e., "that plaintiffs made the decision to take the

loan in reliance on their belief that the $275 fee would not

apply."  Id.

        The court went on to distinguish between the related

concepts of reliance and causation, explaining:

> [h]ere, plaintiffs allege that because of defendant's
> deceptive act, they were forced to pay a $275 fee that
> they had been led to believe was not required.  In other
> words, plaintiffs allege that defendant's material
> deception caused them to suffer a $275 loss. This
> allegation satisfies the causation requirement.
> Plaintiffs need not additionally allege that they would
> not otherwise have entered into the transaction.

Id. at 612-13.  Put another way, a plaintiff need not show that

the defendant's misrepresentation was the sole impetus behind the

decision to purchase a product, but the plaintiff cannot be

wholly unaware of the misrepresentation prior to making the

decision to purchase.

        This nuance between reliance and causation is fatal to

Macken's claim under GBL 349.  Consistent with the holding in
Stutman, courts have found that a plaintiff must allege some
awareness of a defendant's misrepresentations prior to purchasing
the product in order to establish the element of causation.  See
Gale, 781 N.Y.S.2d at 45 (plaintiff who did not see any of
defendant's misleading statements prior to purchasing computer
hard drive failed to state a claim under GBL 349 because these
statements could not have caused the plaintiff's injury); Pelman,
396 F. Supp. 2d at 446 (stating that in order for plaintiffs to
establish a claim under GBL 349, the plaintiffs need to show an
awareness of the defendant's deceptive advertisements in order to
demonstrate that the injuries were caused by reason of
defendant's deceptive act).  Therefore, as the Amended Complaint
does not state that Macken was even aware of the PD Marketing and
DTC Advertising campaigns prior to purchasing Nexium, the
required element of causation is absent.[11]

---

[11]     Several courts in a similar context have dismissed the
complaints for failure to state a claim based on the absence of
causation.  See, e.g., Cooper, 2009 WL 5206130, at *9-10
(dismissing claims under Alabama consumer fraud statute based
upon design, promotion, marketing, and labeling of drug Plavix on
the basis that plaintiff failed to allege with specificity the
connection between defendants' conduct and the injury where
plaintiff did not specify how he was misled by advertisements or
identify what misstatements were made to his physician or relied
upon in prescribing Plavix to him); S. Ill. Laborers' & Employers
Health & Welfare Fund v. Pfizer, Inc., No. 08-5175, 2009 WL
3151807, at *6 (S.D.N.Y. Sept. 30, 2009) (dismissing complaint on
the ground that plaintiffs failed to allege that physicians or
third party payors relied on misrepresentations of Lipitor's
efficacy); In re Schering-Plough Corp. Intron/Temodar Consumer

With respect to causation, Plaintiffs contend that Defendants' alleged misrepresentations caused the relevant injury because "customers had to pay inflated prices for what <u>they thought was a superior product</u>." (Pls.' Resp. Defs.' Mot. Dismiss 36.) (emphasis added). This very logic presupposes that Macken was aware of Defendants' representations concerning the relative quality of Nexium and Prilosec prior to purchasing Nexium. The Amended Complaint, however, contains no factual averments to support this theory of causation. Therefore, as the Amended Complaint cannot establish the element of causation under GBL 349, Macken's claim will be dismissed.

    (c)  <u>Plaintiff Watters/Wellness Plan</u>

The Court concludes that Watters' consumer protection claim must be dismissed on the ground that the Amended Complaint fails to allege sufficient facts to demonstrate that Watters has standing to assert a claim under the MCPA. As explained above, a

---

<u>Class Action</u>, No. 06-5774, 2009 WL 2043604, at *26 (D.N.J. July 10, 2009) (dismissing RICO claims in class action complaint alleging, <u>inter alia</u>, that defendants engaged in improper and illegal off-label promotion of prescription drugs on the ground of causation where the complaint provided only generalized allegations that would force the court "to determine whether each prescribing physician received fraudulent marketing information from the Defendants and whether each physician was influenced to prescribe the Subject Drugs on account of Schering's conduct"); <u>In re Actimmune Mktg. Litig.</u>, 614 F. Supp. 2d 1037, 1052 (N.D. Cal. 2009) (granting a motion to dismiss where plaintiffs did not "allege what specific information the individual plaintiffs or their physicians had about the drug [and] the extent to which they relied upon that information").

valid claim under the MCPA must involve a consumer who purchased
a product for "personal, family or household purposes."   See MCL
445.903(1); id. 445.902(d); Noggles, 395 N.W.2d at 323.
Therefore, in order to determine whether Watters is eligible to
bring a claim under the MCPA, it must be determined whether the
underlying purchases of Nexium were for "personal, family or
household purposes."

        In Zine v. Chrysler Corp., 600 N.W.2d 384 (Mich. Ct.
App. 1999), the Court of Appeals of Michigan addressed the proper
approach in determining whether a transaction qualified under the
MCPA as a purchase involving a personal, family or household
purpose.   Zine involved a buyer of a truck bringing suit against
the manufacturer on the grounds that the warranty and lemon law
documents provided violated the MCPA.   Id. at 388-91.   The court
reasoned that in determining business versus personal use for
purposes of the MCPA the focus is on the use to which the goods
would be put, rather than the characterization of the purchaser
herself as a consumer.   Id. at 393.   The court then examined the
actual purpose for which the plaintiff used the defective truck
and concluded that because he used the truck primarily for
business as a sales representative, and only secondarily for
personal needs, the MCPA did not apply.   Id. at 394 (noting that
plaintiff described the truck as a business asset, claimed a
business deduction for depreciation of the vehicle, and admitted

that "over eighty percent of the miles he put on the truck were attributable to business driving").

The Michigan Supreme Court subsequently cited Zine with approval in Slobin v. Henry Ford Health Care, 666 N.W.2d 632, 634-35 (Mich. 2003). In Slobin, a law firm requested a copy of one of its client's medical records for purposes of legal representation, for which the law firm was charged a copying fee. Id. at 632. The law firm challenged the demand for copying fees under the MCPA. Id. The Michigan Supreme Court held that the MCPA was inapplicable as the transaction was primarily for a commercial, rather than personal, purpose. Id.

In Slobin, the Michigan Supreme Court, citing Zine, reiterated that "the MCPA applies only to purchases by consumers and does not apply to purchases that are primarily for business purposes." Id. at 634. The court reasoned that:

> [i]n this case, we have precisely the business or commercial purpose that is outside the express contemplation of the MCPA. The law firm here did not act as a mere conduit or intermediary, procuring the medical records in order to pass them along for plaintiff's "personal, family or household" use. Rather, the medical records were sought principally so that the law firm itself could engage in its own business or commercial enterprise, namely, the evaluation and pursuit of legal avenues to procure financial rewards and other relief for its client. While there will sometimes be a fine line between activities within the scope of the MCPA and those beyond its coverage, we believe that the activities in question here are too indirectly related to plaintiff's "personal, family, or household" use to fall within the act.

Id. at 635. This rationale is consistent with the approach

- 49 -

adopted in <u>Zine</u>, and other courts applying the MCPA, in which the ultimate purpose for which the product is purchased is determinative in deciding whether a plaintiff has a cognizable claim.  See <u>Zine</u>, 600 N.W.2d at 393-94; <u>Tang v. Putruss</u>, No. 06-12624, 2007 WL 2909527, at *3 (E.D. Mich. Oct. 5, 2007) (photographs taken to be used in a fashion trade magazine were indisputably for commercial use and did not qualify under the MCPA); <u>German Free State of Bavaria v. Toyobo Co., Ltd.</u>, 480 F. Supp. 2d 958, 968-69 (W.D. Mich. 2007) (rejecting argument that plaintiff's purchase of protective vests worn by individual police officers were primarily for personal use under the MCPA because the underlying purpose for the goods was the course of public police business); <u>Edwards v. Cape To Cairo, LLC</u>, No. 06-782, 2010 WL 986502, at *3-5 (Mich. Ct. App. Mar. 18, 2010) (finding that plaintiff's planned trip to Africa with several church members was "primarily for personal, family, or household purposes," and thus MCPA applied to tour operator, which allegedly failed to provide full refund after consumer cancelled trip); <u>Cunningham v. Charbonneau</u>, No. 241909, 2004 WL 345296, at *3 (Mich. Ct. App. Feb. 24, 2004) (holding that MCPA did not apply to purchase of farm land because although plaintiff intended to live on the land, it was to be used to conduct a horse-boarding business for profit).

Importantly, <u>Slobin</u> dealt with a case in which the

plaintiff asserting the MCPA claim obtained the subject goods for
the benefit of the third party, i.e., a law firm procuring
medical records to assist a client in pursuing a personal injury
lawsuit.  In addition, the goods themselves in <u>Slobin</u> would have
qualified as primarily for personal use if they had been
purchased directly by the third party.  In such third party
procurer situations, the Michigan Supreme Court distinguished
between a party who acts "as a mere conduit or intermediary" by
procuring the subject goods only to pass them along for another's
personal use with one who purchases the goods "principally so
that [the party] itself could engage in its business or
commercial enterprise."  <u>Slobin</u>, 666 N.W.2d at 635.

In accordance with the teachings provided by <u>Slobin</u>,
the Court must determine whether the ultimate purpose for the
purchase of Nexium by the Wellness Plan was for a personal or
commercial purpose.  In other words, the Court must decide
whether the Wellness Plan's role as a third party payor ("TPP")
rendered it a "mere conduit or intermediary" for its
participants' use of Nexium or whether it purchased Nexium
principally to engage in its own commercial enterprise.

The fatal flaw in the Amended Complaint with respect to
this issue is that there is no explanation of the role that the
Wellness Plan played as a TPP in purchasing Nexium.  The Amended
Complaint states simply that the Wellness Plan was a TPP "whose

function was to assume the risk of payment of medical and
prescription costs on behalf of the participants in [its] plan.
During the Class Period as described herein, Wellness Plan and
Omnicare paid for prescriptions of Nexium and thereby have been
injured by Defendants' conduct."   (Am. Compl. ¶ 17.)   The Amended
Complaint contains no other recitation of facts explaining the
manner in which the Wellness Plan purchased Nexium, i.e., whether
the Wellness Plan paid for Nexium directly or whether it simply
reimbursed its members for a portion of the cost paid.   Without
additional factual information, the Court cannot ascertain
whether the ultimate purpose for which the Wellness Plan paid for
Nexium was "personal" or commercial.[12]   In other words, the

---

[12]     Federal courts which have addressed the issue of
whether a TPP may properly assert a claim under the MCPA for the
purchase of prescription drugs have reached conflicting
conclusions.   Compare In re Bextra and Celebrex Mktg. Sales
Practices and Prod. Liab. Litig., 495 F. Supp. 2d 1027, 1033-34
(N.D. Cal. 2007) (stating that "[t]here is no serious dispute
that the transactions that gave rise to the TTP plaintiffs'
alleged damages-purchasing Celebrex and Bextra-were primarily for
personal purposes, that is, the personal use of the patients,"
and rejecting defendant's argument that a TPP could not have
standing under the MCPA as a matter of law), with In re Pharma.
Indus. Average Wholesale Price Litig., 252 F.R.D. 83, 97 n.13 (D.
Mass. 2008) (noting that "Michigan does not provide a cause of
action when an item is purchased primarily for business or
commercial purposes, rather than personal ones," and simply
concluding that TPPs cannot assert a cause of action under the
MCPA); In re K-Dur Antitrust Litig., No. 01-1652, 2008 WL
2660783, at *8 n.23 (D.N.J. Mar. 19, 2008) (noting, without
deciding, "that it is doubtful that a TPP's claims brought on its
own behalf-rather than on behalf its members-could be construed
to involve purchases made as a conduit for its members' personal,
family or household purposes") (citing Zine 600 N.W.2d at
392-94).

Amended Complaint fails to establish that the Wellness Plan acted merely as a "conduit or intermediary" for its members purchasing of Nexium.  Without more, the Court finds that Plaintiffs have not shown that the purchase of Nexium was for "personal, family or household purposes" as required by the MCPA.  See MCL 445.903(1); id. 445.902(d).  Therefore, this claim shall be dismissed.

### 3. Unjust Enrichment

Unjust enrichment is "the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." Fleer Corp. v. Topps Chewing Gum, Inc., 539 A.2d 1060, 1062 (Del. 1988).  The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. Nemec v. Shrader, --- A.2d ----, 2010 WL 1320918, at *7 (Del. Apr. 6, 2010).

Defendants contend that the claims for unjust enrichment must be dismissed because Plaintiffs cannot establish a relation between the "enrichment" and "impoverishment" in this case.  In other words, the Amended Complaint fails to allege that an adequate causal connection exists between Defendants' alleged misrepresentations and Plaintiffs' decision to purchase Nexium

- 53 -

over Prilosec.

Plaintiffs counter that the Amended Complaint satisfies these elements because it alleges that Defendants were unjustly enriched at Plaintiffs' expense due to the allegedly deceptive marketing scheme in obtaining the higher price for Nexium over Prilosec.  Plaintiffs contend that a sufficient connection exists between Defendants' gain and Plaintiffs' losses since Plaintiffs paid higher prices for an equivalent drug as a result of Defendants deceptive conduct.

The Third Circuit's decision in <u>Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.</u>, 171 F.3d 912, (3d Cir. 1999), provides guidance to the Court on this issue. The Third Circuit explained that "[i]n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim (i.e., if defendant is permitted to keep the benefit of his tortious conduct, he will be unjustly enriched)."  <u>Id.</u> at 936.  Therefore, the court held that dismissal of an unjust enrichment claim was appropriate where a plaintiff cannot establish proximate cause due to the remoteness of the injuries in relation to the defendant's wrongful conduct. <u>Id.</u> at 936-37.

As explained above, the Amended Complaint has failed to establish the requisite causal nexus between the alleged wrongful conduct (Defendants' marketing of Nexium) and the injuries

suffered (Plaintiffs' purchase of Nexium).   Therefore, based on
the remoteness between the alleged misconduct and the injury
sustained, the Court finds that the claims for unjust enrichment
must be dismissed.   See <u>Pa. Employees Ben. Trust Fund v.
Astrazeneca Pharmaceuticals LP</u>, No. 09-5003, 2009 WL 2231686, at
*6 (M.D. Fla. July 20, 2009) (dismissing claim for unjust
enrichment based on defendant's alleged deceptive marketing
practices to substantially inflate the number of Seroquel
prescriptions on the ground of remoteness); <u>Ironworkers Local
Union No. 68 v. AstraZeneca Pharmaceuticals LP</u>, 585 F. Supp. 2d
1339, 1346-47 (M.D. Fla. 2008) (dismissing unjust enrichment
claim against pharmaceutical manufacturer and medical marketing
firm for sales from fraudulent scheme to promote antipsychotic
drug, Seroquel, given remoteness of economic harm from alleged
fraudulent scheme); <u>see also In re Guidant Corp. Implantable
Defibrillators Prods. Liab. Litig.</u>, 484 F. Supp. 2d 973, 985 (D.
Minn. 2007) (dismissing third party payor unjust enrichment claim
under Pennsylvania law because the alleged harm was "too
remote.").

    4.   <u>Negligent Misrepresentation</u>

To assert a claim for negligent misrepresentation, the
following elements must be present: (1) a pecuniary duty to
provide accurate information, (2) the supplying of false
information, (3) failure to exercise reasonable care in obtaining

or communicating information, and (4) a pecuniary loss caused by justifiable reliance upon the false information.  See Atwell v. RHIS, Inc., No. 02-12-003, 2006 WL 2686532, at *1 (Del. Super. Ct. Aug. 18, 2006).  More specifically, in order to successfully assert a claim for negligent misrepresentation, the plaintiff must allege that she relied upon the misrepresentations.  See H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 142-43 (Del. Ch. 2003) (stating that justifiable reliance is an element of negligent misrepresentation under Delaware law); Bortz v. Noon, 729 A.2d 555, 561 (Pa. 1999) ("Negligent misrepresentation [under Pennsylvania law] requires proof of: (1) a misrepresentation of material fact; (2) made under circumstances in which the misrepresenter ought to have known of the falsity; (3) with an intent to induce another to act on it; and [ ](4) which results in injury to a party acting in justifiable reliance on the misrepresentation.") (emphasis added); Rose v. Am. Tobacco Co., 787 N.Y.S.2d 681, (N.Y. Sup. 2004) ("A viable claim of negligent misrepresentation [under New York law] requires the plaintiff to demonstrate the existence of a representation of material fact, falsity, scienter, justifiable reliance and injury.") (internal citations omitted); Fejedelem v. Kasco, 711 N.W.2d 436, 437 (Mich. Ct. App. 2006) ("A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by

- 56 -

one who owed the relying party a duty of care.") (emphasis added)
(citations and quotation marks omitted).

Reliance is a necessary predicate for Plaintiffs'
negligent misrepresentation claims.  As explained above, the
Amended Complaint contains no allegations establishing that the
named Plaintiffs relied upon, or were even aware of, Defendants
allegedly deceptive marketing campaigns before purchasing Nexium.
Therefore, Plaintiffs' negligent misrepresentation claims will be
dismissed on the ground that no allegations of reliance are
presented in the Amended Complaint.

C.   Dismissal with Prejudice/Leave to Amend

Defendants have moved to have this action dismissed
with prejudice.  Dismissal with prejudice has been characterized
by the Supreme Court as a "harsh remedy."  New York v. Hill, 528
U.S. 110, 118 (2000).  Although Federal Rule of Civil Procedure
15 states that leave to amend "shall be freely given when justice
so requires," dismissal of a count in a complaint with prejudice
is appropriate if amendment would be inequitable or futile.
Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).  "When a
plaintiff does not seek leave to amend a deficient complaint
after a defendant moves to dismiss it, the court must inform the
plaintiff that he has leave to amend within a set period of time,
unless amendment would be inequitable or futile."  Grayson v.
Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002).  In Shane

v. Fauver, 213 F.3d 113, 116 (3d Cir. 2000), the Third Circuit instructed district courts to provide an opportunity for leave to amend a complaint where the deficiencies warranting dismissal could be cured by amendment.  The decision whether to grant leave to amend is within the discretion of the Court.  Rolo v. City Investing Co. Liquidating Trust, 155 F.3d 644, 654 (3d Cir. 1998).

The passage of time, standing alone, does not require that a plaintiff be prevented from amending a deficient complaint.  Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984).  The focus of this inquiry is whether the delay is considered "undue" in light of the effect on the defendant and the plaintiff's reason for not amending the complaint sooner.  Id.; see In re Mortgage Lenders Network, USA, Inc., 395 B.R. 871, 876 (Bankr. D. Del. 2008).

Plaintiffs contend that leave to amend is appropriate in this circumstance because the issue of reliance had never been presented to the Court.  In other words, Plaintiffs emphasize that despite the long pendency of the case, they never had any reason to amend prior to the filing of Defendants' motion.

Critical to the Court's decision is that despite the fact that this case has been pending for approximately five years, the majority of this time has been spent litigating issues on appeal wholly separate from the issue of the deficiency of the

pleadings currently before this Court.  In fact, this case was only transferred to this Court approximately 11 months ago. Courts have recognized that leave to amend is appropriate when the delay involved was less than one year.  See, e.g., Arthur v. Maersk, Inc., 434 F.3d 196, 204-05 (3d Cir. 2006) (affirming grant of leave to amend after a delay of eleven months and observing that "only one appellate court uncovered in our research has approved of denial of leave to amend based on a delay of less than one year"); Dubicz v. Commonwealth Edison Co., 377 F.3d 787, 793 (7th Cir. 2004) (holding that the district court abused its discretion in denying leave to amend after a delay of eight months); Roberson v. Hayti Police Dep't, 241 F.3d 992, 996 (8th Cir. 2001) (holding that delay of eleven months did not justify denial of leave to amend).  The Court concludes that Plaintiffs have offered a justifiable reason for failing to amend the complaint earlier and that the approximately eleven month delay will not work an undue hardship on Defendants.  Thus, Defendants' request for dismissal with prejudice will be denied and Plaintiffs will be granted leave to cure the deficiencies with the Amended Complaint.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss will be granted, however, the dismissal will be without prejudice.  An appropriate order follows.

- 59 -

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|                            |   |               |
|----------------------------|---|---------------|
|                            | : | CIVIL ACTION  |
| PENNSYLVANIA EMPLOYEE,      | : | NO. 05-075-ER |
| BENEFIT TRUST FUND,         | : |               |
| et al.,                    | : |               |
|                            | : |               |
|     Plaintiffs,            | : |               |
|                            | : |               |
| v.                         | : |               |
|                            | : |               |
| ZENECA, INC., et al.,      | : |               |
|                            | : |               |
|     Defendants.            | : |               |

## O R D E R

**AND NOW**, this **6th** day of **May, 2010,** upon consideration
of Defendants' Motion to Dismiss for Failure to State a Claim
upon which Relief can be Granted (doc. no. 100), it is hereby
**ORDERED** that Defendants' motion is **GRANTED,** and the Amended
Complaint is hereby **DISMISSED with leave to amend by Monday, May
17, 2010.**

**AND IT IS SO ORDERED.**

**S/Eduardo C. Robreno**

**EDUARDO C. ROBRENO, J.**